David H. Fry (*pro hac vice*)
Erin J. Cox (*pro hac vice*)
Eric P. Tuttle (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
   Telephone: (213) 683-9100

James S. Jardine (1647)
Elaina M. Maragakis (7929)
Michael D. Mayfield (8237)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
   Telephone: (801) 532-1500

*Attorneys for Defendants Wells Fargo Bank, N.A.
and Wells Fargo & Co.*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| Lawrence J. Mitchell, Kay Mitchell, Matthew C. Bishop, Tracy Kilgore, Jennifer K. Zeleny, Joseph W. Steele V, Scott Westin, Bruce Bird, Nathan Ornellas, Anu Sood, Brent Miller, Nicholas Beach, Alex Inskeep, Loretta Grady, Richard Fountain, Matthew Gragg, Akoya Lawani, Sharon Williams, Ken Gregory, Sbeen Ajmal, David Self, Edward Dowdy, April Thomas, Don Black, Reza Kamali, Anthony Baquero, Carina Rhea, Shanell Golden, Kim Weston, Adam Brandt, Jacci Brandt, Jennifer King, Ralph McCoy, Aaron Hands, Ayana Smith, Lisa Stern, Mbegane Diouf, Doug Waters, Candyce Ravenell, Paul Fos, Patricia Burkhalter, Blake Knight, Cameron Casey, Jeffery Taylor, Robert Moyer, Marcia Cameron, Gloria Pledger, Charles Jones, Aaron Brodie, Dominique Evans, Richard Farr, Kevin Saliva, Harold Beard, Travis Ashby, Andrew Gorayeb, Scott Mugrage, Edwin Zorilla, Curtis Dowdle, Edward Klann, Steven Stetzel, Glenn Gilleshammer, Wenoka Thompson, Maryann Aldous, Jennifer Porter, Robin Quigg, Tamar Hodges, Barbara Shadoan, Austin Law, Jennifer Ellsworth, Michelle Sterling, Denise Poe, Jamal Dean, Brandon Westman, Concepcion Powell, Adrian Thompson, Eric Talaska, Zachary | **MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ARBITRATION PURSUANT TO FAA §§ 3-4**<br><br>Case No. 2:16-cv-00966<br>Judge Clark Waddoups |

| Christensen, Erica Jones, Stephen Hope, Nedelka Martinsen *et al* and unknown Plaintiffs 1-1,000,000,<br><br>          Plaintiffs,<br>   v.<br><br>Wells Fargo Bank, National Association, a National Banking Association, and Wells Fargo & Company, a Delaware Corporation, and Does 1-5,300,<br><br>          Defendants. | |
| --- | --- |

Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company (collectively, "Wells Fargo") hereby move this Court for an order compelling 58 of the 80 named plaintiffs in this putative class action to submit their claims to binding arbitration, and staying the resolution of Wells Fargo's pending motion to dismiss—and any other litigation—until the remaining 22 named plaintiffs provide information sufficient for Wells Fargo to confirm their identity and bring a motion to compel these individual to arbitrate their claims as well.  Wells Fargo hereby submits this Memorandum in Support of its Motion.

## <u>TABLE OF CONTENTS</u>

**Page**

PRECISE RELIEF SOUGHT AND SPECIFIC GROUNDS FOR RELIEF………………….iii

STATEMENT OF FACTS……………………………………………………….........iv

    *Procedural Background*……………………………………………………….iv

    *Plaintiffs' Accounts*………………………………………………………...vii

    *Consumer Account Agreements*……………………………………………xliv

    *Business Account Agreements*……………………………………………..xlvi

ARGUMENT…………………………………………………………………...1

    I.    Plaintiffs Agreed to Arbitration With Wells Fargo…………………………..1

    II.    The Disputes Are Arbitrable, But the Court Should Not Reach that Question…8

        A.    Interpretation of the Arbitration Agreement Has Been Clearly and Unmistakably Assigned to the Arbitrator……………………………….8

        B.    If the Court Were To Reach the Question of Arbitrability, Plaintiffs' Claims Should Be Arbitrated…………………………………………11

    II.    The Court Should Stay This Action Pending Limited Discovery by Wells Fargo for the Purpose of Enforcing Its Arbitration Rights……………………...14

CONCLUSION………………………………………………………………..15

## PRECISE RELIEF SOUGHT AND SPECIFIC GROUNDS FOR RELIEF

Plaintiffs' Second Amended Complaint in this putative class action names an unwieldy *80 representative plaintiffs* pursuing 17 causes of action against Wells Fargo.  Plaintiffs concede, however, that "they entered into valid and enforceable agreements with Defendants whereby Defendants promised to provide goods or services to Plaintiffs and Class Members, and Plaintiffs and Class Members agreed to pay for those goods or services, including payment made with debit or credit cards."  (Second Amended Complaint ("SAC") ¶ 137.)  In these same agreements—which Plaintiffs admit are enforceable—Plaintiffs agreed to arbitrate any disputes with Wells Fargo, including the claims they assert in this lawsuit.  Plaintiffs are judicially estopped from arguing otherwise, as a party "cannot rely on the contract, when it works to their advantage, and repudiate it when it works to their disadvantage."  *Island Peak Ranch, L.L.C. v. FIIK Inv. & Holdings, Inc.*, 2008 WL 2673925, at *12 (D. Utah July 7, 2008) (unpublished) (holding that banking customers were judicially estopped from avoiding arbitration provision in Wells Fargo deposit agreement where complaint alleged plaintiffs' performance of the deposit agreement) (quoting *Upstate Shredding, LLC v. Carloss Well Supply Co.*, 84 F. Supp. 2d 357, 363 (N.D.N.Y. 2000)).  Moreover, Plaintiffs' use of Wells Fargo's banking services after being informed of the arbitration agreement constitutes their acceptance, by conduct, of the terms of the agreement.

Any argument against enforcing the parties' agreements to arbitrate on the basis of allegedly unauthorized accounts opened in Plaintiffs' names has already been considered, and rejected, by Judge Chhabria in the Northern District of California in the context of another consumer class action brought against Wells Fargo.  *See Jabbari v. Wells Fargo & Co.*, Case No. 3:15-cv-02159-VC, ECF . No. 69 (N.D. Cal. Sept. 23, 2015) (order granting Wells Fargo's

motions to compel arbitration of named plaintiffs' claims, attached hereto as **Exhibit A**).  The

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, requires that agreements to arbitrate be enforced.

Plaintiffs must therefore arbitrate their claims and may not pursue them in court, as they are

attempting to do here.

In the instant motion to compel arbitration, Wells Fargo moves with respect to 58 of the

80 named plaintiffs.  At present Wells Fargo lacks sufficient information to confirm the identity

of, and locate the pertinent agreements with, the remaining 22 named plaintiffs.  Plaintiffs should

not be permitted to escape enforceable arbitration agreements by their failure to either allege or

provide sufficient information to enable Wells Fargo to pursue its right to arbitration.  Wells

Fargo thus requests that this Court stay further litigation pending the completion of limited

discovery by Wells Fargo to enable Wells Fargo to move to compel arbitration with the

remaining 22 named plaintiffs.  Wells Fargo respectfully requests that the Court refrain from

ruling on Wells Fargo's concurrently filed Motion to Dismiss Plaintiffs' Second Amended

Complaint until Wells Fargo has had the opportunity to present, and the Court has had an

opportunity to rule upon, such a motion to compel arbitration of the remaining 22 named

plaintiffs.  (*See* Motion to Stay Litigation on the Merits Pending Resolution of Pending and

Anticipated Motions to Compel Arbitration (concurrently filed).)

## **STATEMENT OF FACTS**

### *Procedural Background*

1.      On September 8, 2016, the City Attorney of Los Angeles, the Consumer Financial

Protection Bureau ("CFPB"), and the Office of the Comptroller of the Currency ("OCC")

announced a settlement with Wells Fargo, under which Wells Fargo agreed to pay $185 million

in penalties and $5 million in redress to customers in connection with allegations of improper sales practices.  (*See* SAC, Ex. B (Consent Order).)

2.       The following week, three of the current named Plaintiffs filed a putative class action complaint alleging 10 claims.  (ECF No. 2.)

3.       On September 26, 2016, 32 named Plaintiffs filed a first amended complaint in this action, alleging 17 claims.  (ECF No. 6.)  Summons was served on Wells Fargo the following day.

4.       On October 14, 2016, the parties stipulated to a 30-day extension of Wells Fargo's deadline to respond to the first amended complaint (ECF No. 8), which was approved by Court Order on October 17, 2016 (ECF No. 12.)

5.       On November 1, 2016, the parties stipulated that Plaintiffs would be granted leave to file a Second Amended Complaint for the purpose of adding additional plaintiffs, correcting the names of some existing plaintiffs, and dismissing certain plaintiffs, on condition that Plaintiffs provide Wells Fargo with identifying information to enable Wells Fargo to respond to the Second Amended Complaint; the parties further stipulated that Wells Fargo would have 21 days to respond to the Second Amended Complaint.  (ECF No. 13.)  This stipulation was approved by Court Order the next day.  (ECF No. 14.)

6.       On November 3, 2016, Plaintiffs filed the Second Amended Complaint.  (ECF No. 15.)  Among other things, the Second Amended Complaint increased the number of named plaintiffs to 80 (net of the dismissal of certain prior plaintiffs).  Although the Second Amended Complaint lists 80 plaintiffs on its caption page, it includes factual allegations concerning Wells Fargo's customer relationships with only *three* identifiable plaintiffs:  "Plaintiff Tracy [Kilgore]," "Plaintiff Anu [Sood]," and "Plaintiff Steve[n Stetzel]."  (Second Amended

Complaint ("SAC") ¶¶ 169, 214, 233.)[1]  The Complaint mentions seven additional plaintiffs only to recite where they reside, (*id.* ¶¶ 1-7),[2] while at least 67 of the plaintiffs are not mentioned at all.

7.     Before Plaintiffs filed the Second Amended Complaint, in accordance with the parties' stipulation, Plaintiffs' counsel provided to Wells Fargo's counsel certain identifying information concerning each of the 80 named plaintiffs.  Wells Fargo analyzed this information against its own records in an attempt to confirm the identity of Plaintiffs in this action for the purpose of moving to compel arbitration of Plaintiffs' claims with reference to the specific agreements governing the relationship between Wells Fargo and each individual Plaintiff.  On November 8, 2016, Wells Fargo's counsel notified Plaintiffs' counsel by email that the information provided for 14 of the named plaintiffs was insufficient to confirm their identity through Wells Fargo's records.  Wells Fargo's counsel therefore requested certain alternative pieces of information to enable Wells Fargo to confirm these individuals' identities (*e.g.,* the city and state of residence, and the last four digits of a Wells Fargo account number).  Plaintiffs' counsel did not provide the requested information for these 14 plaintiffs, and on November 10, 2016 Wells Fargo's counsel advised Plaintiffs' counsel that without the ability to confirm the Plaintiffs' identities, Wells Fargo could not, at this juncture, move to compel arbitration for these individuals and would reserve its rights to compel arbitration once the identity of the Plaintiffs could be confirmed through discovery. Subsequent to these exchanges, Wells Fargo determined that it likewise required additional information concerning the Wells Fargo accounts of eight

---

[1] The Second Amended Complaint also refers to "Plaintiff Matthew" (SAC ¶ 125), but there are two Plaintiffs with that name; "Plaintiff Jennifer" (*id.* ¶ 233), but there are four Plaintiffs with that name; and "Plaintiff J." (*id.* ¶ 73 n.7), which is unclear.
[2] An eighth individual, "Allen Roberts," is alleged to be a Utah resident, (*see* SAC ¶ 8), but Allen Roberts is not listed on the caption page as a named plaintiff in this action.

other named plaintiffs in order to enable it to enforce its arbitration rights under the relevant account agreements between Wells Fargo and these plaintiffs.

### *Plaintiffs' Accounts*

8.      Using the information provided by Plaintiffs' counsel pursuant to the parties' stipulation, Wells Fargo was able to the confirm the identity of, and locate account records for, 58 named plaintiffs.  By this motion Wells Fargo moves to compel these plaintiffs to bring their claims in arbitration based on the arbitration agreements between Wells Fargo and the plaintiffs described below.

### <u>Sbeen Ajmal</u>

9.      On July 9, 2010, Sbeen Ajmal, a California resident and at the time a Wells Fargo employee, opened a team member checking account (x5671) and a consumer savings account (x6215).[3]  Ajmal signed the Consumer Account Application for the two accounts as the primary joint owner on July 9, 2010; Mohammad Nazir was listed as a secondary joint owner. (Declaration of Karen Nelson ("Nelson Decl.") ¶ 26, Ex. 3-A at 3.)  In signing this application, Ajmal confirmed the following:  "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them… . I also agree to the terms of the dispute resolution program described in the account agreement."  (*Id*.; *see also id*. ¶ 26 & Ex. 1-G (March 2010 Consumer Account Agreement).)  Ajmal further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*. ¶ 26, Ex. 3-A at 3.)  Ajmal actively used her team member checking account (x5671), and had her paychecks directly deposited into the account.  (*Id*. ¶ 27, Ex. 3-B.)

---

[3] Plaintiffs' accounts are referred to here by their last four digits alone.

**Maryann Aldous**

10.     On August 8, 2007, Maryann Aldous, a Utah resident, signed an account

application for a Wells Fargo a consumer checking account (x4411) and a consumer savings

account (x3325).  (*Id*. ¶ 28, Ex. 4-A.)  Aldous also opened a consumer time account (x6081) on

September 13, 2007.  (*See id*. ¶ 30, Ex. 4-C.)  In signing the Consumer Account Applications for

the x4411 account, the x3325 account, and the x6081 account,  Aldous certified that she had

"received a copy of the applicable account agreement and privacy brochure and agree to be

bound by them… . I also agree to the terms of the dispute resolution program described in the

account agreement."  (*Id*. ¶ 28, Ex. 4-A at 2, Ex. 1-D (October 2006 Consumer Account

Agreement).)  Aldous further agreed that "disputes will be decided before one or more neutral

persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*. ¶ 28,

Ex. 4-A at 2.)  Aldous actively used her checking account, including for direct deposit of her

paycheck.  (*See id*. ¶ 29, Ex. 4-B.)

**Travis Ashby**

11.     Travis Ashby, a Utah resident, became the joint owner of a First Security

checking account on September 23, 2000, when he signed a relationship change form that added

him to a preexisting account belonging to his wife, Tara Ashby, whose maiden name was Tara

Blight.  (*See id*. ¶ 32, Ex. 5-B.)  Tara Blight had opened the checking account (x9930) with First

Security in 1998.  (*Id*. ¶ 31, Ex. 5-A.)  First Security merged with Wells Fargo in 2000, and First

Security accounts were gradually converted to Wells Fargo accounts.  First Security accounts in

Utah were converted to Wells Fargo accounts on April 21, 2001.  On or about March 19, 2001, a

package of materials related to the conversion of the x9930 account was mailed to Ashby.  The

enclosed welcome letter informed him that, as of April 21, 2001, his First Security account

would become a Wells Fargo account. (*Id.* ¶ 33, Ex. 5-C at 1 .) The welcome letter notified him that after the conversion date, if his account remained open, it would be governed by the terms of the Consumer Disclosure brochure and Consumer Account Agreement provided in the conversion packet sent to him. (*Id.* at 1-2.)

12. The Consumer Disclosure brochure included in the conversion packet sent to Utah First Security accountholders, including Ashby, contained a Consumer Account Agreement (hereinafter referred to as "First Security Conversion CAA"). (*Id.* ¶ 33, Ex. 5-C.) The First Security Conversion CAA contained a section entitled "Dispute Resolution Program: Arbitration Agreement." (*Id.* at 30 (internal page 14).) The terms of the Arbitration Agreement provided that, in continuing to use an account after the conversion date, the customer "understand[s] and agree[s] that [he] is waiving the right to a jury trial or a trial before a judge in a public court," and that "by opening or maintaining a deposit account with the Bank…any dispute between us, regardless of when it arose, will be settled using" the binding arbitration procedure described in the First Security Conversion CAA. (*Id.*) The agreement defined as a "dispute" as:

> [A]ny unresolved disagreement between you and the Bank that relates in any way to account or services described in this brochure [including] any claim that arises out of or is related to these accounts, services or related agreements. It includes claims based on broken promises or contracts, torts (injuries caused by negligent or intentional conduct), or other wrongful actions. It also includes statutory, common law and equitable claims. A dispute also includes any disagreement about the meaning of this Arbitration Agreement, and whether a disagreement is a 'dispute' subject to binding arbitration as provided for in this Arbitration Agreement.

(*Id.*)

13. Ashby continued to actively use the x9930 account, including to the present, with regular transactions including payroll deposits. (*Id.* ¶ 34, Ex. 5-D.)

**Anthony Baquero**

14.     Carmine Anthony Baquero, Sr., a California resident, opened a Wells Fargo consumer savings account as the trustee of The Damrek Living Trust on November 20, 2009. Baquero, as primary trustee, signed the account application, as did Debra Sependa, the secondary trustee.  (*Id*. ¶ 35, Ex. 6-A.)  On the same day, Baquero executed a separate application for a consumer savings account (x2506) listing Debra Sependa as a beneficiary.  (*Id*. ¶ 36, Ex. 6-B.) In both of these applications, Baquero confirmed: "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them…I also agree to the terms of the dispute resolution program described in the account agreement."  (*See, e.g., id*. ¶¶  35-36, Ex. 6-A at 4, Ex. 6-B at 3; *see also id*. ¶ 37 & Ex. 1-F (November 2008 Consumer Account Agreement).)  Baquero also agreed "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*. ¶ 35, Ex. 6 -A at 4.)

**Nicholas Beach**

15.     Nicholas Beach, a California resident, opened two bank accounts as a sole owner with Wells Fargo on February 19, 2013, a consumer checking account (x6823) and a consumer savings account (x2590).  (*Id*. ¶ 38, Ex. 7-A.)  Beach signed the Consumer Account Application for these two accounts, and his signature also appears on a countersigned check deposited into the account on April 1, 2013—part of a consistent pattern of account usage.  (*Id*. ¶¶ 38-40, Exs. 7-A, 7-B, 7-C.)  In signing the Consumer Account Application these two accounts, Beach certified that he "ha[d] received a copy of the applicable account agreement…and agre[ed] to be bound by [its] terms."  (*Id*. ¶ 38, Ex. 7-A at 2, Ex. 1-I (October 2011 Account Agreement).)  Beach further agreed "to the terms of the dispute resolution

program described in the foregoing agreements," including the applicable account agreement, and that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*. ¶ 38, Ex. 7-A at 2.)

**Harold Beard**

16.      Harold Beard, an Arizona resident, opened a Wells Fargo consumer checking account (x1937) on January 23, 2004 with Virginia Beard as a joint owner.  (*Id*. ¶ 41, Ex. 8-A.) In the course of opening this account, Beard signed a Consumer Account Application certifying the following:  "I have received a copy of Consumer Account Agreement, Consumer Account Fee and Information Schedule, and Privacy Policy (collectively the "Account Agreement"), and agree to be bound by the terms and conditions contained therein.  I also agree to the terms of the dispute resolution program described in the Account Agreement."  (*Id*., Ex. 8-A at 1, Ex. 1-A (April 2003 Account Agreement).)  Beard further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*., Ex. 8-A at 1.)  Beard actively used his account after opening it.  (*Id*. ¶ 42, Ex. 8-B.)

**Bruce Bird**

17.      Bruce Bird, a Utah resident, opened a Wells Fargo consumer checking account (x6337) on June 4, 2005.  (*Id.* ¶ 43, Ex. 9-A.)  Bird signed a Consumer Account Application for the x6337 account on June 4, and on July 11, 2005 he signed a Relationship Change Application to add his wife, Ann Bird, as a joint owner of the account.  (*Id.* ¶¶ 43-44, Ex. 9-A, Ex. 9-B.)  In signing the applications, Bird verified that he "ha[d] received a copy of the applicable account agreement and privacy brochure and agre[ed] to be bound by them."  (*Id.* ¶¶ 43-44, Ex. 9-A at 1, Ex. 9-B, Ex. 1-B (October 2004 Account Agreement).)  Beach further agreed "to the terms of the dispute resolution program described in the account agreement" and that "disputes will be

decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.* ¶ 43, Ex. 9-A at 1.)

**<u>Matthew Bishop</u>**

18.     Matthew Bishop, a Utah resident, opened a consumer checking account (x6866) with First Security on September 23, 1999. (*Id.* ¶ 45, Ex. 10-A.) He signed an application to open the account as a joint owner with Louise Bishop. (*Id.*) First Security merged with Wells Fargo in 2000, and First Security accounts were gradually converted to Wells Fargo accounts in a staggered process. (*Id.* ¶ 46.) As previously mentioned, First Security accounts in Utah were converted to Wells Fargo accounts on April 21, 2001. On or around March 19, 2001, a package of materials related to the conversion of the (x6866) account was mailed to Bishop. The enclosed welcome letter informed him that, as of April 21, 2001, his First Security account would become a Wells Fargo account. (*Id.* ¶ 46, Ex. 10-B at 1.) The welcome letter also notified him that after the conversion date, if his account remained open, it would be governed by the terms of the Consumer Disclosure brochure and Consumer Account Agreement provided in the conversion packet sent to him. (*Id.* at 1-2.)

19.     Bishop received the same First Security Conversion CAA as did Travis Ashby (*supra* ¶¶ 11-12), and thus received notice of the same terms of the "Dispute Resolution Program: Arbitration Agreement." (*Id.* at 30 (internal page 14).)

20.     Bishop continued to actively use his x6866 account after the conversion. For example, Bishop enrolled in a Wells Fargo "Add-On Package" for the x6866 account and signed an acknowledgement disclosure form on January 27, 2005. (*Id.* ¶ 47, Ex. 10-C.) The add-on package paperwork that Bishop signed notified him that "[t]he terms and conditions of the

Consumer Account Agreement are supplemented by this Membership Enrollment Form." (*Id.*) Bishop continues to actively use the x6866 checking account. (*See id.* ¶ 48, Ex. 10-D at 1.)

**<u>Don Black</u>**

21. Donald Black, a Washington state resident, opened a Wells Fargo joint consumer checking account with Georgina Valdez on April 7, 2010. (*Id.* ¶ 49.) Black signed the Consumer Account Application, and in doing so verified: "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them… I also agree to the terms of the dispute resolution program described in the account agreement." (*Id.*, Ex. 11-A at 3, Ex. 1-G (March 2010 Account Agreement).) Black further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.*, Ex. 11-A at 3.) Black and Valdez have actively used the checking account (x0529), including direct payroll deposits for Valdez. (*Id.* ¶ 50, Ex. 11-B.)

**<u>Aaron Brodie</u>**

22. Aaron Brodie, a California resident, opened two accounts with Wells Fargo on May 10, 2011, a consumer checking account (x1587) and a consumer savings account (x2590). (*Id.* ¶ 51, Ex. 12-A.) In signing the Consumer Account Application for these accounts, Brodie confirmed: "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them." (*Id.*, Ex. 12-A at 2, Ex. 1-H (September 2010 Account Agreement).) Brodie further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.* ¶ 51, Ex. 12-A at 2.) Brodie actively used these accounts. (*Id.* ¶¶ 52-53, Ex. 12-B, Ex. 12-C.)

**Particia Burkhalter**

23.    Patricia Burkhalter, an Arizona resident, opened two accounts with Wells Fargo on June 13, 2014, a consumer checking account (x3784) and a consumer savings account (x2240).  In the course of opening these accounts, Burkhalter signed a Consumer Account Application certifying: "I have received a copy of the applicable account agreement and the privacy policy (each may be amended from time to time) and agree to be bound by their terms.  I also agree to the terms of the dispute resolution program described in the foregoing agreements." (*Id*. ¶ 54, Ex. 13-A at 2, Ex. 1-K (April 2014 Account Agreement).)  Burkhalter further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." *Id*.  Burkhalter began to actively use her accounts immediately after opening them.  (*Id*. ¶¶ 55-56, Ex. 13-B, Ex. 13-C.)

**Marcia Cameron**

24.    On July 11, 1994, Marcia Cameron, a Utah resident, opened a First Security checking account.  (*Id*. ¶ 57.)  Marcia Cameron signed the application to open the joint account (x0959) with Bruce Cameron.  (*Id*., Ex. 14-A.)  As stated previously, after the merger of First Security and Wells Fargo, and First Security accounts in Utah were converted to Wells Fargo accounts on April 21, 2001.  On or around March 19, 2001, a package of materials related to the conversion of the x6866 account was mailed to Cameron.  (*Id*. ¶ 58.) The enclosed welcome letter informed her that as of April 21, 2001, her joint account (x0959) would become a Wells Fargo account, and if her account remained open after that date, it would be governed by the terms of the Consumer Disclosure brochure and Consumer Account Agreement provided in the conversion packet.  (*Id*. ¶ 58, Ex. 14-B at 1.)

25.     Cameron received the same First Security Conversion CAA as did Travis Ashby and Mathew Bishop (*supra* ¶¶ 11-12, 18-19), and thus received notice of the same terms of the "Dispute Resolution Program: Arbitration Agreement." (Nelson Decl. ¶ 58, Ex. 14-B at 30 (internal page 14).)

26.     Cameron actively used her checking account (x0959) as a Wells Fargo customer after the conversion.  (*Id*. ¶ 59, Ex. 14-C.)

**Cameron Casey**

27.      Cameron Casey, a California resident, opened two accounts with Wells Fargo on September 20, 2013, a consumer checking account (x9477) and a consumer savings account (x2261).  The Consumer Account Application signed by Casey provides that: "I have received a copy of the applicable account agreement…and agree to be bound by [its] terms.  I also agree to the terms of the dispute resolution program described in the account agreement."  (*Id*. ¶ 60, Ex. 15-A at 2, Ex. 1-J (April 2013 Consumer Account Agreement).)  As a signatory, Casey further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*., Ex. 15-A at 2.)  Casey actively used his checking account, making deposits, withdrawals, and transfers.  (*Id*. ¶ 61, Ex. 15-B.)

**Zachary Christensen**

28.      Zachary Christensen, a Utah resident, applied for a Wells Fargo Visa Credit Card (x7714) on April 16, 2016; the application he signed an application notified him in bold lettering above his signature that "You acknowledge receipt of a copy of the Credit Card Agreement . . . . You acknowledge the existence of the Arbitration Agreement contained in the Credit Card Agreement and you specifically agree to be bound by its terms."  (*Id*. ¶ 62, Ex. 16-A.)  The Arbitration Agreement in the application states that the signatory and Wells Fargo "agree that if

a Dispute (As defined below) arises between you and the Bank, upon demand by either you or the Bank, the Dispute shall be resolved by the following arbitration process." (*Id*., Ex. 16-A at 2.) A "dispute" is defined as "any unresolved disagreement between you and the Bank," including "claims based on broken promises or contracts, torts, or other wrongful actions.  It also includes statutory, common law and equitable claims." (*Id*.)  A "dispute" further includes "any disagreements about the meaning or application of this Arbitration Agreement." (*Id*.)  The Arbitration Agreement in the credit card application provided that any arbitration would be administered according to the Commercial Arbitration Rules of the AAA.  (*Id*.) In signing the application, Christensen agreed that he was "waiving the right to a jury trial or a trial before a judge in a public court."  (*Id*.)

29.     On the same day he opened the credit card, Christensen made a purchase and proceeded to carry a balance on the card and make regular monthly payments.  (*Id*. ¶ 63, Ex. 16-B.)

**Jamal Dean**

30.     Jamal Dean, a California resident, opened a Wells Fargo business checking account (x6035) on September 19, 1996, for Focus-on-u Photography.  (*Id*. ¶ 64.)  Dean signed up for online banking on December 31, 2013, (*id*. ¶ 65), and in doing so Dean had to affirmatively agree to the terms of the operative Online Account Agreement by clicking "I Agree" on an online portal.  (*Id*., Ex. 17-B.)  The terms included the "agreement with [Wells Fargo] to use binding arbitration for most disputes arising under this Agreement or concerning the Service and to waive the right to a trial by jury."  (*Id*. at 1.)  A "dispute" was defined as "any unresolved agreement between or among you and us." (*Id*. at 24.)  That included "claims based on broken promises or contracts, torts . . . or other wrongful actions" as well as all "statutory,

common law, and equitable claims." (*Id.*)  A "dispute" subject to arbitration also encompasses the disputes concerning the "interpretation of this Agreement (including the meaning of this arbitration agreement and whether a disagreement is a 'dispute' subject to binding arbitration as provided for in this arbitration agreement.)" (*Id.*)  The agreement specified that any arbitration would be administered by the AAA according to the Commercial AAA Rules. (*Id.* at 25.)  The Online Account Agreement provides notice that the operative "separate agreements" that govern the customer's accounts continue to apply. (*Id.* at 5; Ex. 2-B (April 2013 Business Account Agreement); *id.* ¶ 22 (the operative Business Account Agreements have been available online via the Wells Fargo website since 1999).)

31. Dean both actively used the x6035 account and his business online banking. (*Id.* ¶¶ 64, 67, Exs. 17-A, 17-C, 17-D.)  Dean continues to use business online banking and his x6035 account. (*Id.* ¶ 67, Exs. 17-E, 17-F.)

**Mbegane Diouf**

32. Mbegane Diouf, a New Jersey resident, opened a Wells Fargo consumer checking account (x4444) on October 19, 2012.  The Consumer Account Application Diouf signed stated: "I have received a copy of the applicable account agreement … and agree to bound by [its] terms.  I also agree to the terms of the dispute resolution program described in the account agreement." (*Id.* ¶  69, Ex. 18-A at 4, Ex. 1-I (October 2011 Account Agreement).)  Diouf further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.* ¶ 69, Ex. 18-A at 4.)  Diouf began to actively use her checking account (x4444) immediately after opening it. (*Id.* ¶ 70, Ex. 18-B.)

**Curtis Dowdle**

33.     Curtis Dowdle, a Utah resident, opened a Wells Fargo consumer checking account (x1401) on January 9, 2006.  Dowdle signed the Consumer Account Application on January 9, 2006, and the next day, January 10, 2006, he signed a Relationship Change form to add Martha A. Dowdle as a joint owner on the account.  (*Id*. ¶¶ 71-72, Ex. 19-A, Ex. 19-B.) Both of these agreements required Dowdle to acknowledge and consent to the following with his signature:  "I have received a copy of the applicable account agreement and privacy brochure and agree to bound by them.  I also agree to the terms of the dispute resolution program described in the account agreement." (*Id*. ¶ 71, Exs. 19-A, 19-B at 1.)  As a signatory, Dowdle further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*.)  Curtis and Martha Dowdle also opened a consumer savings account (x3461) on February 23, 2009, and several months later, a consumer checking account (x5152) on August 18, 2010, wherein they also agreed to the dispute resolution program in the Consumer Account Agreement.  (*See id*. ¶¶ 73-74, Exs. 19-C, 19-D; *see also id*. ¶ 71, Ex. 1-C (October 2005 Consumer Account Agreement).)

**Edward Dowdy**

34.     Edward Dowdy, a Utah resident, opened two Wells Fargo bank accounts on October 16, 2013, a consumer checking account (7160) and a consumer savings account (x8249). In the course of signing a Consumer Account Application for the two account, Dowdy certified: "I have received a copy of the applicable account agreement…and agree to bound by [its] terms. I also agree to the terms of the dispute resolution program described in the account agreement." (*Id*. ¶ 75, Ex. 20-A at 2, Ex. 1-J (April 2013 Consumer Account Agreement).)  Dowdy further agreed that "disputes will be decided before one or more neutral persons in an arbitration

proceeding and not by a jury trial or a trial before a judge." (*Id.* ¶ 75, Ex. 20-A at 2.)  Dowdy

actively used his accounts (x7160, x8249).  (*Id.* ¶¶  76-77, Ex. 20-B, Ex. 20-C.)

**<u>Jennifer Ellsworth</u>**

35.     Jennifer Ellsworth, a California resident, opened a consumer checking account

(x9893) with Wells Fargo on November 29, 2014.  (*Id.* ¶ 78, Ex. 21-A.)  In signing the

Consumer Account Application, Ellsworth confirmed that she had "received a copy of the

applicable account agreement, and the privacy policy (as each may be amended from time to

time) and agree to bound by their terms.  I also agree to the terms of the dispute resolution

program described in the foregoing agreements."  (*Id.* at 2.)  Ellsworth further agreed that

"disputes will be decided before one or more neutral persons in an arbitration proceeding and not

by a jury trial or a trial before a judge."  (*Id.*; Ex. 1-L (October 2014 Consumer Account

Agreement).)  Ellsworth proceeded to actively use her checking account (x9893) for a wide

variety of transactions, including direct deposit.  (*Id.* ¶ 79, Ex. 21-B.)

**<u>Richard Lynn Farr</u>**

36.     R. Lynn Farr, a Florida resident, signed a Consumer Account Application to open

a consumer checking account (x7401) with Wells Fargo on December 15, 2015.  (*Id.* ¶ 80, Ex.

22-A.)  On September 27, 2016, Farr executed a Legal Name Change Request to change the

Customer Name on the account (x7401) to "Richard Lynn Farr."  (*Id.* ¶ 81, Ex. 22-B.)  In signing

the account application, Farr confirmed:  "I have received a copy of the applicable account

agreement, and the privacy policy (as each may be amended from time to time) and agree to

bound by their terms.  I also agree to the terms of the dispute resolution program described in the

foregoing agreements."  (*Id.* ¶ 80, Ex. 22-A.)  Farr further agreed that "disputes will be decided

before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial

before a judge." (*Id*. ¶ 80, Ex. 22-A, Ex. 1-M (July 2015 Consumer Account Agreement).)  Farr

has maintained active use of his checking account as of October 2016.  (*Id*. ¶ 82, Ex. 22-C.)

**<u>Glenn Gilleshammer</u>**

37. On September 29, 2005, Glenn Gilleshammer, a North Dakota resident, opened a

consumer savings account (x7450) with Wells Fargo.  (*Id*. ¶ 83, Ex. 23-A.)  On the same day, he

filled out and signed an Information Change Request form for the account to add a personalized

account name of "Farm Acct" to account x7450.  (*Id*. ¶ 84, Ex. 23-B.)  In the course of signing

the account application, Gilleshammer certified the following:  "I have a received a copy of the

applicable account agreement and privacy brochure and agree to be bound by them …. I also

agree to the terms of the dispute resolution program described in the account agreement." (*Id*.

¶ 83, Ex. 23-A at 1.).  Gilleshammer actively used his consumer savings account.  (*Id*. ¶¶ 83, 85,

Ex. 23-C, Ex. 1-B (October 2004 Consumer Account Agreement).)

38.     Gilleshammer opened a consumer savings account (x4315) by signing an

application on February 2, 2009.  (*See id*. ¶ 86, Ex. 23-D.)  Several weeks later, on February 28,

2009, Gilleshammer signed a Relationship Change Application transforming the x4315 account

into a trust account for the "g a & l m gilleshammer" trust, with Gilleshammer serving as sole

trustee.  (*Id*. ¶ 87, Ex. 23-E.)  Gilleshammer kept the x4315 account well funded.  (*Id*. ¶ 88, Ex.

23-F.)  Both the Consumer Account Application (x4315) and the Relationship Change

Application required Gilleshammer to agree to the terms of the dispute resolution program

described in the account agreement.  (*Id*. ¶¶ 86, 88, Ex. 23-F, Ex. 1-F (November 2008

Consumer Account Agreement).)

**Shanell Golden**

39.     Shanell Golden, a California resident, opened a consumer checking account

(x3129) and consumer savings account (x2435) with Wells Fargo on October 20, 2008.  (*Id.*

¶ 89, Ex. 24-A.)  In the course of signing a Consumer Account Application for these accounts,

Golden certified the following:  "I have received a copy of the applicable account agreement and

privacy brochure and agree to be bound by them…I also agree to the terms of the dispute

resolution program described in the account agreement."  (*Id.* ¶  89, Ex. 24-A at 2, Ex. 1-E

(November 2007 Consumer Account Agreement).)  As a signatory, Golden further agreed that

"disputes will be decided before one or more neutral persons in an arbitration proceeding and not

by a jury trial or a trial before a judge."  (*Id.* ¶ 89, Ex. 24-A at 2.)  Golden actively used her

x3129 and x2435 accounts.  (*Id.* ¶¶  90, Ex. 24-B.)

**Andrew Gorayeb**

40.     Andrew Gorayeb, a California resident, opened a Wells Fargo consumer

checking account (x5716) on June 20, 2007.  In the course of signing a Consumer Account

Application for this account, Gorayeb certified the following:  "I have received a copy of the

applicable account agreement and privacy brochure and agree to be bound by them… I also

agree to the terms of the dispute resolution program described in the account agreement."  (*Id.*

¶ 91, Ex. 25-A at 2, Ex. 1-D (October 2006 Consumer Account Agreement).)   Gorayeb further

agreed that "disputes will be decided before one or more neutral persons in an arbitration

proceeding and not by a jury trial or a trial before a judge."  (*Id.* ¶ 91, Ex. 25-A at 2.)  Gorayeb

continues to actively use this account as of October 2016.  (*Id.* ¶ 92, Ex. 25-B.)

**Kenneth Gregory**

41.     Kenneth Gregory, a Colorado resident, opened a Wells Fargo consumer checking account (x4327) and consumer savings account (x9996) on January 2, 2015.  In the course of signing a Consumer Account Application for these accounts, Gregory certified the following:  "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them. … I also agree to the terms of the dispute resolution program described in the foregoing agreements."  (*Id*. ¶¶ 93, Ex. 26-A at 2; Ex. 1-L (October 2014 Consumer Account Agreement).)   Gregory further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*. ¶ 93, Ex. 26-A at 2.)  Gregory continues to actively use these accounts.  (*Id*. ¶ 94, Ex. 26-B.)

**Aaron Hands**

42.     Aaron Hands opened a Wells Fargo consumer checking account (x9788) on December 1, 2015.  Three days later he signed a Relationship Change Application adding Rebecca Barsoum as a joint owner on the account.  (*Id*. ¶¶  95-96, Ex. 27-A, Ex. 27-B.)  In the course of signing both documents,  Hands certified the following:  "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them … I also agree to the terms of the dispute resolution program described in the account agreement."  (*Id*. ¶ 95, Ex. 27-A at 2, Ex. 1-M (July 2015 Consumer Account Agreement).)   Hands further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*. ¶ 95, Ex. 27-A at 2.)  Hands continues to actively use his Wells Fargo account (x9788) as of October 2016.  (*Id*. ¶ 97, Ex. 27-C.)

**Charles Jones**

43.     Charlie Jones opened a Wells Fargo consumer checking account (x2031) and consumer savings account (x2999) on July 27, 2010.  In the course of signing a Consumer Account Application for these accounts, Jones certified the following, "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them. I also agree to the terms of the dispute resolution program described in the account agreement."  (*Id.* ¶ 98, Ex. 28-A at 2, Ex. 1-G (March 2010 Consumer Account Agreement).)  Jones further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id.* ¶ 98, Ex. 28-A at 2.)  Jones actively used of the x2031 account.  (*Id.* ¶ 99, Ex. 28-B.)

**Erica Bendixsen Jones**

44.     On August 19, 2003, Jan Bendixsen opened a consumer savings account (x9685) with Wells Fargo.  Several months later, on December 11, 2003, Plaintiff, then named Erica Bendixsen, signed a Consumer Account Application for Relationship, Name or Title Change form, which added her as a joint owner to the preexisting consumer savings account (x9685) owned by Jan Bendixsen.  (*Id.* ¶ 100, Ex. 29-A.)  Carrie Bendixsen was also added as a joint owner to the x9685 account on the same Consumer Account Application.  (*Id.* at 1)  In signing this application, Erica Bendixsen verified the following:  "I have received a copy of [the] applicable account agreement and use of information brochure and agree to be bound by them. I also agree to the terms of the dispute resolution program described in  the account application."  (*Id.*, Ex. 29-A at 1, Ex. 1-A (April 2003 Consumer Account Agreement).)  She further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding

and not by a jury or a trial before a judge." (*Id., Ex. 29-A at 1*.)  The joint owners of the x9685 account have actively used the account.  (*Id. ¶ 101, Ex. 29-B.*)

**Reza Kamali-Sarvestani**

45.     Reza Kamali-Sarvestani, an Alabama resident, opened a Wells Fargo consumer checking account (x0925) and consumer savings account (x6401) on September 2, 2011. Kamali-Sarvestani signed the Consumer Account Application using the name "Rezi," a typographical error that was corrected by a legal name change request signed and submitted on the same day, September 2, 2011.  (*Id. ¶¶  102-03, Ex. 30-A, Ex. 30-B.*)  In signing and executing both the account application and name change form, Kamali-Sarvestani certified the following: "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them … I also agree to the terms of the dispute resolution program described in the account agreement." (*Id. ¶ 102, Ex. 30-A at 2, Ex. 30-B, Ex. 1-H (September 2010 Consumer Account Agreement).*)   Kamali-Sarvestani further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id., Ex. 30-A, 30-B.*)  Kamali-Sarvestani continues to actively use the accounts as of October 2016.  (*Id. ¶¶ 104-105, Ex. 30-C, Ex. 30-D.*)

**Jennifer King**

46.     Jennifer King, a Florida resident, opened a Wells Fargo consumer checking account (x1925) and consumer savings account (x7693) on June 10, 2014.  In the course of signing a Consumer Account Application for these accounts, King certified that she had "received a copy of the applicable account agreement and the privacy policy … and agre[ed] to be bound by their terms." (*Id. ¶ 106, Ex. 31-A at 2, Ex. 1-K (April 2014 Consumer Account Agreement).*)  King also "agre[d] to the terms of the dispute resolution program described in the

foregoing agreements" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*. ¶ 106, Ex. 31-A at 2.)  On November 13, 2014 King signed a Relationship Change Application to add Evan Jones as a beneficiary to the x1925 account.  (*Id*. ¶ 107, Ex. 31-B.)  King reaffirmed in this document that she agreed to the terms of the dispute resolution program as described in the account agreement. (*Id*.)  King continues to actively use her x1925 account as of October 2016.  (*Id*. ¶ 108, Ex. 31-C.)

**Edward Klann**

47.     Edward Klann, a Georgia resident, opened a Wells Fargo consumer checking account (x6086) and consumer savings account (x0749) on April 25, 2011.  In the course of signing a Consumer Account Application for these accounts, Klann certified the following: "I have received a copy of the applicable account agreement and the privacy brochure and agree to be bound by them."  (*Id*. ¶ 109, Ex. 32-A at 2.)  Klann also "agree[d] to the terms of the dispute resolution program described in the account  agreement" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*., Ex. 1-H (September 2010 Consumer Account Agreement).)  Klann actively used his checking and savings accounts.  (*Id*. ¶¶ 110-11, Ex. 32-B, Ex. 32-C.)

**Austin Law**

48.     Austin Law, a California resident, opened a Wells Fargo consumer checking account (x8747) and consumer savings account (x6759) on May 5, 2016.  In the course of signing a Consumer Account Application for these accounts, Law certified the following that he had "received a copy of the applicable account agreement and the privacy policy (each may be amended from time to time) and agre[ed] to be bound by their terms."  (*Id*. ¶ 112, Ex. 33-A at 2,

Ex. 1-N (April 2016 Consumer Account Agreement).)  Law also "agree[d] to the terms of the dispute resolution program described in the foregoing agreements" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.*)  Law actively used both accounts. (*Id.* ¶¶ 113-14, Exs. 33-B, 33-C.)

**Ayoka Lawani**

49.      Ayoka Evelyn Lawani, a Maryland resident, signed a Wachovia Customer Access Agreement on April 26, 2006. (*Id.* ¶ 115, Ex. 34-A.)  Lawani opened a Wachovia checking account (x5419) and savings account (x9343) on August 11, 2010 which remained open after the merger of Wachovia and Wells Fargo.  Wachovia bank accounts were gradually converted to Wells Fargo accounts in a staggered process, and Wachovia deposit accounts in Maryland were converted to Wells Fargo accounts on February 18, 2012. (*Id.* ¶ 116.)  On or about December 30, 2011, a package of materials related to the conversion of the two accounts (x5419, x9343) was mailed to Lawani. (*Id.*)  The enclosed welcome letter informed Lawani that her existing Wachovia accounts would become Wells Fargo accounts on February 18, 2012. (*Id.*, Ex. 34-B.)  The welcome letter, which came enclosed with a conversion packet, notified Lawani that after the conversion date, if her accounts remained open, they would be governed by the terms of the Consumer Disclosure booklets provided to her, which contained a copy of the Wells Fargo Consumer Account Agreement.  (*Id.*, Ex. 34-B, Ex. 34-C.)

50.      The first booklet in the Consumer Disclosures provided to Lawani contained the Consumer Account Agreement; a section entitled "Dispute Resolution Program: Arbitration Agreement" can be found on page 4 of the booklet.  (*Id.*, Ex. 34-C at 4.)  The Arbitration Agreement provided that, "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the

dispute will be resolved through the arbitration process as set forth in this part…" (*Id.*)  A

"dispute" was defined as "any unresolved disagreement between you and the Bank."  (*Id.*) It

included "claims based on broken promises or contracts, torts, or other wrongful actions.  It also

includes statutory, common law, and equitable claims." (*Id.*)  "Disputes" also included

"disagreements about the meaning, application or enforceability of this Arbitration Agreement."

(*Id.*)  In bold, block letters, the Arbitration Agreement made clear: "YOU AGREE THAT YOU

AND THE BANK ARE WAIVING THE RIGHT TO A JURY TRIAL OR TRIAL BEFORE A

JUDGE IN A PUBLIC COURT."  (*Id.*)  The agreement provided that any arbitration would be

administrated by the AAA using AAA Rules.  (*Id.* at 5.)

    51.    Lawani continues to use her Wells Fargo x5419 accounts.  (*Id.* ¶ 117, Ex. 34-D.)

**Nedelka Martinsen**

    52.    Nedelka Martinsen, a Utah resident, opened a Wells Fargo Team Member

Checking account (x7841) on March 28, 2014, listing his employer as Wells Fargo.  (*Id.* ¶ 118,

Ex. 35-A.)  This signature confirmed that Martinsen had "received a copy of the applicable

account …and agre[ed] to be bound by [its] terms."  (*Id.*, Ex. 35-A at 2, Ex. 1-J (April 2013

Consumer Account Agreement).)  Martinsen also "agree[d] to the terms of the dispute resolution

program described in the foregoing agreements" whereby "disputes will be decided before one or

more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."

(*Id.*, Ex. 35-A at 2.)  Martinsen actively used her Team Member checking account (x7841).  (*Id.*

¶ 119, Ex. 35-B.)

**Ralph McCoy**

    53.    Ralph McCoy, a California resident, opened a Wells Fargo consumer checking

account (x2033) on November 14, 2014.  In the course of signing a Consumer Account

Application for this account, Gorayeb certified that he had "received a copy of the applicable

account agreement and privacy brochure … and agree[s] to be bound by their terms." (*Id*. ¶ 120,

Ex. 36-A at 2, Ex. 1-L (October 2014 Consumer Account Agreement).)  McCoy also "agree[d]

to the terms of the dispute resolution program described in the foregoing  agreements" whereby

"disputes will be decided before one or more neutral persons in an arbitration proceeding and not

by a jury trial or a trial before a judge." (*Id*., Ex. 36-A at 2.)  McCoy continues to use this

account actively as of October 2016.  (*Id*. ¶ 121, Ex. 36-B.)

### Kay and Lawrence Mitchell

54.     Lawrence Mitchell, a Utah resident, opened a Wells Fargo consumer checking

account (x9055) on April 2, 1982.  (*Id*. ¶ 122.)  Lawrence Mitchell signed up for online banking

on May 20, 2005, and in doing so he had to affirmatively agree to the terms of the operative

Online Account Agreement by clicking "I Agree" on an online portal.  (*Id.*) The terms of the

Online Account Agreement Lawrence Mitchell agreed to included a Dispute Resolution

provision that read:  "[a]t the request of either party, any dispute concerning the Service shall be

decided by binding arbitration pursuant to the commercial arbitration rules of the American

Arbitration Association."  (*Id*. at 14)  The Online Account Agreement provides notice that the

customer's accounts "continue to be subject to the agreements otherwise governing them."  (*Id*.,

Ex. 37-A at 2; *id.,* Ex. 1-B (October 2004 Consumer Account Agreement); *id*. ¶ 7 (the operative

Consumer Account Agreements have been available online via the Wells Fargo website since

1999).)

55.     Kay Mitchell was added to the x9055 account as a joint owner. (*Id*. ¶ 124.)  The

Mitchells actively used the x9055 account, and had Kay Mitchell's monthly social security check

deposited to the account. (*Id*. ¶ 124, Ex. 37-D.)  In their December of 2011 statement, the

Mitchells received an "Important Change in Terms Notice" from Wells Fargo, notifying them that the Consumer Account Agreement would be revised effective February 15, 2012.  (*Id.* ¶ 125, Ex. 37-E.)  This notice, which constituted an Addenda to the Consumer Account Agreement, was titled, "Dispute Resolution Program: Arbitration Agreement." (*Id.*) The Addenda provides that "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process set forth in this part." (*Id.*)  A "dispute" was defined as "any unresolved disagreement between you and the Bank."  (*Id.*)  Such a dispute includes "claims based on broken promises or contracts, torts, or other wrongful actions.  It also includes statutory, common law, and equitable claims." (*Id.*)  Moreover, a "dispute" encompassed "disagreements about the meaning, application or enforceability of this arbitration agreement." (*Id.*)

56.     The Mitchells continued to actively use the x9055 account after the change in terms took effect (*id.* ¶ 126, Ex. 37-F), and continue to actively use the account up to the present. (*Id.* ¶ 127, Ex. 37-G.),  Lawrence Mitchell has actively used is online banking account from May 2005 to the present.  (*Id.* ¶ 123, Exs. 37-B, 37-C.)

**Robert Moyer**

57.     On October 20, 2006, Noel Taxin, a Utah resident, signed a Consumer Account Application to open three consumer accounts with Wells Fargo (x8542, x6341, x6333).  (*Id.* ¶ 128, Ex. 38-A.)  Less than two months later, Taxin signed a relationship change form adding Robert Moyer, another Utah resident, as a beneficiary to one of the consumer savings accounts (x6341).  (*Id.* ¶ 129, Ex. 38-B.)  On December 5, 2009, Taxin and Moyer signed a Relationship Change Application, making Moyer a joint owner of the x6341 account.  (*Id.* ¶ 130, Ex. 38-C.)

58.     In signing the Relationship Change Application, Moyer confirmed that he had "received a copy of the applicable account agreement and privacy brochure and agree[s] to be bound by them."  (*Id*., Ex. 38-C at 3, Ex. 1-F (November 2008 Consumer Account Agreement).)  Moyer also "agree[d] to the terms of the dispute resolution program described in the account agreement" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*., Ex. 38-C at 3.)

**<u>Nathan Ornellas</u>**

59.     Nathan Ornellas, a California resident, opened a Wells Fargo consumer checking account (x5197) on July 12, 2016.  (*Id.* ¶ 131, Ex. 39-A.)  The same day, Ornellas signed a Relationship Change Application to add Cara Pellegri as a joint owner of the account.  (*Id.* ¶ 132, Ex. 39-B.)   In signing these applications, Ornellas and Pellegri certified they had "received a copy of the applicable account agreement and the privacy policy … and agree to be bound by their terms." (*Id.* ¶¶ 131-32, Exs. 39-A, 39-B, 1-N (April 2016 Consumer Account Agreement).)  They further confirmed that they "agree to the terms of the dispute resolution program described in the foregoing agreements," wherein "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*., Ex. 39-A at 2.)  They continue to use their checking account up to the present.  (*Id*. ¶ 133, Ex. 39-C.)

**<u>Gloria Pledger</u>**

60.     Gloria Pledger, a Maryland resident, opened a Wells Fargo consumer checking account (x7310) and consumer savings account (x0990) on April 15, 2016.  (*Id.* ¶ 134, Ex. 40-A.)  In the course of signing a Consumer Account Application for these accounts, Pledger certified the following: "I have received a copy of the applicable account agreement and the privacy policy (each may be amended from time to time) and agree to be bound by their terms. I

also agree to the terms of the dispute resolution program described in the foregoing agreements." (*Id.* ¶ 134, Ex. 40-A at 2, Ex. 1-M (July 2015 Consumer Account Agreement).)  Pledger further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id.*, Ex. 40-A at 2.)  Pledger has continued to use these accounts.  (*Id.* ¶ 135, Ex. 40-B.)

**Denise Poe**

61.      Denise Poe, an Ohio resident, opened a Wells Fargo Cash on Demand account (x8211) and, on November 7, 2005, signed a Supplemental Disclosure form for the account, wherein she "agre[ed] to the terms of the Cash on Demand Account Agreement (form number NA-1613-1005) and acknowledg[ed] receipt of the agreement."  (*Id.* ¶ 136, Ex. 41-A at 1.)  Poe further "acknowledge[d] the existence of the Arbitration Agreement" and "agree[d] to be bound by its terms."  (*Id.*)

62.      The operative Cash on Demand Account Agreement (form number NA-1613-1005) explained that any party covered by the agreement "may elect to have any claim, dispute or controversy ('Claim') of any kind (whether in contract, tort or otherwise) arising out of or relating to your Cash on Demand Account Agreement, or any prior or future dealings between us, resolved by binding arbitration."  (*Id.,* Ex. 41-B at 3.)  Furthermore, a "Claim" included "the issue of whether any particular Claim must be submitted to arbitration, or the facts and circumstances involved with your signing of this Agreement, or your willingness to abide by the terms of this Agreement or the validity of this Agreement."  (*Id.*)  The agreement specified that any arbitration would be conducted pursuant to the rules of the AAA.  (*Id.*)

**Jennifer Porter**

63.     Jennifer Porter, a Utah resident, opened a Wells Fargo consumer checking account (x8047) and consumer savings account (x3740) on October 31, 2011.  In the course of signing a Consumer Account Application for these accounts, Porter certified that she had "received a copy of the applicable account agreement and privacy brochure and agre[es] to be bound by them."  (*Id*. ¶ 137, Ex. 42-A at 2.)  As a signatory, Porter also "agre[ed] to the terms of the dispute resolution program described in the account agreement" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*.)  Porter made active use of her checking account (x8047) in the months following its creation.  (*Id*. ¶ 138, Ex. 42-B.)

**Robin Quigg**

64.     On May 17, 1995, Robin Quigg, a Florida resident, opened a checking account (x9160) with First Union National Bank of Florida, which was later acquired by Wachovia. (*Id*. ¶ 139.) On September 23, 2001, Robin Quigg signed a Wachovia Customer Access Agreement. (*Id.,* Ex. 43-A.) Wells Fargo later acquired Wachovia and, over the weekend of June 11, 2011, certain Wachovia accounts in Florida were converted into Wells Fargo accounts and integrated into the Wells Fargo system, including Robin Quigg's x9160 account.  (*Id*. ¶ 140.)  On or about April 29, 2011, a conversion package including a welcome letter was delivered to each Florida Wachovia account holder whose account would be converted in June 2011, including Robin Quigg.  (*Id*. ¶ 140, Ex. 43-B at 1.)  The welcome letter, which came attached to a conversion packet, notified her that after the conversion date, if her account remained open, it would be governed by the terms of the Consumer Disclosure booklets provided to her, which contained a copy of the Wells Fargo Consumer Account Agreement.  (*Id*. ¶ 140, Ex. 43-B, Ex. 43-C.)

65.     The first booklet in the Consumer Disclosures provided to Quigg contained the Consumer Account Agreement; a section entitled "Dispute Resolution Program: Arbitration Agreement" can be found on page 4 of the booklet.  (*Id*., Ex. 43-C at 4.)  The Arbitration Agreement provided that, "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process as set forth in this part…" (*Id.*)  A "dispute" was defined as "any unresolved disagreement between you and the Bank." (*Id.*) It included "claims based on broken promises or contracts, torts, or other wrongful actions.  It also includes statutory, common law, and equitable claims." (*Id.*)  "Disputes" also included "disagreements about the meaning, application or enforceability of this Arbitration Agreement." (*Id.*)  In bold, block letters, the Arbitration Agreement made clear: "YOU AGREE THAT YOU AND THE BANK ARE WAIVING THE RIGHT TO A JURY TRIAL OR TRIAL BEFORE A JUDGE IN A PUBLIC COURT." (*Id.*)  The agreement provided that any arbitration would be administrated by the AAA using AAA Rules.  (*Id.* at 5.)

66.     After the conversion of her x9160 account, Quigg opened a new Wells Fargo consumer savings account (x6036) on January 6, 2014.  In the course of signing a Consumer Account Application for this account, Quigg certified that she had "received a copy of the applicable account agreement … and agree to be bound by [its] terms." (*Id*. ¶ 141, Ex. 43-D at 2, Ex. 1-J (April 2013 Consumer Account Agreement).)  Quigg also "agre[ed] to the terms of the dispute resolution program described in the foregoing  agreements" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id*.)  Quigg continues to actively use her Wells Fargo checking account (x9160) and savings account (x4518) as of October 2016.  (*Id*. ¶ 142, Ex. 43-E.)

**Carina Rhea**

67.     Carina Rhea, a California resident, opened a Wells Fargo consumer bank account (x3236) on January 19, 1999.  (*Id.* ¶ 143.)  Rhea enrolled in online banking on April 3, 2008; to do so she had to affirmatively agree to the terms of the operative Online Account Agreement by clicking "I Agree" on an online portal. (*Id.* ¶ 144, Ex. 44-B.)  The Online Account Agreement provided that, "[i]f you have a dispute with us, and it cannot be resolved informally, you and we agree that any dispute between or among you and us, regardless of when it arose, will be resolved by the following arbitration process."  (*Id.* at 27.)  The Online Account Agreement defined a "dispute" as is "any unresolved agreement between or among you and us."  (*Id.*) It includes "claims based on broken promises or contracts, torts . . . or other wrongful actions. It also includes statutory, common law, and equitable claims." (*Id.*) A "dispute" subject to arbitration also encompasses "any disagreement about the meaning of this Arbitration Agreement, and whether a disagreement is a 'dispute' subject to binding arbitration as provided for in this Arbitration Agreement."  (*Id.*)  The agreement made clear that any arbitration would be administered in accordance with AAA rules.  (*Id.* at 28.)

68.     In December of 2011, Rhea received the "Important Change in Terms Notice" with her monthly statement, notifying her that the Consumer Account Agreement would be revised effective February 15, 2012.  (*Id.* ¶¶ 146-47, Ex. 44-D, 44-E.)  This notice, which constituted an Addenda to the Consumer Account Agreement, was titled, "Dispute Resolution Program: Arbitration Agreement." (*Id.*) The Addenda provides that "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process set forth in this part." (*Id.*)  A "dispute" was defined as "any unresolved disagreement

between you and the Bank." (*Id.*)  Such a dispute includes "claims based on broken promises or contracts, torts, or other wrongful actions.  It also includes statutory, common law, and equitable claims." (*Id.*)  Moreover, a "dispute" encompassed "disagreements about the meaning, application or enforceability of this arbitration agreement."  (*Id.*)

69.    Rhea continued to actively use her account after the change in terms took effect, including up to the present, and likewise has actively used her online banking account. (*Id.* ¶¶ 145, 147-48, Exs. 44-C, 44-E, 44-F.).

**David Self**

70.    On June 7, 1996, a Wells Fargo consumer checking account (x1623) was opened for David M. Self, Sue A. Waters, and James J. Waters. (*Id.* ¶ 149.)  In December of 2011, David M. Self, Sue A. Waters, and James J. Waters received the same "Important Change in Terms Notice" with their monthly statement as did Carina Rhea, notifying them that the Consumer Account Agreement would be revised effective February 15, 2012.  (*Id.* ¶¶ 149-50, Ex. 45-B.)  They continue to actively use the account after the change in terms took effect.  (*Id.* ¶ 149, Ex. 45-A.)

**Barbara Shadoan**

71.    Barbara Shadoan, a Nevada resident, opened a Wells Fargo consumer checking account (x0548) by signing a Consumer Account Agreement on August 12, 2005.  (*Id.* ¶ 151, Ex. 46-A.)  Shadoan's signature on a Form W-9 on April 18, 2011 is identical to the signature on her Consumer Account Application for the x0548 account.  (*Id.* ¶ 152, Ex. 46-B.)  In the course of signing the Consumer Account Application, Shadoan certified:  "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them…I also agree to the terms of the dispute resolution program described in the account agreement."  (*Id.* ¶ 151,

Ex. 46-A at 1, Ex. 1-B (October 2004 Consumer Account Application).)  Shadoan further agreed

that "disputes will be decided before one or more neutral persons in an arbitration proceeding

and not by a jury trial or a trial before a judge."  (*Id*.)  Shadoan actively used the x0548 account.

(*Id.* ¶ 153, Ex. 46-C.)

**Anurag Sood**

72.     On July 2, 2001 Anurag Sood, a California resident, and Supriya Sood opened a

checking account with World Savings Bank.  (*Id*. ¶ 154.)  On March 2, 2002, Anurag Sood and

Supriya executed an ownership change form for the checking account (x3882) that changed the

account to a joint ATF account with  Anurag  Sood and Supriya Sood listed as joint trustees and

Mohinder Sood listed as the beneficiary.  (*Id*., Ex. 47-A.)  Wachovia later acquired World

Savings Bank and, on July 24, 2008, Anurag Sood and Supriya Sood each signed a Wachovia

Customer Access Agreement. (*Id*. ¶¶ 155-56, Exs. 47-B, 47-C.).  The Soods continued to

regularly use the x3882 account.  (*Id*. ¶ 157, Ex. 47-D.)

73.     After Wells Fargo acquired Wachovia, Wachovia bank accounts in California

were converted to Wells Fargo accounts the weekend of June 11, 2011.  On or around April 29,

2011, a package of materials related to the conversion of the (x3882) account was mailed to the

Soods.  The conversion package included a welcome letter, informing the Soods that their

Wachovia account was being transferred over to Wells Fargo, and that as of June 11, 2011, the

accompanying Customer Disclosure and Guide would govern the account.  (*Id*. ¶ 158, Ex. 47-E

at 2, Ex. 47-F.)  The Customer Disclosure documents sent to the Soods contained the same terms

for the Arbitration Agreement and dispute resolution program as what was sent to other former

Wachovia customers who had their accounts converted after the merger, *e.g., supra* ¶¶ 49-50.

74.     The Soods maintained highly active use of account x3882 after it transitioned to Wells Fargo.  (*Id.* ¶ 159, Ex. 47-G.)  In December of 2011, the Soods were mailed an "Important Change in Terms Notice" from Wells Fargo, notifying them that the Consumer Account Agreement would be revised effective February 15, 2012.  (*Id.* ¶ 160, Ex. 47-H at 1.)  This notice was identical to the December 2011 change in terms notice previously described, *e.g, supra* ¶ 55.  The Soods continued to actively use their account after the change in terms took effect. (*Id.* ¶ 159, Ex. 47-G.)

**Joseph Steele**

75.     On March 26, 2011, Celia Steele opened a consumer savings account with Wells Fargo (x7182).  (*Id.* ¶ 161, Ex. 48-A.)   Later that year, on October 7, 2011, Celia Steele and Joseph W. Steele signed a Relationship Change Application to add Joseph W. Steele to the x7182 account as a joint owner.  (*Id.* ¶ 162, Ex. 48-B.)  In signing the Relationship Change Application, Steele confirmed that he had  "received a copy of the applicable account agreement and privacy brochure and agree to be bound by them…I also agree to the terms of the dispute resolution program described in the account agreement."  (*Id.* ¶ 162, Ex. 48-B at 2, Ex. 1-H (September 2010 Consumer Account Agreement).)  Joseph W. Steele further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id.*, Ex. 48-B.)  The Steeles keep their joint account well-funded to this day. (*Id.* ¶ 164, Ex. 48-D.)

**Lisa Stern**

76.     Lisa Stern opened a Wells Fargo business account (x2372) on November 14, 2006 for Closetshoppers.com, Inc.  In signing the Business Account Application for the x2372 account, Stern agreed that "[t]he Customer's use of any Bank account, product or service will

confirm its receipt of and agreement to be bound by the Bank's applicable account fee schedule and account agreement that includes the dispute resolution program under which any disputes between the Customer and the Bank relating to the Customer's use of any bank account or service will be decided in an arbitration proceeding before a neutral arbitrator and not by a jury or court trial." (*Id.* ¶ 165, Ex. 49-A at 2, Ex. 2-A (October 2006 Business Account Agreement).) Stern maintained her business account over several years. (*Id.* ¶ 166, Ex. 49-B.)

**<u>Steven Stetzel</u>**

77.     Steven Stetzel, an Idaho resident, opened a consumer checking account (x7618) and consumer savings account (x2006) with Wells Fargo on April 10, 2009.  In the course of signing the Consumer Account Application, Stetzel certified the following:  "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them…I also agree to the terms of the dispute resolution program described in the account agreement." (*Id.* ¶ 167, Ex. 50-A at 2, Ex. 1-F (November 2008 Consumer Account Agreement).)  Stetzel further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.* ¶ 167, Ex. 50-A at 2.)  Stetzel has continued to actively use the x7618 account as of October 2016. (*Id.* ¶ 168, Ex. 50-B.)

**<u>Eric Talaska</u>**

78.     Eric Talaska, a Colorado resident, opened a consumer checking account (x0787) and consumer savings account (x9625) with Wells Fargo on July 9, 2010.  In the course of signing the Consumer Account Application, Talaska certified the following:  "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them…I also agree to the terms of the dispute resolution program described in the account

agreement." (*Id.* ¶ 169, Ex. 51-A at 2, Ex. 1-G (March 2010 Consumer Account Agreement).)

Talaska further agreed that "disputes will be decided before one or more neutral persons in an

arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.*, Ex. 51-A at 2.)

After agreeing to these terms, Talaska actively used his Wells Fargo checking and savings

accounts. (*Id.* ¶ 170, Ex. 51-B.)

**Jeffery Taylor**

79.    Jeffery Taylor opened an individual retirement account with Wells Fargo on

November 23, 2012. (*Id.* ¶ 171, Ex. 52-A .)  Taylor signed an IRA application form for the plan

(x7038) in addition to a Retirement Plan Deposit Receipt/Disclosure, which included the

following language:  "By signing this receipt, I agree with the Consumer Account Agreement

you have given me." (*Id.* ¶ 172, Ex. 52-B; Ex. 1-I (October 2011 Consumer Account

Agreement).) Taylor routinely signed for distributions from this IRA account. (*See, e.g., id.*

¶¶ 173-75, Ex. 52-C, Ex. 52-D, Ex. 52-E.)

**April Thomas**

80.    April Thomas, a Minnesota resident, opened a consumer checking account

(x0544) and consumer savings account (x9472) with Wells Fargo on August 18, 2015.  In the

course of signing the Consumer Account Application for these accounts, Thomas certified the

following:  "I have received a copy of the applicable account agreement and privacy brochure

(each to be amended from time to time) and agree to be bound by their terms.  I also agree to the

terms of the dispute resolution program described in the foregoing agreements." (*Id.* ¶ 176, Ex.

53-A at 2, Ex. 1-M (July 2015 Consumer Account Agreement).)  Thomas further agreed that

"disputes will be decided before one or more neutral persons in an arbitration proceeding and not

by a jury trial or a trial before a judge." (*Id*. ¶ 176, Ex. 53-A at 2.)  Thomas actively used her

Wells Fargo accounts.  (*Id*. ¶ 177, Ex. 53-B.)

**<u>Doug Waters</u>**

81.     Doug Waters, a Utah resident, opened a First Security checking account (x5833)

on September 2, 1986.  (*Id*. ¶ 178, Ex. 54-A.)  As stated previously, on April 21, 2001 First

Security accounts in Utah were converted to Wells Fargo accounts.  On or about March 19,

2001, a package of materials related to the conversion of the x5833 account was mailed to

Waters.  (*Id*. ¶ 179.)   The enclosed welcome letter informed him that, as of April 21, 2001, his

First Security account would become a Wells Fargo account, and that after the conversion date,

if his account remained open, it would be governed by the terms of the Consumer Disclosure

brochure and Consumer Account Agreement provided in the conversion packet sent to him.

(*Id*., Ex. 54-B.)  Waters received the same First Security Conversion CAA as did Travis Ashby,

Mathew Bishop, and Marcia Cameron (*supra* ¶¶ 11-12, 18-19, 24-25), and thus received notice

of the same terms of the "Dispute Resolution Program: Arbitration Agreement." (Nelson Decl.

¶ 58, Ex. 1454-B at 30 (internal page 14).)

82.     After the conversion, on February 6, 2013, Waters signed an Authorization for

Automatic Transfer for the x5833 account to make regular transfers to a trust account.  (*Id.* ¶

180, Ex. 54-C.)

83.     Waters opened a Wells Fargo consumer savings account (x4772) on April 7,

2009.  In signing the application for the savings account (x4772), Waters acknowledged that he

has "received a copy of the applicable account agreement and privacy brochure and agre[ed] to

be bound by them."  (*Id*. ¶ 181, Ex. 54-D at 2; Ex. 1-F (November 2008 Consumer Account

Agreement).)  He further "agre[ed] to the terms of the dispute resolution program described in

the account agreement," including that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id.*)

**<u>Scott Westin</u>**

84.     Scott Westin, a Minnesota resident, opened a Norwest bank checking account (x8066) on January 12, 1995.  (*Id.* ¶ 182, Ex. 55-A.)  Norwest and Wells Fargo merged and Norwest accounts were gradually converted to Wells Fargo accounts; Northwest accounts in Minnesota were converted to Wells Fargo accounts on July 8, 2000.  (*Id.* ¶ 183.)  On or around June 2, 2000, a package of materials related to the conversion of the (x8066) account were mailed to Westin.  The enclosed welcome letter explained that as of July 8, 2000, Westin's Norwest account would become a Wells Fargo account.  (*Id.* ¶ 183, Ex. 55-B at 2.)  The welcome letter, which came attached to a conversion packet for new Wells Fargo customers, notified him that after the conversion date, his account would be governed by the terms of the Disclosures and the Consumer Account Agreement.  (*Id.*)

85.     Scott Westin and Lusila R. Westin jointly opened a Wells Fargo consumer checking account (x0793) on January 8, 2008.  (*Id.* ¶ 184, Ex. 55-C.)  In signing the Consumer Account Application for the x0793 account, Westin acknowledged that he has "received a copy of the applicable account agreement and privacy brochure and agre[ed] to be bound by them." (*Id.*, Ex. 55-C, Ex. 1-F.)  He further "agre[ed] to the terms of the dispute resolution program described in the account agreement."  (*Id.*, Ex. 55-C.)  Westin actively used the x8066 account and the x0793 account, including after he received the "Important Change in Terms Notice" with his December 2011 statements that concerned his Arbitration Agreement with Wells Fargo.  (*Id.* ¶¶ 185-87, Exs. 55-D, 55-E, 55-F.)

**Brandon Westman**

86.     Brandon Westman, a Minnesota resident, jointly opened a Wells Fargo consumer checking account (x8956) with Nancy Gleue on June 24, 2003.  In the course of signing the Consumer Account Application, Westman certified the following:  "I have received a copy of your  applicable account agreement and Use of Information brochure and agree to be bound by them.  I also agree to the terms of the dispute resolution program described in the account agreements."  (*Id*. ¶ 188, Ex. 56-A at 2, Ex. 1-A (April 2003 Consumer Account Agreement).).  Westman further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*. ¶ 188, Ex. 56-A at 2.)  Westman actively used the x8956 account.  (*Id*. ¶ 189, Ex. 56-B.)

**Kim Weston**

87.     Kim Weston, a Washington, DC, resident, opened a Wells Fargo consumer checking account (x3779) and a consumer savings account (x1854) on February 3, 2014.  (*Id*. ¶ 190, Ex. 57-A.)  On June 3, 2014, with a different banker, Weston opened a consumer savings account (x2391), and signed another Consumer Account Application.  (*Id*. ¶ 191, Ex. 57-B.)  In the course of signing both Consumer Account Applications, Weston certified that she had "received a copy of the applicable account agreement,  the privacy policy … (each may be amended from time to time) and agre[ed] to be bound by their terms."  (*Id*. ¶¶ 190-91, Ex. 57-A at 2, Ex. 57-B at 2.)  She further "agre[ed] to the terms of the dispute resolution program described in the foregoing agreements" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or before a judge." (*Id*. ¶190, Ex. 57-A at 2.)

88.     Weston actively used the x3779 and x2391 accounts.  (*Id.* ¶ 192, Ex. 57-C, Ex. 1-J (April 2013 Consumer Account Agreement).)

**<u>Sharon Williams</u>**

89.     Sharon Williams, a North Carolina resident, applied for a Wells Fargo Visa Credit Card on September 9, 2013, signing the application below bold letters in block type reading, "You acknowledge receipt of a copy of the credit card agreement" and "you acknowledge the existence of the Arbitration Agreement contained in the credit card agreement and you specifically agree to be bound by its terms." (*Id.* ¶ 193, Ex. 58-A.)  The Arbitration Agreement in the application states that Williams and Wells Fargo "agree that if a Dispute (as defined below) arises between you and the Bank, upon demand by either you or the Bank, the Dispute shall be resolved by the following arbitration process," where a "dispute" is "any unresolved disagreement between you and the Bank."  (*Id.*, Ex. 58-A at 2.)  A dispute includes "claims based on broken promises or contracts, torts, or other wrongful actions. It also includes statutory, common law and equitable claims. A Dispute also includes any disagreements about the meaning or application of this Arbitration Agreement."  (*Id.*)  In signing the application, Williams specifically "waiv[ed] the right to a jury trial or a trial before a judge in a public court" (*Id.*)  The Arbitration Agreement provided that an arbitration would be administered under AAA rules.  (*Id.*)

90.     The same day she applied for the card Williams made a purchase, and proceeded to carry a balance on the card and make regular monthly payments.  (*Id.* ¶ 194, Ex. 58-B.)

**<u>Jennifer Zeleny</u>**

91.     Jennifer K. Zeleny, a Utah resident, opened a Wells Fargo business checking account (x3533) on August 13, 2014 in the name of Jennifer K. Zeleny dba Jennifer K. Zeleny.

She signed the Business Account Application, and in doing so certified her "agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial."   (*Id*. ¶ 195, Ex. 59-A at 3, Ex. 2-C (April 2014 Business Account Agreement).)  On the same day, Zeleny signed an Authorization for Information form in connection with her business account (x3533).  (*Id*. ¶ 196, Ex. 59-B.)  After opening the account, Zeleny actively used the account for deposits and transfers.  (*Id*. ¶¶ 197-98, Ex. 59-C, Ex. 59-D.)

### *Consumer Account Agreements*

92.     Each time a Wells Fargo customer opens a new consumer account, he or she receives a Consumer Account Agreement ("CAA"), which provides the terms that govern the account.  (*Id*. ¶ 7.)  From time to time these CAAs are updated or amended, but as relevant to this motion their provisions relating to the arbitration of disputes has remained materially unchanged.

93.     Prominently featured in each of the CAAs is an arbitration provision entitled, "Dispute Resolution Program: Arbitration Agreement."  The binding arbitration agreement in each Consumer Account Agreement covers, as relevant here, the following topics: (1) the resolution of disputes by an arbitration process; (2) the definition of a dispute; (3) delegation of the question of arbitrability to an arbitrator; (4) waiver of the right to a jury trial or a trial before a judge; and (5) the application of the American Arbitration Association Rules ("AAA Rules") to any arbitration.

94.     The CAAs effectively and plainly state, in substantially similar language, that "you and the Bank agree that any dispute between or among you and the Bank, regardless of when it arose, shall be resolved by the following arbitration process."  (*See*, *e.g., id*. ¶¶ 9-12, Exs.

1-B, 1-C, 1-D, 1-E at 8; *see also* Exs. ¶¶ 13-15, 1-F, 1-G, 1-H at 4) (CAAs from Oct. 2004 to

Sep. 2010 with identical language).)  The versions of the CAA effective from October 2011

through October 2014 similarly state:  "[i]f you have a dispute with the Bank, and you are not

able to resolve the dispute informally, you and the Bank agree that upon demand by either you or

the Bank, the dispute will be resolved through the arbitration process as set forth in this part."

(*Id*. ¶¶ 16-19, Exs. 1-I, 1-J,1-K, 1-L at 4; *see also id*. ¶ 8, Ex. 1-A at 4 ("at the request of you or

the bank, disputes must be resolved by an arbitration proceeding before a neutral arbitrator"),

Exs. 1-M and 1-N at 3 ("[i]f your banker is unable to resolve your dispute, you agree that either

Wells Fargo or you can initiate arbitration as described in this section").)

95.    Each CAA also provides a broad definition of a "dispute" under the arbitration

clause.  For example, From October 2011 until October 2014, a "dispute" was defined in the

CAA as:

> [A]ny unresolved disagreement between you and the Bank. . . .   It includes claims based
> on broken promises or contracts, torts, injuries caused by negligent or intentional conduct
> or other wrongful actions. It also includes statutory, common law, and equitable claims."

(*Id*. ¶¶ 16-19, Exs. 1-I, 1-J, 1-K, and 1-L at 4; *id*. ¶¶ 8-12, Exs. 1-A, 1-B, 1-C, 1-D, 1-E at 6; *id*.

¶¶ 13-15, Exs. 1-F, 1-G, 1-H at 4 (nearly identical language); *see also id*. ¶¶ 20-21, Exs. 1-M and

1-N at 3 (a "dispute is any unresolved disagreement between Wells Fargo and you.").)

96.    In every CAA, the definition of a "dispute" subject to arbitration also

encompasses "disagreements about the meaning of this Arbitration Agreement, and whether a

disagreement is a 'dispute' subject to binding arbitration."   (*Id*. ¶¶ 8-12, Exs. 1-A, 1-B, 1-C, 1-

D, 1-E at 6; *cf. id*. ¶¶ 13-15, Exs. 1-F, 1-G, 1-H at 4) ("dispute also includes any disagreement

about the meaning of this Arbitration Agreement, and whether a disagreement is a 'dispute'

subject to binding arbitration as provided for in this Arbitration Agreement."); *id*. ¶¶ 16-19, Exs.

1-I, 1-J, 1-K, 1-L at 4 (a "dispute includes disagreements about the meaning, application or

enforceability of this arbitration agreement."); *see also id. ¶¶* 20-21, Exs. 1-M and 1-N at 3) ("a dispute may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement").)

97.     Each CAA  states that Wells Fargo and the customer "agree that [they] are each waiving the right to a jury or a trial before a judge in a public court."  (*Id.* ¶¶ 8-12; Exs. 1-A, 1-B, 1-C, 1-D, 1-E at 6; *id.* ¶¶ 13-19, Exs. 1-F, 1-G, 1-H, 1-I, 1-J, 1-K, 1-L at 4; *see id.* ¶¶ 20-21, Exs. 1-M and 1-N at 3 ("Wells Fargo and you each agrees to waive the right to a jury trial or a trial in front of a judge in a public court").)

98.     Lastly, each and every CAA specifies that the arbitration "shall be administered by the American Arbitration Association (AAA)" in accordance with the "Commercial Arbitration Rules" known as the AAA rules.  (*See, e.g., id.* ¶¶ 9-19, Exs. 1-B, 1-C, 1-D, 1-E at 9; Exs. 1-F, 1-G, 1-H at 5; Exs. 1-I, 1-J, 1-K, 1-L at 4; *id.* ¶ 8, Ex. 1-A at 6 ("[e]ach arbitration, including the selection of the arbitrator(s) shall be administered by the American Arbitration Association (AAA)");  *id.* ¶¶ 20-21, Exs. 1-M and 1-N at 3 ("[t]he American Arbitration Association (AAA) will administer each arbitration and the selection of arbitrators according to the Commercial Arbitration Rules and the Supplemental Procedures for Consumer Related Disputes (AAA Rules)").)

### *Business Account Agreements*

99.     Each time a Wells Fargo customer opens a new business account, he or she receives a Business Account Agreement ("BAA"), which provides the terms that govern the account.  (*Id.* ¶ 22.)  From time to time these BAAs are also updated or amended, but the BAAs relevant to this motion contain nearly identical arbitration clauses.

100.     Each of the BAAs contain an arbitration provision entitled, "Dispute Resolution Program; Arbitration Agreement" which states:

> [Y]ou and the Bank agree, at your or the Bank's request, to submit to binding arbitration all claims, disputes, and controversies between or among you and the Bank (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract, or otherwise arising out of or relating in any way to your Account(s) and/or Service(s), and their negotiation, execution, administration, modification, substitution, formation, inducement, enforcement, default, or termination.

(*Id.* ¶¶ 23-25, Ex. 2-A at 2, Exs. 2-B & 2-C at 4.)  Furthermore, each BAA provides "Governing rules" stating that "[a]ny arbitration proceeding will:  [p]roceed in a location selected by the American Arbitration Association ("AAA");" "[b]e governed by the Federal Arbitration Act;" and "[b]e conducted by the AAA…in accordance with the AAA's commercial dispute resolution procedures," or, if the claim exceeds a certain limit, the AAA's optional procedures.  (*Id.* ¶¶ 23-25, Ex. 2-A at 2-3, Exs. 2-B and 2-C at 4.)

101.     Each of the BAAs also specifically assigns the responsibility for determining whether a dispute is subject to arbitration to the arbitrator—under the heading "Arbitrator qualifications and powers," the agreements state that "[t]he arbitrator(s) will determine whether or not an issue is arbitrable."  (*Id.* ¶¶ 23-25, Ex. 2-A at 3, Exs. 2-B & 2-C at 5.)

<u>**ARGUMENT**</u>

**I.    <u>Plaintiffs Agreed to Arbitration With Wells Fargo.</u>**

The FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on

issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v.

Byrd*, 470 U.S. 213, 218 (1985).  The threshold question for the court to decide is whether the

parties entered into an agreement to arbitrate.  *See AT&T Techs., Inc. v. Commc'ns Workers of

Am.*, 475 U.S. 643, 649 (1986).  To determine whether the parties agreed to arbitrate, courts

"should apply ordinary state-law principles that govern the formation of contracts." *First Options

of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  The Consumer Account Agreements and

Business Account Agreements each contain a contractual choice-of-law provision stating in

materially similar language:  "Your account is governed by the laws and regulations of the

United States and, to the extent applicable, the laws of the state in which the office of the Bank

that maintains your account is located . . . without regard to conflicts of laws principles."

(Nelson Decl., Exs. 1-G, 1-H, 1-I at 40, Ex. 1-J at 38, Ex. 1-A at 8 (Consumer Account

Agreements); Exs. 2-A at 2-3, Exs. 2-B and 2-C at 33 (Business Account Agreements) ("The

laws governing your Account include the laws and regulations of the United States and, to the

extent applicable, the laws of the state in which the office of the Bank that maintains your

Account is located . . . without regard to conflicts of laws principles.").)[4]  Plaintiffs' accounts

---

[4] The framework for a motion to compel arbitration in this Circuit is "similar to summary
judgment practice":  Wells Fargo bears the initial burden to present evidence sufficient to
demonstrate the existence of an arbitration agreement, and Plaintiffs may "attempt to rebut that
showing with evidence establishing a genuine dispute as to whether the provisions apply."
*Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012); *Bellman v.
i3Carbon, LLC*, 563 Fed. App'x 608, 612 (10th Cir. 2014) (unpublished); *Leslie v. Heath*, 2016
WL 3033715, at *2 (D. Utah May 26, 2016) (unpublished); *see also Getzelman v. Trustwave*

were opened and maintained in offices across the country, with concentrations in Utah and California, but the result is the same in every jurisdiction: Plaintiffs agreed to arbitration with Wells Fargo.

Plaintiffs themselves concede that "they entered into valid and enforceable agreements with Defendants whereby Defendants promised to provide goods or services to Plaintiffs and Class Members, and Plaintiffs and Class Members agreed to pay for those goods or services, including payment made with debit or credit cards."  (SAC ¶ 137.)  Indeed, Plaintiffs assert a claim for breach of contract based on these enforceable agreements, alleging that "a meeting of the minds occurred," and that "Wells Fargo breached the contracts by failing to implement sufficient security measures to protect Plaintiffs' and the Class Members' private and confidential information."  (*Id.* ¶¶ 143, 146.)  Thus, Plaintiffs cannot now be heard to deny that there is an enforceable agreement between the parties as a means to escape arbitration.  "In short, the plaintiffs cannot have it both ways. They cannot rely on the contract, when it works to their advantage, and repudiate it when it works to their disadvantage."  *Island Peak Ranch, L.L.C. v. FIIK Inv. & Holdings, Inc.*, 2008 WL 2673925, at *12 (D. Utah July 7, 2008) (unpublished) (holding that banking customers were judicially estopped from avoiding arbitration provision in Wells Fargo deposit agreement where complaint alleged plaintiffs' performance of the deposit agreement) (quoting *Upstate Shredding, LLC v. Carloss Well Supply Co.*, 84 F. Supp. 2d 357,

---

*Holdings, Inc.*, 2014 WL 3809736, at *1 (D. Colo. Aug. 1, 2014) (unpublished) (analyzing motion to compel arbitration under Rule 12(b)(1), under which moving party may "go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests") (citation and internal quotation marks omitted); *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) (on a Rule 12(b)(1) motion a court has "wide discretion" to allow affidavits and other documentary evidence, and "a court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion.")

363 (N.D.N.Y. 2000)).  Factual admissions contained in a complaint constitute binding judicial admissions, and judicial estopped prevents parties from advancing inconsistent positions to avoid arbitration.  *See, e.g., Hughes Masonry Co. v. Greater Clark Cty. Sch. Bldg. Corp.,* 659 F.2d 836, 838–39 (7th Cir. 1981) ( "[W]e believe it would be manifestly inequitable to permit [plaintiff] to both claim that [defendant] is liable . . . for its failure to perform the contractual duties described in the [parties'] agreement and at the same time deny that [defendant] is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause."); *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006) (holding plaintiff estopped from arguing that it was not a party to the arbitration clause or that its claims fell within the scope of the arbitration clause); *Upstate Shredding,* 84 F. Supp. 2d at 364 (listing "courts [that] have similarly estopped parties from maintaining such inconsistent positions to avoid arbitration").

Plaintiffs imply that they did not read the contracts which they concede are enforceable and seek to enforce in this action, alleging that Wells Fargo "'hid[]' arbitration clauses deep within the boilerplate documents" governing their banking relationship.  (SAC ¶ 51.)  As a factual matter, this is plainly incorrect—the agreement to arbitrate was specifically called out in the account applications Plaintiffs signed, directly above the signature line, and the Consumer Account Agreements and Business Account Agreements included the section on Wells Fargo's dispute resolution program within the first 10 pages of the document, as the first substantive section.  For credit card applications, the full text of the arbitration agreement is provided on the application itself, on the first page following the plaintiffs' signatures which manifested their assent to be bound by the agreement. But even assuming that Plaintiffs did not read the contracts

which they rely upon as the basis for their breach of contract claim, this is legally irrelevant to the outcome of Wells Fargo's motion to compel arbitration: A person who signs a contract is bound by its provisions, whether or not he reads them.  "A party may not sign a contract and thereafter assert ignorance or failure to read the contract as a defense.  This rule is based upon the panoply of contract law upholding the principle that a party is bound by the contract which he or she voluntarily and knowingly signs." *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1207-08 (Utah 1987) (reversing the trial court's determination that there was no "meeting of the minds" as a result of party's failure to read the contract terms); *see also Urbanic v. Travelers Ins. Co.*, 2011 WL 1743412, at *8 (D. Colo. May 6, 2011) (unpublished) ("I am similarly unpersuaded by Plaintiff's contention that he never read the Arbitration Agreement. It is well settled that one who signs a contract without reading it is barred from claiming he or she is not bound by its terms."); *Randas v. YMCA of Metropolitan Los Angeles,* 17 Cal. App. 4th 158, 163 (1993) (person who signs a contract "is deemed to assent to all its terms, and cannot escape liability on the ground that he has not read it.").  Additionally, "[n]o law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract, particularly where, as here, the language of the contract expressly and plainly provides for the arbitration of disputes arising out of the contractual relationship." *Brookwood v. Bank of Am.*, 45 Cal. App. 4th 1667, 1674 (1996) (citation and internal quotation marks omitted); *see also John Call*, 743 P.2d at 1208 ("each party has the burden to read and understand the terms of a contract before he or she affixes his or her signature to it").  The rule is the same in all relevant

jurisdictions—Plaintiffs are bound by the arbitration provision regardless of whether they read the agreement.[5]

A person may also assent to a contract through action or inaction. "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting."  Cal. Civ. Code § 1589.  Plaintiffs here "seek to accept the benefits of the contract, but avoid the full force of its obligations. This they cannot do."  *Lawson v. Woodmen of the World*, 53 P.2d 432, 435 (Utah 1936). "When one having the right to accept or reject a transaction takes and retains the benefits thereunder, he becomes bound by the transaction, and cannot avoid its obligation or effect by taking a position inconsistent therewith."  *Id.* (citation and internal quotation marks

---

[5] *See Walther v. Sovereign Bank*, 386 Md. 412, 429–30 (Md. 2005) ("[O]ne of the most commonsensical principles in all of contract law [is] that a party that voluntarily signs a contract agrees to be bound by the terms of that contract."); *Wright v. Safari Club Int'l, Inc.*, 322 Ga. App. 486, 493 (Ga. Ct. App. 2013) ("[P]arties to a contract are presumed to have read their provisions and to have understood the contents. One who can read, must read, for he is bound by his contracts."); *Locklear Dodge City, Inc. v. Kimbrell*, 703 So. 2d 303, 306 (Ala. 1997) ("[T]his Court has held that a person who signs a contract is on notice of the terms therein and is bound thereby even if he or she fails to read the document."); *Campanelli v. Conservas Altamira, S.A.*, 86 Nev. 838, 841 (Nev. 1970) ("Parties to a written arbitration agreement are bound by its conditions regardless of their subjective beliefs at the time the agreement was executed."); *Sovereign Camp, W. O. W. v. Daniel*, 48 Ariz. 479, 487 (Ariz. 1936); *Diocese of Bismarck Tr. v. Ramada, Inc.*, 553 N.W.2d 760, 769 (N.D. 1996); *Irwin Rogers Ins. Agency, Inc. v. Murphy*, 122 Idaho 270, 273, 833 P.2d 128, 131 (Idaho Ct. App. 1992); *GECMC 2006-C1 Carrington Oaks, LLC v. Weiss*, 757 S.E.2d 677, 679 (N.C. Ct. App. 2014); *Maines Paper & Food Serv. Inc. v. Adel*, 256 A.D.2d 760, 761–62 (N.Y. App. Div. 1998)  *Gras v. Assocs. First Capital Corp.*, 786 A.2d 886, 894 (N.J. Super. Ct. App. Div. 2001); *Gartner v. Eikill*, 319 N.W.2d 397, 398 (Minn. 1982); *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 138 n.5 (Colo. 1998); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Benton*, 467 So. 2d 311, 312 (Fla. Dist. Ct. App. 1985); *In re McKinney*, 167 S.W.3d 833, 835 (Tex. 2005); *Nat'l City Bank of Marion v. Bader*, 1986 WL 3482, at *2 (Ohio Ct. App. Mar. 12, 1986) (unpublished); *Sherman v. Lunsford*, 44 Wash. App. 858, 861 (Wash. Ct. App. 1986).

omitted).  This is, once more, a basic tenet of contract law.[6]  Applying foundational contract

principles, therefore, "the parties to an arbitration agreement may demonstrate their assent to be

bound by the agreement by acting upon or accepting benefits under the contract containing the

arbitration agreement."  *Athon v. Direct Merchs. Bank*, 2007 WL 1100477, at *4 (M.D. Ga. Apr.

11, 2007) (unpublished).

        Plaintiffs accepted the benefits of their Wells Fargo accounts by using them—depositing

and withdrawing funds, writing checks, using credit lines and paying them down—and thus are

bound by the agreement governing Wells Fargo's products and services.  *See Hill v. Gateway*

*2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997) (consumer who receives arbitration agreement in

the mail bound by terms if he does not return the computer); *Bischoff v. DirecTV, Inc.*, 180 F.

---

[6] *See B.J. Kadrmas, Inc. v. Oxbow Energy, LLC*, 727 N.W.2d 270, 274 (N.D. 2007) ("A
voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the
obligations arising from it so far as the facts are known or ought to be known to the person
accepting." (citing N.D.C.C. § 9-03-25)); *Krutchik v. Chase Bank USA, N.A.*, 531 F. Supp. 2d
1359, 1365 (S.D. Fla. 2008) (continued use of credit card constitutes "a legal acceptance of the
terms contained within the Cardholder Agreement, including the arbitration provision"); *Ellin v.
Credit One Bank*, 2015 WL 7069660, at *3 (D.N.J. Nov. 13, 2015) (unpublished) ("New Jersey
case law indicates that the cardholder's use of the credit card alone is sufficient in proving that
a valid contract compelling arbitration exists between the parties"); *Excess Underwriters at
Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 74 (Tex. 2008)
("A contracting party cannot accept the benefits of a contract and disclaim its obligations.");
*Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 992 (Cal. Ct. App. 1972)
("an offeree, knowing that an offer has been made to him but not knowing all of its terms, may
be held to have accepted, by his conduct, whatever terms the offer contains."); *Lyles v. Pioneer
Hous. Sys., Inc.*, 858 So. 2d 226, 229 (Ala. 2003) ("[A]ssent to a contract may be manifested
when a plaintiff accepts the benefits of a contract."); *Sonneman v. Blue Cross & Blue Shield of
Minn.*, 403 N.W.2d 701, 704 (Minn. Ct. App. 1987); *Terrible v. Terrible*, 91 Nev. 279, 283–84
(Nev. 1975); *Huisenga v. Dairymen's League Co-Operative Ass'n*, 16 N.Y.S.2d 137, 138 (N.Y.
App. Div. 1939); *New Hermes, Inc. v. Adams*, 125 Wash. App. 1021, at *4 (Wash. Ct. App.
2005); *Cochran v. Norkunas*, 398 Md. 1, 23–24 (Md. 2007); *Johnson v. George*, 119 Colo. 594,
597–98 (Colo. 1949); *Texas Co. v. Andres*, 97 F. Supp. 454, 456 (D. Idaho 1951); *Nilavar v.
Osborn*, 127 Ohio App. 3d 1, 12 (Ohio Ct. App. 1998), *modified on reconsideration* (May 12,
1998); *Burden Pallet Co. v. Ryder Truck Rental*, 49 N.C. App. 286, 289 (N.C. Ct. App. 1980);
*Carroll v. Lee*, 148 Ariz. 10, 12–13 (Ariz. 1986).

Supp. 2d 1097, 1105 (C.D. Cal. 2002) (satellite television contract was binding where customer used service after receiving contract in the mail); *Honig v. Comcast of Ga. I, LLC*, 537 F. Supp. 2d 1277, 1283–84 (N.D. Ga. 2008) (plaintiffs agreed to the terms of the customer agreement, including arbitration of disputes, by using cable services); *cf. Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593 (1991) (cruise ship passenger bound by forum selection clause in form contract printed on back of ticket).  In fact, "[w]hether or not [Plaintiffs] received a copy of the [account] agreement, [they] could not accept services [they] knew were being tendered on the basis of a[n] agreement without becoming bound by that agreement."  *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007) (unpublished) (citing Restatement (Second) of Contracts § 23 (1981) ("[W]here an offer is contained in a writing [a party] may, without reading the writing, manifest assent to it and bind himself without knowing its terms . . . .  [A]n offeror or offeree who should be aware of [the terms of a writing] may be bound in accordance with them if he manifests assent.")).

For Plaintiffs who first opened their accounts with a different bank that was later acquired by Wells Fargo, their continued use of the accounts after they were converted to Wells Fargo accounts likewise manifested their assent to the terms of the agreement.  Each of these individuals was sent a conversion packet containing a welcome letter and a copy of the Wells Fargo Consumer Account Agreement that would govern their account following the conversion to a Wells Fargo account.  The welcome letter expressly informed the customer that, if their account remained open after the conversion date, it would be converted into a Wells Fargo account and governed by the terms of the agreement provided in the conversion packet.  If these

Plaintiffs did not wish to be bound by the terms of the Wells Fargo agreement, including the arbitration provision, they could have closed their accounts.

The district court opinion in *Ackerberg v. Citicorp USA, Inc.*, 898 F. Supp. 2d 1172 (N.D. Cal. 2012), is on point.  In *Ackerberg,* the plaintiff had been a long-standing Sears credit card holder; neither party possessed the original account agreement at the time of the motion to compel arbitration but both agreed it did not contain an arbitration provision.  *Id.* at 1173-74. Sears ultimately assigned the plaintiff's account to Citibank, which over a number of years sent the plaintiff various amended account agreements that included arbitration clauses.  *Id.* at 1174. Each amendment gave account holders a period of time to close their accounts if they did not wish to be bound by the new terms.  *Id.*  The plaintiff did not close her account, but continued to use it, and the court found that she was bound by the amendment.  *Id.* at 1176.  The same result is compelled here.

**II.**     **The Disputes Are Arbitrable, But the Court Should Not Reach that Question.**

     **A.**     **Interpretation of the Arbitration Agreement Has Been Clearly and Unmistakably Assigned to the Arbitrator.**

The "arbitrability" question—*i.e.*, whether a particular dispute is subject to an agreement to arbitrate—may be decided by either the court or the arbitrator, depending on the parties' agreement.  *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).  If the agreement "clearly and unmistakably" provides that the arbitrator should decide questions of arbitrability, then the court must honor that agreement.  *AT&T Techs.,* 475 U.S. at 649.

The Consumer and Business Account Agreements, the Online Access Agreements, as well as the credit card agreements here clearly and unmistakably assign those questions to the arbitrator.  The Consumer Account Agreements and credit card agreements provide that

"disputes" will be arbitrated and states that disputes "include disagreements about the meaning, application or enforceability of this arbitration agreement." (Nelson Decl. ¶¶ 16-21, Exs. 1-I through 1-L at 4; *id.* ¶ 62, Ex. 16-A ("A Dispute also includes any disagreements about the meaning or application of this Arbitration Agreement.").) The agreements also make clear that "[t]he arbitrator shall decide any dispute regarding the enforceability of this arbitration agreement." (*Id.*) This language is tantamount to "clear and unmistakable evidence" of the parties' intent to arbitrate the question of arbitrability. *See Momot v. Mastro,* 652 F.3d 982, 987-98 (9th Cir. 2011) (language delegating to the arbitrator the authority to determine "the validity or application of any of the provisions" of the arbitration clause was clear and unmistakable) (citation and internal quotation marks omitted); *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199-1200 (2d Cir. 1996) (holding that a provision requiring arbitration of "any and all controversies" concerning "the construction" of the agreement indicates the parties' intent to arbitrate the question of arbitrability). The language used for business accounts in the Business Account Agreements, Online Account Agreements, and credit card agreements is equally clear, if more succinct: "The arbitrator(s) will determine whether or not an issue is arbitrable." (Nelson Decl., ¶¶ 23-25, Ex. 2-A at 3, Exs. 2-B and 2-C at 5; *id.* ¶ 65, Ex. 17-B (disputes subject to arbitration include "interpretation of this Agreement (including the meaning of this arbitration agreement and whether a disagreement is a 'dispute' subject to binding arbitration as provided for in this arbitration agreement.)").

Even without these provisions, however, the issue of arbitrability would still be one for the arbitrator because the agreements incorporate the *AAA Commercial Arbitration Rules,* Rule 7(a) of which provides that the arbitrator shall decide the validity of the arbitration agreement

and the arbitrability of any claim.  (Nelson Decl., ¶¶8-21, Ex. 1-A at 6-7, Exs. 1-B, 1-C, 1-D, 1-E at 9, Exs. 1-F, 1-G, 1-H at 5, Exs. 1-I, 1-J, 1-K, 1-L at 4, Exs. 1-M and 1-N at 3,, ¶¶23-25, Ex. 2-A at 2-3, Exs. 2-B and 2-C at 3.)   As numerous courts in the Tenth Circuit, and other circuits, have held, "by incorporating the AAA Rules and agreeing to be bound by these rules, the parties 'clearly and unmistakably' evidenced their intent to arbitrate all matters, including the question of arbitrability."  *Getzelman v. Trustwave Holdings, Inc.*, 2014 WL 3809736, at \*3 (D. Colo. Aug. 1, 2014) (unpublished); *Chen v. Dillard's Inc.*, 2012 WL 4127958, at \*2 n.1 (D. Kan. Sept. 19, 2012) (unpublished) ("incorporation of these [AAA] rules is additional clear and unmistakable evidence that the parties intended for the arbitrator to decide threshold issues of arbitrability"); *Pikes Peak Nephrology Assocs., P.C. v. Total Renal Care, Inc.*, 2010 WL 1348326, at \*6 (D. Colo. Mar. 30, 2010) (unpublished); *cf. P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 867 (10th Cir. 1999) ("A party who consents by contract to arbitration before the AAA also consents to be bound by the procedural rules of the AAA, unless that party indicates otherwise in the contract.").  Because the AAA rules give the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement," the parties' incorporation of those rules "serves as clear and unmistakable evidence of the parties' intent" to delegate the determination of arbitrability to an arbitrator. *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (citation and internal quotation marks omitted); *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir.2005) (same); *Fallo v. High–Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009) (same).

In the context of a class action brought by Wells Fargo customers who allegedly had unauthorized accounts opened in their names, Judge Chhabria in the Northern District considered identical  or nearly identical language from some of the very same account agreements.  *See Jabbari v. Wells Fargo & Co.*, Case No. 3:15-cv-02159-VC, Dkt. No. 69 at 1 (N.D. Cal. Sept. 23, 2015) (unpublished) (order granting Wells Fargo's motions to compel arbitration of named plaintiffs' claims, attached hereto as Exhibit A).  Judge Chhabria held that "[t]hese provisions clearly assign arbitrability determinations to the arbitrator," and the agreements did not "contain other language that would create doubt about whether the parties intended to delegate the arbitrability determination."  *Id.*

The Court should therefore compel arbitration, leaving for the arbitrator to decide (to the extent the matter is disputed) whether Plaintiffs' claims are within the scope of the agreement to arbitrate.

   **B.    If the Court Were To Reach the Question of Arbitrability, Plaintiffs' Claims Should Be Arbitrated.**

If the Court were to reach the question whether Plaintiff's claims fall within the arbitration agreement, the answer would be that they do.

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Techs.*, 475 U.S. at 650 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).  And where the arbitration clause is sufficiently broad, as is the case here, there is a heightened presumption of arbitrability such that "[i]n the absence of any express provision excluding a particular grievance from

arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id.*

That principle plainly applies here. The Consumer Account Agreements state that "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process as set forth in this part." (Nelson Decl. ¶¶ 16-19, Exs. 1-I, 1-J, 1-K, and 1-L at 4; *cf. id.* ¶¶ 8-12, Exs. 1-A, 1-B, 1-C, 1-D and 1-E at 8; *id.* ¶¶ 13-15, Exs. 1-F, 1-G, and 1-H at 4 (nearly identical language); *see also id.* ¶¶ 20-21, Exs. 1-M and 1-N at 3.) The agreements then define "dispute" as broadly as possible to include any disagreement between the customer and the bank: "A 'dispute' is any unresolved disagreement between you and the Bank." (*See, e.g., id.* ¶ 8, Ex. 1-A at 6.) The agreements provide examples of things that would come within that expansive scope: "It includes any disagreement relating in any way to services, accounts or matters; to your use of any of the Bank's banking locations or facilities; or to any means you may use to access your account(s). It includes claims based on broken promises or contracts, torts, or other wrongful actions. It also includes statutory, common law, and equitable claims." (*See, e.g., id.* ¶ 16, Ex. 1-I at 4.) Similarly, under the Business Account Agreements the parties agreed to arbitrate "all claims, disputes, and controversies between or among you and the Bank (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise arising out of or relating in any way to your account(s) and/or service(s), and their negotiation, execution, administration, modification, substitution, formation, inducement, enforcement, default, or termination." (*Id.* ¶ 24 Ex. 2-B at 4.)

Plaintiffs' claims, which are indisputably an unresolved disagreement between them and the Bank, fall well within any plausible interpretation of these provisions. Their claims constitute an "unresolved disagreement" with the Bank, and they are inescapably tied to the accounts which Plaintiffs admit to opening.  In support of their claim for conversion, Plaintiffs allege that they "and members of the Class entered into banking agreements with Wells Fargo whereby they deposited funds with Defendant" (SAC ¶ 199), and that Wells Fargo converted those funds by "requir[ing Plaintiffs] to pay Wells Fargo excessive fees, fines, collection costs, [and] had their person information was misued [*sic*] by Wells Fargo."  (*Id.* ¶ 206.)  Plaintiffs' claim for invasion of privacy is premised on their "reasonable expectation of privacy in the private information Defendants Wells Fargo obtained from them in opening accounts," (*id.* ¶ 115), the alleged violation of the Stored Communications Act and the Gramm-Leach-Bliley Act is based on a failure "to safeguard sensitive private financial information" Wells Fargo obtained in connection with Plaintiffs' authorized accounts (*id.* ¶ 107; *id.* ¶ 112), and the remainder of Plaintiffs' claims likewise are premised on either an alleged misuse of Plaintiffs' information which was provided to Wells Fargo in connection with authorized accounts, or the misappropriation of funds deposited within those accounts.  In short, the Second Amended Complaint is filled with alleged wrongs directly involving Plaintiffs authorized accounts.

Moreover, the thrust of each of Plaintiffs' claims is echoed by their breach of contract claim:  "Plaintiffs alleged that Wells Fargo breached the contracts by failing to implement sufficient security measures to protect Plaintiffs' and the Class Members' private and confidential information, as described herein, as well as actively 'mining' customers private information to use as Wells Fargo saw fit in order to maximize its own profit."  (SAC ¶ 146.) For

13

the same reason Plaintiffs are judicially estopped from denying the enforceability of their agreements, they are estopped from contending that their claims do not fall within the scope of the arbitration provision within those agreements.  *See Long*, 453 F.3d at 627–28  ("To be equitably estopped from denying the applicability of an arbitration clause, . . . the signatory need not necessarily assert a cause of action against the nonsignatory for breach of the contract containing the arbitration clause. Instead, estoppel is appropriate if 'in substance [the signatory's underlying] complaint [is] based on the [nonsignatory's] alleged breach of the obligations and duties assigned to it in the agreement,' 'regardless of the legal label assigned to the claim.'" (Internal citations omitted)).

Plaintiffs can hardly claim surprise that unauthorized activity is covered when their Consumer and Business Account Agreements explicitly contemplate disputes related to such activity.  Both agreements have a section applying to "unauthorized transactions," which include "a missing signature, an unauthorized signature . . . or otherwise a transaction that was not authorized by you."  (Nelson Decl. ¶¶ 13-19, Exs. 1-F,1-G, 1-H, 1-I, 1-J, 1-K, 1-L at 3; *id.* ¶¶ 23-25, Exs. 2-B, 2-C at 3; *see also id.* ¶ 8 Ex. 1-A at 32; *id.* ¶¶ 9-12, Exs. 1-B, 1-C, 1-D, 1-E at 14; *id.* ¶¶ 20-21, Exs. 1-M, 1-N at 6; *id.* ¶¶ 23-25, Ex. 2-A at 4-5, Exs. 2-B and 2-C at 7-8 (setting forth customer obligations to review account statements and notify the bank of any unauthorized activity); Exs. 1-B, 1-C, 1-D, 1-E at 13-15, Ex. 1-F at 11, Exs. 1-G, 1-H, 1-I at 12, Ex. 1-J at 10, Exs. 1-K and 1-L at 9, Ex. 2-A at 6-7, Exs. 2-B, 2-C at 10-11 (listing "Fraud Prevention" guidelines); Ex. 1-B at 42-43, Ex. 1-C at 46, Ex. 1-D at 48, Ex. 1-E at 47, Ex. 1-F at 47, Ex. 1-G at 51, Ex. 1-H, 1-I at 51, 1-J at 51, Ex. 1-K at 39, Ex. 1-L, at 40-41, Exs. 2-B, 2-C at 42 (listing advice for ATM card and debit card loss prevention, including a recommendation to regularly

review Account statements to verify transactions and contact Wells Fargo immediately if there

are any discrepancies); Ex. 1-B at 50-51, Ex. 1-C at 54, Ex. 1-D at 56, Exs. 1-E, 1-F at 55, Ex. 1-

G at 64-66, Exs. 1-H, 1-I at 60,  1-J at 60, Ex. 1-K at 46, Ex. 1-L at 47, Ex. 1-M at 42, Ex. 2-A at

39, Ex. 2-B at 50-51, Ex. 2-C at 52 (discussing unauthorized fund transfers and unauthorized

card transactions)).

**III.**    **The Court Should Stay This Action Pending Limited Discovery by Wells Fargo for the Purpose of Enforcing Its Arbitration Rights.**

Just as a plaintiff may not "use artful pleading to avoid arbitration," *Chelsea Family*

*Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1198 (10th Cir. 2009) (citation

omitted),  and principles of estoppel prevent a plaintiff from contradicting binding judicial

admissions to avoid arbitration, *Island Peak Ranch,* 2008 WL 2673925, at *12 (unpublished),

Plaintiffs here should not be permitted to escape arbitration simply by refusing to provide

sufficient information to allow Wells Fargo to confirm their identity and locate their relevant

account records at the outset of the case.  Wells Fargo presently moves to compel arbitration of

58 named plaintiffs' claims, but intends to—and reserves its right to—compel arbitration of the

remaining 22 named plaintiffs once it has obtained the necessary information to identify the

relevant arbitration agreements between Wells Fargo and each individual plaintiff.  Wells Fargo

requests that, in ruling on its present Motion to Compel Arbitration, this Court also permit Wells

Fargo to serve limited discovery on Plaintiffs before the occurrence of the Rule 26 status

conference for the purpose of confirming the identity of the remaining 22 named plaintiffs and

identifying the relevant arbitration agreements to enable Wells Fargo to move to compel

arbitration of these plaintiffs as well.  In its concurrently filed Motion to Stay, Wells Fargo

further requests that this Court stay further litigation on the merits in this case—including by

refraining from ruling on Wells Fargo's concurrently filed Rule 12(b)(6) Motion to Dismiss Plaintiffs' Second Amended Complaint—until Wells Fargo has had the opportunity to present, and the Court has had an opportunity to rule upon, a motion to compel arbitration of the remaining 22 named plaintiffs.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Wells Fargo respectfully requests that this Court order 58 of the 80 named plaintiffs to bring their claims in arbitration, dismissing their claims in this lawsuit, granting Wells Fargo leave to serve limited discovery in advance of the Rule 26 status conference, and staying litigation of the merits of the case as to the remaining 22 named plaintiffs pending the completion of this limited discovery to enable Wells Fargo to bring a motion to compel arbitration as to these individuals.

DATED this 23rd day of November, 2016.

MUNGER, TOLLES & OLSON LLP


*/s/ Erin J. Cox*
Erin J. Cox
David H. Fry
Eric P. Tuttle

RAY QUINNEY & NEBEKER P.C.
James S. Jardine
Elaina M. Maragakis
Michael D. Mayfield

*Attorneys for Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co.*

16

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 23rd day of November, 2016, a true and correct copy of the

foregoing **MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO COMPEL**

**ARBITRATION PURSUANT TO FAA §§ 3-4** was filed using CM/ECF which sent

notification of the filing to the following:

> Zane L. Christensen
> Steven A. Christensen
> CHRISTENSEN YOUNG & ASSOCIATES, PLLC
> 9980 South 300 West, #200
> Sandy, UT 84070

> */s/ Angelica Torres* .
> Angelica Torres