Zane L. Christensen (USB 14614)
Steven A. Christensen (USB 5190)
Christensen Young & Associates, PLLC
9980 South 300 West #200
Sandy, UT  84070
Telephone: (801) 676-6447
Facsimile: (888) 569-2786

| IN THE UNITED STATES DISTRICT COURT DISTRICT OF UTAH, CENTRAL DIVISION | |
|---|---|
| Lawrence J. Mitchell, Kay Mitchell, Matthew C. Bishop, Tracy Kilgore, Jennifer K. Zeleny, Joseph W. Steele V, Scott Westin, Bruce Bird, Nathan Ornellas, Anu Sood, Brent Miller, Nicholas Beach, Alex Inskeep, Loretta Grady, Richard Fountain, Matthew Gragg, Akoya Lawani, Sharon Williams,  Ken Gregory, David Self, Edward Dowdy, April Thomas, Don Black, Reza Kamali, Carina Rhea, Shanell Golden, Kim Weston, Adam Brandt, Jacci Brandt, Jennifer King, Ralph McCoy, Aaron Hands, Ayana Smith, Lisa Stern, Mbegane Diouf, Doug Waters, Paul Fos, Patricia Burkhalter, Blake Knight, Cameron Casey, Jeffery Taylor, Robert Moyer, Marcia Cameron, Gloria Pledger, Charles Jones, Aaron Brodie, Dominique Evans, Richard Farr, Kevin Saliva, Harold Beard, Travis Ashby, Andrew Gorayeb, Scott Mugrage, Edwin Zorilla, Curtis Dowdle, Edward Klann, Steven Stetzel, Glenn Gilleshammer, Wenoka Thompson, Maryann Aldous, Jennifer Porter, Robin Quigg, Tamar Hodges, Barbara Shadoan, Austin Law, Jennifer Ellsworth, Michelle Sterling, Denise Poe, Jamal Dean, Brandon Westman, Concepcion Powell, Adrian Thompson, Eric Talaska, Zachary Christensen, Erica Jones, Stephen Hope *et al* and unknown Plaintiffs 1-1,000,000  Plaintiffs  v.  Wells Fargo Bank, National Association, a National Banking Association, and Wells | THIRD    AMENDED    CLASS    ACTION COMPLAINT FOR  1. Violation of Utah Protection of Personal Information Act, Utah Code Annotated 13-44-101 et seq.; 2. Stored Communications Act Violations and Data Breach 3. Invasion of Privacy 4. Violation of Gramm-Leach-Bliley Act, 15 U.S.C. §6801 5. Intentional Violation of Fair Credit Reporting Act 6. Negligent Violation of Fair Credit Reporting Act 7. Declaratory Judgment 8. Conversion 9. Fraud 10. Unjust Enrichment 11. Violation of the Anti Tying Provision, 15 U.S.C. § 1972 et seq 12. Violation of RICO, 18 U.S.C. §1961 et seq 13. Electronic Mail Fraud, 18 U.S.C. §1037 14. Injunctive Relief 15. Intentional/Negligent    Infliction    of Emotional Distress  Judge Clark Waddoups  Case 2:16-cv-00966 |

| Fargo & Company, a Delaware Corporation, and Does 1-5,300 | |
|---|---|

**COME NOW** Plaintiffs Lawrence J. Mitchell, Kay Mitchell, and Matthew C. Bishop, *et al.* individually and on behalf of all unknown Plaintiffs, 1-1,000,000 ("Plaintiffs") and bring this class action against Defendants Wells Fargo Bank, National Association and Wells Fargo & Company (collectively "Wells Fargo") a Delaware corporation, and DOES 1-5,300 (collectively, "Defendants") on behalf of themselves and all others similarly situated to obtain damages, restitution and injunctive relief for themselves and the Class, as defined, below, from Defendants.  Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record, and aver and allege as follows:

1.      Plaintiff Lawrence J. Mitchell and Kay Mitchell are residents of South Jordan, County of Salt Lake, Utah.

2.      Plaintiff Matthew Bishop is a resident of Salt Lake County, State of Utah.

3.      Plaintiff Tracy Kilgore is a resident of New Mexico.

4.      Plaintiff Jennifer K. Zeleny is a resident of Salt Lake County, State of Utah.

5.      Plaintiff Joseph Walters Steele V, is a resident of Salt Lake County, State of Utah.

6.      Plaintiff Scott Westin is a resident of Utah.

7.      Plaintiff Bruce Bird is a resident of Utah.

8.      The other Plaintiffs are residents of numerous states.

9.      Defendant Wells Fargo & Company is, and at all times relevant hereto was, a corporation organized and existing under the laws of the State of Delaware.  Wells Fargo & Company is a financial services company with over $1.9 trillion in assets, and provides banking,

insurance, investments, mortgage, and consumer and commercial finance through more than 9,000 locations, 12,000 ATMs, and via Internet.  It has approximately 265,000 full-time employees, and is ranked 29th on Fortune Magazine's 2014 rankings of America's 500 largest corporations.

10.     Defendant Wells Fargo Bank, National Association is, and at all times relevant hereto was, a national banking association chartered under the laws of the United States, with its primary place of business in Sioux Falls, South Dakota. Wells Fargo Bank, National Association provides Wells Fargo & Company's personal and commercial banking services, and is Wells Fargo & Company's principal subsidiary.

11.     The true names and capacities of Defendants sued herein as DOES 1 through 5,300, inclusive, are unknown to the Plaintiffs, who therefore sue said Defendants by such fictitious names.

12.     At all times relevant hereto, Wells Fargo boasted t h a t the average number of products held by its customers, was  approximately six bank accounts or financial  products per customer. Wells Fargo's goal was to increase the average accounts held to eight bank accounts or financial products per account holder, a company goal Wells Fargo called its "Gr-Eight" initiative.

13.     Wells Fargo's resulting market dominance  came at a significant price to the  general public, because it was achieved in large part through an ambitious and strictly enforced sales quota system implemented by Wells Fargo executives. Wells Fargo quotas are difficult for many bankers to meet without resorting to the abusive and fraudulent tactics described further below.

14.     Moreover, at all times material and relevant herein, Wells Fargo enforced its sales quotas by constant monitoring.  Daily sales for each branch, and each sales employee, were reported and discussed by Wells Fargo's District Managers four times a day, at 11:00 a.m., 1:00 p.m., 3:00p.m.,

and 5:00p.m.   Those failing to meet daily sales quotas are approached by management, and often reprimanded and/or told to "do whatever it takes" to meet their individual sales quotas.

15.     Consequently, at all times relevant hereto, Wells Fargo's managers and bankers have for years engaged in unethical, and illegal practices called "gaming."   Gaming consists of, among other things, opening and manipulating fee generating customer accounts through often unfair, fraudulent, and unlawful means, such as omitting signatures and adding unwanted secondary accounts to primary accounts without permission. Other practices utilized as part of these "gaming" schemes have included misrepresenting the costs, benefits, fees, and/or attendant services that come with an account or product, all in order to meet sales quotas.

16.     Defendant Wells Fargo's CEO admitted before the Senate Banking Committee, in a congressional hearing on September 20, 2016, that Wells Fargo had engaged in fraudulent activities, including "gaming," "sandbagging" and "pinning" activities and admitted that Wells Fargo had engaged in said activities and that Wells Fargo was "deeply sorry" for selling customers unauthorized bank accounts, credit cards, services and other unwanted products.

17.     At all relevant times, each Defendant, and unknown Does, was acting as an agent, servant, assignee, representative, partner, joint venturer, co-conspirator, or employee of the other Defendants, and, in engaging in the acts alleged herein, said actions were within the course and scope of said agency, service, assignment, representation, partnership, joint venture, conspiracy, or employment. Due to the relationship between Defendants, each Defendant has knowledge or constructive notice of the acts of each of the other Defendants.

18.     Each Defendant is a "person" within the meaning of Utah, Federal and various State Statutes.

19.     In this Complaint, when reference is made to any act or omission of a Defendant, such allegations shall include the acts, and omissions of owners, officers, directors, agents, employees, contractors, vendors, affiliates, and representatives of said Defendant while acting within the course and scope of their employment or agency on behalf of said Defendant.

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). In the aggregate, Plaintiffs claims and the claims of the other members of the Class exceed $5,000,000.00 exclusive of interest and costs, and there are numerous class members who are citizens of states other than Wells Fargo's state of citizenship.

21.     This Court has personal jurisdiction over Wells Fargo because Wells Fargo is authorized to do business in the State of Utah, and operates stores within this Judicial District and Wells Fargo has significant continuous and pervasive contacts with the State of Utah, and maintains numerous banking establishments and employees in the State of Utah, including, upon information and belief, some of the 5,300 employees who were terminated by Wells Fargo for engaging in the gaming tactic established by Wells Fargo.

22.     This Court has personal jurisdiction over Plaintiffs because they are residents of the State of Utah or are class members affected by Defendants actions.

23.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events and/or omissions giving rise to the Plaintiffs claims and Class Member claims arise in this action or occurred in this District and because Defendants are subject to personal jurisdiction in this District.

## **BACKGROUND**

24.     Plaintiffs opened accounts with Wells Fargo, and other banking institutions which were

subsequently acquired or merged with Wells Fargo, dating back to 1989, and/or received some notification that an account had been opened, or attempted to be opened, by Wells Fargo when the Plaintiff had not authorized, nor consented to opening any account with Wells Fargo.

25.     Wells Fargo was founded in 1852, and, according to Wells Fargo's 2017, 1st Quarter Fact Sheet, has $1.9 trillion dollars in assets, with earnings of over $22 billion in profits in 2016.[1]

26.     Since opening, Wells Fargo has grown into one of the largest banks in the United States. Many of the banks acquired, or merging with Wells Fargo, did not have arbitration agreements in place when customers opened accounts.  For example, including, but not limited to:

    a.   **First Security Bank** accounts were opened by numerous Plaintiffs prior to the acquisition by Wells Fargo, including, but not limited to, Tara Blight; (Wells Fargo disclosure exhibits (WFDE) 5-A and 5 B;)); Matthew Bishop (WFDE 10A, 10C, 10D); Marcia Cameron (WFDE, 14A, 14 C); Larry Mitchell (WFDE, 37B, 37C, 37F, 37G); Doug Waters (WFDE 54A, 54C, 54D);[2]

    b.   **Norwest**, Scott Westin (WFDE 55A);

    c.   **Wachovia** customers, whose accounts had no disclosures regarding arbitration, include, but are not limited to: Ayoka Evelyn Lawani (WFDE, 34A, 34D); First Union Wachovia, Robin A. Quigg (WFDE 43A);

---

[1] https://www08.wellsfargomedia.com/assets/pdf/about/corporate/wells-fargo-today.pdf  In 1986 Wells Fargo merged with Crocker National Corporation; 1987 Wells Fargo acquired the personal trust business of Bank of America; in 1988 Wells Fargo acquired Barclays Bank of California; in 1998 Wells Fargo merged with Norwest Bank, ($34 billion) making it the seventh-largest bank in the country.  The following years Wells Fargo continued to expand acquiring First Security Bank in 2000, ($2.9 billion dollars) followed by acquisition of numerous other banking institutions including Wachovia in 2008.

[2] Wells Fargo Disclosure Exhibit 27-18 Letter to First Security Clients - makes no mention of arbitration requirements in a letter sent to clients, and in its Utah Disclosures it makes no mention of engaging in unethical or illegal sales practices and fraudulently opening banking, credit card accounts, or selling identity theft insurance while engaging in identity theft of clients private and confidential information.

     d.  **World Savings:** no customer arbitration provisions Anurag Sood (WFDE 47 A, transferred to Wachovia 47 B, 47C, 47D,)

     e.  No account opening information: Carina L. Rhea (WFDE 44A, 44C, 44E, 44F); David Self (WFDE 45A);

     f.  R. Lynn Farr,(WFDE 22A) purportedly opened his account "out of Store" without indication what documents were available at the time "out of store," or provided to him.

27.    In a recent news article by Bethany Mclean,[3] (**Exhibit 1**) she discusses the Wells Fargo fraudulent account activity, and interviews with former employees and other knowledgeable individuals, along with pertinent timeframes of Wells Fargo activities.

28.    In 1998, Mclean first interviewed Richard Kovacevich (who was then CEO of Norwest Bank hereinafter "Norwest"), regarding a change in approaching the banking industry.[4]

29.    Richard Kovacevich ("Kovacevich,") who was working with Carrie Tolstedt ("Tolstedt") at Norwest, at the time of the first Mclean interview Kovacevich indicated that he had developed a significant change in the method and modality that banks serve their clients.  As originated by Kovacevich and Tolstedt, banks were no longer regarded as banking branches, but were referred to as "stores," and banking clients became "customers."  The scheme was implemented to cross-sell (similar to churning in stocks) as many banking products and services as possible to "customers," who came into the "stores," regardless of whether or not the customer wanted or needed the product or service.

---

[3] Summer 2017, Vanityfair.com, "How Wells Fargo's Cutthroat Corporate Culture Allegedly Drove Bankers To Fraud. http://www.vanityfair.com/news/2017/05/wells-fargo-corporate-culture-fraud

[4] [t]he key question facing banks was "How do you sell money?" His answer was that financial instruments—A.T.M. cards, checking accounts, credit cards, loans—were consumer products, no different from, say, screwdrivers sold by Home Depot. In Kovacevich's lingo, bank branches were "stores," and bankers were "salespeople" whose job was to "cross-sell," which meant getting "customers"—not "clients," but "customers"—to buy as many products as possible.

30.     Just prior to the Wells Fargo merger with Norwest in 1998, Mclean authored a profile in Fortune Magazine on Richard Kovacevich. (**Exhibit 2**)  In the interview Kovacevich noted that it was his job to "cross-sell" which meant getting "customers" to buy as many products as possible.[5]

31.     Subsequent to the merger, Kovacevich became the CEO of Wells Fargo where he served from November 1998-June 2007.  John Stumpf succeeded Kovacevich as CEO in 2007 and continued to allow Carrie Tolstedt a *carte blanche* in operation of the Wells Fargo Community Banking, with little oversight, direction or control.

32.     Upon the Wells Fargo-Norwest merger, Kovacevich continued to work with Tolstedt, first in her role as regional president for Central California, and then as the vice president of the Community & Border Banking group, in order to fine tune the team members, and refining the "Gr-Eight" cross-selling scheme.

33.     It was during Kovacevich's tenure that Wells Fargo transformed its banking model from providing traditional "banking services," with bankers, into a "store" with customers.  The transition was based on the work Kovacevich, and Tolstedt initiated at Norwest.  Once this model was instituted with select Wells Fargo team members, the team members helped refine the business model and employees were instructed, coached, and rewarded (or punished) based on their efforts at "sandbagging, gaming[6], pinning[7]" and unethical, illegal fraudulent sales

---

[5]  "Cross-sell is like the Loch Ness monster--always talked about but never seen," says Kovacevich. Except at Norwest. Today the average Norwest customer buys nearly four products, vs. the industry average of two, which generates $113 per customer in profits for Norwest, about triple the amount a two-product purchase yields. Doubling the average product purchase to *eight--Kovacevich's current obsession*--would again triple productivity. http://archive.fortune.com/magazines/fortune/fortune_archive/1998/07/06/244842/index.htm

[6]  Gaming, as defined in the Wells Fargo Code of Ethics as "the manipulation and/or misrepresentation of sales or referrals . . . in an attempt to receive compensation or to meet sales goals."

[7]  Pinning was assigning customers personal-identification numbers (PINs,) without their knowledge in order to impersonate them on Wells Fargo computers and enroll the customer in various products without their knowledge.

practices.[8]

34.    The team members were recruited, trained and managed by Carrie Tolstedt, under the initial direction of Richard Kovacevich, and subsequently, with little to no interference by John Stumpf.[9]

35.    The Office of the Comptroller of the Currency (OCC) was aware before January 2010, of 700 cases of "whistleblower complaints" regarding Wells Fargo's sales practices.[10]   In an internal review published in April 2017, the OCC noted that it confronted Carrie Tolstedt, then head of Wells Fargo's Community Bank, about the large numbers of whistleblower complaints about illegal, unethical fraudulent sales practice, to which Tolstedt downplayed the complaints as coming from a culture which encouraged complaints and assured the OCC regulators that all of the complaints had been investigated and appropriately addressed.[11]

36.    The "sales practice abuses," (fraudulent activities) engaged in by Wells Fargo was brought to public attention in a Los Angeles Times article by E. Scott Reckard (hereinafter "Reckard"), in 2013. (**Exhibit 3**).

37.    The Reckard article cited Wells Fargo's fraudulent account opening activities, along with other fraudulent, deplorable activities engaged in by Wells Fargo.  For instance, the article cited

---

Over 193,000 non-employee accounts were opened between 2011-2015 for which the only e-mail domain name listed was @wellsfargo.com.

[8] In 1997, prior to Norwest's merger with Wells Fargo, Richard Kovacevich launched an initiative called "going for Gr-Eight," which meant getting the customer to buy eight products from the bank.

[9] The number of team members constituted the majority of Wells Fargo branch, regional and other executives. The Board of Directors terminated, for cause, Claudia Russ Anderson, the former community bank chief risk officer who took a six-month, unpaid leave of absence after news of the account scandal broke in September 2016; Pamela Conboy, the lead regional president in Arizona who was named in an employee letter to Wells executives as someone who was responsible for pushing unethical sales tactics in Arizona branches; Shelley Freeman, the former Los Angeles regional president and head of consumer credit solutions; and Matthew Raphaelson, the head of community bank strategy and initiatives.

[10] http://money.cnn.com/2017/04/19/investing/wells-fargo-regulator-whistleblower-2010-occ/index.html?iid=EL

[11] https://www.occ.gov/publications/publications-by-type/other-publications-reports/pub-wells-fargo-supervision-lessons-learned-41917.pdf

"[o]ne former branch manager who worked in the Pacific Northwest described her dismay at discovering that employees had *talked a homeless woman* into opening six checking and savings accounts with fees totaling $39 a month. "It's all manipulation. We are taught exactly how to sell multiple accounts," the former manager said. "It sounds good, but in reality it doesn't benefit most customers."[12]

38.     In response to the Reckard, Los Angeles Times article, the Consumer Financial Protection Bureau ("CFPB"), the Office of the Comptroller of the Currency (OCC), and the Los Angeles City Attorney, began investigating the allegations of fraudulent sales practices, which culminated in the September 2016, $185,000,000 consent orders with the OCC the CFPB, and settling the litigation filed by the City of Los Angeles on behalf of California residents. (**Exhibit 4**)

39.     Wells Fargo had for years (and to this day) refused to disclose the nature or extent of its fraudulent cross-selling, and the fraudulent sale's practices which were occurring.[13]

---

[12] To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork. Some employees begged family members to open ghost accounts.

Erick Estrada, a former Wells Fargo personal banker and business specialist at a Canoga Park branch, said managers there coached workers on how to inflate sales numbers. Employees opened duplicate accounts, sometimes without customers' knowledge, he said. Workers also used a bank database to identify customers who had been pre-approved for credit cards — then ordered the plastic without asking them, Estrada said.

David Douglas made similar accusations against Wells Fargo in a lawsuit filed Sept. 11, 2015 in Los Angeles County Superior Court. He alleged that three Wells Fargo employees in Century City and Beverly Hills used his birth date and Social Security number to open accounts in his name and those of fictitious businesses. At least one employee forged his signature several times, said Douglas' lawyer, Michael P. Kade of Los Angeles. "They put their own addresses on the accounts so he wouldn't know about it," Kade said. "It showed up on his credit report — that's how he found out."

Prior to his October firing, Wells Fargo business specialist Estrada … said the manager would greet the staff each morning with a daily quota for products such as credit cards or direct-deposit accounts. To fail meant staying after hours, begging friends and family to sign up for services…."He would say: 'I don't care how you do it — but do it, or else you're not going home….'" Estrada …. said branch and district managers told him to <u>falsify the phone numbers of angry customers so they couldn't be reached for the bank's satisfaction surveys.</u>

[13] *See, e.g.*, Transcript of Q1 2013 Wells Fargo Earnings Conference Call, April 12, 2013, available at *http://www.warren.senate.gov/files/documents/2013Q1_WellsFargoEarningsCall.pdf* ("Our growth reflects the

40.     In response to the Reckard, Los Angeles Times investigative article, Wells Fargo had an analysis performed by Pricewaterhouse Coopers (PwC) which determined that Wells Fargo had, in fact, engaged in opening over 1.5 million unauthorized checking and savings accounts and over 565,000 credit card accounts (no number was provided on the number of unauthorized credit card applications that were submitted but did not result in the opening of a new card). *See consent order, supra.*

41.     Upon receiving this verified information, and approving the terms of the Consent Order, the Wells Fargo Board of Directors initiated an "independent review" of the Wells Fargo operations, by Sherman & Sterling, LLP in September 2016. (**Exhibit 5**)

42.     The "independent review" failed to set forth adequate analysis of the culpability of the Company operation, even though it did acknowledge that the fraudulent sales practices were first identified as early as 2002.[14]

---

benefit of our relationship model, as demonstrated by achieving record Retail Banking cross-sell of 6.1 products per household."); Transcript of Q2 2013 Wells Fargo Earnings Conference Call, July 12, 2013, available at *http://www.warren.senate.gov/files/documents/2013Q2_WellsFargoEarningsCall.pdf ("We achieved record retail cross-sell of* 6. 14 products per household'."); Transcript of Q3 2013 Wells Fargo Earnings Conference Call, Oct. 11, 201 3, available at *http://www.warren.senate.gov/files/documents/2013Q3_WellsFargoEarningsCall.pdf* ("We deepened relationships across our Company achieving record retail banking cross-sell of 6.15 products per household,"); Transcript of Q4 2013 Wells Fargo Earnings Conference Call, Jan. 14, 2014, available at *http://www.warren.senate.gov/files/documents/2013Q4_WellsFargoEarningsCall.pdf (By focusing on meeting our* customers' financial needs, we achieved record cross-sell across the company with retail banking cross-sell growing to 6.16 products per household."); Transcript of Q1 2014 Wells Fargo Earnings Conference Call, April 11, 2014, available at *http://www.warren.senate.gov/files/documents/2014Q1_WellsFargoEarningsCall.pdf* (We deepened relationships across our Company, achieving record retail banking cross-sell of 6.17 products per household."); Transcript of Q2 2014 Wells Fargo Earnings Conference Call, available at *http://www.warren.senate.gov/files/documents/2014Q2_WellsFargoEarningsCall.pdf* ("We deepened relationships across our company. Retail banking cross-sell was 6.17 products per household."); see also United States, Congress, Senate Banking, Housing, and Urban Affairs Committee, "An Examination of Wells Fargo's Unauthorized Accounts and the Regulatory Response," 114th Congress, 2nd Session, Accessed September 29,2016. Available at*: http://www.banking.senate.gov.public/index.cfm/hearings?ID_B80F9B81-4331-4F95-91BC-718288EC9DA0* (questions from Senator Elizabeth Warren).

[14] *https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-fines-wells-fargo-100-million-widespread-illegal-practice-secretly-opening-unauthorized-accounts/.* For illustrative press coverage at

43.     According to the Sherman & Sterling report, the Wells Fargo Board was unaware of the extent of what was going on until 2014.  However, in reviewing Wells Fargo's own 2013 annual corporate filings, at page 51; "Our risk culture also depends on the "tone at the top" set by our Board, CEO, and Operating Committee members. Through oversight of the three lines of defense, the Board and the Operating Committee are the starting point for establishing and reinforcing our risk culture and have overall and ultimate responsibility for oversight of our risks, which they carry out through committees with specific risk management functions."[15]

44.     It is contended that in 2013, the Board of Directors was ready to assume "ultimate responsibility" for the oversight of risk.  But in the Shearman & Sterling Report of 2017, the Board alleges that it was an innocent victim of a risk management function that somehow failed to stand up on its own.  As the Shearman & Sterling Report wistfully admits, "Wells Fargo should have moved toward the centralization of the risk function earlier than it did."  This admission makes good sense, but needs the missing conclusion: that the failure to do so clearly falls at the feet of the firm's directors. (**Exhibit 6**)

45.     John Stumpf, noted in the Wells Fargo 2014 annual report, page 3:

"Cultures take years to establish and mature, a lesson I learned while growing up on a family farm in a small town in central Minnesota….The *reason* our team members go to work each day is to help customers — we serve 70 million customers and one in three U.S. households across our more than 90 businesses. The *result* is that Wells Fargo makes money, not the other way around.  In 2014, Wells Fargo generated record earnings for a sixth consecutive

---

the time, see The High Cost of Wells Fargo's Sales Practices, Financial Times, Sept. 13, 2016.
[15] *https://wwww08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2013-annual-report.pd*f

year, remaining the most profitable bank in the United States. We also ended 2014 as the world's most valuable bank by market capitalization.  Our 2014 net income was $23.1 billion, up 5 percent from 2013. Diluted earnings per common share also rose 5 percent to $4.10. Our 2014 revenue of $84.3 billion was a balanced mix of net interest income and noninterest income, reflecting the strength of our diversified business model.  We generated this growth through a focus on customers, as more of them entrusted us with their deposits and rewarded us with opportunities to serve more of their financial needs."[16]

46.    The culture that Richard Kovacevich, John Stumpf, Carrie Tolstedt and other executive and management team members brought to Wells Fargo, and which matured from 1998-2016 was one of fear, back stabbing, and doing "whatever it takes," to open accounts and make money for Wells Fargo.

47.    In 1999, almost immediately after Kovacevich and Tolstedt began working at Wells Fargo, according to its annual report, Wells Fargo instituted: "Going for Gr-Eight product packages,"[17] which was the foundation of "run it like your own it," do whatever is necessary to sell products and services, including falsifying documents, forgery, unauthorized account applications.

48.    Wells Fargo composed employee handbooks, such as *Wells Fargo Code of Ethics*, and *Wells Fargo Team Member Handbook*, which ostensibly prohibited gaming, pinning, sandbagging, *etc.* in principal, while in practice if employees failed to engage in these illegal activities they were subject to termination. (**Exhibit 7** -Yesenia Guitron, and Judi Klosek v. Wells Fargo Bank et al 4:10-cv-03461- CW  US DC ND CA)

---

[16] http://www.annualreports.com/HostedData/AnnualReportArchive/w/NYSE_WFC_2014.pdf
[17] Wells Fargo Annual Report, Wells Fargo (1999), at p. 7, *http://bit.ly/2ddwP90*.

49.     In its 2010 annual report, Wells Fargo noted, at page 5: "If anyone tells you it's easy to earn more business from current customers in financial services, don't believe them. We should know. *We've been at it almost a quarter century*. We've been called, true or not, the "king of cross-sell."[18]

50.     Wells Fargo noted in their 2003, annual report: "Our cross-sell strategy and diversified business model facilitates growth in strong and weak economic cycles, as we can grow by expanding the number of products our current customers have with us. We estimate that each of our current customers has an average of over four of our products. Our goal is eight products per customer, which is currently half of the estimated potential demand."[19]

51.     It is documented that the "Gr-Eight" business model had been implemented by Kovacevich, Tolstedt and other team members, as evidenced in early 2000 annual reports.

52.     In an interview with CNN, former Wells Fargo Branch Manager Susan Fischer said: "These practices were going on way before 2011."  Fischer said she remembers her district manager instructing her in 2007 to make the employees reporting to her open unauthorized accounts.[20]

53.     Wells Fargo noted in its 2004 annual report that *it had perfected cross-selling over the past 18 years*, and stated: "Cross-selling: our most important customer-related measure."[21]

54.     Employees concerned about violating the Wells Fargo Handbooks, and being terminated by engaging in fraudulent activities, including specifically gaming and pinning, began speaking with managers, writing e-mails to managers and corporate officers, and contacting an Ethics'

---

[18] Wells Fargo Annual Report, Wells Fargo (2010), at p. 5, *http://bit.ly/2cTplHd*.
[19] Wells Fargo Annual Report, Wells Fargo (2003), at pages, 15, 16, and 34 at p. 15, 16 and 34, *http://bit.ly/2dxaBid*.
[20] Matt Egan, Wells Fargo Workers: Fake Accounts Began Years Ago, CNN MONEY (Sep. 26, 2016), *http://cnnmon.ie/2ddF1He*.
[21] Wells Fargo Annual Report, Wells Fargo (2014), at page 18. *http://bit.ly/2dpvw6C*.

hotline to report documented cases of fraud by co-employees. (**Exhibits 8-12**)

55.     Wells Fargo's illegal gaming, and identity theft continued to increase from 2002 through 2016.  Employees were systematically indoctrinated that they were working in a store, and stores sold products and services to customers.  Employees were terminated if they failed to achieve the "sales goals," that were implemented by management.

56.     Julia L. Miller, who lives in Pennsylvania, and is a former Wachovia/Wells Fargo employee noted *In re Wells Fargo & Company Derivative Litigation* Superior Court of the State of California, In and For the City and County of San Francisco, CGC 16-554407 (hereinafter referred to as "Wells Fargo Derivative") that upper management required employees to take whatever action was necessary to obtain new accounts.[22]  (**Exhibit 13**)

57.     Kelsey Hess, a former Wells Fargo employee living in Utah, declared in the Wells Fargo Derivative matter, that during times when it was difficult to open an account, management directed employees to seek out undocumented immigrants at construction sites and open numerous unauthorized checking accounts, savings accounts, and credit cards, knowing that the

---

[22] Declaration of Julia L. Miller, April 24, 2017. Paragraph 4.  As a banker, I was required by upper management to meet daily account and "solution" quotas.  A "solution" is one of Wells Fargo's "Gr-eight" products . . .a "solution" was a new account whether in the name of a current or new Wells Faro customer.

        5. The branch managers were constantly surveilling me during my time as a banker and prioritized getting more accounts over all else.  For example, a family came in to complain about charges they had incurred from accounts that they did not open.  The couple asked me to reverse the charges.  I asked my manager if that was possible, and my manager told me the *charges could be reversed only if I was able to upsell new solutions to the family.*...

        8. As a branch manager, I was contacted at 8 a.m. most days of the week by a district manager.  The purpose of the call was to establish account and solutions quotas for the day....[t]the bankers and tellers were instructed to force random people off the streets or from social security offices to get them into local branches and pressure them into opening new accounts.

        11. When the pressure on managers and employees kept increasing, I began to have wine on Friday nights with my district manager.  She told me that some of the branches were "doing stuff unethically and getting rewarded."  I expressed my frustration that certain branches were getting rewarded for unethical behavior and that other branches, including my own, that were honest, received nothing and were struggling.  This is how I learned that branch, regional, and executive management knew about the unethical conduct that was occurring, but chose to ignore it for profit.

workers would not discover their action within 60 days.[23] (**Exhibit 14**)

58.     Denny Russo, also submitted a declaration in the Wells Fargo Derivative action that several of his World Savings/Wells Fargo clients complained to him of new accounts being opened in their names without their consent.   Furthermore, upper management, including regional management, frequently discussed what he considered unethical and illegal "solutions" to locate new accounts, including, rounding up day labors (undocumented immigrants) and opening accounts they neither needed nor wanted.[24] (**Exhibit 15**)

---

[23]  Wells Fargo Derivative,  Paragraph 3, I was a teller for Wells Fargo Bank from May 2013 to August 2014 at the Draper branch….

    4. …One of my duties as a teller was to get walk-up customers to sit down with a Wells Fargo personal banker at all costs….one tactic I was taught to use was to convince customers, even those who came in for something like cashing or depositing a check, that they needed to do an address update with a banker, who would later sign them up for products like credit cards without their knowledge or consent….

    5. …One customer complained to me that the banker that person had been referred to of being coerced to open new accounts.  The customer further complained that even after saying "no" to some of the banker's recommendations, he or she received a notice a few days later that the refused account had nonetheless been opened.
6.  After a while of referring all my walk-up customers to Sean, our branch manager Jason Gowan called Sean and myself into his office.  Jason told Sean that he was being watched by upper management for opening unauthorized accounts.  I thought that Sean was going to be fired for doing that, and feared that I was also going to be fired for referring my customers to him.  But Jason did not terminate either of us at that meeting.  Instead, after mentioning that Jason was being watched for opening unauthorized accounts, he made clear to Sean that he was not telling him to stop doing that, but just that we "needed to be more careful."

[24] Denn Russo Declaration: 6. Because of my former supervisory role at World Savings Bank, I had established relationships with World Savings Bank customers who were now Wells Fargo customers. Within a couple of months of the acquisition by Wells Fargo, former World Savings customers began to approach me with complaints about the Wells Fargo banking practices.
7.     Former World Savings customers told me that Wells Fargo bankers had instructed them to close their old World Savings accounts and open new Wells Fargo accounts. Several of the older, former World Savings customers complained to me that they were receiving multiple Wells Fargo debit and credit cards without ever having requested them. When I investigated these complaints, I learned that Wells Fargo management had established an aggressive "SOLUTIONS" program that placed extreme pressure on bankers to open new accounts. I was informed that this was widespread within Wells Fargo by senior and regional employees and was insisted on by Wells Fargo management in the Bay Area.
8.     The "Solutions" program was aggressively pursued by management at the branch level, district level, and regional level. Bankers' performance under the "Solutions" program was under constant review by both local and corporate management and reports would regularly be issued on the results or progress.
9.     The "Solutions/Points" program provided that for every new account a Wells Fargo employee opened for a customer where a debit or credit card was issued, that employee would obtain "Solutions/points." Bonus pay scales were calculated based on the number of "solution points" an employee collected. Managers' compensation was likewise based on the number of "solutions/points" bankers they oversaw accrued. Wells Fargo corporate management and executives created a "pressure cooker" environment, where employees were constantly pressured to accrue "solutions/points."
12.     Elderly customers of mine, with whom I had worked during the World Savings years, frequently approached

59.     The massive fraudulent activities engaged in by Wells Fargo has not been fully determined: "Based on public information, negotiations, and confirmatory discovery, the parties estimate the number of unauthorized accounts for the period 2002-2017 is approximately 3.5 million,"[25] more than double the number initially identified by PwC.  *See Exhibit E, supra.*

60.     The massive fraudulent activities at Wells Fargo commenced almost immediately when Richard Kovacevich and Carrie Tolstedt began occupying their new position at Wells Fargo in 1998.

61.     Wells Fargo, once the company wide fraudulent sales practice was implemented, placed enormous pressure on the employees to comply, or suffer the consequences.

62.     Wells Fargo, in order to perpetuate its' fraudulent scheme, notified branches at least 24-72 hours ahead of time when risk management and auditors would be appearing, allowing branch employees to falsify records and forge customer signatures.[26]

---

me to ask why accounts had been opened in their names without their permission. Several such elderly customers complained to me that every time they met with a local banker at Wells Fargo for any reason, upwards of 9-10 new debit cards would be issued in their names without their authorization.

13.     I observed that the constant pressure to open new accounts led branch employees to engage in unethical practices to keep up with management's unrealistic demands, and employees regularly complained to me and others about the pressure.

14.     A practice that was regularly used was enlisting Hispanic employees to gain new accounts through a practice developed by regional management. When foot traffic was slow, the branch manager on duty instructed Wells Fargo employees of Hispanic heritage to go to a nearby 7-Eleven at 430 Washington Street in Petaluma, a known congregating point for undocumented day laborers to wait for potential employers. The Wells Fargo employees were instructed to "round up" a group of the undocumented workers and drive them back to the Wells Fargo branch to open up checking and savings accounts in exchange for "waiving" check-cashing fees that the day laborers would otherwise have to pay. The employees would convince the undocumented day laborers that they needed these accounts because the day laborers would no longer have to incur the check-cashing fees if they had accounts with Wells Fargo. ..

15….I have personal knowledge that this is the 7-Eleven where Wells Fargo employees would pick up day laborers to bring them back to the branch because the employees needed more solutions for the day and my colleagues constantly went to and from this location to try to meet their sales goals.

16.     Based on discussions with other Wells Fargo employees and managers, I was aware that these practices were not just isolated to the Petaluma branch where I worked, but were also widespread throughout the state of California. Upper level managers closely monitored the opening of new accounts and signed off on every new account.

[25]

[26] *https://www.wsj.com/articles/at-wells-fargo-bank-branches-were-tipped-off-to-inspections-1485253800* . Often,

63.     Bank employees have repeatedly confirmed that Wells Fargo customers were not provided any new account information until *after* they had signed an application, nor were they advised of any disclosures relating to fraudulent activities by Wells Fargo prior to, or after signing the new account application.[27]

64.     It has been established that the fraudulent conduct was present in one form or another back to 2002.  Wells Fargo's Board of Directors denies any culpability, in the well crafted investigation performed by Sherman & Sterling.  However, this same corporate sales activity was identified in the Board report submitted by Sherman & Sterling.

65.     Wells Fargo has admitted reports, prepared at its own direction, that it was aware of "sales practice violations," as early as 2002. [28] (*See Exhibit E, supra*)

66.     And as part of the Consent Order with CFPB, the CFPB Order characterized the activities of Wells Fargo as being "**fraudulent conduct …on a massive scale.**"  The Office of the Comptroller of the Currency on September 8, 2016, found that between 2011-2015 Wells Fargo employees opened more than 1.5 million deposit accounts and more than 565,000 credit-card

managers would call for all hands on deck at a branch to stay late into the evening—or sometimes all night—to shred documents or forge signatures if they weren't there, some current and former managers said. For instance, they would go through desks to find signature cards that hadn't been approved, make sure wire forms had been filled out properly and that documents in a "control binder" like cash or teller audits were filled out, said Ivan Rodriguez, a former branch banker at Wells Fargo for about six years until 2013. Some branches that opened accounts for customers without the customer present would cut and paste a signature the bank had on file for the customer and add it to the required signature card, Mr. Rodriguez said.

[27] The account application, such as the one for Bruce Bird, states "I have received a copy of the **applicable account agreement** and privacy brochure…"  However, no information was provided to him on what constituted the "applicable account agreements," nor were any disclosures made to him regarding Wells Fargo's business practices of opening fraudulent accounts. Further there was never any information provided on AAA rules or requirements.

[28] Ivan Rodriguez worked at three Wells Fargo branches in California, starting in 2007, and was quickly promoted to be a banker. There was pressure right away, but he knew he was in a sales job, and he thought, It is what it is. But he saw things: bankers changing customers' phone numbers in the system so, if they complained, no one could get in touch with them; online banking accounts for elderly customers who didn't know how to use computers. But the worst, he says, was the shredding. In order to get a signature on an account a customer didn't want, bankers would cut a signature out of an existing account, scan that through, and then shred the evidence. They never got caught, because, in the branches he worked at, the manager would get 24 hours' notice before Wells Fargo's auditors came through

accounts that were not authorized. Wells Fargo neither admitted nor denied the activities alleged. *See, Consent Order, supra.*

67.    Dreydy Metelin, in a Declaration in the Guitron litigation, noted that "[i]t was normal business practices to use false identification on accounts and to change customers' names and open new accounts…management made it clear that no employee was allowed to complain about the unethical practices that were going on within the branch." (**Exhibit 16** at 5 b., and 6.)

68.    Also in the Guitron litigation, Richard George noted at paragraph 21, "[h]owever it is apparent upon review of the evidence, that the Defendants permitted gaming to be carried on even after irrefutable evidence was brought to the attention of management." (**Exhibit 17**)

69.    *Inter alia*, and not limited to the following, Plaintiffs have had their accounts moved to Wells Fargo without their consent or authorization; Plaintiffs have had credit reports ran without their consent, which has on numerous occasions had a negative impact on Plaintiffs' credit history; Plaintiffs have signed on signature cards for organizations they belong to, only to find that Wells Fargo submitted an application for a credit card and was notified through the U.S. Mail that her credit card application was not approved, and numerous other instances of unfair competition, disclosure of private facts, invasion of privacy, misappropriation of likeness, conversion, breach of contract, and other causes of action to be set forth at the time of trial.

70.    Wells Fargo's *modus operandi* is to attempt to get each customer to maintain numerous accounts with Wells Fargo.  In, a brochure published by Wells Fargo called "The Vision & Values: of Wells Fargo;"[29] Wells Fargo' states: "Going for Gr-Eight,'  Our average retail

---

[29] https://www.wellsfargo.com/about/corporate/vision-and-values/index.

banking household has about six products with us.  We want to get to eight… and beyond. One of every four already has eight or more.  Four of every 10 have six or more:"

71.     In Wells Fargo's "The Vision & Values: of Wells Fargo," CEO John G. Stumpf states, "Everything we do is built on trust. It doesn't happen with one transaction, in one day on the job or in one quarter. It's earned relationship by relationship." John Stumpf went on to note that Wells Fargo is one of the nation's largest financial institutions, serving **one in three** U.S. households.[30]

72.     In its 2014 Annual Report to the U.S: Securities and Exchange Commission, Wells Fargo boasts about its "products" per customer and its "cross-sell strategy,"… "Our vision is to satisfy all our customers' financial needs, help them succeed financially, be recognized as the premier financial services company in our markets and be one of America's great companies. Important to our strategy to achieve this vision is to increase the number of our products our customers use and to offer them all of the financial products that fulfill their financial needs."  That report further states: "*Our cross-sell strategy is to increase the number of products our customers use by offering them all of the financial products that satisfy their financial needs.*"[31]

73.     Wells Fargo further stated in its 2014 Annual Report to the U.S. Securities & Exchange Commission: "we continued to maintain our solid customer relationships across the Company, with retail banking household cross-sell of 6.17 products per household (November 2014); Wholesale Banking cross-sell of 7.2 products per relationship (September 2014); and Wealth,

---

[30] We've become one of the nation's largest financial institutions, serving one in three U.S. households and employing approximately one in 600 working Americans. We have team members in 36 countries, serving **70 million customers** in more than 130 countries around the world. *Forbes* **magazine ranks us among the top 10 publicly traded companies in the world based on a composite of sales, assets, profits, and market value**. And we are consistently ranked as one of the world's most respected banks by *Barron's* magazine and one of the world's most admired companies by *Fortune* magazine. The reason for this is simple. **We've never lost sight of putting our customers first and helping them succeed financially**.
[31] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2014-annual-report.pdf

Brokerage and Retirement cross-sell of 10.49 products per retail banking household (November 2014)." Wells Fargo further stated in that same filing: "We believe there is more opportunity for cross-sell as we continue to earn more business from our customers. Our goal is eight products per household . . . ."

74.     In order to achieve its goal of eight accounts per household, Wells Fargo imposes unrelenting pressure on its bankers to open numerous accounts per customer.

75.     Wells Fargo has strict quotas regulating the number of daily "solutions" that its bankers must reach; these "solutions" include the opening of all new banking, credit card accounts, online activities and other "product" sold/serviced by Defendants. Managers constantly hound, berate, demean and threaten employees to meet these unreachable quotas. Managers often tell employees to do whatever it takes to reach their quotas. Employees who do not reach their quotas are often required to work hours beyond their typical work schedule without being compensated for that extra work time, and/or are threatened with, and have been termination, not because of their fraudulent activity, but because their activity did not produce a big enough return for Defendants.

76.     Wells Fargo's arrogance and "too big to fail" attitude was evident in John Stumpf's testimony before the Senate Banking Committee. After acknowledging that Wells Fargo had opened over 2 million unauthorized accounts, and was heavily engaged in illegal cross-selling activities, he noted that Wells Fargo was going to continue its current (fraudulent) cross-selling activities until the end of the year, thus maintaining the pressure on employees, and exposing the public to further fraudulent activity.

77.     As noted in the Guitron declarations, above, the quotas imposed by Wells Fargo on its employees were often not attainable because there simply were not enough customers who enter a branch on a daily basis for employees to meet their quotas through traditional means.

78.     Wells Fargo's bankers, tellers and "team members" are thus naturally and predictably forced to resort to alternative means to meet quotas, including using high pressure sales tactics to coerce customers into opening additional accounts or using inaccurate or misleading information about potential accounts to induce customers to open new accounts.

79.     Defendant employees who have objected to the fraudulent activity have been terminated, in violation of the Whistleblower's Act.[32] *See, also Guitron litigation supra.*

80.     Wells Fargo employees also pressure their own family members and friends to sign up for accounts to meet their quotas.  Some employees report that they have "tapped out" every family member and friend for accounts.  Others report that they spend holiday dinners trying to convince family members to sign up for accounts.  Management encourages employees to achieve 'solutions' through family members.  Since these accounts are opened by friends and family as favors, they are often unfunded, and can result in fees charged by Wells Fargo to its own employees' families or acquaintances, even for such 'zero balance' accounts.

81.     Wells Fargo's credibility is non-existent.  Quoting Wells Fargo's CEO, in its Vision and Values "[i]ntegrity is not a commodity.  It's the most rare and precious of personal attributes.  It is the core of a person's – and a company's- reputation." (*See footnote* 29)

82.     Employees thus resort to *gaming tactics* to increase their "solutions," and meet minimum quotas.  At all times material and relevant to this matter, gaming has been so ingrained in the

---

[32] Wells Fargo employee "Sbeen" who worked for Wells Fargo from 2002-2010 was terminated after he filed complaints about management pressure to open accounts without customer permission. "At times for the new sales goal, we were told to open 35 accounts in the morning within 2 hours to collectively hit 300 new accounts to beat the other branches."

business of Wells Fargo that many of the tactics, employed to meet these sky-high quotas have commonly-used names:

a. *"Sandbagging"* refers to Wells Fargo's practice of failing to open accounts when requested by customers, and instead accumulating a number of account applications to be opened at a later date. Specifically, Wells Fargo employees collect manual applications for various products, stockpile them in an unsecured fashion, and belatedly open up the accounts (often with additional, unauthorized accounts) in the next sales reporting period, frequently before or after banking hours, or on bank holidays such as New Year's Day;

b. *"Pinning"* refers to Wells Fargo's practice of assigning, without customer authorization, Personal Identification Numbers ("PINs") to customer ATM card numbers with the intention of, among other things, impersonating customers on Wells Fargo computers, and enrolling those customers in online banking and online bill paying without their consent;

c. *"Bundling"* refers to Wells Fargo's practice of incorrectly informing customers that certain products are available only in packages with other products such as additional accounts, insurance, annuities, and retirement plans.

83.     While Wells Fargo terminated over 5,300 employees (by all sources this is but a fraction of employees who participated in these illegal activities) who engaged in these types of illegal, unethical behavior, fraudulent activities, Wells Fargo, nevertheless, still reward individuals such as Carrie Tolstedt, who was referred to as the "chief sandbagger," with over a $124 million dollar termination payments, prior to clawbacks by Wells Fargo in April 2017.

84.     Upon information and belief Carrie Tolstedt with John Stumpf conspired with other Wells Fargo executives, and "team members" throughout the world, to initiate quotas, sales targets, and authorizing, and paying employee incentives, bonuses, and rewarding employees with promotions who assisted in opening more than 2 million unauthorized customer accounts.[33]

85.     Although Wells Fargo has admitted its fraudulent activities, John Stumpf continued to blame employees they fired.  Wells Fargo was fined approximately $180 million dollars, which is less than 2% of one quarter's profits - Wells Fargo continues, and will continue to abuse government programs that were intended to assist and help Americans after the financial meltdown.[34]

86.     However, based upon clawbacks against Stumpf, Tolstedt, and other managers and executives who were terminated "for cause," Wells Fargo has received more from its former employees than it will expend in fines, costs, and settlements for its illegal sales practices!. Thereby, once again, making it more profitable to ignore laws, regulations and fines and continue to rake in over twenty-two billion dollars a year in profits.

---

[33] *See*, Exhibit E, Board Report: Carrie Tolstedt, head of the Community Bank, and certain of her senior leaders paid insufficient regard to the substantial risk to Wells Fargo's brand and reputation from improper and unethical sales practices even as they failed to recognize the potential for financial or other harm to customers. In addition, keeping the sales model intact and sales growing meant that the Community Bank's performance management system had to exert significant, and in some cases extreme, pressure on employees to meet or exceed their goals. Many employees felt that failing to meet sales goals could (and sometimes did) result in termination or career-hindering criticism by their supervisors. Employees who engaged in misconduct most frequently associated their behavior with sales pressure, rather than compensation incentives, although the latter contributed to problematic behavior by over-weighting sales as against customer service or other factors.  Conversely, employees saw that the individuals most likely to be praised, rewarded and held out as models for success were high sales performers. At p. 7

[34] A recent CFPB report noted that in 2015, the financial industry collected $11 billion dollars in overdraft fees alone, or 8% of total profits.  During the time frame in question it is estimated that John Stumpf earned in excess of $200 million in increase of his stock holding with Wells Fargo.

87.     Tolstedt was acknowledged for her actions in pushing "strong cross-selling ratios."  In fact, prior to July 2016 Wells Fargo singled out Tolstedt and other executives touting the bank's "expertise" in selling multiple products which was immensely profitable for the bank .

88.     Even after determining that the problems existed, years ago (2002), Wells Fargo took no action to terminate the fraudulent activities, they continued to promote and monetarily reward individuals who opened fraudulent accounts, fabricated false emails, PIN numbers, and intentionally sold customers bundled accounts the customer did not need, or desire.

89.     Upon information and belief, Wells Fargo employees opened substantially more that the PwC reported 1,534,280 deposit accounts that may not have been authorized and that may have been funded through simulated funding, or transferring funds from consumers' existing accounts without their knowledge or consent.  PwC's analysis went only back to 2011 and determined that roughly 85,000 of those accounts incurred about $2 million in fees. The fees included overdraft fees on linked accounts the consumers already had, monthly service fees imposed for failure to keep a minimum balance in the unauthorized account, and other fees.

90.     Section 1036(a)(1)(B) of the Consumer Financial Protection Act ("CFPA") prohibits "unfair" acts or practices. 12 U.S.C. § 5536(a)(1)(B).  An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).

91.     By opening unauthorized deposit accounts and engaging in acts of simulated funding, Wells Fargo caused and was likely to cause substantial injury to consumers that was not reasonably avoidable, because it occurred without consumers' knowledge, and was not outweighed by countervailing benefits to consumers or to competition.

92.     Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).   An act or practice is abusive if it materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service. 12 U.S.C. § 5531(d)(1).   Additionally, an act or practice is abusive if it takes unreasonable advantage of the inability of the consumer to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

93.     The Plaintiffs contend that any alleged agreements between themselves and Wells Fargo were entered into based upon fraudulent inducement and failure to disclose material elements of the agreement, thereby rendering the alleged agreements void, *ab initio*.   The Plaintiffs did not have a meeting of the mind, because Wells Fargo intentionally omitted to disclose material facts (fraudulent sales practices as outlined above) which were mandatory in order to have a valid contract formed.

94.     Wells Fargo's acts of opening unauthorized deposit accounts and engaging in simulated funding materially interfered with the ability of consumers to understand a term or condition of a consumer financial product or service, as they had no, or limited knowledge, of those terms and conditions, including associated fees.

95.     Based upon Wells Fargo's admitted fraudulent sales activities, including fraudulent inducement to open accounts with the bank, dating at least until 2002, any agreements entered into subsequent to that date with Plaintiffs, were based upon fraudulent inducement and are void.

96.     Wells Fargo's acts of opening unauthorized deposit accounts, and engaging in simulated funding, took unreasonable advantage of consumers' inability to protect their interests in selecting or using consumer financial products or services, including interests in having an account opened only after affirmative agreement, protecting themselves from security and other

26

risks, including identity theft, and avoiding associated fees.  This additionally affected their customers' credit records.(**Exhibits 18, 19**)

97.     Therefore, Wells Fargo engaged in "unfair" and "abusive" acts or practices that violate §§ 1031(c)(1), (d)(1), (d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B).

98.     Wells Fargo's analysis, and admissions by Wells Fargo's CEO, along with the admissions of culpability set forth in the Independent Directors of the Board of Wells Fargo & Company "Sales Practices Investigation Report" dated April 10, 2017, concluded that Wells Fargo employees from 2011:  (a) submitted applications for 565,443 credit-card accounts that were not authorized – and were submitted by using consumers' information without their knowledge or consent; (b)  Roughly 14,000 of those accounts incurred $403,145 in fees.  Fees incurred by consumers on such accounts included annual fees and overdraft-protection fees, as well as associated finance or interest charges and other late fees; (c)  Over 3.5 million unauthorized accounts were opened without authorization or consent;  (d)  That executives, and upper management, including, but not limited to, the CEO, John Stumpf, Matthew Raphaelson, Patricia Hardison, and Carrie Tolstedt, executed sales models inherited from Richard Kovacevich, which led to fraudulent account activity by Wells Fargo employees. *See Exhibit E, supra*.

99.     Section 1036(a)(1)(B) of the CFPA prohibits "unfair" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).  This is additionally a violation of Utah's Unfair Practices Act and unfair practices for all states, as outlined below.

100.   By failing to inform potential customers of the ongoing fraudulent corporate practices of opening fraudulent accounts, in applying for and opening credit-card accounts using consumers' information without their knowledge or consent, Wells Fargo intentionally misrepresented and/or omitted material information necessary for the Plaintiffs to make an informed decision to open an account.   Wells Fargo's actions and omissions caused, and was likely to cause, substantial injury that was not reasonably avoidable, because it occurred without consumers' knowledge, and was not outweighed by countervailing benefits to consumers or competition.

101.   Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service. 12 U.S.C. § 5531(d)(1). Additionally, an act or practice is abusive if it takes unreasonable advantage of the consumer's inability to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

102.   Wells Fargo's acts of misrepresentation and/or omission to provide Plaintiffs material facts regarding Wells Fargo's ongoing and continuous fraudulent activities, constituted actionable fraud in the inducement to individuals and "persons" opening Wells Fargo accounts, thereby rendering accounts opened since 2002, void.

103.   Wells Fargo's actions of opening credit-card accounts using consumers' information without their knowledge or consent materially interfered with the ability of consumers to understand a term or condition of a consumer financial product or service, as they had no or limited knowledge of those terms and conditions, including associated fees.   In addition to the foregoing, Wells Fargo activities constituted a violation of 12 U.S.C. § 1972 (section 106 anti-

tying provision) of the Bank Holding Company Act Amendments of 1970 (BHCA)[35], prohibiting financial institutions from imposing anticompetitive conditions on their customers.

104.    Additionally, Wells Fargo's acts of failing to disclose material information prior to opening accounts of any nature, and subsequently opening credit-card accounts using consumers' information without their knowledge or consent, took unreasonable advantage of the consumers' inability to protect their interests in selecting or using a specific consumer financial product or service, and constituted actionable fraud in the inducement, vitiating all banking accounts entered into subsequent to 2002.

105.    Therefore, Wells Fargo engaged in "unfair" and "abusive" acts or practices that violate §§ 1031(c)(1), (d)(1), (d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B), and Utah Unfair Competition Act, and Utah Unfair Practices Act, and constituted further violations of other states unfair competition, or practices laws, as set forth below.

106.    Beginning as early as 2002, Wells Fargo's employees used email addresses not belonging to consumers/Plaintiffs to enroll consumers in online-banking services without Plaintiffs knowledge or consent.  Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or

---

[35] The basic anti-tying provision of 12 U.S.C. § 1972 reads as follows: A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement
(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;
(B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;
(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;
(D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company; or
(E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.
The [Federal Reserve] Board may by regulation or order permit such exceptions to the foregoing prohibition and the prohibitions of section 1843(f)(9) and 1843(h)(2) of this title as it considers will not be contrary to the purposes of this chapter.

practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it takes unreasonable advantage of the consumer's inability to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

107.    Wells Fargo's acts of enrolling Plaintiffs/consumers in online-banking services without their knowledge or consent took unreasonable advantage of Plaintiffs'/consumers' inability to protect their interests in selecting or using a consumer financial product or service, including interests in having these products or services activated only after a valid and affirmative agreement was entered into, allowing them to protect themselves from security and other risks.

108.    Therefore, Wells Fargo engaged in "abusive" acts or practices that violate §§ 1031(d)(2)(B) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(B), 5536(a)(1)(B).

109.    Plaintiffs allege that Section 1975 of the BHCA provides that:

> Any person who is injured in his business or his property by reason of anything forbidden in 1972 of this Title may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover **three times** the amount of damages sustained by him and the cost of suit including a reasonable attorney's fee. 12 U.S.C. §1975 [36]

110.    Beginning in 2002, or earlier, Wells Fargo's employees requested debit cards, credit cards, and created PINs to activate them without consumers' knowledge or consent. 35 Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it takes unreasonable advantage of the consumer's inability to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B), which is additionally an anti-tying violation of BHCA, Section 1975.

---

[36] *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."

111.   Wells Fargo's acts of issuing debit cards or credit cards to consumers/Plaintiffs without their knowledge or consent took unreasonable advantage of consumers' inability to protect their interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

112.   Therefore, Wells Fargo engaged in "abusive" acts that violate §§ 1031(d)(2)(B) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(B), 5536(a)(1)(B), and Section 1975 of the BHCA.

113.   Wells Fargo had strict quotas regulating the number of daily "solutions" that its bankers, tellers, and "team members," had to reach; these "solutions" included the opening of all new banking and credit card accounts.   Managers constantly hounded, berated, demeaned and threatened employees to meet these unreachable quotas. Managers often told employees to do whatever it takes to reach their quotas.   Defendants should be enjoined from compelling this practice as it is in direct violation of the law, and has been acknowledged as an admission by Mr. Stumpf, and the Board of Directors of Wells Fargo.

114.   Plaintiffs who have complained about receiving credit cards they did not request were advised by Wells Fargo to simply destroy the unrequested and unauthorized cards.[37]   However; simply destroying these unauthorized cards does not close the account, nor does it repair the impact to a customer's credit profile which may continue to show open credit cards.

---

[37] Plaintiff Jennifer Zeleny. opened an attorneys' trust account in 2014.  When opening the account she stressed that the account was regulated by the Utah State Bar and she could not have a line of credit attached to the account.  Wells Fargo employees opened the account, and pulled her credit history, without her consent, and opened two credit cards in her name, and the trust account had a line of credit attached to it, contrary to her instructions, and laws regulating attorneys.  Jennifer Zeleny was regulating her credit history in order to purchase a home.  The credit lines and credit authorizations for over $15,000 had a negative effect on her credit scores and impeded her ability to qualify for a home loan.  Jennifer. spent numerous hours requesting Wells Fargo to correct her account at the branch level and had to petition Wells Fargo's legal counsel in California to finally remove the credit inquires, and remove the unauthorized credit cards.

115.    In the practice known at Wells Fargo as "pinning," a Wells Fargo banker obtained a debit card number, and personally set the PIN, often to 0000, without customer authorization. "Pinning" permitted a banker to enroll a customer in online banking, for which the banker would receive a solution (sales credit).   To bypass computer prompts requiring customer contact information, *bankers impersonate* the customer online, and input false generic email addresses such as 1234@wellsfargo.com, noname@wellsfargo.com, or none@wellsfargo.com to ensure that the transaction is completed, and that the customer remains unaware of the unauthorized activity.

116.    Because of Wells Fargo's setting of unrealistic sales goals, Wells Fargo employees have engaged in other gaming tactics, including, but not limited to:

a. Making misrepresentations to customers to get them to open additional accounts such as falsely stating: "you will incur a monthly fee on your checking account until you add a savings account."

b. Misrepresenting that additional accounts do not have monthly fees, when they actually do incur such fees.

c. Referring unauthorized, and therefore unfunded, accounts to collections because, Wells Fargo's practices cause the accounts to have negative balances.

d. Failing to disclose material matters to Plaintiffs prior to opening any accounts.

e. Wells Fargo sold heavy to individuals holding Mexican Matriculada Consular cards because the lack of a Social Security Number makes it easier to open numerous fraudulent accounts.

f. Advising customers who do not want credit cards that they will be sent a credit card anyway, and to just tear it up when they receive it.

32

117.    Plaintiffs/customers who have discovered unauthorized accounts often make the discovery accidentally.  For instance: (a) unexplained money being withdrawn from authorized accounts to fund unauthorized accounts; (b) mailings from Wells Fargo congratulating a customer on opening a new account the customer does not recognize, or asking a customer to update account information for accounts that the customer does not recognize; (c) calls from collection agencies stating the customer is overdrawn on an account that the customer does not recognize; and (d) discovering that checks a customer intended to be deposited into an authorized account do not appear in monthly statements because the checks had instead been deposited into an unauthorized account.

118.    Plaintiffs have been prejudiced in numerous ways by Wells Fargo's gaming: (a) Plaintiffs lost money to monthly service fees charged for unauthorized accounts; (b) Plaintiffs accounts have been placed into collection, forcing customers to fight with debt collection agencies for fees charged by Wells Fargo on unauthorized accounts; (c) Plaintiffs' credit reports are impacting job applications, loans for automobiles, and mortgage applications; and (d) Plaintiffs are forced to purchase costly identity theft protection services to ensure against further activities. But for Wells Fargo's quota-based business model, Plaintiffs would not have incurred wrongful fees, been put into collections, suffered derogatory references on their credit reports, or forced to purchase identity theft protection, or had to pay increased fees on purchases due to their credit score.

119.    Plaintiffs have experienced difficulty reporting unauthorized activity.  Reaching the correct representative has been no guarantee the unauthorized account would be remedied, as complaining Plaintiffs often never received return calls from Wells Fargo, or have remained on hold for four (4) hours or longer to speak with a representative.

120.    Wells Fargo knew, or in the exercise of reasonable care should have known, that it's employees would not report the complaints made by Plaintiffs, because upon information and belief, Wells Fargo executives, such as Carrie Tolstedt, were more concerned with profit and the "**Gr-Eight**" program.

121.    Wells Fargo required that all new customer accounts be approved by a branch manager or assistant manager, thereby providing Wells Fargo management with a clear record of the number and types of accounts opened for each customer.  However, Wells Fargo had <u>never</u> disclosed in SEC filings, prior to 2017 that it engaged in opening fake accounts in Plaintiffs names, engaged in identity theft of plaintiffs information, used plaintiffs information without their consent, or charged plaintiffs fees and reported late payments to credit reporting agencies, on plaintiffs accounts that the plaintiff did not even know existed.

122.    Despite Wells Fargo's knowledge of gaming by its employees, it has done little, if anything, to either terminate these practices, or to reform the business model it created that has fostered them. While Wells Fargo has made a few minor changes to its policies, and has fired a handful of employees, those efforts have been, at most, cosmetic, and ultimately benefit Wells Fargo by providing them with plausible deniability. However, the policies that encourage these tactics continue, and employees who engage in them continue to be rewarded monetarily, and even promoted, or given bonuses of over $20 million dollars to executives such as Carrie Tolstedt, John Stumpf, Pamela Conboy, Shelley Freeman, Matthew Raphelson, Claudia Russ Anderson, Patricia Callahan*, etc*.

123.    Wells Fargo refused to alter its quota or goal incentive system, or reduce the illegal fraudulent activities, identity theft, manipulation of processing customer debit card purchases to

maximize overdraft fees, *et. al*. (See John Stumpf testimony before Senate Banking Committee) until after John Stumpf's testimony.

124.    Wells Fargo has a plethora of fines, refusal to follow regulatory Orders, or Department of Justice settlement agreements.  Plaintiffs contend that because the United States Government decided that Wells Fargo is "to big to fail," Wells Fargo believes it can do whatever it wants with impunity, all the time using interest free money, or virtually interest free money from the United States and the Plaintiffs in order to pay the judgments for violation of laws and regulatory requirements.  Because Wells Fargo makes so much money, it doesn't really affect their profitability, as noted that the last fine from CFPA was less than 2% of one quarter's profits.  Such a small fine, *vis-à-vis* their profit provides little, or no incentive to adhere to the law when you can pay less than a days profit for your fraudulent activity that has literally ruined numerous plaintiffs' lives, resulted in the loss of jobs, ruined credit history, shed false light on the plaintiffs, resulted in identity theft, collection activities, and other problems plaintiffs will testify to *ad nauseam.*

## **PLAINTIFFS**

### **Plaintiffs That Defendants Have Attempted to Compel to Arbitration**

### **Maryann Aldous**

125.    Defendants argue that Plaintiff Maryann Aldous signed a consumer checking account and consumer savings account on August 8, 2007.

126.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

127.    Plaintiff Maryann Aldous contends that she was not told at the time of her account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer

information, or engaging in fraudulent activities.

128.    Plaintiff Maryann Aldous asserts that she does not recall arbitration terms, nor would she have agreed to arbitration terms if she knew Wells Fargo was creating fake accounts using customers private information at the time.

129.    Plaintiff Maryann Aldous contends that she would not have opened up her account with Wells Fargo if she had been informed that Wells Fargo was actively taking customer information and creating fake accounts, and that she was fraudulently induced into open the account.

**Travis Ashby**

130.    Defendants argue that Plaintiff Travis Ashby initially opened a First Security checking account on September 23, 2000.

131.    Plaintiffs contend that Defendants continued to send notices and unilateral account agreement updates, modifying any prior agreements, to individuals, during a time when Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo.

132.    Plaintiff Travis Ashby contends that he was not told through any of the consumer account agreements, after Wells Fargo's acquisition of First Security Bank, that were allegedly subsequently sent, that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

133.    Plaintiff Travis Ashby asserts that he does not recall arbitration terms, nor would he have agreed to arbitration terms if he knew Wells Fargo was creating fake accounts using customers private information at the time.

134.    Plaintiff Travis Ashby not only contends that he would not have opened, or continued an account, if he was aware of the arbitration terms, but if Wells Fargo had disclosed its illegal sales practices and if he had been made aware that Wells Fargo was going to engage in fake accounts

using customer information, he would not have banked with Wells Fargo.

135.    Plaintiff Travis Ashby contends that he does not recall receiving a "welcome packet" (nor does he know was documents were purportedly contained in the alleged "welcome packet") from Wells Fargo for the conversion of his account, and failure of Wells Fargo to disclose material information regarding its gaming practices, fraudulently induced him to continue his First Security account with Wells Fargo, which he would not have done.

## Nicholas Beach

136.    Defendants argue that Plaintiff Nicholas Beach opened a checking and savings account on February 19, 2013.

137.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

138.    Plaintiff Nicholas Beach contends that he was not told at the time of his account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

139.    Plaintiff Nicholas Beach contends that he does not recall any arbitration terms, nor would he have agreed to arbitration terms, or even opened an account, if he knew that Wells Fargo was creating fake accounts using customers private information at the time.

140.    Plaintiff Nicholas Beach asserts that he would not have opened up his account if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts and that opening his account was achieved through fraudulent inducement.

## Harold Beard

141.    Defendants argue that Plaintiff Harold Beard opened a checking account on January 23, 2004.

142.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

143.    Plaintiff Harold Beard contends that he was not told at the time of his account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

144.    Plaintiff Harold Beard contends that he does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customers private information at the time.

145.    Plaintiff Harold Beard further contends that he would not have opened up his account if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that the opening of his account was through fraudulent inducement.

**Bruce Bird**

146.    Defendants argue that Plaintiff Bruce Bird opened a consumer checking account on June 4, 2005.

147.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

148.    Plaintiff Bruce Bird contends that he was not told at the time of his account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

149.    Plaintiff Bruce Bird contends that he does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customers private information at the time.

150.    Plaintiff Bruce Bird contends that he would not have opened up his account if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his account was opened by fraudulent inducement.

**Matthew Bishop**

151.     Defendants argue that Plaintiff Matthew Bishop opened a consumer checking account with First Security on September 23, 1999.

152.     Defendants contend that on or around March 19, 2001 a package of materials relating to the conversion of his account to Wells Fargo was mailed to him.

153.     Defendants further contend that Plaintiff Matthew Bishop enrolled in a Wells Fargo "Add-On Package" on January 27, 2005.

154.     Plaintiffs contend that Defendants never included in subsequent consumer account agreements, the fact that Wells Fargo was engaging in fraud.

155.     Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on the date of Matthew Bishop's "Add-On Package".

156.     Plaintiff Matthew Bishop contends that the was not told at the time of his account rollover, or at the time of his enrollment in his "Add-On Package" that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

157.     Plaintiff Matthew Bishop contends that he does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customers information at the time.

158.     Plaintiff Matthew Bishop asserts that he would not have opened up an "Add-On Package" if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts and that his accounts were opened under a fraudulent inducement.

**Don Black**

159.     Defendants argue that Plaintiff Don Black opened a joint consumer checking account on

39

April 7, 2010.

160.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

161.    Plaintiff Don Black contends that he was not told at the time of his account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

162.    Plaintiff Don Black contends that he does not recall arbitration terms, nor would he have agreed to arbitration if he knew Wells Fargo was creating fake accounts using customers information at the time.

163.    Plaintiff Don Black contends that he would not have opened up his account if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Aaron Brodie**

164.    Defendants argue that Plaintiff Aaron Brodie opened up a consumer checking and consumer savings account on May 10, 2011.

165.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

166.    Plaintiff Aaron Brodie contends that he was not told at the time of his account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

167.    Plaintiff Aaron Brodie contends that he does not recall any arbitration terms, nor would he have agreed to arbitration if he knew Wells Fargo was creating fake accounts using customer information at the time.

168.    Plaintiff Aaron Brodie contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer

information and creating fake accounts.

169.    Plaintiff Aaron Brodie contends that at the time of account opening, a credit card was opened up without his consent for overdraft protection.

170.    Plaintiff Aaron Brodie indicated to the personal banker that he did not apply for this, nor did he want one.

171.    Plaintiff Aaron Brodie asserts that he was told to just leave it be and not use it and everything would be ok.

172.    Plaintiff Aaron Brodie was unaware at the time that the credit card had been linked for overdraft protection.

173.    Plaintiff Aaron Brodie indicates he overdrafted without knowing it, and this unauthorized credit card was charged.

174.    Plaintiff Aaron Brodie contends he went to the bank to talk to the teller, and the branch manager told him to just pay the credit card.

175.    Plaintiff Aaron Brodie was eventually sent to collections, and his credit score has dropped by an estimated 125 points.

176.    Plaintiff Aaron Brodie's credit score was so badly damaged, he had to retain a credit repair specialist and pay thousands of dollars to try and fix his credit.  Had Wells Fargo disclosed to him their fraudulent sales activities, he would never have opened an account with them, and contends he was fraudulently induced into the agreement.

**Patricia Burkhalter (Rivas)**

176.    Defendants argue that Patricia Burkhalter opened a checking account and a consumer savings account on June 13, 2014.

177.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were

occurring at Wells Fargo on this date.

178.    Plaintiff Patricia Burkhalter contends that she was not told at the time of her account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

179.    Plaintiff Patricia Burkhalter contends that she does not recall any arbitration terms, nor would she have agreed to arbitration if she knew Wells Fargo was creating fake accounts using customer information at the time.

180.    Plaintiff Patricia Burkhalter contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

181.    Plaintiff Patricia Burkhalter contends that a credit card was opened up in her name without her authorization, accounts and that her accounts were opened under a fraudulent inducement.


**Marcia Cameron**

182.    Defendants argue that Marcia Cameron opened a First Security checking account on July 11, 1994.

183.    Plaintiffs contend that when she opened her account with First Security Bank there were no arbitration provisions.  Plaintiffs further allege Defendants never included in subsequent consumer account agreements, the fact that Wells Fargo was engaging in fraudulent account practices with customer accounts.

184.    Plaintiffs contend that Wells Fargo left out any information regarding fraudulent account openings in the consumer account agreements, when Wells Fargo knew the fraudulent activity

was going on.

185.    Plaintiff Marcia Cameron contends that she does not recall any arbitration terms, nor would she have agreed to arbitration if she knew Wells Fargo was creating fake accounts using customer information.

186.    Plaintiff Marcia Cameron contends that she would not have used her account if she were made aware that Wells Fargo would begin to take customer information and create fake accounts, she would have closed the account to protect her information.

187.    Plaintiff Marcia Cameron contends that Wells Fargo opened up an overdraft protection and linked it to an unauthorized credit card.

188.    Plaintiff contends that the unauthorized card was stolen and had multiple charges added to it, causing her significant damage to her credit and that Wells Fargo refused to remedy the situation.  If she had known of Wells Fargo's fraudulent sales practices she never would have continued the account with Wells Fargo transferred from First Security Bank, and that her accounts were opened under a fraudulent inducement.

**Cameron Casey**

189.    Defendants argue that Cameron Casey opened a consumer checking account and a consumer savings account on September 20, 2013.

190.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

191.    Plaintiff Cameron Casey contends that he was not told at the time of his account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

192.    Plaintiff Cameron Casey contends that he does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using

customer information.

193.    Plaintiff Cameron Casey contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

194.    Plaintiff Cameron Casey contends that but for Wells Fargo's fraudulent conduct, he would not have lost everything and be forced into a business bankruptcy and a personal bankruptcy, causing him severe damage to his credit and that his accounts were opened under a fraudulent inducement.

**<u>Zachary Christensen</u>**

195.    Defendants argue that Zachary Christensen applied for a Wells Fargo Visa Credit Card on April 16, 2016.

196.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

197.    Plaintiff Zachary Christensen contends that he was not told at the time of his credit card application that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

198.    Plaintiff Zachary Christensen does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

199.    Plaintiff Zachary Christensen contends that he would not have opened up a Wells Fargo Visa Credit Card with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts and that his accounts were opened under a fraudulent inducement.

**Jamal Dean**

200.    Defendants argue that Jamal Dean opened a business checking account on September 19, 1996, and signed up for online banking on December 31, 2013.

201.    Plaintiffs contend that Defendants never provided updated Business Account Agreements to Plaintiff Jamal Dean indicating that Wells Fargo was using client information to create fake accounts.

202.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at the date of Plaintiff Jamal Dean's Online Banking.

203.    Plaintiff Jamal Dean contends that he was not told in any of the Business Account Agreements, or at the time of his online banking, that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

204.    Plaintiff Jamal Dean does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

205.    Plaintiff Jamal Dean contends that if he were made aware during any of the Business Account Agreements that Wells Fargo was going to take customer information and create false accounts, he would not have kept his business checking account with Wells Fargo.

206.    Plaintiff Jamal Dean contends that he would not have opened up Online Banking if he knew that Wells Fargo was in the practice of creating fraudulent accounts with customer information accounts, and that his accounts were opened under a fraudulent inducement.

**Mbegane Diouf**

207.    Defendants argue that Mbegane Diouf opened a consumer checking account on October 19, 2012.

208.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were

45

occurring at Wells Fargo on this date.

209.    Plaintiff Mbegane Diouf contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

210.    Plaintiff Mbegane Diouf does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

211.    Plaintiff Mbegane Diouf contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that any accounts opened were under fraudulent inducement.

**Curtis Dowdle**

212.    Defendants argue that Curtis Dowdle opened a consumer checking account on January 9, 2006.

213.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

214.    Plaintiff Curtis Dowdle contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

215.    Plaintiff Curtis Dowdle contends that he is the financial caretaker for schizophrenic brother.

216.    Plaintiff asserts that SSDI is deposited into an account that he is a beneficiary payee on.

217.    Plaintiff asserts that Defendants showed a Visa had been issued on this account and was

46

being used.

218.   Plaintiff contends he attempted to close this down numerous times and Defendants refused to close down the account.

219.   Plaintiff asserts that Defendants proceeded to send the account for his schizophrenic brother to collections.

220.   Plaintiff Curtis Dowdle does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

221.   Plaintiff Curtis Dowdle contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts and any accounts were entered into under fraudulent inducement, without sufficient disclosures of material facts.

**<u>Edward Dowdy</u>**

222.   Defendants argue that Edward Dowdy opened up a consumer checking account and a consumer savings account on October 16, 2013.

223.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

224.   Plaintiff Edward Dowdy contends that at the time of opening his checking and savings account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

225.   Plaintiff Edward Dowdy does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

226.   Plaintiff Edward Dowdy contends that he would not have opened up any account with

Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts and that his accounts were opened under a fraudulent inducement.

**Jennifer Ellsworth**

227.   Defendants argue that Jennifer Ellsworth opened up a consumer checking account on November 29, 2014.

228.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

229.   Plaintiff Jennifer Ellsworth contends that at the time of opening her checking account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

230.   Plaintiff Jennifer Ellsworth does not recall any arbitration terms, nor would she have agreed to arbitration if she knew that Wells Fargo was creating fake accounts using customer information.

231.   Plaintiff Jennifer Ellsworth contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

232.   Plaintiff Jennifer Ellsworth contends that she was directed to a personal banker when opening up her account and the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

**Richard Farr**

234.   Defendants argue that Richard Farr opened up a consumer checking account on December 15, 2015.

48

235.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

236.    Plaintiff Richard Farr contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

237.    Plaintiff Richard Farr does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

238.    Plaintiff Richard Farr contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Glenn Gilleshammer**

239.    Defendants argue that Plaintiff Glenn Gilleshammer opened a consumer savings account on September 29, 2005, a consumer savings account on February 2, 2009.

240.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

241.    Plaintiff Glenn Gilleshammer contends that at the time of opening his savings accounts, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

242.    Plaintiff Glenn Gilleshammer does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

243.    Plaintiff Glenn Gilleshammer contends that he would not have opened up any account

49

with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

244.   Plaintiff Glenn Gilleshammer contends that he had a credit card with Wells Fargo which was stolen.

245.   Plaintiff Glenn Gilleshammer asserts that he called and cancelled the card.

246.   Plaintiff Glenn Gilleshammer contends that Wells Fargo opened up a new credit card, which was not authorized and closed.

247.   Plaintiff Glenn Gilleshammer asserts that Defendants opened a third credit card in his name, transferred all the costs, fees, bank charges, and interest from the original card to this new card.

248.   Plaintiff Glenn Gilleshammer contends that despite numerous attempts, even after hiring an attorney, Defendants have refused to close the third credit card and the associated fraudulent charges and further that all credit cards, savings and other accounts were opened under fraudulent inducement, without disclosure of material facts by Defendants.

**Shanell Golden**

249.   Defendants argue that Plaintiff Shanell Golden opened a consumer checking and a consumer savings account on October 20, 2008.

250.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

251.   Plaintiff Shanell Golden contends that at the time of opening her consumer checking and savings account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

252.   Plaintiff Shanell Golden does not recall any arbitration terms, nor would she have agreed

50

to arbitration if she knew that Wells Fargo was creating fake accounts using customer information.

253.    Plaintiff Shanell Golden contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Andrew Gorayeb**

254.    Defendants argue that Plaintiff Andrew Gorayeb opened a consumer checking account on June 20, 2007.

255.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

256.    Plaintiff Andrew Gorayeb contends that at the time of opening his consumer checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

257.    Plaintiff Andrew Gorayeb does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

258.    Plaintiff Andrew Gorayeb contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

259.    Plaintiff Andrew Gorayeb asserts that he was directed to a personal banker when he went in to open an account.  Said banker failed to disclose material facts relating to ongoing fraudulent sales practices and Plaintiff was fraudulent induced into opening the account referenced herein.

51

260.    Plaintiff Andrew Gorayeb asserts that he would have kept his account at California Bank and Trust in lieu of moving his account if he had been made aware of the fraud at the time.

261.    Plaintiff Andrew Gorayeb indicates that Defendants opened up an investment account without his authorization.

262.    Plaintiff Andrew Gorayeb indicates that Defendants transferred money out of his account and placed it into the unauthorized account without his consent, and that his accounts were opened under a fraudulent inducement.

**Kenneth Gregory**

263.    Defendants argue that Plaintiff Kenneth Gregory opened a consumer checking account and consumer savings account on January 2, 2015.

264.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

265.    Plaintiff Kenneth Gregory contends that at the time of opening his consumer checking and consumer savings account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

266.    Plaintiff Kenneth Gregory does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

267.    Plaintiff Kenneth Gregory contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Aaron Hands**

52

268.     Defendants argue that Plaintiff Aaron Hands opened up a consumer checking account on December 1, 2015.

269.     Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

270.     Plaintiff Aaron Hands contends that at the time of opening his consumer checking account and the Relationship Change Application, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

271.     Plaintiff Aaron Hands does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

272.     Plaintiff Aaron Hands contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.


**Charles Jones**

273.     Defendants argue that Plaintiff Charles Jones opened a consumer checking account and consumer savings account on July 27, 2010.

274.     Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

275.     Plaintiff Charles Jones contends that at the time of opening his consumer checking account and savings account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

276.     Plaintiff Charles Jones does not recall any arbitration terms, nor would he have agreed to

arbitration if he knew that Wells Fargo was creating fake accounts using customer information.

277.    Plaintiff Charles Jones contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

278.    Plaintiff Charles Jones asserts that he was directed to a personal banker when he entered the store to open a checking account.  Said banker failed to disclose any information about Wells Fargo's fraudulent sales practices, and any account was opened under fraudulent inducement.

279.    Plaintiff Charles Jones asserts that the personal banker indicated to Plaintiff that he could not open up a checking account without also opening a savings account.

280.    Plaintiff Charles Jones further asserts that Defendants would place unsolicited calls to him asking him about a home loan.

**Erica Bendixsen Jones**

281.    Defendants argue that Erica Bendixsen Jones opened a consumer savings account on August 19, 2003.

282.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

283.    Plaintiff Erica Jones contends that at the time of opening her account she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

284.    Plaintiff Erica Jones does not recall any arbitration terms, nor would she have agreed to arbitration if she knew that Wells Fargo was creating fake accounts using customer information.

285.    Plaintiff Erica Jones contends that she would not have opened any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer

information and creating fake accounts, and that her accounts were opened under a fraudulent inducement.

**Reza Kamali-Sarvestani**

286. Defendants argue that Plaintiff Reza Kamali-Sarvestani opened a consumer checking account and consumer savings account on September 2, 2011.

287. Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

288. Plaintiff Reza Kamali-Sarvestani contends that at the time of opening the account, Plaintiff was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

289. Plaintiff Reza Kamali-Sarvestani does not recall any arbitration terms, nor would Plaintiff Reza Kamali-Sarvestani have agreed to arbitration if it was made known to Plaintiff that Wells Fargo was creating fake accounts using customer information.

290. Plaintiff Reza Kamali-Sarvestani contends that Plaintiff would not have opened up any account with Wells Fargo if Plaintiff had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Jennifer King**

291. Defendants argue that Plaintiff Jennifer King opened a consumer checking account and consumer savings account on June 10, 2014.

292. Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

293. Plaintiff Jennifer King contends that at the time of opening her account, she was not told

55

that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

294.   Plaintiff Jennifer King does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

295.   Plaintiff Jennifer King contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that her accounts were opened under a fraudulent inducement.

**Edward Klann**

296.   Defendants argue that Plaintiff Edward Klann opened a consumer checking and a consumer savings account on April 25, 2011.

297.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

298.   Plaintiff Edward Klann contends that at the time of opening his account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

299.   Plaintiff Edward Klann does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

300.   Plaintiff Edward Klann contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent

inducement.

**Austin Law**

301.    Defendants argue the Plaintiff Austin Law opened a consumer checking account and consumer savings account on May 5, 2016.

302.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

303.    Plaintiff Austin Law contends that at the time of opening his account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

304.    Plaintiff Austin Law does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

305.    Plaintiff Austin Law contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Ayoka Lawani**

306.    Defendants argue that Plaintiff Ayoka Lawani opened a Wachovia checking and savings account on August 11, 2010, which was converted to a Wells Fargo account on February 18, 2012.

307.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo at the time of conversion.

308.    Plaintiff Ayoka Lawani contends that at the time of her account conversion, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent

57

accounts.

309.   Plaintiff Ayoka Lawani does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

310.   Plaintiff Ayoka Lawani contends that she would have closed her Wachovia account and opened an account elsewhere in lieu of having her account converted to Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that her accounts were opened under a fraudulent inducement.

**Ralph McCoy**

311.   Defendants argue that Plaintiff Ralph McCoy opened a consumer checking account on November 14, 2014.

312.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

313.   Plaintiff Ralph McCoy contends that at the time of his account opening, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

314.   Plaintiff Ralph McCoy does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

315.   Plaintiff Ralph McCoy contends that he would not have opened any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Kay Mitchell**

316.    Defendants argue that Plaintiff Kay Mitchell was added to a consumer checking account, and that she received on her December 2011 statement "Important Changes in Terms of Notice".

317.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at the time.

318.    Plaintiff Kay Mitchell contends that at the time of her being added as a joint owner to the present, Wells Fargo did not indicate to her that Defendants were in the practice of taking customer information and opening fraudulent accounts.

319.    Plaintiff Kay Mitchell does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

320.    Plaintiff Kay Mitchell contends that she would not have been put on as a joint owner, and would have encouraged her son to not open an account with Wells Fargo, if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that her accounts were opened under a fraudulent inducement.

**Lawrence Mitchell**

321.    Defendants argue that Plaintiff Lawrence Mitchell opened a consumer checking account with First Security Bank on April 2, 1982, and signed up for online banking with Wells Fargo on May 20, 2005.

322.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at the time of the online banking sign up.

323.    Plaintiff Lawrence Mitchell contends that his account with First Security did not have an arbitration agreement, and that after the acquisition of First Security by Wells Fargo he never

received information from Defendants in any of the subsequent disclosures, in which Defendants informed him that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

324.   Plaintiff Lawrence Mitchell does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

325.   Plaintiff Lawrence Mitchell contends that he would not have signed up for online banking, and would have closed his account if he was informed that Wells Fargo was going to start taking customer information to create fake accounts, and that his accounts were opened under a fraudulent inducement.

**Robert Moyer**

326.   Defendants argue that Plaintiff Robert Moyer was added to three consumer accounts opened by Noel Taxin, which were opened on October 20, 2006.

327.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

328.   Plaintiff Robert Moyer contends that at the time of being added to the accounts, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

329.   Plaintiff Robert Moyer does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

330.   Plaintiff Ralph McCoy contends that he would not have been added to any account with Wells Fargo, and he would have encouraged Noel Taxin not to open any account whatsoever

with Wells Fargo, if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Nathan Ornellas**

331.   Defendants argue that Plaintiff Nathan Ornellas opened a consumer checking account on July 12, 2016.

332.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

333.   Plaintiff Nathan Ornellas contends that at the time of his account opening, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

334.   Plaintiff Nathan Ornellas does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

335.   Plaintiff Nathan Ornellas contends that he would not have opened any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Gloria Pledger**

336.   Defendants argue that Plaintiff Gloria Pledger opened a consumer checking account and consumer savings account on April 15, 2016.

337.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

61

338.    Plaintiff Gloria Pledger contends that at the time of her account opening, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

339.    Plaintiff Gloria Pledger does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information, accounts and that her accounts were opened under a fraudulent inducement.

340.    Plaintiff Gloria Pledger contends that she would not have opened any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

341.    Plaintiff Gloria Pledger asserts that she went to talk with a personal banker with Defendants back in 2013.

342.    Plaintiff Gloria Pledger asserts she received a credit card following this visit, which she had not applied for.

343.    Plaintiff asserts that on her debit card is says "proud member since 2013".

**Denise Poe**

344.    Defendants argue that Plaintiff Denise Poe opened a Cash on Demand account on November 7, 2005.

345.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

346.    Plaintiff Denise Poe contends that at the time of her account opening, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

347.    Plaintiff Denise Poe does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

348.    Plaintiff Denies Poe contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that her accounts were opened under a fraudulent inducement.

**Jennifer Porter**

349.    Defendants argue that Plaintiff Jennifer Porter opened a consumer checking account and consumer savings account on October 31, 2011.

350.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

351.    Plaintiff Jennifer Porter contends that at the time of her account opening, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

352.    Plaintiff Jennifer Porter does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

353.    Plaintiff Jennifer Porter contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that her accounts were opened under a fraudulent inducement.

**Robin Quigg**

354.    Defendants argue that Plaintiff Robin Quigg opened a checking account with First Union National Bank of Florida, which was acquired by Wachovia, and later acquired by Wells Fargo on June 11, 2011.

355.    Plaintiffs contend that the Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on the date of conversion.

356.    Plaintiff Robin Quigg contends that the time of her account conversion, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

357.    Plaintiff Robin Quigg does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

358.    Plaintiff Robin Quigg contends that she would have closed her account from Wachovia and found a different bank in lieu of converting, if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

359.    Plaintiff Robin Quigg asserts that she has had numerous accounts opened by Wells Fargo without her authorization, accounts and that her accounts were opened under a fraudulent inducement.

**Carina Rhea**

360.    Defendants argue that Plaintiff Carina Rhea opened a consumer bank account on January 19, 1999, and enrolled in online banking on April 3, 2008.

361.    Plaintiffs contend that the Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo during the time between the account opening and the enrollment in online banking, as well as the gaming and fraud which were occurring at Wells Fargo.

64

362.    Plaintiff Carina Rhea contends that at the time of her account opening and online banking enrollment, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

363.    Plaintiff Carina Rhea does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

364.    Plaintiff Carina Rhea contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that her accounts were opened under a fraudulent inducement.

**David Self**

365.    Defendants argue that Plaintiff David Self opened a consumer checking account on June 7, 1996, but doesn't identify with what bank. In December of 2011, Wells Fargo alleges that it sent a monthly statement with "Important Change in Terms Notice."

366.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo during the time between account opening and the 2011 monthly statement.

367.    Plaintiff David Self contends that at the time of account opening and through September 2016, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

368.    Plaintiff David Self does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

369.    Plaintiff David Self contends that he would not have opened up any account with Wells Fargo, or would have closed his account if he had been informed that Wells Fargo was going to begin actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Barbara Shadoan**

370.    Defendants argue that Plaintiff Barbara Shadoan opened a consumer checking account on August 12, 2005.

371.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

372.    Plaintiff Barbara Shadoan contends that at the time of account opening, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

373.    Plaintiff Barbara Shadoan does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

374.    Plaintiff Barbara Shadoan contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

375.    Plaintiff Barbara Shadoan asserts that she either opened up her account in person or at drive thru window, and that her accounts were opened under a fraudulent inducement.

376.    Plaintiff Barbara Shadoan asserts that she was told that if she didn't open up other accounts, she would be charged additional fees.

**Anu Sood**

377.    Defendants argue that Plaintiff Anu Sood opened a checking account with World Savings Bank, which was acquired by Wachovia on July 24, 2008, and later acquired by Wells Fargo on June 11, 2011.

378.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on the date of conversion.

379.    Plaintiff Anu Sood contends that at the time of account conversion, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

380.    Plaintiff Anu Sood does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

381.    Plaintiff Anu Sood contends that he would not have permitted his account to be converted to Wells Fargo and would have closed his account with Wachovia if he had been informed that the proposed new servicer Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

382.    Plaintiff Anu Sood asserts that he was asked to set up a new account by a banker so the banker could meet quota requirements.

**Joseph Steele**

383.    Defendants argue that Plaintiff Joseph Steele was added to a consumer savings account opened by Celia Steele on March 26, 2011. This took place allegedly on October 7, 2011.

384.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on these dates.

385.    Plaintiff Joseph Steele contends that at the time of account opening and at the time he was added to the account as a joint owner, he was not told that Wells Fargo was in the practice of

taking customer information and opening fraudulent accounts.

386.    Plaintiff Joseph Steele does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

387.    Plaintiff Joseph Steele contends that he would not have opened any account or signed as a joint owner on any account if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Lisa Stern**

388.    Defendants argue that Plaintiff Lisa Stern opened a business account on November 14, 2006.

389.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

390.    Plaintiff Lisa Stern contends that at the time of account opening, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

391.    Plaintiff Lisa Stern does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

392.    Plaintiff Lisa Stern contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

393.    Plaintiff Lisa Stern asserts that she was directed to a personal banker when she went to open a business account and that the banker failed to disclose material facts regarding Wells

Fargo's fraudulent sales practices, and the account was obtained by fraudulent inducement.

**Steven Stetzel**

394.   Defendants argue that Plaintiff Steven Stetzel opened a consumer checking account and a consumer savings account on April 10, 2009.

395.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

396.   Plaintiff Steven Stetzel contends that at the time of account opening, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

397.   Plaintiff Steven Stetzel does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

398.   Plaintiff Steven Stetzel contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Eric Talaska**

399.   Defendants argue that Plaintiff Eric Talaska opened a consumer checking account and consumer savings account on July 9, 2010.

400.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

401.   Plaintiff Eric Talaska contends that at the time of account opening, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

402.   Plaintiff Eric Talaska does not recall any arbitration terms, nor would he have agreed to

arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

403.   Plaintiff Eric Talaska contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

404.   Plaintiff Eric Talaska opened an account in person and was sent over to a personal banker and said banker failed to disclose fraudulent activities and the account was acquired by fraudulent inducement.

405.   Plaintiff Eric Talaska asserts that he made several in person visits and phone calls relating to the fraudulent accounts which were opened up in his name.

406.   Plaintiff Eric Talaska asserts he questioned if Defendants had opened up the fraudulent accounts and was told no, it was all his mistake.

**Jeffery Taylor**

407.   Defendants argue that Plaintiff Jeffery Taylor opened an individual retirement account on November 23, 2012.

408.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

409.   Plaintiff Jeffery Taylor contends that at the time of account opening, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

410.   Plaintiff Jeffery Taylor does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

411.   Plaintiff Jeffery Taylor contends that he would not have opened up any account with

70

Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

412.    Plaintiff Jeffery Taylor asserts that he went to Wells Fargo for a job interview on or around November 23, 2012.

413.    Plaintiff Jefferey Taylor contends that during the middle of the interview, Defendants took his personal information and opened up an account without his authorization, and any accounts that were opened, were opened under a fraudulent inducement.

**April Thomas**

414.    Defendants argue that Plaintiff April Thomas opened a consumer checking account and consumer savings account on August 18, 2015.

415.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

416.    Plaintiff April Thomas contends that at the time of account opening, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

417.    Plaintiff April Thomas does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

418.    Plaintiff April Thomas contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

419.    Plaintiff April Thomas asserts that she opened an account with Wells Fargo for a checking account, but the account was opened under fraudulent inducement.

420.    Plaintiff April Thomas asserts that a few weeks later, she noticed on her credit report a

credit inquiry was made by Wells Fargo.

**Doug Waters**

421.    Defendants argue that Plaintiff Doug Waters opened a First Security checking account on September 2, 1986, and allegedly signed an Authorization for Automatic Transfer on February 6, 2013.

422.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date, and before.

423.    Plaintiff Doug Waters contends that at the time of signing Authorization, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

424.    Plaintiff Doug Waters does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

425.    Plaintiff Doug Waters contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Scott Westin**

426.    Defendants argue that Plaintiff Scott Westin opened a Northwest bank checking account on January 12, 1995. This was later converted to a Wells Fargo account.

427.    Defendants argue that Plaintiff Scott Westin opened a consumer checking account on January 8, 2008.

428.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were

occurring at Wells Fargo on this date, and before.

429.   Plaintiff Scott Westin contends that at the time of opening his account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

430.   Plaintiff Scott Westin does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

431.   Plaintiff Scott Westin contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Brandon Westman**

432.   Defendants argue that Plaintiff Brandon Westman opened a consumer checking account on June 24, 2003.

434.   Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

435.   Plaintiff Brandon Westman contends that at the time of opening his account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

436.   Plaintiff Brandon Westman does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

437.   Plaintiff Brandon Westman contends that he would not have opened up any account with

73

Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

438.    Plaintiff Brandon Westman contends that he closed his account with Wells Fargo in 2009.

439.    Plaintiff Brandon Westman asserts that after he closed his account, Defendants opened up a credit card in his name without his authorization and maintains that it was opened under fraudulent inducement.

**Kim Weston**

440.    Defendants argue that Plaintiff Kim Weston opened a consumer checking account and consumer savings account on February 3, 2014.

441.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

442.    Plaintiff Kim Weston contends that at the time of opening his account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

443.    Plaintiff Kim Weston does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

444.    Plaintiff Kim Weston contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Sharon Williams**

445.    Defendants argue that Plaintiff Sharon Williams opened a Wells Fargo Visa Credit Card on September 9, 2013.

446.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

447.    Plaintiff Sharon Williams contends that at the time of opening her account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

448.    Plaintiff Sharon Williams does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

449.    Plaintiff Sharon Williams contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that her accounts were opened under a fraudulent inducement.

**Jennifer Zeleny**

450.    Defendants argue that Plaintiff Jennifer Zeleny opened a business checking account on August 13, 2014.

451.    Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.

452.    Plaintiff Jennifer Zeleny contends that at the time of opening her account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

453.    Plaintiff Jennifer Zeleny does not recall any arbitration terms, nor would she have agreed

to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

454.    Plaintiff Jennifer Zeleny contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that her accounts were opened under a fraudulent inducement

**Plaintiffs Defendants Have Not Yet Attempted to Compel to Arbitration**

**<u>Tracy Kilgore</u>**

455.    Defendants have not yet attempted to compel Plaintiff Tracy Kilgore to arbitration, despite being provided with her name, city, state, last 4 of her social security number, and even a copy of the decline letter Plaintiff Tracy Kilgore received for a credit card.

456.    Plaintiffs assert that Defendants are unable to locate Plaintiff Tracy Kilgore's information, as she never had an account with Defendants.

457.    Plaintiff Tracy Kilgore contends that she entered a Wells Fargo branch to be added as an authorized signor for a non-profit organization in which she had recently been elected as Treasurer.

458.    Plaintiff Tracy Kilgore received a letter a few days later which was dated the day after she had been added as an authorized signor.

459.    The letter states: "Your request for a credit card was carefully considered and unfortunately we are unable to approve your application at this time for the following reason(s): Ratio of monthly debt payments to the income you provided on your application".

460.    Plaintiff Tracy Kilgore never put in any information about debt payments or income when she visited the branch, as she was only there to be added on as an authorized signor on

behalf of the non profit.

461.    Plaintiff Tracy Kilgore does not recall any arbitration terms, nor would she have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

462.    Plaintiff Tracy Kilgore contends that she would not have agreed to provide any information to Wells Fargo if she had been informed at the time that Wells Fargo was actively taking information and creating fake accounts.

463.    Plaintiff Tracy Kilgore contends that she would have urged the non-profit to change banks if she had been informed at the time that Wells Fargo was actively taking information and creating fake accounts.

**Brent Miller**

464.    Defendants have not yet attempted to compel arbitration on Plaintiff Brent Miller, despite being provided with his name, state, last 4 of his social and last 4 of the two fraudulent accounts opened in his name.

465.    Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Brent Miller, as he never had a legitimate account to start with.

466.    Plaintiff Brent Miller asserts that even if he had opened up a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information and that he does not know when or were Wells Fargo obtained his confidential information.

**Alex Inskeep**

467.    Defendants have not yet attempted to compel arbitration on Plaintiff Alex Inskeep, despite being provided with name, state, and last four of Plaintiff's social security number.

468.    Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Alex Inskeep, as Plaintiff never had a legitimate account to start with.

469.    Plaintiff Alex Inskeep asserts that even if he had a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

470.    Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

471.    Plaintiff asserts that even if there had been a legitimate account at any time, he would not have opened an account with Defendants if he had been made aware of the fraud which was occurring and he does not when or how Defendants obtained his information and caused a credit inquiry.

**<u>Loretta Grady</u>**

472.    Defendants have not yet attempted to compel arbitration on Plaintiff Loretta Grady, despite being provided with name, state, and last four of Plaintiff's social security number.

473.    Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Loretta Grady, as Plaintiff never had a legitimate account to start with.

474.    Plaintiff Loretta Grady asserts that even if she had a legitimate account, she would not have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

475.    Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

476.    Plaintiff asserts that even if there had been a legitimate account at any time, she would not have opened an account with Defendants if she had been made aware of the fraud which was

occurring and she does not know how Defendants obtained her credit information.

**Richard Fountain**

477.    Defendants have not yet attempted to compel arbitration on Plaintiff Richard Fountain, despite being provided with name, state, and last four of Plaintiff's social security number.

478.    Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Richard Fountain, as Plaintiff never had a legitimate account to start with.

479.    Plaintiff asserts that even if he had a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

480.    Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

481.    Plaintiff asserts that even if there had been a legitimate account at any time, he would not have opened an account with Defendants if he had been made aware of the fraud which was occurring.

**Matthew Gragg**

482.    Defendants have not yet attempted to compel arbitration on Plaintiff Matthew Gragg, despite being provided with name, state, and last four of Plaintiff's social security number.

483.    Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Matthew Gragg, as Plaintiff never had a legitimate account to start with.

484.    Plaintiff asserts that even if he had a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

485.    Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as

Defendants have a history of bad record keeping, specifically during the time period alleged.

486.    Plaintiff Matthew Gragg asserts that a business line of credit was opened in his name without his authorization for $30,000.

487.    Plaintiff Matthew Gragg asserts he was harassed by Defendants and was threatened lawsuits against him.

488.    Plaintiff Matthew Gragg was required to hire an attorney to stop this abuse by Defendants, costing him thousands of dollars.

489.    Plaintiff asserts that even if there had been a legitimate account at any time, he would not have opened an account with Defendants if he had been made aware of the fraud which was occurring.

**Adam Brandt**

490.    Defendants have not yet attempted to compel arbitration on Plaintiff Adam Brandt, despite being provided with name, state, and last four of Plaintiff's social security number.

491.    Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Adam Brandt as Plaintiff never had a legitimate account to start with.

492.    Plaintiff asserts that even if he had a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

493.    Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

494.    Plaintiff asserts that even if there had been a legitimate account at any time, he would not have opened an account with Defendants if he had been made aware of the fraud which was occurring.

**Jacci Brandt**

495.    Defendants have not yet attempted to compel arbitration on Plaintiff Jacci Brandt, despite being provided with name, state, and last four of Plaintiff's social security number.

496.    Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Jacci Brandt, as Plaintiff never had a legitimate account to start with.

497.    Plaintiff asserts that even if she had a legitimate account, she would not have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

498.    Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

499.    Plaintiff Jacci Brandt has provided a screenshot of a Facebook post she made on April 6, 2010, in which she describes going in a Wells Fargo to talk about a mortgage refinance.

500.    Plaintiff Jacci Brandt did not move forward with the mortgage refinance, and later found out a credit card application had been opened in her name.

501.    Plaintiff asserts that even if there had been a legitimate account at any time, she would not have opened an account with Defendants if she had been made aware of the fraud which was occurring.

**Ayana Smith**

502.    Defendants have not yet attempted to compel arbitration on Plaintiff Ayana Smith, despite being provided with name, state, and last four of Plaintiff's social security number.

503.    Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Ayana Smith, as Plaintiff never had a legitimate account to start with including account ending 0982.

504.    Plaintiff asserts that even if she had a legitimate account, she would not have agreed to

arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

505.    Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

506.    Plaintiff asserts that even if there had been a legitimate account at any time, she would not have opened an account with Defendants if she had been made aware of the fraud which was occurring.

**Paul Fos**

507.    Defendants have not yet attempted to compel arbitration on Plaintiff Paul Fos, despite being provided with name, state, and last four of Plaintiff's social security number.

508.    Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Paul Fos, as Plaintiff never had a legitimate account to start with.

509.    Plaintiff asserts that even if he had a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

510.    Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

511.    Plaintiff asserts that even if there had been a legitimate account at any time, he would not have opened an account with Defendants if he had been made aware of the fraud which was occurring.

**Blake Knight**

512.    Defendants have not yet attempted to compel arbitration on Plaintiff Blake Knight, despite being provided with name, state, and last four of Plaintiff's social security number.

513.   Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Blake Knight, as Plaintiff never had a legitimate account to start with.

514.   Plaintiff asserts that even if he had a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

515.   Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

516.   Plaintiff Blake Knight asserts that Defendants filed a lawsuit against him after unilaterally raising his business credit limit.

517.   Plaintiff Blake Knight asserts that Defendants lawsuit caused him to hire an attorney to defend and cost him over $33,000 in attorney fees to defend a frivolous suit.

518.   Plaintiff asserts that even if there had been a legitimate account at any time, he would not have opened an account with Defendants if he had been made aware of the fraud which was occurring.

**<u>Dominique Evans</u>**

519.   Defendants have not yet attempted to compel arbitration on Plaintiff Dominique Evans, despite being provided with name, state, and last four of Plaintiff's social security number.

520.   Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Dominique Evans, as Plaintiff never had a legitimate account to start with.

521.   Plaintiff asserts that even if she had a legitimate account, she would not have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

522.   Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as

Defendants have a history of bad record keeping, specifically during the time period alleged.

523.   Plaintiff Dominique Evans contends that a Wells Fargo checking account has been opened in her name, and the fact that Defendants cannot locate her information is indicative of Defendants poor record keeping and fraudulent conduct.

524.   Plaintiff asserts that even if there had been a legitimate account at any time, she would not have opened an account with Defendants if she had been made aware of the fraud which was occurring.

**Kevin Saliba**

525.   Defendants have not yet attempted to compel arbitration on Plaintiff Kevin Saliba, despite being provided with name, state, and last four of Plaintiff's social security number.

526.   Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Kevin Saliba, as Plaintiff never had a legitimate account to start with.

527.   Plaintiff asserts that even if he had a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

528.   Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

529.   Plaintiff asserts he had an investment account with Wells Fargo and broker asked if he could open a deposit account in his name for a co-worker who needed to meet quota.

530.   Plaintiff asserts Defendants not only opened up a deposit account, but opened a credit card which was never authorized.

531.   Plaintiff asserts that Defendants transferred $100 into deposit account without his authorization, which was completely gone from fees, account went into overdraft and

84

collections.

532.    Plaintiff was never made aware of the credit card until years later and found out his credit score had been severely impacted.

533.    Plaintiff asserts that even if there had been a legitimate account at any time, he would not have opened an account with Defendants if he had been made aware of the fraud which was occurring.

**Scott Mugrage**

534.    Defendants have not yet attempted to compel arbitration on Plaintiff Scott Mugrage, despite being provided with name, state, and last four of Plaintiff's social security number.

535.    Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Scott Mugrage, as Plaintiff never had a legitimate account to start with.

536.    Plaintiff asserts that even if he had a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

537.    Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

538.    Plaintiff asserts that he had a new account opened up at Wells Fargo in his name without his knowledge or consent.

539.    Plaintiff asserts that even if there had been a legitimate account at any time, he would not have opened an account with Defendants if he had been made aware of the fraud which was occurring.

**Edwin Zorilla**

540.    Defendants have not yet attempted to compel arbitration on Plaintiff Edwin Zorilla,

despite being provided with name, state, and last four of Plaintiff's social security number.

541.   Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Edwin Zorilla, as Plaintiff never had a legitimate account to start with.

542.   Plaintiff asserts that even if he had a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

543.   Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

544.   Plaintiff asserts that he had a new account opened up at Wells Fargo in his name without his knowledge or consent.

545.   Plaintiff asserts that even if there had been a legitimate account at any time, he would not have opened an account with Defendants if he had been made aware of the fraud which was occurring.

**Wenoka Thompson**

546.   Defendants have not yet attempted to compel arbitration on Plaintiff Wenoka Thompson, despite being provided with name, state, and last four of Plaintiff's social security number.

547.   Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Wenoka Thompson, as Plaintiff never had a legitimate account to start with.

548.   Plaintiff asserts that even if she had a legitimate account, she would not have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

549.   Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

550.   Plaintiff asserts that multiple emails from her business receive emails regarding an account opened up in her name.

551.   Plaintiff asserts she never opened up an account with Defendants.

552.   Plaintiff asserts that even if there had been a legitimate account at any time, she would not have opened an account with Defendants if she had been made aware of the fraud which was occurring.

**Tamar Hodges**

553.   Defendants have not yet attempted to compel arbitration on Plaintiff Tamar Hodges, despite being provided with name, state, and last four of Plaintiff's social security number.

554.   Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Tamar Hodges, as Plaintiff never had a legitimate account to start with.

555.   Plaintiff asserts that even if she had a legitimate account, she would not have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

556.   Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

557.   Plaintiff asserts that even if there had been a legitimate account at any time, she would not have opened an account with Defendants if she had been made aware of the fraud which was occurring.

**Michelle Sterling**

558.   Defendants have not yet attempted to compel arbitration on Plaintiff Michelle Sterling, despite being provided with name, state, and last four of Plaintiff's social security number.

559.   Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Michelle

Sterling, as Plaintiff never had a legitimate account to start with.

560.   Plaintiff asserts that even if she had a legitimate account, she would not have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

561.   Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

562.   Plaintiff asserts that even if there had been a legitimate account at any time, she would not have opened an account with Defendants if she had been made aware of the fraud which was occurring.

**Concepcion Powell**

563.   Defendants have not yet attempted to compel arbitration on Plaintiff Concepcion Powell, despite being provided with name, state, and last four of Plaintiff's social security number.

564.   Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Concepcion Powell, as Plaintiff never had a legitimate account to start with.

565.   Plaintiff asserts that even if she had a legitimate account, she would not have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

566.   Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

567.   Plaintiff asserts that to the best of her knowledge, there have been 8-12 accounts opened up in her name without her authorization.

568.   Plaintiff asserts that even if there had been a legitimate account at any time, she would not have opened an account with Defendants if she had been made aware of the fraud which was

occurring.

**Adrian Thompson**

569.   Defendants have not yet attempted to compel arbitration on Plaintiff Adrian Thompson, despite being provided with name, state, and last four of Plaintiff's social security number.

570.   Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Adrian Thompson, as Plaintiff never had a legitimate account to start with.

571.   Plaintiff asserts that even if she had a legitimate account, she would not have agreed to arbitration if she had been informed that Wells Fargo was creating fake accounts using customer information.

572.   Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as Defendants have a history of bad record keeping, specifically during the time period alleged.

573.   Plaintiff asserts that even if there had been a legitimate account at any time, she would not have opened an account with Defendants if she had been made aware of the fraud which was occurring.

**Stephen Hope**

574.   Defendants have not yet attempted to compel arbitration on Plaintiff Stephen Hope, despite being provided with name, state, and last four of Plaintiff's social security number.

575.   Plaintiffs assert that Defendants are unable to compel arbitration on Plaintiff Stephen Hope, as Plaintiff never had a legitimate account to start with.

576.   Plaintiff asserts that even if he had a legitimate account, he would not have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

577.   Plaintiffs further assert that Defendants are unable to compel arbitration on Plaintiff, as

Defendants have a history of bad record keeping, specifically during the time period alleged.

578.    Plaintiff Stephen Hope contends that he had a mortgage with Defendants.

579.    Plaintiff Stephen Hope asserts on his Credit Report it shows a credit card with $5,000 limit, high balance and no payment with Defendants.

580.    Plaintiff Stephen Hope asserts he never had a credit card with Defendants at any time.

581.    Plaintiff asserts that even if there had been a legitimate account at any time, he would not have opened an account with Defendants if he had been made aware of the fraud which was occurring.

## CLASS ACTION ALLEGATIONS

582.    Plaintiffs bring this action on their own behalf, and on behalf of all other persons similarly situated ("the Class").  The Class that Plaintiffs seek to represent is:

A. All persons who had checking, savings, brokerage accounts, financial advisors, mortgages, credit cards, debit cards, online accounts, had credit history reviewed, or used knowingly, or had used unknowingly, any of Wells Fargo's banking services, including credit inquiry's, placement of unsolicited services or products, such as Prudential Life insurance, Identity Theft Protection, beginning from  January 1, 2002 through the filing of this Complaint. Excluded from the Class are Defendants; officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest; the affiliates, legal representatives, attorneys, heirs, and assigns of the Defendants.

B. All persons who purchased services from Wells Fargo not during the affected time period, but whose identifying information was stored on Wells Fargo's

database. Excluded from the Class are Defendants; officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest; the affiliates, legal representatives, attorneys, heirs, and assigns of the Defendants.

C. All persons who have been financially harmed or damaged because of Wells Fargo's fraudulent conduct, had improper fees assessed against their accounts, improper overcharges, had their accounts bundled, were sandbagged, or victims of pinning, subjected to financial harm or damages, loss of time, bank charges, late fees, collection costs, had credit effected, had credit inquiries, and/or other miscellaneous costs and damages. Excluded from the Class are Defendants; officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest; the affiliates, legal representatives, attorneys, heirs, and assigns of these Defendants.

583.   The members of the Class are so numerous that the joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiffs at this time, based on information and belief, it is in the hundreds of thousands, if not millions.

584.   There is a well-defined community of interest among the members of the Class because common questions of law and fact predominate, Plaintiffs claims are typical of the members of the Class, and Plaintiffs can fairly and adequately represent the interests of the Class.

585.   This action satisfies the requirements of Federal Rules of Civil Procedure, Rule 23(b)(3) because it involves questions of law and fact common to the members of the Class that

predominate over any questions affecting only individual members, including, but not limited to:

a.     Whether Defendants, jointly and severally, unlawfully used, maintained, manipulated, lost or disclosed Class members' personal and/or financial information;

b.     Whether Wells Fargo created a hostile working environment which fostered and rewarded fraudulent actions by its employees.

c.     Whether all Defendants violated the requirements of Utah Code Annotated, Section 13-5a 103 *et seq.* and other states statutes;

d.     Whether all Defendants' conduct was negligent, and/or grossly negligent;

e.     Whether all Defendants acted willfully and/or with oppression, fraud, malice, or indifference to the consequences to Plaintiffs;

f.     Whether all Defendants' conduct constituted intrusion;

g.     Whether Defendants' conduct constituted public disclosure of private facts;

h.     Whether all Defendants' conduct constituted misappropriation of likeness and identity;

i.     Whether all Defendants' conduct violated Class members' Utah Constitutional Right to Privacy;

j.     Whether all Defendants' conduct constituted conversion;

k.     Whether Plaintiffs and the Class are entitled to damages, civil penalties, punitive damages, and/or injunctive relief;

n.     Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief;

o.      Whether Wells Fargo Management engaged in theft of customers funds;

p.      Whether Wells Fargo breached Gramm Leach Bliley Act, 15 U.S.C. §6801 provisions;

q.      Whether Defendants actions breached the provisions of the Bank Holding Company Act Amendments of 1970.

r.      Whether Defendants actions constituted a pattern of racketeering in violation of 18 U.S.C. §§'s 1961 *et seq*., the Racketeer Influenced and Corrupt Organizations Act (RICO);

s.      Whether Defendants actions constituted violations of the Fair Credit Reporting Act (FCRA) 15 U.S.C. § 1681, *et seq*.;

t.      Whether Defendants fraudulent actions violated Plaintiffs right to privacy under Utah Constitution, Article 1, Section 1;

u.      Whether Defendants actions violated the Stored Communications Act (SCA) 18 U.S.C. § 2702, *et seq*.;

v.      Whether Defendants fraudulent actions constituted a fraudulent inducement as to all accounts entered into subsequent to January 1, 2002.

586.    Plaintiffs claims are typical of those other Class members who have likewise been subjected to financial harm or damages, loss of time, bank charges, late fees and/or other miscellaneous costs and damages.

587.    Plaintiffs will fairly and accurately represent the interests of the Class.

588.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants and would lead to

repetitive adjudication of common questions of law and fact.  Accordingly, class treatment is superior to any other method for adjudicating the controversy.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action under Rule 23(b)(3).

589.   Damages for any individual class member are likely insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendants' violations of law and fraudulent conduct inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.

590.   Defendants have acted or refused to act on grounds that apply generally to the class, as alleged above, and certification is proper under Rule 23(b)(2).

## FIRST CLAIM FOR RELIEF

**Protection of Personal Information Act, Unfair Competition Act, Deceptive Trade Practices Act and Federal Protection of nonpublic information.**

591.   Plaintiffs incorporate by reference all proceeding paragraphs as if fully set forth fully herein.

592.   Defendants' conduct constitutes unfair and illegal and fraudulent business practices within the meaning of the Utah Unfair Competition Act, Utah Protection of Personal Information Act and Deceptive Trade Practices Acts and the acts of the individual stets, as set forth below.

593.   Defendants' conduct violated certain laws as alleged herein, and, *ergo*, by engaging in the said conduct in the course of doing business, Defendants engaged in unlawful business practices in violation of the Utah Laws and 15 U.S.C. Section 6801.[38]

---

[38] 15 U.S. Code § 6801 (a) Privacy obligation policy. It is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information.

594.    Plaintiffs contend that by engaging in the above-described conduct in the course of doing business, Defendants engaged in unfair business practices in violation of the unfair business practices and that Defendants had a duty to safeguard Plaintiffs confidential and personal information.[39]

595.    Wells Fargo incentivized employees to use Plaintiffs' personal information[40] by, *inter alia*, fabricating emails allegedly belonging to customers, making illegal data entries, engaging in fraudulent activity on the customer's accounts.  Wells Fargo was aware of the ongoing breaches and failed to provide adequate and prompt notice.  Consumers were and are entitled to adequate and prompt notification about the illegal actions to help them mitigate the harm and avoid additional instances of fraud as alleged herein. Wells Fargo, however, failed

---

(b) Financial institutions safeguards. In furtherance of the policy in subsection (a), each agency or authority described in section 6805(a) of this title, other than the Bureau of Consumer Financial Protection, shall establish appropriate standards for the financial institutions subject to their jurisdiction relating to administrative, technical, and physical safeguards—

(1) to insure the security and confidentiality of customer records and information;

(2) to protect against any anticipated threats or hazards to the security or integrity of such records; and (3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer.

[39] 13-44-201 Protection of personal information.

(1) Any person who conducts business in the state and maintains personal information shall implement and maintain reasonable procedures to: (a) prevent unlawful use or disclosure of personal information collected or maintained in the regular course of business; and (b) destroy, or arrange for the destruction of, records containing personal information that are not to be retained by the person.

[40] U.C.A. 13-44-102 Definitions. (1)(b)Breach of system security" does not include the acquisition of personal information by an employee or agent of the person possessing unencrypted computerized data unless the personal information is used for an unlawful purpose or disclosed in an unauthorized manner. (2) "Consumer" means a natural person.

(3) (a) "Personal information" means a person's first name or first initial and last name, combined with any one or more of the following data elements relating to that person when either the name or date element is unencrypted or not protected by another method that renders the data unreadable or unusable: (i) Social Security number; (ii) (A) financial account number, or credit or debit card number; and (B) any required security code, access code, or password that would permit access to the person's account; or (iii) driver license number or state identification card number.

to take reasonable steps to notify consumers that their information has been compromised.

596.   Beginning on or about January 1, 2002, Defendants and Does 1-100, and each of them, have violated and conspired to violate the Utah, and other states' and federal statutes by engaging in one or more of the following *unlawful* business acts and practices, among others:

a. Willfully obtaining personal identifying information of another person (which includes name, address, telephone number, health insurance number, taxpayer identification number, school identification number, state or federal driver's license or identification number, Social Security number, place of employment, employee identification number, professional or occupational number, mother's maiden name, demand deposit account number, savings account number, checking account number, PIN or password, alien registration number, government passport number, and date of birth), and using that information for an unlawful purpose, including to obtain or attempt to obtain credit, goods, services, real property, or medical information without the consent of that person;

b. Being a party to any fraudulent conveyance of any contract or conveyance had, made, or, contrived, with intent to deceive and defraud others, or while being a, party to any fraudulent conveyance of any contract or conveyance, wittingly and willingly putting in, using, avowing, maintaining, justifying, or defending the fraudulent conveyance of any contract or conveyance as true and done, had or made in good faith, or upon good consideration;

c. Knowingly accessing and without permission using data, computers, computer systems, or computer networks to execute a scheme to defraud or wrongfully obtain money, property, or data;

96

d. Knowingly accessing, and without permission taking, copying, or making use of customer information, in violation of Utah's Unfair Competition Act, Utah Protection of Personal Information Act, and Utah's Deceptive Practices Act, and other state statutes, as set forth herein;

e. Knowingly accessing, and without permission taking, copying, or making use of, customer information, in violation of 15 United States Code Section 6801, *et seq*., and the rules and regulations promulgated thereunder.

597.   Beginning on or around January 1, 2002, Defendants and Does 1-5,300, and each of them, have violated and conspired to violating the foregoing statutes by engaging in one or more of the following unfair business acts and practices, among others:

a.   Threatening incipient violations of the aforementioned Utah laws and the individual state laws and statutes; and violated the public policy embodied in and the spirit of those laws;

b. Violation of the established public policy of the State of Utah, along with the individual states listed below, which among other things, seeks to ensure that: all monetary contracts are duly authorized by each party; all bank accounts are authorized and agreed to by the customer in whose name the bank account is opened; residents of the state are not harmed in their credit reports by acts not actually performed, or debts not actually incurred, by that resident; personal information of an individual is not improperly obtained and used for, an unlawful purpose; and that when, personal, information is obtained without authority; that the person whose information was obtained is informed immediately;

c. Defendants' conduct as described in this Complaint has been immoral, unethical, oppressive and unscrupulous in that Defendants: (1) profited by improperly signing customers up for bank accounts to which the customers did not agree; (2) boast about the average number of accounts per customer they have achieved, knowing that many of those accounts were unauthorized; (3) exposed Plaintiffs and other consumers to financial hardships involving unjustified debt collection and negative credit reporting, thus jeopardizing those customers' ability to obtain mortgages, automobile loans, and employment; and (4) otherwise garnered an unfair advantage over lawfully competing businesses;

d. Wells Fargo's acts and practices alleged in this Complaint have had, and continue to have, a substantial detrimental impact upon its customers and the community.  This detrimental impact is not outweighed by any countervailing reasons, justifications, and motives of Wells Fargo.   In short, the harm experienced by the customers and the surrounding community far outweighs the utility of Wells Fargo's conduct.

598.  Plaintiffs, individually, and on behalf of all similarly situated residents of each of the 50 States and the District of Columbia allege Defendants violated of the respective statutory consumer protection laws, as follows:

a.   the Alabama Deceptive Trade Practices Act, Ala.Code 1975, § 8–19–1, *et seq.*

b.   the Alaska Unfair Trade Practices and Consumer Protection Act, AS § 45.50.471, *et seq.*;

c.   the Arizona Consumer Fraud Act, A.R.S §§ 44-1521, *et seq.*;

d.   the Arkansas Deceptive Trade Practices Act, Ark.Code §§ 4-88-101, *et seq.*;

e.   the California Unfair Competition Law, Bus. & Prof. Code §§17200,

*et seq.* and 17500 *et seq.*;

f.      the California Consumers Legal Remedies Act, Civil Code §1750, *et seq.*;

g.      the Colorado Consumer Protection Act, C.R.S.A. §6-1-101, *et seq.*;

h.      the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110, *et seq.*;

i.      the Delaware Consumer Fraud Act, 6 Del. C. § 2513, *et seq.*;

j.      the D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq.*;

k.      the Florida Deceptive and Unfair Trade Practices Act, FSA § 501.201, *et seq.*;

l.      the Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq.*;

m.      the Hawaii Unfair Competition Law, H.R.S. § 480-1, *et seq.*;

n.      the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*;

o.      the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1 *et seq.*;

p.      the Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq.*

q.      The Iowa Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714H.1, *et seq.*;

r.      the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.*;

s.      the Kentucky Consumer Protection Act, KRS 367.110, *et seq.*;

t.      the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA- R.S. 51:1401, *et seq.*;

u.      the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A, *et seq.*;

v.      the Maryland Consumer Protection Act, MD Code, Commercial Law, §13-301, *et seq.*;

w.      the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq.*;

x.      the Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq.*;

y.      the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*;

z.      the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*

aa.      the Missouri Merchandising Practices Act, V.A.M.S. § 407, *et seq.*;

bb.      the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101, *et seq.*;

cc.      the Nebraska Consumer Protection Act, Neb.Rev.St. §§ 59-1601, *et seq.*;

dd.      the Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq.*

ee.      the New Hampshire Regulation of Business Practices for Consumer Protection, N.H.Rev.Stat. § 358-A:1, *et seq.*;

ff.      the New Jersey Consumer Fraud Act, N.J.S.A. 56:8, *et seq.*;

gg.      the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1, *et seq.*;

hh.      the New York Consumer Protection from Deceptive Acts and Practices, N.Y. GBL (McKinney) § 349, *et seq.*;

ii.      the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq.*;

jj.      the North Dakota Consumer Fraud Act, N.D. Cent.Code Chapter 51-15,

*et seq.*;

kk.     the Ohio Consumer Sales Practices Act, R.C. 1345.01, *et seq.*;

ll.     the Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, *et seq.*;

mm.     the Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq.*;

nn.     the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*;

oo.     the Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), *et seq.*;

pp.     the South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, *et seq.*;

qq.     the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24-1, *et seq.*;

rr.     the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq.*;

ss.     the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq.*;

tt.     the Utah Consumer Sales Practices Act, UT ST § 13-11-1, *et seq.*;

uu.     the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq.*;

vv.     the Virginia Consumer Protection Act of 1977, VA ST § 59.1-196, *et seq.*;

ww.     the Washington Consumer Protection Act, RCWA 19.86.010, *et seq.*;

xx.     the West Virginia Consumer Credit And Protection Act, W.Va.Code §46A-1-101, *et seq.*;

yy.     the Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100.18, *et seq.*; and

zz.     the Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq.*

599.     Beginning on or about January 1, 2002, Defendants, and each of them, have violated and conspired to violate the previously cited Utah, state statutes and laws, and Federal Laws by engaging in one or more of the following *fraudulent* business acts and practices, among others:

a. Using misrepresentations, deception, omission, fraudulent inducement, and concealment of material information to open accounts and unauthorized accounts in customers' names.

b. Using misrepresentations, deception, omission, fraudulent inducement and concealment of material information and then failing to reveal to the customers that their personal information was compromised.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of judgment jointly and severally against Defendants, and awarding Plaintiffs and the Class compensatory damages, statutory damages, treble damages, and punitive damages, in the amount of one billion dollars ($1,000,000,000.00), and reasonable attorneys' fees and costs; and such other and further relief as this Court deems just and proper

## SECOND CLAIM FOR RELIEF

### Stored Communications Act Violations and Data Breach

600.   Plaintiff incorporate by reference paragraphs 1-599 as if set forth in full particularity herein.

601.   The Stored Communications Act ("SCA") contains provisions that provide consumers with redress if a company mishandles their electronically stored information.  The SCA was designed, in relevant part, "to protect individuals' privacy interests in personal and proprietary information."  S. Rep. No. 99-541, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555 at 3557.

602.   Section 2702(a)(1) of the SCA provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service."  18 U.S.C. § 2702(a)(1).

603.   The SCA defines "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  *Id*. at § 2510(15).

604.   Through its payment processing equipment, Wells Fargo provides an "electronic communication service to the public" within the meaning of the SCA because it provides

101

consumers at large with credit and debit card payment processing capability that enables them to send or receive wire or electronic communications concerning their private financial information to transaction managers, card companies, or banks.

605. By failing to take commercially reasonable steps to safeguard sensitive private financial information, even after Wells Fargo was aware that Plaintiffs' private and confidential information had been compromised by its own employees, Wells Fargo has knowingly divulged customers' private financial information that was communicated to financial institutions, while in electronic storage in Wells Fargo's data systems.

606. Section 2702(a)(2)(A) of the SCA provides that "a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service."  18 U.S.C. § 2702(a)(2)(A).

607. The SCA defines "remote computing service" as "the provision to the public of computer storage or processing services by means of an electronic communication system." 18 U.S.C. § 2711(2).

608. An "electronic communications systems" is defined by the SCA as "any wire, radio, electromagnetic, photo-optical or photo-electronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications."  18 U.S.C. § 2510(4).

609. Wells Fargo provides onsite and remote computing services to its customers and the public by virtue of its computer processing services, including, but not limited to, banking

services, consumer credit and debit card payments, *etc*. which are used by customers and carried out by means of an electronic communications system, namely the use of wire, electromagnetic, photo-optical or photo-electric facilities for the transmission of wire or electronic communications received from, and on behalf of, the customer concerning customer private financial information.

610.   By failing to take commercially reasonable steps to safeguard sensitive private financial information, and requiring scrutiny of their own employees, Wells Fargo has knowingly divulged customers' private financial information that was carried and maintained on Wells Fargo's computing data bank services.

611.   As a result of Wells Fargo's conduct described herein and its violations of Sections 2702(a)(1) and (2)(A) of the SCA, Plaintiffs and Class Members have suffered actual identity theft, as well as damages in the form of (i) improper disclosure of their private confidential information; (ii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Data Breach; (iii) the value of their time spent mitigating identity theft and/or identity fraud, and/or the increased risk of identity theft and/or identity fraud; (iv) and deprivation of the value of their private information, for which there is a well-established national and international market.  Plaintiffs, on their own behalf and on behalf of the Class Members, seek an order awarding themselves and the Class Members the maximum statutory damages available under 18 U.S.C. § 2707, in addition to the cost for 3 years of credit monitoring services.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of judgment jointly and severally against Defendants, and awarding Plaintiffs and the Class compensatory damages, statutory damages, treble damages, punitive damages, in the amount of

one billion dollars ($1,000,000,000.00), and reasonable attorney's fees and costs; and such other and further relief as this Court deems just and proper.

### THIRD CLAIM FOR RELIEF

**Invasion of Privacy**

612.   Plaintiffs incorporate by reference paragraphs 1-611 as if set forth in full particularity herein.

613.   Plaintiffs, and the other Class Members, had a reasonable expectation of privacy in the private information Defendants Wells Fargo obtained from them in opening accounts.  Said information was provided in a fiduciary capacity, and Wells Fargo and its employees mishandled and/or failed to protect said information, and knowingly violated their fiduciary duties.

614.   By failing to keep Plaintiffs private information safe, and by misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendants invaded Plaintiffs privacy by:

a.  intruding into Plaintiffs private affairs in a manner that would be highly offensive to a reasonable person;

b.  publicizing private facts about Plaintiffs, which is highly offensive to a reasonable person;

c.  using, appropriating and impersonating Plaintiffs identity without Plaintiffs' consent;

d.  violating Plaintiffs right to privacy under Utah Constitution, Article 1, Section 1, and the various constitutions of each of the fifty states through the improper use of Plaintiff s private information properly obtained for a specific purpose for another purpose, or the disclosure of it to some third party;

e. misrepresenting and holding out themselves, as over three million, five-hundred thousand (3,500,000) different Plaintiffs, in order to secure credit cards, open accounts, open emails, and use the U.S. Mails.

615. Plaintiffs allege that Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiffs position would consider Defendants' actions highly offensive.

616. Plaintiffs assert that Defendants, jointly and severally invaded Plaintiffs and the Class Members right to privacy and intruded into Plaintiffs private affairs by misusing and/or disclosing Plaintiffs private information without their informed, voluntary, affirmative and clear consent, and/or failed to properly secure confidential information by encouraging employees to abuse the customers private information for purposes of promotions, personal gains, and monetary remuneration.

617. Plaintiffs contend that Defendants, without authorization, intentionally invaded, and allowed to be invaded by its employees, the private affairs of Plaintiffs, including their personal and confidential information.

618. Plaintiffs assert the invasion was offensive and would be offensive to a reasonable person.

619. Plaintiffs contend that Defendants intruded into private matters relating to Plaintiffs, including the use of Plaintiffs social security numbers, and other confidential information, in opening unauthorized accounts, credit cards, and impersonating Plaintiffs over three million five hundred (3,500,000) times.

620. Plaintiffs assert that the intrusion by Defendants caused them to suffer anguish, loss of time, loss of money, loss of credit, and numerous other losses to be set forth at the time of trial.

621. Plaintiffs allege that Wells Fargo had been aware of the employee violations for over

fifteen years before taking any action, and refused to take action during this time in lieu of maximizing financial gains from the employees unethical and fraudulent behavior that Wells Fargo was fully aware of, and thereby exposed Plaintiffs to added, unnecessary risk.  From 2002 the bank opened more than three million five hundred (3,500,000) deposit and credit card accounts that may not have been authorized.[41]

622.   Plaintiffs contend that as a direct and proximate result of such misuse and disclosures, Plaintiffs reasonable expectations of privacy in their private information was unduly frustrated and thwarted, and that the Defendants' conduct amounted to a serious invasion of Plaintiffs' and the Class Members protected privacy interests.

623.   Plaintiff Matthew Gragg was not an account holder with Wells Fargo, however he was involved in an identity theft issue with Wells Fargo.  Wells Fargo employees opened a business line of credit and allowed charges of $30,000 to be charged against the account.   Plaintiff contacted local and regional representatives of Wells Fargo who refused to listen to the identity theft issues.  Plaintiff was required to contact local police and the FBI.  Plaintiff had to take the time and effort (and money) to freeze all of his credit reports.  The credit reports included "hard inquiries" by Wells Fargo.

624.   Defendants had a duty to protect Plaintiffs private information and failed to protect Plaintiffs private information, and in misusing and/or disclosing Plaintiffs private information, Defendants have acted with malice, oppression and in conscious disregard of Plaintiffs and the

---

[41] Wells Fargo employees pushed checking account customers into savings, credit and online accounts that could generate fees. Bank employees were told that the average customer tapped six financial tools but that they should push households to use eight products, according to the complaint. The bank opened more than 2 million deposit and credit card accounts that may not have been authorized, according to the CFPB. http://www.cnbc.com/2016/09/08/wells-fargo-reaches-185m-settlement-to-settle-secret-account-fraud-case.html

Class members' rights to have such information kept confidential and private.

WHEREFORE Plaintiffs, accordingly, seek an award of compensatory damages, nominal damages, and punitive damages of one billion dollars ($1,000,000,000.00), attorneys' fees, expert witness fees, and associated court costs on their behalf as well as on behalf of the Class.

## FOURTH CLAIM FOR RELIEF

### Violation of Gramm-Leach-Bliley Act, 15 U.S.C. §6801

625.     Plaintiffs incorporate the allegations in paragraphs 1-624 as if set forth with full particularity herein.

626.     Plaintiffs assert that under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, Wells Fargo had a duty to protect and keep sensitive personal information that it obtained from customers that conducted banking, financial, credit card and debit card transactions, or other services, secure, private, and confidential.

627.     Plaintiffs allege that Wells Fargo violated the Gramm-Leach-Bliley Act by: (a) not adequately safeguarding Plaintiffs' and the Class Members' sensitive personal information, (b) encouraging and rewarding its employees for violating privacy provisions of the Act in order to maximize financial gain; and (c) failing to follow applicable state law designed to protect cardholder information.

628.     Plaintiffs contend that Wells Fargo's encouragement and reward to employees for violations of privacy provisions, and those accompanying rules and regulations, and to follow applicable state law constitutes conspiracy and negligence *per se*.

629.     Plaintiffs assert that as a result of Wells Fargo's conduct alleged herein, Plaintiffs and Class Members suffered actual identity theft, as well as damages in the form of (i) improper

disclosure of their private and confidential information; (ii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the data breach; (iii) the value of their time spent mitigating identity theft and/or identity fraud, and/or the increased risk of identity theft and/or identity fraud; (iv) and deprivation of the value of their private and confidential information, for which there is a well-established national and international market.

630.    Plaintiffs assert that as a direct and proximate result of Defendant's negligence *per se* Plaintiffs and Class Members were damages and harmed to their detriment and seek the award of actual damages, compensatory damages, attorneys' fees, and such other and further damages as this Court deems just and reasonable.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of judgment jointly and severally against Wells Fargo Defendants, and awarding Plaintiffs and the Class compensatory damages, statutory damages, treble damages, punitive damages, of one billion dollars ($1,000,000,000.00) and reasonable attorneys' fees and costs; and such other and further relief as this Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

### Intentional Violation of Fair Credit Reporting Act

631.    Plaintiffs incorporate the allegations in paragraphs 1-630, as if fully set forth herein.

632.    Plaintiffs contend that The Fair Credit Reporting Act ("FCRA") requires consumer reporting agencies to adopt and maintain procedures for meeting the needs of commerce for consumer credit, personnel, insurance and other information in a manner fair and equitable to consumers while maintaining the confidentiality, accuracy, relevancy and proper utilization of such information. 15 U.S.C. § 1681(b).

633.    The FCRA allows for a private right of action against any reporting agency for the negligent or willful violation of any duty imposed under the statute.

634.    The FCRA defines a "consumer reporting agency" as:

>    Any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. 15 U.S.C. § 1681a(f).

635.    FCRA defines a "consumer report" as:

>    [A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of establishing the consumer's eligibility for credit or insurance to be used primarily for personal, family, or household purposes; employment purposes, or any other purpose authorized under [15 U.S.C. §] 1681(b).
>    15 U.S.C § 1681a(d).

636.    Wells Fargo is a consumer reporting agency as defined under the FCRA because Wells Fargo through third parties, for monetary fees, regularly engages, in part, in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties and/or uses interstate commerce for the purpose of preparing and/or furnishing consumer reports.

637.    As a consumer reporting agency, Wells Fargo was (and continues to be) required to adopt and maintain procedures designed to protect and limit the dissemination of consumer credit, personnel, insurance and other information (such as Plaintiffs' and other Class Members' private and confidential information) in a manner fair and equitable to consumers, while maintaining the confidentiality, accuracy, relevancy, and proper utilization of such information.

638.     Plaintiffs allege that Defendants violated the provisions of the FCRA by failing to adopt and maintain such protective procedures which, in turn, directly and/or proximately resulted in the theft of Plaintiffs' and Class Members' private and confidential information and its wrongful dissemination.

639.     On information and belief, Wells Fargo knowingly failed to adequately implement these proactive actions to secure and protect Plaintiffs' and Class Members' private and confidential information, and/or put itself in a position to immediately notify Plaintiffs and Class Members about the data breach.

640.     As a direct and/or proximate result of Wells Fargo's willful and/or reckless violations of the FCRA as described above, Plaintiffs' and Class Members' private and confidential information was stolen and made accessible to unauthorized third parties, including, but not limited to unauthorized access to confidential information, and use thereof, by Wells Fargo employees.

641.     As a direct and/or proximate result of Wells Fargo's willful and/or reckless violations of the FCRA, as described above, Plaintiffs and Class Members were (and continue to be) damaged in the form of, without limitation, expenses for credit monitoring and identity theft insurance, out-of-pocket expenses, anxiety, emotional distress, loss of privacy and other economic and non-economic harm.

642.     Plaintiffs and Class Members, therefore, are entitled to compensation for their actual damages including, (i) actual damages resulting from the identity theft; (ii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the data breach; (iii) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (iv) deprivation of

the value of their private and confidential information, for which there is a well-established national and international market; (v) anxiety and emotional distress; and (vi) statutory damages of not less than $100, and not more than $1,000, each, as well as attorneys' fees, litigation expenses and costs, pursuant to 15 U.S.C. §1681n(a).

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of judgment jointly and severally against Defendants, and awarding Plaintiffs and the Class compensatory damages, statutory damages, treble damages, punitive damages, and reasonable attorney's fees and costs; and such other and further relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

### Negligent Violation of Fair Credit Reporting Act

643.  Plaintiffs incorporate the allegations in paragraphs 1-642, as if fully set forth herein.

644.    In the alternative to the Fifth Claim, above, Wells Fargo negligently violated the FCRA by failing to adopt and maintain procedures designed to protect and limit the dissemination of Plaintiffs' and Class Members' private and confidential information for the permissible purposes outlined by the FCRA which, in turn, directly and/or proximately resulted in the wrongful dissemination of Plaintiffs' and Class Members' private and confidential information.

645.    Wells Fargo's action, by its pressure on employees, and refusing to enforce fiduciary duties because payment of a fine is cheaper to them than the profits they obtained, and it was reasonably foreseeable that Wells Fargo's failure to implement and maintain procedures to protect and secure Plaintiffs' and Class Members' private and confidential information would result in the unauthorized use by Wells Fargo, of Plaintiffs' private and confidential information, for no permissible purpose under the FCRA.

646.    As a direct and/or proximate result of Wells Fargo's negligent violations of the FCRA, as

described above, Plaintiffs' and Class Members' private and confidential information was essentially stolen and made accessible for unauthorized purposes by Wells Fargo executives and employees.

647.   As a direct and/or proximate result of Wells Fargo's negligent violations of the FCRA, as described above, Plaintiffs and Class Members were (and continue to be) damaged in the form of, without limitation, actual identity theft, expenses for credit monitoring and identity theft insurance, anxiety, emotional distress, loss of privacy, and other economic and noneconomic harm.

648.   Plaintiffs and Class Members, therefore, are entitled to compensation for their actual damages, including, (i) actual damages resulting from the identity theft; (ii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the data breach; (iii) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (iv) deprivation of the value of their private and confidential information, for which there is a well-established national and international market; (v) anxiety and emotional distress; and (viii) attorneys' fees, litigation expenses and costs, pursuant to 15 U.S.C.§1681o(a).

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of judgment jointly and severally against Defendant Wells Fargo, and awarding Plaintiffs and the Class compensatory damages, statutory damages, treble damages, punitive damages of one billion dollars ($1,000,000,000.00), and reasonable attorneys' fees and costs; and such other and further relief as this Court deems just and proper.

## SEVENTH CLAIM FOR RELEIF COUNT

### Declaratory Judgment

649.    Plaintiffs incorporate the allegations in paragraphs 1-648 as if fully set forth herein.

650.   The Declaratory Judgment Act ("DJA") states:

> "In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a).

651.    In the case at hand, there is an actual controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, due to the imminence of harm facing Plaintiffs and Class Members.  As set forth above, Class Members have already suffered identity theft and damages as a result of the breach, and the perpetrators are still at large with Class Members' private and confidential information.

652.    Plaintiffs seek a declaration that Wells Fargo have engaged in fraudulent inducement to secure the accounts of Plaintiffs and Class Members, by failing to disclose to Plaintiffs and Class Members that Defendants were engaging in identity theft, opening unauthorized accounts, gaming, Pinning, sandbagging, securing insurance policies without authorization, using clients personal information for their personal gain.  That by allowing authorized and unauthorized individuals access to personal financial data, and/or authorized parties Defendants engaged in fraudulent activities in accessing and misusing fiduciary, confidential information.

653.    Plaintiffs further seek a declaration that due to the imminence and likelihood of harm to Plaintiffs and Class Members, Wells Fargo be ordered to pay for mitigation in the form of legitimate and adequate credit monitoring, identity theft protection, damages, and identity

theft insurance, and also be ordered to indemnify Plaintiffs and Class Members for future harm.

## EIGHTH CLAIM FOR RELIEF

### Conversion

654.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

655.   Plaintiffs and members of the Class entered into banking agreements with Wells Fargo whereby they deposited funds with Defendant.

656.   Plaintiffs were never made aware prior to opening a banking agreement with Defendants, that Defendants were stealing client information to create fake accounts.

657.   Plaintiffs contend that Defendant used Plaintiffs confidential information to open credit card accounts, savings accounts, loans, or other "services or products," without Plaintiffs knowledge or consent.

658.   Plaintiffs contend that the money they deposited or property they possessed, including mortgages, were their property to which they had the right to possess without the interference of Wells Fargo.

659.   Plaintiffs assert Wells Fargo intentionally asserted control over the assets belonging to Plaintiffs, including the fraudulent accounts that were opened with Plaintiffs funds.

660.   Plaintiffs allege that Wells Fargo exercised dominion and control over the fees Plaintiffs were charged, including, but not limited to, overdraft fees, late fees, increased interest fees.

661.   Plaintiffs contend that the interference by Wells Fargo deprived Plaintiffs of possession of use of the personal property in question, and Wells Fargo's refusal to disclose the theft, conversion, or existence of the personal property constituted an act of intentional malice.

662.   Plaintiffs assert the conversion of their funds, and control exerted over their personal

property by Wells Fargo caused them to suffer damages, anxiety, stress, loss of personal property, damages in higher costs, and payment of fees which Plaintiffs were not obligated to pay, has caused Plaintiffs damages.

663.    Plaintiffs allege they were required to pay Wells Fargo excessive fees, fines, collection costs, had their personal information was misused by Wells Fargo for the benefit of Wells Fargo and its employees.

664.    Plaintiff Kevin Saliva asserts that he had $100 taken out of his investment account to fund a fraudulent account, which eventually depleted his entire $100 deposit, based upon user fees.

665.    Upon information and belief, executives and employees of Wells Fargo received bonuses in the millions of dollars, including severance fees of over one hundred million dollars, for their participation in the "Gr-Eight" program where Plaintiffs were the victims of fraudulent activities.

666.    Defendant and its employees have been unjustly enriched at the expense of Plaintiffs and the Class and its retention of this benefit under the circumstances would be inequitable.

667.    Plaintiffs seek an order requiring Defendant to make restitution to them and the other members of the Class, including additional clawbacks, or disgorgement provision for those who profited personally from the illegal behavior.

### NINTH CLAIM FOR RELIEF

### Fraud and Misrepresentation

668.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

669.    Plaintiffs assert that not a single one of them were ever told at the time of account opening, or in any subsequent consumer account agreements, that Defendants were engaging in

fraud against customers.

670.     Plaintiffs contend that Defendants knew of the fraud which was occurring since 2002 and deliberately omitted disclosing this material information to Plaintiffs prior to opening their initial accounts.

671.     Plaintiffs contend that Defendants, as early as January 1, 2002 Defendants knew, had knowledge, instructed and encouraged their employees, to engage in unethical, illegal, fraudulent "sales practices," including, but not limited to: gaming, Pinning, sandbagging, impersonation of customers, identity theft, invasion of privacy, opening unauthorized checking, savings and other accounts, opening credit cards without authorization, transferring money from Plaintiffs and Class Members accounts without authorization, creating fraudulent email accounts, online accounts, purchasing life insurance policies without the customers knowledge, charging unethical fees on overdraft charges, reporting to credit reporting agencies false and inaccurate information, *etc*. and Plaintiffs were unable to know of the fraud at the time.[42]

672.     Plaintiffs contend that none of them would have opened up an account with Defendants, had the illegal, fraudulent activity been disclosed to them, much less would Plaintiffs have agreed to arbitration if they had been informed.

673.     Plaintiffs assert that Defendants knew disclosure of such information would lead to Plaintiffs refusing to open accounts, and Defendants deliberately, intentionally, and wantonly withheld this material information from being disclosed, causing Plaintiffs to rely on Defendants intentional, omissions of material facts surrounding the formation of a contractual agreement.

---

[42] Fraudulent inducement occurs when one makes material (decision influencing) false statements of fact intending the other to rely on them without knowledge of their falsity, and this reliance causes injury. Typically fraudulent inducement occurs prior to the signing of a contract.   Fraudulent inducement occurs when one makes material (decision influencing) false statements of fact intending the other to rely on them without knowledge of their falsity, and this reliance causes injury. Typically fraudulent inducement occurs prior to the signing of a contract

674.    Plaintiffs allege that Defendants engaged in over three million five hundred (3,500,000) causes of fraud, including, but not limited to, Plaintiffs have had their accounts moved to Wells Fargo without their consent or authorization; Plaintiffs have had credit reports ran without their consent, Defendants have opened online accounts, loans, credit cards, debit cards, checking accounts, submitted credit applications to credit reporting agencies, and engaged in acts of misappropriation, conversion, identity theft, disclosure of private facts, misappropriation of likeness, and other causes of action to be set forth at the time of trial.

675.    Plaintiffs contend that Defendants made false and misleading statements to fraudulently induce Plaintiffs to open, or maintain banking accounts with Defendants, as well as the status of their accounts with Wells Fargo, including, but not limited to, the illegal, unethical, fraudulent "sales practices," Defendants were engaging in on a daily basis for over fifteen years.

676.    Plaintiffs allege that at the time Defendants made the statements, or intentionally omitted to disclose material information, including those notes in the above paragraphs, Defendants knew the statement were false, or the statements were made recklessly and without regard for their truth with the deliberate intent to have Plaintiffs and Class Member rely on the misrepresentations, and omitted information.

677.    For example, Plaintiff Tracy Kilgore signed a signature card for a non-profit entity, and Wells Fargo ran her credit and attempted to open an account without her knowledge, authorization or consent.

678.    Plaintiff Anu Sood was told he couldn't open a simple checking account and had to open multiple new accounts in order to qualify for a simple checking account.

679.    Plaintiff Steve Hope had a mortgage account with Wells Fargo and later found out that someone at Wells Fargo had opened a credit card and charged $5,000.

680.   Plaintiff Aaron Brodie was told the credit card Defendants opened for him, without his authorization or consent, could be shredded and nothing would be wrong.

681.   Plaintiff Aaron Brodie, relying on the representations of Defendants, later found out the unwanted credit card was set up for overdraft protection, which he had not authorized.

682.   Plaintiff Aaron Brodie was eventually sent to collection for overdraft fees on a credit card he never authorized.

683.   Plaintiffs contend that the statements made by Wells Fargo were made with the intent that the Plaintiffs would rely on the statements, or rely upon no notifications of the fraud occurring within the bank as to the safety of their accounts.

684.   Plaintiffs did in fact have no reason to believe they were being lied to and in fact did rely upon the fraudulent misrepresentations made by Defendants to their detriment, and damage.

685.   Plaintiffs contend that Defendants had a duty to disclose material facts surrounding the opening of their accounts and that by misrepresenting the material facts about the fraudulent activity being engaged in by Defendants, that Plaintiffs were fraudulently induced into opening their initial accounts with Defendants.

686.   Plaintiffs assert that as a direct and proximate result of the fraudulent activities engaged in by Defendants, Plaintiff suffered damages as a result of reasonably and justifiably relying on said statements, and/or omissions. (*Cardon v. Jean Brown Research*, 327 P.3d 22 (2014 Ut. App.))

687.   Plaintiffs allege that Defendants, through their fraudulent actions, both prior to January 1, 2002, and subsequent thereto, made intentional statements or omissions regarding their participation in the fraudulent "sales practices," and that the misrepresentations were material to Plaintiffs' decision to enter into a banking agreement with Defendants.   Furthermore, the

Plaintiffs and Class Members justifiably and reasonably relied on the misrepresentations, statements and/or omissions to their detriment, injury and harm.[43]

688.    Additionally, Plaintiffs were economically, financially, emotionally, and mentally harmed and damaged by the negligent, material misrepresentations made by Defendants.

689.    Plaintiffs allege Defendants made material representations to Plaintiffs regarding significant, important facts regarding their accounts, which statements or omissions Defendants knew to be untrue.

690.    In fact the representations made by Defendants regarding Defendants actions were not true, and Defendants knew at the time the misrepresentations, and/or omissions, were made that the statements were lies and not the truth.

691.    Defendants intentionally concealed the material fact of their fraudulent actions in order to induce Plaintiffs and Class Members into opening multiple banking, credit and other accounts with Defendants.

692.    Defendants were in a superior position to know of the truth of the statements made to Plaintiffs, and knew the Plaintiff would rely upon Defendants representations.[44]

693.    Plaintiffs did in fact rely to their financial, emotional, mental detriment upon the statements made by Defendants, and were fraudulent induced into opening accounts with a bank

---

[43] *See* 11 Williston on Contracts § 33:14 (4th ed.) (The parol evidence rule "permits the admission of facts that negate mutuality of assent, such as duress or fraud"); Parol-evidence rule; Right to show fraud in inducement or execution of written contract, 56 A.L.R. 13 ("It is a general rule, supported by many decisions, that as fraud vitiates any contract or transaction into which it enters, the doctrine that parol or extrinsic evidence is inadmissible to contradict, vary, or explain the terms of a written contract is inapplicable where the issue is whether the contract was procured by fraud.)

[44] *Emery v. Third National Bank of Pittsburgh,171 A. 881, 882* (1934) "The law is not designed to protect the vigilant alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked.'

that they would not have conducted business with, but for the fraudulent inducement by Defendants.

694.    Plaintiffs suffered harm, injury and damages by their detrimental reliance on Defendants misrepresentations and omissions of material facts. (*West v. Inter-Financial, Inc*. (139 P.3d 1059, (2006 Utah Ct. App.))

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of judgment jointly and severally against Defendants, and awarding Plaintiffs and the Class compensatory damages, statutory damages, treble damages, punitive damages of one billion dollars ($1,000,000,000.00), and reasonable attorneys' fees and costs; and such other and further relief as this Court deems just and proper.

## TENTH CLAIM FOR RELIEF

### Unjust Enrichment

695.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

696.    As a result of Defendants fraudulent activities, Wells Fargo and John Does received incentive payments, bonuses, and an increase in the value of their stock ownership.

697.    Plaintiffs lost money, time, suffered anguish, lost jobs, lost automobiles, lost homes, lost credit ratings, had improper fees imposed on accounts, suffered higher interest rates, and other damages as a result of Defendants activities.

698.    Defendants have been unjustly enriched at the expense of Plaintiffs and Class Members and the retention of these benefits under the circumstances would be inequitable, especially in light of the fact that Defendants have had profits of over twenty billion dollars ($20,000,000,000.00)a year.

699.    Plaintiffs seek an order requiring Defendants to make restitution to Plaintiffs and Class Members, and to disgorge all gains, bonuses, and incentive pay received from 2002 through the date of trial, and pray for entry of judgment jointly and severally against Defendants, and awarding Plaintiffs and the Class compensatory damages, statutory damages, punitive damages of at least one billion dollars ($1,000,000,000.00), and reasonable attorney's fees and costs; and such other and further relief as this Court deems just and proper.

## ELEVENTH CLAIM FOR RELIEF

**Violation of the Anti-Tying Provisions of the Bank Holding Company Act Amendments of 1970 "BHCA" as Codified at 12 U.S.C. §1972, *et seq*.**

700.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

701.    Plaintiffs allege the BHCA was designed to prevent banks from imposing anticompetitive conditions on their customers by requiring customers to take out additional services from a bank, who can thereafter exert economic power over individuals and businesses through their control of credit.

702.    The terms of the statute, as set out in 12 U.S.C. §1972, prohibit a bank from requiring a customer to obtain some additional credit, property, or service from such bank, or requiring the customer to obtain additional credit, property or service, from any other subsidiary requiring a customer to provide additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, deposit….*etc*.

703.    Section 1975 of the BHCA provides that "any person who is injured in his business or his property by reason of anything forbidden in 1972 of this Title may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent, without

121

regard to the amount in controversy, and shall be entitled to recover three times the amount of damages sustained by him and the cost of suit including a reasonable attorney's fee."

704.    Plaintiffs allege, as in the case of Plaintiff Jennifer Zeleny, in spite of her repeated refusal to obtain a credit card and line of credit on her account, Defendants submitted an application without her authorization or consent.  Plaintiff Steve Hope, who had a mortgage with Wells Fargo, and Defendants issued, without his knowledge or consent, a credit card in his name to an unknown individual who charged $5,000.  Plaintiff Anu Sood, who wanted to open a checking account and Defendants set up multiple other accounts he did not want so Defendants could meet quotas.

705.    Plaintiffs assert Defendants required numerous Plaintiffs' and Class Members to purchase additional products, through their cross-sales and employee incentives, which falls within the prohibitions contained in BHCA Section 1972 (1) (A-E).

706.    Plaintiffs allege that in addition to the accounts that Plaintiffs were aware of, Defendants opened millions of unauthorized accounts, in violation to the anti-tying provisions contained in the BHCA provisions.

707.    Plaintiff Charles Jones asserts that when he attempted to open a checking account, he was told he could not have a checking account unless he also opened a savings account.

708.    Plaintiffs allege that CEO John Stumpf has acknowledged that Defendants actions were fraudulent and that numerous violations of the BHCA act were committed from 2002 when he first became aware of the cross-selling.

709.    Plaintiffs contend that the examples provided herein demonstrate that the anti-tying prohibition activities were in fact consummated by Defendants actions in requiring Plaintiffs and Class Members to sign up for accounts they did not want or need, and had no relation to the

purpose of their initial transaction with Defendants, and/or those accounts were entered into by Wells Fargo employees without the knowledge of Plaintiffs and Class Members.

710.     Plaintiffs further assert that Defendants profited from the illegal tying actions of Defendants in increased fees, charges, opening accounts, and increase in stock price.

711.     Plaintiffs allege that Defendants actions were coercive, and/or carried out behind the backs of Plaintiffs and Class Members without their consent or knowledge.

712.     Plaintiff additionally contend that the actions of Defendant resulted in anticompetitive effects, in that Plaintiffs and Class Members were unable to obtain additional credit, or services when they became aware of Defendants actions.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of judgment jointly and severally against Defendants, and awarding Plaintiffs and the Class compensatory damages, statutory damages, treble damages, punitive damages of at least one billion dollars ($1,000,000,000.00), and reasonable attorneys' fees and costs; and such other and further relief as this Court deems just and proper.

## TWELFTH CLAIM FOR RELIEF

**Civil Violation of Racketeer Influenced Corrupt Organizations Act 15 U.S.C. §1972 *et seq*.**

713.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

714.     Plaintiffs contend that Defendants, by and through employees, such as, but not limited to: Richard Kovacevich; Carrie Tolstedt; John Stumpf; Pamela Conboy; Shelley Freeman; Matthew Raphaelson; Claudia Russ Anderson; Jason Gowan; Sean Alexander; Hope Hardison; Patricia Callahan; Didier Giron and Does 1-10,000 (hereafter "co-conspirators") conspired and acted in concert together to obtain financial rewards by implementing the actions noted above, and in the

process therof, to fraudulently deprive Plaintiffs and Class Members of their assets, name, privacy, *etc.*[45]

715.    Section 18 U.S.C. § 1962 (c) prohibits any person from conducting the affairs of an enterprise through a pattern of racketeering.

716.    At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. §1961(3) and 1962(c).

717.    Each Plaintiff is a person within the meaning of 18 U.S.C. § 1964(c).

718.    Each and every Defendant is a person capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3)

719.    Because of each and every one of Defendants' violations of Racketeer Influenced & Corrupt Organizations Act ("RICO"), Plaintiffs were financially injured as a result to their business and/or property.

720.    Each and every Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

### The RICO Enterprise

721.    The Defendants and their co-conspirators are a group of "persons" associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint.  These Defendants form this association in fact for the

---

[45] In Crocker Nat. Bank v Rockwell International Corp. (555 F Supp 47 (1982, ND Cal.)) the court held that no connection to organized crime is required for a civil RICO action. In 1984 the Northern District of California agreed (Wilcox v Ho-Wing Sit (586 F Supp 561 (1984, ND Cal.)) in a case in which the plaintiffs, limited partners in an investment company, alleged that the defendant general and limited partners fraudulently induced the plaintiffs to sell stock and invest the proceeds in an investment company. The court rejected the defendants' contention that RICO plaintiffs must allege a "nexus" or "link" to organized crime on the part of the defendants. The reason that Congress purposely declined to require that a RICO defendant be proved a member of organized crime for two reasons: 1) Congress was concerned a limitation of the statute to organized crime members would create an unconstitutional "status" offense based on the affiliation rather than the conduct of the defendants; and 2) Congress wanted to avoid imposing a difficult if not impossible burden of proof against defendants who were adept at concealing their organized crime connections.

common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. There may be other members of the enterprise who are unknown at this time, but which will be uncovered during discovery.

722. At all material times, the enterprise has engaged in, and their activities have affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

### Pattern of Racketeering Activity in General

723. Defendants and co-conspirators, each of whom are persons associated with, or employed by the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961 (1), 1961(5), and 1962(c).

724. The racketeering activity, through fraud in the inducement to open an account, the use of mail fraud (section 1341), wire fraud (1343) and financial institution fraud (section 1344), was made possible by Defendants' regular and repeated use of the services of the enterprise, including, but not limited to repeated access to Plaintiffs and Class Members confidential and private information, social security numbers, driver's license information, *etc*.

725. Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

726. Predicate acts of racketeering activity are acts which are indictable under provisions of U.S.C. § 1961(1)(B).  Defendants each committed at least two such acts or else aided and abetted such acts.

727. The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of

commission. If Defendant employees refused to participate in the fraudulent activities, they were terminated, or did not receive bonuses similar to other employees who actively engaged in fraudulent activities, including fraudulent sales practices, as identified above.

728.    Further, the acts of racketeering by Defendants have been continuous.  There was repeated conduct during a period of time beginning in approximately in 2002, and there is a continued threat of repetition of such conduct.

729.    Defendants mandated that employees must reach a certain goal of new accounts, products, or services sold to customers.

730.    Defendants, by and through its use of co-conspirators, implemented unrealistic sales goals and ran the bank as a store, pushing for sales goals, rather than customer service.

731.    Defendants and co-conspirators were often confronted by customers, and co-employees about illegal activity and after these employees spoke with the ethics hotline, these individuals were later fired.

732.    Defendants and co-conspirators created a culture of bullying and fear from managers to the lower level employees, forcing these individuals to choose between ethics and a paycheck.

**Pattern of Racketeering: Violation of 18 U.S.C. § 1341**

733.    18 U.S.C. § 1341 is designed to protect citizens from fraudulent activities sent through the mail, via the United States Postal Service or through private carrier.

734.    Defendants and co-conspirators devised a scheme to defraud Plaintiffs and Class Members through opening up millions of fake accounts in order to comply with the unrealistic quota criteria of forcing each client to have eight accounts with Wells Fargo.

735.    In pursuing this scheme to defraud Plaintiffs, Defendants and co-conspirators regularly prepared and sent out through the Postal Service and other private carriers, including, but not

limited to: rejection letters for credit cards that were processed without the client's authorization; credit card approvals with cards that were processed without authorization; billing statements showing business line of credit to individuals who had not authorized opening up such account, collection notices to clients on accounts that client did not open, and other such incidences.

736.    Defendants and co-conspirators would look up Plaintiffs information without their consent, submit applications fraudulently for new accounts, and then sent out the above mentioned papers through the Postal Service or private carrier to the Plaintiffs address.

737.    Defendants and co-conspirators, for example, created a fraudulent account application for a credit card for Plaintiff Tracy Kilgore.

738.    Plaintiff Tracy Kilgore never applied for a credit card, nor did she ever have an account with Defendants.

739.    Defendants and co-conspirators took Plaintiff Tracy Kilgore's signature from a signature card for a non-profit entity that had banking services with Defendants, and made an application for a credit card.

740.    Plaintiff Tracy Kilgore received a rejection letter at her home address for a personal credit card.

741.    Defendants would further initiate debt collection and send client accounts that were opened up fraudulently to debt collection agencies.

742.    Defendants would knowingly ignore the arbitration agreement within their own contract to take advantage of individuals who were not aware of the arbitration provision and commence court actions against Plaintiffs, again delivering fraudulent paperwork through Postal Service or private carrier.

743.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus

costs and attorneys' fees from each and every Defendant.

## Pattern of Racketeering: Violation of 18 U.S.C. § 1343

744.    18 U.S.C. § 1343 is designed to protect citizens from fraudulent activities sent by wire, radio or television transmission.

745.    Defendants and co-conspirators devised a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises did cause to be transmitted by means of wire communication in interstate commerce for the purpose of executing said scheme to defraud.

746.    In pursuing this scheme to defraud Plaintiffs and Class Members, Defendants and co-conspirators consistently caused for false accounts to be opened up in Plaintiffs' names and unilaterally transfer money from one account to the other without Plaintiffs' authorization, knowledge or consent.

747.    Plaintiff contend, for example, that Kevin Saliva had an investment account with Defendants, which Defendants and co-conspirators used to transfer money into a fraudulent account, which account was hit with repeat fees and fines until his money that was transferred in was gone.

748.    Many of the new online accounts included monthly charges that Defendants reaped the benefit thereof.

749.    Neither Plaintiffs, nor Class Members authorized the opening of false accounts, and did not authorize the transfer of money, causing distress, lost income, decreased credit scores, *etc.* to Plaintiffs and Class Members.

750.    Defendants and co-conspirators further caused for fraudulent "online banking" accounts to be set up on Plaintiffs' accounts without Plaintiffs authorization, causing fraudulent

communication to be sent over the wire.

751.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from each and every Defendant.

**Pattern of Racketeering: Violation of 18 U.S.C. § 1344**

752.    18 U.S.C. § 1344 is designed to protect citizen's moneys, funds, credits, assets and other property under the control of a financial institution.

753.    Defendants and co-conspirators devised a scheme to obtain moneys, funds or other property under the control of Wells Fargo, by means of false or fraudulent pretenses.

754.    Defendants and co-conspirators had access to and control over Plaintiffs' accounts.

755.    Defendants and co-conspirators used this access to fraudulently create new accounts, manipulate accounts, including balances and transfer money from a Plaintiffs' account to a new account, or product, such as a Prudential Life insurance policy, with monthly fees.

756.    Defendants and co-conspirators used these fraudulent pretenses of new accounts to generate more revenue for Defendants, including bonuses, and for individual workers to keep their positions within the company.

757.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from each and every Defendant.

**Predicate Act: Use of Mail Fraud to Defraud in Violation of 18 U.S.C. § 1341**

758.    Defendants and co-conspirators committed acts constituting indictable offenses under 18 U.S.C. § 1341 in that they devised a scheme or artifice to defraud Plaintiffs and the greater public by means of false or fraudulent pretenses.

759.    Defendants and co-conspirators did place in an authorized depository for mail, or did deposit or cause to be deposited with private commercial interstate carriers and knowingly

caused to be delivered by the U.S. postal service, letters, billing statements, credit cards and other matters, in violation of 18 U.S.C. § 1341, or aided and abetted in such criminal acts.

760.     Defendants and co-conspirators caused delivery of possibly millions of false documents knowingly to Plaintiffs, and to the entire class from as early as 2002 to the present, using the mail system to transmit fraudulent information concerning accounts to Plaintiffs.

### Predicate Act: Use of Wire Fraud to Defraud in Violation of 18 U.S.C. § 1343

761.     Defendants and co-conspirators committed acts constituting indictable offenses under 18 U.S.C. § 1343 in that they devised a scheme or artifice to defraud Plaintiffs and the greater public by means of false or fraudulent pretenses.

762.     Defendants and co-conspirators did create false accounts, fraudulent credit cards, enrolled Plaintiffs in fraudulent programs or services, and did cause for the transfer of moneys and funds over the wire from Plaintiffs accounts to the new accounts, in violation of 18 U.S.C. § 1343, or aided and abetted in such criminal acts.

763.     Defendants and co-conspirators caused for the illegal transfer of moneys on numerous accounts, from as early as 2002 to the present, using wire transfers to transmit fraudulent transfer requests and information concerning the Plaintiffs'.

### Predicate Act: Use of Bank Fraud to Defraud in Violation of 18 U.S.C. § 1344

764.     Defendants and co-conspirators committed acts constituting indictable offenses under 18 U.S.C. § 1344 in that they knowingly executed a scheme to obtain moneys, funds, credits or other property under the control of a financial institution by means of a false or fraudulent pretense.

765.     Defendants and co-conspirators devised a scheme to obtain moneys, funds or other property under the control of Wells Fargo, by means of false or fraudulent pretenses.

766.    Defendants and co-conspirators had access to and control over Plaintiffs' accounts.

767.    Defendants and co-conspirators used this access to fraudulently create new accounts and transfer money from a Plaintiffs' account to a new account with monthly fees.

768.    Defendants and co-conspirators created false accounts and initiated the transfer of moneys in the control of the financial institution, in violation of 18 U.S.C. § 1344, or aided and abetted in such criminal acts.

769.    Defendants and co-conspirators caused for the illegal transfer from as early as 2002 to the present and used these fraudulent pretenses of new accounts to generate more revenue for Defendants, and for individual workers to keep their positions within the company.

## Continuity of Conduct

770.    Defendants and co-conspirators violations of these laws as set forth herein, each of which directly and proximately injured Plaintiffs and Class Members, constituted a continuous course of conduct from as early as 2002 to the present.

771.    These acts were intended to obtain money from Plaintiffs and Class Members, and to increase stock price through false representations, fraud, deceit, and other improper and unlawful means.

772.    Therefore, violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961 (1) and (5).

773.    On information and belief, Defendants have conducted and/or participated directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined in violation of 18 U.S.C. § 1962(c).

774.    The unlawful actions of Defendants, each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs' in their business and property.

131

775.    Pursuant to 18 U.S.C. § 1964 (c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from each and every Defendant.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of judgment jointly and severally against Defendants, and awarding Plaintiffs and the Class compensatory damages, statutory damages, treble damages, punitive damages of one billion dollars ($1,000,000,000.00), and reasonable attorneys' fees and costs; and such other and further relief as this Court deems just and proper.

### THIRTEENTH CLAIM FOR RELIEF

### Civil Violation of Electronic Mail Fraud, 18 U.S.C. §1037 *et seq*.

776.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

777.    18 U.S.C. § 1037 is designed to protect individuals from electronic mail fraud.

778.    Defendants in affecting interstate commerce, knowingly registered, using information that materially falsifies the identity of the actual registrant, for five or more electronic mail accounts, or online user accounts, and intentionally initiated the transmission of multiple commercial electronic mail messages from said online user accounts.

779.    Plaintiffs allege Defendants actions, as set forth above, constitute electronic mail fraud as set forth in 18 U.S.C. § 1037 *et seq*. and that Plaintiffs and Class Members were harmed and damaged to their detriment.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of judgment jointly and severally against Defendants, and awarding Plaintiffs and the Class compensatory damages, statutory damages, treble damages, punitive damages, and reasonable attorney's fees and costs; and such other and further relief as this Court deems just and proper.

## FOURTEENTH CLAIM FOR RELIEF

### Request for Injunctive Relief

780.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

781.     Plaintiffs contend that the former CEO of Wells Fargo has repeatedly stated that Wells Fargo will continue its cross selling and other current business practices and sells action until January 1, 2017.

782.     Plaintiffs contend that Defendants have already admitted that the cross selling is fraught with fraudulent activity, and driven by pressuring the sale of services Plaintiffs and other Class Members do not want or need.

783.     Defendants have already been fined for this activity, and if it is allowed to continue, unabated, thousands or hundreds of thousands of unsuspecting customers will be sold products, or have their confidential information used without their authorization or consent.

784.     Without the issuance of an immediate injunction, Defendants can continue business as normal, violating laws, engaging in fraudulent activities, opening accounts, emails, credit cards, running unauthorized credit reports, and the other various acts set forth herein.

785.     Unless Defendants are enjoined from their criminal and fraudulent behavior, and sales, Plaintiffs and Class Members will continue to be harmed emotionally, financially and Wells Fargo will further its illegal activities.

786.     Plaintiffs request this Court issue an Order immediately enjoining Defendants from offering any product, or service not specifically requested for by the customer, including financial services, providing advice or requests on selling stocks or bonds in Defendants brokerage services, and all other activities of Defendants.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of an immediate injunction prohibiting Defendants from engaging in selling any product service, or the solicitation of the sale of any product, service, mortgage, stock or bonds, issuance of credit cards, loans, online accounts, opening email accounts, transferring money between customers accounts, and ceasing all fraudulent activities.

## FIFTEENTH CLAIM FOR RELIEF

### Intentional and/or Negligent Infliction of Emotional Distress

787.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

788.    Utah law, and other state laws and statutes, require that the tort of intentional infliction of emotional distress consist of four elements; 1) the Defendants conduct was outrageous and intolerable in that if offended generally accepted standards of decency and morality; 2) Defendants intended to cause, or acted in reckless disregard of the likelihood of causing, emotional distress; 3) Plaintiffs suffered severe emotional distress, and 4) Defendants conduct proximately caused the emotional distress.[46]

789.    Plaintiffs and Class Members have laid out specific instances which meet and exceed all four requirements of the four prongs of the intentional inflictions of emotional distress.  Plaintiffs have set forth the great anxiety, anger, frustration and distress in not getting answers from Defendants, Defendants caviler attitude, keeping Plaintiffs and Class Members on hold over 4 hours, and not remedying the situation. Defendants in fact intentionally inflicted emotional distress by their conduct vis-à-vis the Plaintiffs and Class Members with indifference or specifically with the purpose of inflicting emotional distress and/or knowing any reasonable

---

[46] *Prince v. Bear River Mut. Ins. Co.*, 56 p.3d 524 (Utah 202)

person would have known that such would result and were considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

790.   In the alternative, Plaintiffs contend that Defendants caviler attitude of fraudulently inducing Plaintiffs to open accounts, opening unauthorized accounts is demonstrative of Defendants disregard for the emotional distress suffered by Plaintiffs and Class Members.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for entry of judgment jointly and severally against Defendants, and awarding Plaintiffs and the Class compensatory damages, statutory damages, treble damages, punitive damages, and reasonable attorney's fees and costs; and such other and further relief as this Court deems just and proper.

Plaintiffs and Class Members request

A. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in set forth in Fed.R.Civ.P. 23, and certifying the Class defined herein;

B. Designating Plaintiffs as the representatives of the Class and their undersigned counsel as Class Counsel;

C. Entering judgment jointly and severally in favor of Plaintiffs and the Class and against Wells Fargo Defendants in a sum adequate to punish Defendants more than 3% of one quarters profits;

D. Entering a declaration that Defendants have committed fraud between it and Plaintiffs and Class Members by allowing unauthorized third-parties to access personal financial data, and/or allowed authorized personnel to knowingly misuse, misappropriate, and engage in fraudulent activity with respect to Plaintiffs and Class Members confidential information, and that Defendants be ordered to pay for mitigation in the form of clawbacks from employees who profited from the illegal activity, along

135

with adequate credit monitoring, identity theft protection, and identity theft insurance, and also be ordered to indemnify Plaintiffs and Class Members for future harm; and

E. Granting all such further and other relief as the Court deems just and appropriate as set forth in the complaint, including damages in excess of one billion dollars ($1,000,000,000.00).

**PRAYER FOR RELIEF** WHEREFORE Plaintiffs pray for judgment as follows:

A.   For an Order certifying this action as a class action and appointing Plaintiffs and their Counsel to represent the Class;

B.   For equitable relief enjoining Defendants, jointly and severally, from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs and Class members' private information, and from refusing to issue prompt, complete and accurate disclosures to the Plaintiffs and Class members;

C.   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct, including clawback and disgorgement provisions;

D.   For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount of not less than one billion ($1,000,000,000.00) to be determined for Defendants knowing theft, engagement in a continuous pattern of fraud, conspiracy to commit fraud, identity theft, cleaning up each customers' account from inaccurate reporting to credit agencies ;

E.   For an award of punitive damages in addition to the actual, compensatory, and statutory damages, which damages will dissuade Defendants from continuing to engage in fraudulent and unfair, illegal, unethical behavior;

136

F.  An award specifically for anti-ting violations with treble damages, attorneys' fees and costs;

F.  For an award of costs of suit and attorneys' fees, as allowable by law; and

G.  Such other and further relief as this court may deem just and proper as plead herein.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of their claims to the extent authorized by law.

Dated: June 27, 2017

Christensen Young & Associates, PLLC
__/s/ Steven A. Christensen___.
Steven A. Christensen
Zane L. Christensen
Christensen Young & Associates, PLLC
9980 So. 300 West, #200
Sandy, Utah, 84070
(801) 676-6447
schristensen@christensenyounglaw.com
zane@christensenyounglaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of June, 2017, a true and correct copy of the

foregoing THIRD AMENDED CLASS ACTION COMPLAINT was filed using CM/ECF

which sent notification of the filing to the following:

David H. Fry
Erin J. Cox
Eric P. Tuttle
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071

James S. Jardine
Elaina M. Maragakis
Michael D. Mayfield
Ray Quinney & Nebekker
36 South State Street, Suite 1400
Salt Lake City, UT 84145

*/s/ Steven A. Christensen* .
Steven A. Christensen