David H. Fry (*pro hac vice*)
Erin J. Cox (*pro hac vice*)
Eric P. Tuttle (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, 50th Floor
Los Angeles, California  90071
   Telephone:  (213) 683-9100

James S. Jardine (1647)
Elaina M. Maragakis (7929)
Michael D. Mayfield (8237)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah  84145-0385
   Telephone:  (801) 532-1500

*Attorneys for Defendants Wells Fargo Bank, N.A.*
*and Wells Fargo & Co.*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| Lawrence J. Mitchell, Kay Mitchell, Matthew C. Bishop, Tracy Kilgore, Jennifer K. Zeleny, Joseph W. Steele V, Scott Westin, Bruce Bird, Nathan Ornellas, Anu Sood, Brent Miller, Nicholas Beach, Alex Inskeep, Loretta Grady, Richard Fountain, Matthew Gragg, Akoya Lawani, Sharon Williams, Ken Gregory, David Self, Edward Dowdy, April Thomas, Don Black, Reza Kamali, Carina Rhea, Shanell Golden, Kim Weston, Adam Brandt, Jacci Brandt, Jennifer King, Ralph McCoy, Aaron Hands, Ayana Smith, Lisa Stern, Mbegane Diouf, Doug Waters, Paul Fos, Patricia Burkhalter, Blake Knight, Cameron Casey, Jeffery Taylor, Robert Moyer, Marcia Cameron, Gloria Pledger, Charles Jones, Aaron Brodie, Dominique Evans, Richard Farr, Kevin Saliva, Harold Beard, Travis Ashby, Andrew Gorayeb, Scott Mugrage, Edwin Zorilla, Curtis Dowdle, Edward Klann, Steven Stetzel, Glenn Gilleshammer, Wenoka Thompson, Maryann Aldous, Jennifer Porter, Robin Quigg, Tamar Hodges, Barbara Shadoan, Austin Law, Jennifer Ellsworth, Michelle Sterling, Denise Poe, Jamal Dean, Brandon Westman, Concepcion Powell, Adrian Thompson, Eric Talaska, Zachary Christensen, Erica Jones, Stephen Hope, | **MOTION AND MEMORANDUM IN SUPPORT OF RENEWED MOTION TO COMPEL ARBITRATION PURSUANT TO FAA §§ 3-4**<br><br>Case No.  2:16-cv-00966<br><br>Judge Clark Waddoups<br><br>Magistrate Judge Dustin B. Pead |

| | |
|---|---|
| *et al* and unknown Plaintiffs 1-1,000,000,<br><br>        Plaintiffs,<br>v.<br><br>Wells Fargo Bank, National Association, a<br>National Banking Association, and Wells<br>Fargo & Company, a Delaware Corporation,<br>and Does 1-5,300,<br><br>        Defendants. | |

Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company (collectively, "Wells Fargo") hereby move this Court for an order compelling 64 named plaintiffs in this putative class action to submit their claims to binding arbitration. Wells Fargo hereby submits this Memorandum in Support of its Motion.

i

## <u>TABLE OF CONTENTS</u>

**Page**

PRECISE RELIEF SOUGHT AND SPECIFIC GROUNDS FOR RELIEF……………………iii

STATEMENT OF FACTS………………………………………………………........ viii

     *Procedural Background*……………………………………….……………… viii

     *Plaintiffs' Accounts*…………………………………………………………...xii

     *Consumer Account Agreements*………………………………………...….cvi

     *Business Account Agreements*…………………………………...….…cviii

ARGUMENT……………………………………………………………….…………...…..1

I.     Plaintiffs Agreed to Arbitration With Wells Fargo…………………………...…..1

     A.     Plaintiffs Agreed to Arbitration By Signing Account Applications………......…2

     B.     Plaintiffs Agreed to Arbitration By Maintaining Their Accounts With Wells Fargo …………………..………………………………...…….......4

II.     Gateway Questions Concerning Arbitrability—Including Enforceability and Scope—Have Been Clearly and Unmistakably Assigned to the Arbitrator…………….....9

     A.     The Language of the Arbitration Clauses Unambiguously Delegates Arbitrability Issues to the Arbitrator…………………………..…………....…10

     B.     Incorporation of the AAA Rules Clearly and Unmistakably Delegates Arbitrability Issues to the Arbitrator…………………………………………..13

III.     Plaintiffs' Fraudulent Inducement Arguments Must Be Decided By the Arbitrator………………………………………………………………………….....15

IV.     If the Court Were To Reach the Question of Arbitrability, Plaintiffs' Claims Should Be Arbitrated...………………………………………………………18

CONCLUSION…………………………………………………………………………..22

**PRECISE RELIEF SOUGHT AND SPECIFIC GROUNDS FOR RELIEF**

Plaintiffs, having previously reviewed and responded to the voluminous records Wells Fargo submitted in support of its original motion to compel 58 of 80 named plaintiffs, make no attempt to dispute that these Plaintiffs opened accounts with Wells Fargo, signed account applications, used their accounts, and in doing so agreed to the terms of the agreement governing their Wells Fargo accounts—including its arbitration provision.  Rather, they assert that notwithstanding these facts, their agreements with Wells Fargo are unenforceable. With respect to the Plaintiffs who were not the subject of Wells Fargo's original motion to compel, and who have not been dismissed from the case, the Third Amended Complaint alleges that "Defendants are unable to compel arbitration on [these plaintiffs], as [each] Plaintiff never had a legitimate account to start with."  (*See, e.g.,* Third Amended Complaint ("TAC") ¶ 468 (Inskeep), ¶ 478 (Fountain), ¶ 508 (Fosbre), ¶ 520 (Evans), ¶ 554 (Hodges), ¶ 526 (Saliba), ¶ 564 (Powell), ¶ 570 (Thompson).)  Yet, when these Plaintiffs completed a  "Plaintiff Fact Sheet" under penalty of perjury, most of them attested that they *did* open an authorized account with Wells Fargo.  (*See, e.g*., Cox Decl., Ex. A (Evans), Ex. B (Fosbre), Ex. C (Hodges), Ex. D (Inskeep), Ex. F (Powell), Ex. G (Thompson), Ex. H (Saliba), Ex. J (Fountain).)  In fact, three of these Plaintiffs attested that they *only* had authorized accounts with Wells Fargo—clearly indicating on their Plaintiff Fact Sheets that they do not claim that Wells Fargo opened any unauthorized accounts in their names, notwithstanding the allegations of the original, first amended, second amended, and third amended complaints filed by their counsel.  (*See* Cox Decl., Ex. A (Evans), Ex. B (Fosbre), Ex. C (Hodges).)  Plaintiffs' counsel's failure to investigate the facts of a claim before filing a complaint (or four complaints) is alarming, and calls into question the basis for the other claims and allegations regarding their clients they have included in the 790 paragraphs of the complaint.

Plaintiffs' counsel have shown a willingness to shift the allegations of the complaint based on their perception of the most promising tactic to avoid arbitration—but even in this fourth iteration of their complaint, amended after a hearing on a prior motion to compel, Plaintiffs still cannot avoid the result mandated by the law: their claims must be submitted to arbitration.

In Plaintiffs' Second Amended Complaint, they admitted that "they entered into valid and enforceable agreements with Defendants whereby Defendants promised to provide goods or services to Plaintiffs and Class Members, and Plaintiffs and Class Members agreed to pay for those goods or services, including payment made with debit or credit cards." (Second Amended Complaint ("SAC") ¶ 137.) Indeed, the enforceability of the agreements was a prerequisite for the breach of contract claim asserted in the complaint. In their opposition brief to Wells Fargo's motion to compel arbitration based on the Second Amended Complaint, Plaintiffs again "admit[ted] that there were contracts between Wells Fargo and [Class] Members," conceded that "[t]he contract, as a whole, was [a] valid and enforceable agreement," (ECF No. 41 at 3), and explained that "Class members intended to agree to arbitrate things generally associated with bank accounts . . . ." (ECF No. 41 at 11.) Plaintiffs nonetheless argued that the arbitration clause was unenforceable as to the claims asserted in this case, reasoning that the claims fell outside the scope of arbitrable disputes or, if the arbitration clause were to apply, then either the agreement to arbitrate is rendered unconscionable or Plaintiffs' subjective misunderstanding as to its scope would allow them to avoid arbitration. When Plaintiffs were confronted with well-established law stating that, among other things, Plaintiffs could not champion the enforceability of the agreements for purposes of their breach of contract claim and at the same time repudiate the agreements to avoid arbitration, they sought leave to file their fourth attempt at a complaint

iv

in this case.  In their Third Amended Complaint, Plaintiffs have discarded the problematic judicial admissions that their agreements with Wells Fargo are enforceable.

Plaintiffs continue to acknowledge in their Third Amended Complaint that "Plaintiffs and members of the Class entered into banking agreements with Wells Fargo whereby they deposited funds with Defendant."  (TAC ¶ 655.)  However, Plaintiffs now argue that they were fraudulently induced to enter into this banking relationship with Wells Fargo, rendering their facially valid contracts (including the arbitration agreement), unenforceable.[1]  Specifically, Plaintiffs allege that "[b]ased upon Wells Fargo's admitted fraudulent sales activities, including fraudulent inducement to open accounts with the bank, dating at least until 2002, any agreements entered into subsequent to that date with Plaintiffs, were based upon fraudulent inducement and are void."  (TAC ¶ 95; *see also id.* ¶ 104 ("Wells Fargo's acts of failing to disclose material information prior to opening accounts of any nature . . . constituted actionable fraud in the inducement, vitiating all banking accounts entered into subsequent to 2002."); *id.* ¶ 672 ("Plaintiffs contend that none of them would have opened up an account with Defendants, had the illegal, fraudulent activity been disclosed to them, much less would Plaintiffs have agreed to arbitration if they had been informed.").)

Plaintiffs' arguments challenging the enforceability of their contracts with Wells Fargo, including the agreement to arbitrate, on the grounds of fraudulent inducement must be submitted to an arbitrator in light of the delegation provision in their agreements.  The delegation provision vests the arbitrator with broad authority to rule on any arguments regarding the existence,

---

[1] "The Tenth Circuit has upheld a finding of bad faith and dilatory motive in the context of a Rule 15 motion where the plaintiff's amendment was 'a rather lightly veiled attempt to avoid the allegations . . .  and admissions which were made in previous complaints, which [were] unfavorable to the plaintiff under the legal theories now expounded.'" *Barnes v. Harris*, 2013 WL 6732122, at *8 (D. Utah Dec. 19, 2013), *aff'd,* 783 F.3d 1185 (10th Cir. 2015) (citing *Ayon v. Gourley*, 185 F.3d 873, 1999 WL 516088, at *3 (10th Cir. 1999)).

validity, enforceability, or scope of any contract or agreement to arbitrate.  The agreements say this in unambiguous terms and also incorporate the AAA rules, which likewise delegate gateway questions concerning arbitrability to the arbitrator.[2]  As the Tenth Circuit has observed, "all of our sister circuits to address the issue have unanimously concluded that incorporation of the . . . AAA Rules constitutes clear and unmistakable evidence of an agreement to arbitrate arbitrability"—a conclusion which the Tenth Circuit adopted in addressing the effect of incorporating substantively identical JAMS arbitration rules.  *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1283 (10th Cir. 2017); *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11 (1st Cir. 2009) (stating that incorporation of the AAA Rules "is about as 'clear and unmistakable' as language can get" regarding delegation of arbitrability questions to an arbitrator).  When a contract with an arbitration provision contains a delegation clause and a plaintiff raises a challenge to the contract as a whole—or even a challenge to the arbitration provision—courts may not review the claim and instead must order the parties to arbitration in accordance with the delegation clause.  *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 73 (2010) (where delegation provision present, an arbitrator must hear arguments from plaintiffs who "opposed the motion to compel on the ground that the *entire arbitration agreement*, including the delegation clause, was unconscionable.").

Judge Coogler in the Northern District of Alabama recently addressed this issue in a related class action brought against Wells Fargo relating to alleged unauthorized accounts, in which the plaintiffs "argue[d] that Wells Fargo fraudulently induced them to enter into the

---

[2] Rule 7(a) of the AAA rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  Rule 7(b) provides that "[t]he arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part."  *See* American Arbitration Ass'n, *Commercial Arbitration Rules & Mediation Procedures* at 13, *available at* https://www.adr.org/sites/default/files/Commercial%20Rules.pdf.

arbitration agreement by concealing the fact that bank employees would open unauthorized accounts in Plaintiffs' names." *Jeffries v. Wells Fargo & Co.,* 2:16-cv-1987-LSC, 2017 WL 3149513, at *4 (N.D. Ala. July 25, 2017).  The court noted that, under Supreme Court precedent, "[i]f a contract's arbitration agreement includes a delegation provision," as the Wells Fargo agreements do, "then a plaintiff seeking to avoid arbitration must 'direct[ly] challenge' the delegation provision, rather than 'the arbitration provision generally.'" *Id.* (quoting *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1148 (11th Cir. 2015) (citing *Rent-A-Center*, 561 U.S. at 72)). "Even where a particular argument may apply to the contract as a whole, to the arbitration agreement, and to the delegation clause, the plaintiff must overtly attack the delegation clause." *Id.* (citing *Rent-A-Center*, 561 U.S. at 74 ("It may be that had [plaintiff] challenged the delegation provision by arguing that these common procedures *as applied* to the delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court." (emphasis in original)).  Plaintiffs here do not—and cannot—specifically challenge the delegation clause through their allegations of fraudulent inducement based on Wells Fargo's alleged misuse of customer information.  Their arguments of fraudulent inducement must therefore be submitted to an arbitrator.

## STATEMENT OF FACTS

### *Procedural Background*

1.      On September 8, 2016, the City Attorney of Los Angeles, the Consumer Financial Protection Bureau, and the Office of the Comptroller of the Currency announced a settlement with Wells Fargo, under which Wells Fargo agreed to pay $185 million in penalties and $5 million in redress to customers in connection with allegations of improper sales practices.  (*See* SAC, Ex. B (Consent Order).)

2.      The following week, three of the current named Plaintiffs filed a putative class action complaint alleging 10 claims.  (ECF No. 2.)

3.      On September 26, 2016, 32 named Plaintiffs filed a first amended complaint in this action, alleging 17 claims.  (ECF No. 6.)

4.      On November 3, 2016, Plaintiffs filed the Second Amended Complaint.  (ECF No. 15.)  Among other things, the Second Amended Complaint increased the number of named plaintiffs to 80 (net of the dismissal of certain prior plaintiffs), though it included factual allegations concerning Wells Fargo's customer relationships with only three identifiable plaintiffs.

5.      On November 23, 2016, Wells Fargo filed a motion to compel arbitration of 58 of the 80 named plaintiffs, noting that it lacked sufficient information to confirm the identity of, and locate the pertinent agreements with, the remaining 22 named plaintiffs.  (ECF No. 24.) Plaintiffs' opposition was filed on December 23, 2016, (ECF No. 41), and Wells Fargo's reply was filed January 27, 2017 (ECF No. 47).

6.      On February 28, 2017, in light of an upcoming hearing before the Judicial Panel on Multidistrict Litigation regarding Plaintiffs' motion to create an MDL comprised of this case

and related class actions filed against Wells Fargo, the Court issued an order staying further proceedings.  (ECF No. 54.)

7.      On April 5, 2017, Plaintiffs' motion to consolidate this and related class actions in an MDL was denied in light of a nationwide class action settlement in principle reached with the plaintiffs in the first-filed putative class action, *Jabbari v. Wells Fargo & Co.*, Case No. 3:15-cv-02159-VC (N.D. Cal.) ("*Jabbari* Action").

8.      On April 5, 2017, Plaintiffs filed a motion to lift the stay in this action. (ECF No. 55.)  Following a conference with counsel, the Court "lift[ed] the stay for the limited purpose of hearing argument on the motion to compel arbitration," and scheduled a hearing for June 7, 2017.  (ECF No. 58.)

9.      In the *Jabbari* Action, the plaintiffs filed a motion for preliminary approval of the parties' class action settlement agreement on April 20, 2017.  *Jabbari* Action, Case No. 3:15-cv-02159-VC, Dkt. No. 101 (N.D. Cal., filed Apr. 20, 2017).   Following a hearing with the *Jabbari* court, the parties filed an amended class action settlement agreement on June 13, 2017.  *Jabbari* Action, Case No. 3:15-cv-02159-VC, Dkt. No. 160 (N.D. Cal., filed June 13, 2017).   The *Jabbari* court granted preliminary approval of the nationwide class action settlement on July 8, 2017.  *Jabbari* Action, Case No. 3:15-cv-02159-VC, Dkt. No. 165 (N.D. Cal., filed July 8, 2017).   The deadline to opt-out from the *Jabbari* class action settlement is December 5, 2017; the final approval hearing is set for January 4, 2018.  *Id.,* Dkt. No. 165 at 15.

10.      At the June 7, 2017 hearing held on Wells Fargo's motion to compel arbitration, the Court granted "plaintiff's oral motion to amend the complaint," set a deadline of June 27, 2017 for Plaintiffs to file a Third Amended Complaint, and scheduled a status conference for

July 12, 2017 to discuss procedure following filing of the Third Amended Complaint. (ECF No. 67.)

11.     The Third Amended Complaint, filed on June 27, 2017, dismissed from the caption four plaintiffs: Sbeen Ajmal, Anthony Baquero, Nedelka Martinsen, and Candyce Ravenell.  (ECF No. 69.)  The Third Amended Complaint continued to fail to provide information with respect to 21 named plaintiffs sufficient to enable Wells Fargo to identify these individuals for purposes of bringing a comprehensive motion to compel arbitration; this short-coming of the Third Amended Complaint was discussed with the Court at the status conference held on July 12, 2017.  (ECF No. 72.)

12.     The Court issued an order on July 13, 2017 setting out a procedure to enable Wells Fargo to identify the remaining plaintiffs who were included in the Third Amended Complaint.  (ECF No. 73.)  Wells Fargo was ordered to provide Plaintiffs' counsel with a form laying out information needed to identify the 21 remaining plaintiffs by July 14, 2017.  (*Id.*)  By July 28, 2017, Plaintiffs' counsel was ordered to provide the requested information to Wells Fargo "as feasible and appropriate in this case."  (*Id.*)  Wells Fargo would then have until August 25, 2017 to file a renewed motion to compel arbitration or otherwise respond to the Third Amended Complaint. Consistent with the Court's order, on July 14, 2017 Wells Fargo provided a simple one-page form to Plaintiffs' counsel to distribute to their clients for completion, titled "Plaintiff Fact Sheet."

13.     On July 24, 2017, Plaintiffs' counsel provided to Wells Fargo the completed Fact Sheets for seven of the 21 remaining plaintiffs.  When Wells Fargo asked when the remaining Fact Sheets could be expected, Plaintiffs' counsel responded:  "We have requested the information from the other 14 individuals.  If they do not respond, take whatever action you

deem appropriate." On July 28, 2017, Plaintiffs' counsel provided Fact Sheets for three more plaintiffs, and on August 1, 2017, Plaintiffs' counsel provided one more Fact Sheet. As to the remaining 10 plaintiffs, Wells Fargo's counsel asked Plaintiffs' counsel to stipulate to set a new deadline for the remaining Plaintiff Fact Sheets, and an extension of time for Wells Fargo's renewed motion to compel arbitration to encompass these late-received Fact Sheets; after receiving no response Wells Fargo filed an *ex parte* motion seeking such relief. (ECF No. 76.) The Court set a telephonic status conference for August 15, 2017. (ECF No. 77.) On August 15, 2017, just prior to the status conference, Plaintiffs' counsel provided one more Fact Sheet. During the status conference, Plaintiffs' counsel expressed an intent to dismiss five additional plaintiffs. As to the remaining four plaintiffs, the Court issued an order directing Plaintiffs to respond in writing by August 25, 2017 either (a) confirming a Plaintiff Fact Sheet had been completed and provided to Defendants' counsel, or (b) showing cause why their claims should not be dismissed for failure to prosecute. (ECF No. 80.)

14.  On August 16, 2017, Plaintiffs filed a Notice of Voluntary Dismissal dismissing five plaintiffs: Blake Knight, Stephen Hope, Adam Brandt, Jacci Brandt, and Scott Mugrage. (ECF No. 81.)

15.  On August 25, 2017, Plaintiffs filed Fact Sheets for two of the remaining plaintiffs (ECF No. 82), and filed a Notice of Voluntary Dismissal dismissing the other two plaintiffs: Ayana Smith and Michelle Sterling. (ECF No. 83.)

16.  On September 9, 2017, Plaintiffs filed a Notice of Voluntary Dismissal dismissing Loretta Grady. (ECF No. 84.)

17.  On September 13, 2017, Plaintiffs filed a Notice of Voluntary Dismissal dismissing Wenoka Thompson. (ECF No. 85.)

*Plaintiffs' Accounts*

## Maryann Aldous

18.     Wells Fargo's original Motion to Compel included the following facts regarding Maryann Aldous[3]:

> a)      On August 8, 2007, Maryann Aldous, a Utah resident, signed an account application for a Wells Fargo a consumer checking account (x4411) and a consumer savings account (x3325).  (Nelson Decl. ¶ 28, Ex. 4-A.)  Aldous also opened a consumer time account (x6081) on September 13, 2007.  (*See id*. ¶ 30, Ex. 4-C.)  In signing the Consumer Account Applications for the x4411 account, the x3325 account, and the x6081 account,  Aldous certified that she had "received a copy of the applicable account agreement and privacy brochure and agree to be bound by them… . I also agree to the terms of the dispute resolution program described in the account agreement."  (*Id*. ¶ 28, Ex. 4-A at 2, Ex. 1-D (October 2006 Consumer Account Agreement).)  Aldous further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*. ¶ 28, Ex. 4-A at 2.)

---

[3] Given that Plaintiffs have dismissed from this case some of the individuals whom Wells Fargo previously moved to compel, exhibit numbers relating to those plaintiffs have intentionally been left blank in the Declaration of Karen Nelson in support of Wells Fargo's Renewed Motion to Compel Arbitration ("Nelson Decl.") in order to preserve the same exhibit numbering for the records relating to the other Plaintiffs who remain in the case.

b)      Aldous actively used her checking account, including for direct deposit of

her paycheck.  (*See id.* ¶ 29, Ex. 4-B.)

19.      In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 125 ("Defendants argue that Plaintiff Maryann

Aldous signed a consumer checking account and consumer savings account on August 8,

2007.").)  Plaintiffs do not dispute that Aldous opened and authorized the x4411, x3325, and

x6081 accounts.  (*Id.* ¶¶ 125-29.)  They do not dispute that she signed the consumer account

applications, which included language directly above her signature blocks stating that she had

received an applicable account agreement and agreed to be bound by the dispute resolution

program described in it.  (*Id.*)  Plaintiffs do not dispute that Aldous actively used her checking

account.  (*Id.*)  Instead, Plaintiffs allege that Aldous "does not recall arbitration terms."  (*Id.*

¶ 128.)  According to Plaintiffs, Aldous "would not have opened up her account with Wells

Fargo if she had been informed that Wells Fargo was actively taking customer information and

creating fake accounts," and therefore Aldous "was fraudulently induced into open [*sic*] the

account."  (*Id.* ¶ 129.)

**<u>Travis Ashby</u>**

20.      Wells Fargo's original Motion to Compel included the following facts regarding

Travis Ashby:

a)      Travis Ashby, a Utah resident, became the joint owner of a First Security

checking account on September 23, 2000, when he signed a relationship

change form that added him to a preexisting account belonging to his wife,

Tara Ashby, whose maiden name was Tara Blight.  (*See* Nelson Decl.

¶ 32, Ex. 5-B.)  Tara Blight had opened the checking account (x9930) with

First Security in 1998.  (*Id.* ¶ 31, Ex. 5-A.)  First Security merged with Wells Fargo in 2000, and First Security accounts were gradually converted to Wells Fargo accounts.  First Security accounts in Utah were converted to Wells Fargo accounts on April 21, 2001.  On or about March 19, 2001, a package of materials related to the conversion of the x9930 account was mailed to Ashby.  The enclosed welcome letter informed him that, as of April 21, 2001, his First Security account would become a Wells Fargo account.  (*Id.* ¶ 33, Ex. 5-C at 1.)  The welcome letter notified him that after the conversion date, if his account remained open, it would be governed by the terms of the Consumer Disclosure brochure and Consumer Account Agreement provided in the conversion packet sent to him.  (*Id.* at 1-2.)

b) The Consumer Disclosure brochure included in the conversion packet sent to Utah First Security accountholders, including Ashby, contained a Consumer Account Agreement (hereinafter referred to as "First Security Conversion CAA").  (*Id.* ¶ 33, Ex. 5-C.)  The First Security Conversion CAA contained a section entitled "Dispute Resolution Program: Arbitration Agreement." (*Id.* at 30 (internal page 14).)  The terms of the Arbitration Agreement provided that, in continuing to use an account after the conversion date, the customer "understand[s] and agree[s] that [he] is waiving the right to a jury trial or a trial before a judge in a public court," and that "by opening or maintaining a deposit account with the Bank…any dispute between us, regardless of when it arose, will be settled using" the

binding arbitration procedure described in the First Security Conversion

CAA. (*Id*.)  The agreement defined as a "dispute" as:

> [A]ny unresolved disagreement between you and the Bank that
> relates in any way to account or services described in this brochure
> [including] any claim that arises out of or is related to these
> accounts, services or related agreements. It includes claims based
> on broken promises or contracts, torts (injuries caused by negligent
> or intentional conduct), or other wrongful actions. It also includes
> statutory, common law and equitable claims.  A dispute also
> includes any disagreement about the meaning of this Arbitration
> Agreement, and whether a disagreement is a 'dispute' subject to
> binding arbitration as provided for in this Arbitration Agreement.

(*Id*.)

c)       Ashby continued to actively use the x9930 account, including to the

present, with regular transactions including payroll deposits.  (*Id*. ¶ 34, Ex.

5-D.)

21.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 130 ("Defendants argue that Plaintiff Travis Ashby

initially opened a First Security checking account on September 23, 2000.").)  Ashby does not

dispute that he continued to use his bank account for regular transactions, including payroll

deposits, following its conversion to a Wells Fargo account.  (*Id*. ¶¶ 130-35.)  Nor does Ashby

contend that he was unaware of First Security Bank's merger with Wells Fargo, or that he did not

receive the account statements that Wells Fargo sent him, though he states that he "does not

recall receiving a 'welcome packet'"  and "does not recall arbitration terms."  (*Id*. ¶¶ 133, 135.)

Plaintiffs further allege that if "Wells Fargo had disclosed its illegal sales practices and if he had

been made aware that Wells Fargo *was going* to engage in fake accounts using customer

information, [Ashby] would not have banked with Wells Fargo," and thus Wells Fargo

"fraudulently induced [Ashby] to continue his First Security account with Wells Fargo, which he would not have done." (*Id.* ¶¶ 134-35 (emphasis added).)

**<u>Nicholas Beach</u>**

22.     Wells Fargo's original Motion to Compel included the following facts regarding Nicholas Beach:

a)     Nicholas Beach, a California resident, opened two bank accounts as a sole owner with Wells Fargo on February 19, 2013, a consumer checking account (x6823) and a consumer savings account (x2590). (Nelson Decl. ¶ 38, Ex. 7-A.) Beach signed the Consumer Account Application for these two accounts, and his signature also appears on a countersigned check deposited into the account on April 1, 2013—part of a consistent pattern of account usage. (*Id.* ¶¶ 38-40, Exs. 7-A, 7-B, 7-C.) In signing the Consumer Account Application these two accounts, Beach certified that he "ha[d] received a copy of the applicable account agreement…and agre[ed] to be bound by [its] terms." (*Id.* ¶ 38, Ex. 7-A at 2, Ex. 1-I (October 2011 Account Agreement).) Beach further agreed "to the terms of the dispute resolution program described in the foregoing agreements," including the applicable account agreement, and that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.* ¶ 38, Ex. 7-A at 2.)

23.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel. (TAC ¶ 136 ("Defendants argue that Plaintiff Nicholas Beach opened a checking and savings account on February 19, 2013.").) Plaintiffs do not dispute that

Beach opened and authorized the x6823 and x2590 accounts. (*Id.* ¶¶ 136-40.) They do not dispute that he signed the consumer account application, which included language directly above his signature block stating that he had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it. (*Id.*) Plaintiffs do not dispute that Beach consistently used his checking account, nor do they dispute that he signed a countersigned check deposited into the account on April 1, 2013. (*Id.*) Instead, Plaintiffs allege that Beach "does not recall any arbitration terms, nor would he have agreed to arbitration terms, or even opened an account, if he knew that Wells Fargo was creating fake accounts using customers private information," that Beach "would not have opened up his account if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and that "opening his account was achieved through fraudulent inducement." (*Id.* ¶¶ 139-40.)

**Harold Beard**

24.     Wells Fargo's original Motion to Compel included the following facts regarding Harold Beard:

> a)     Harold Beard, an Arizona resident, opened a Wells Fargo consumer checking account (x1937) on January 23, 2004 with Virginia Beard as a joint owner. (Nelson Decl. ¶ 41, Ex. 8-A.) In the course of opening this account, Beard signed a Consumer Account Application certifying the following: "I have received a copy of Consumer Account Agreement, Consumer Account Fee and Information Schedule, and Privacy Policy (collectively the "Account Agreement"), and agree to be bound by the terms and conditions contained therein. I also agree to the terms of the

dispute resolution program described in the Account Agreement." (*Id.*,

Ex. 8-A at 1, Ex. 1-A (April 2003 Account Agreement).)  Beard further

agreed that "disputes will be decided before one or more neutral persons in

an arbitration proceeding and not by a jury trial or a trial before a judge."

(*Id.*, Ex. 8-A at 1.)  Beard actively used his account after opening it.  (*Id.*

¶ 42, Ex. 8-B.)

25.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 141 ("Defendants argue that Plaintiff Harold Beard

opened a checking account on January 23, 2004.").)  Plaintiffs do not dispute that Beach opened

and authorized the x1937 account.  (*Id.* ¶¶ 141-45.)  They do not dispute that he signed the

consumer account application, which included language directly above his signature block

stating that he had received an applicable account agreement and agreed to be bound by the

dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Beach consistently

used his checking account.  (*Id.*)  Instead, Plaintiffs allege that Beard "does not recall any

arbitration terms," that Beard "would not have opened up his account if he had been informed at

the time that Wells Fargo was actively taking customer information and creating fake accounts,"

and thus that "the opening of his account was through fraudulent inducement."  (*Id.* ¶¶ 144-45.)

**<u>Bruce Bird</u>**

26.     Wells Fargo's original Motion to Compel included the following facts regarding

Bruce Bird:

    a)     Bruce Bird, a Utah resident, opened a Wells Fargo consumer checking

           account (x6337) on June 4, 2005.  (Nelson Decl. ¶ 43, Ex. 9-A.)  Bird

           signed a Consumer Account Application for the x6337 account on June 4,

and on July 11, 2005 he signed a Relationship Change Application to add his wife, Ann Bird, as a joint owner of the account.  (*Id*. ¶¶ 43-44, Ex. 9-A, Ex. 9-B.)  In signing the applications, Bird verified that he "ha[d] received a copy of the applicable account agreement and privacy brochure and agre[ed] to be bound by them."  (*Id*. ¶¶ 43-44, Ex. 9-A at 1, Ex. 9-B, Ex. 1-B (October 2004 Account Agreement).)  Bird further agreed "to the terms of the dispute resolution program described in the account agreement" and that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id*. ¶ 43, Ex. 9-A at 1.)

27.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 146  ("Defendants argue that Plaintiff Bruce Bird opened a consumer checking account on June 4, 2005.").)  Plaintiffs do not dispute that Bird opened and authorized the x6337 account.  (*Id*. ¶¶ 146-50.)  Plaintiffs do not dispute that Bird signed a consumer account application and relationship change application, each stating directly above his signature block that he had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id*.)  Instead, Plaintiffs allege that Bird "does not recall any arbitration terms," that Bird "would not have opened up his account if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and thus "his account was opened by fraudulent inducement."  (*Id*. ¶¶ 149-50.)

**<u>Matthew Bishop</u>**

28.     Wells Fargo's original Motion to Compel included the following facts regarding

Matthew Bishop:

a)    Matthew Bishop, a Utah resident, opened a consumer checking account (x6866) with First Security on September 23, 1999.  (Nelson Decl. ¶ 45, Ex. 10-A.)  He signed an application to open the account as a joint owner with Louise Bishop.  (*Id*.)  First Security merged with Wells Fargo in 2000, and First Security accounts were gradually converted to Wells Fargo accounts in a staggered process.  (*Id*. ¶ 46.)  As previously mentioned, First Security accounts in Utah were converted to Wells Fargo accounts on April 21, 2001.  On or around March 19, 2001, a package of materials related to the conversion of the (x6866) account was mailed to Bishop.  The enclosed welcome letter informed him that, as of April 21, 2001, his First Security account would become a Wells Fargo account.  (*Id*. ¶ 46, Ex. 10-B at 1.)  The welcome letter also notified him that after the conversion date, if his account remained open, it would be governed by the terms of the Consumer Disclosure brochure and Consumer Account Agreement provided in the conversion packet sent to him.  (*Id*. at 1-2.)

b)    Bishop received the same First Security Conversion CAA as did Travis Ashby (*supra*  ¶¶ 11-12), and thus received notice of the same terms of the "Dispute Resolution Program: Arbitration Agreement." (*Id.* at 30 (internal page 14).)

c)    Bishop continued to actively use his x6866 account after the conversion.  For example, Bishop enrolled in a Wells Fargo "Add-On Package" for the x6866 account and signed an acknowledgement disclosure form on

January 27, 2005. (*Id*. ¶ 47, Ex. 10-C.)  The add-on package paperwork

that Bishop signed notified him that "[t]he terms and conditions of the

Consumer Account Agreement are supplemented by this Membership

Enrollment Form."  (*Id*.)  Bishop continues to actively use the x6866

checking account.  (*See id*. ¶ 48, Ex. 10-D at 1.)

29.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 151  ("Defendants argue that Plaintiff Matthew

Bishop opened a consumer checking account with First Security on September 23, 1999."); *id*. ¶

152 ("Defendants contend that on or around March 19, 2011 a package of materials relating to

the conversion of his account to Wells Fargo was mailed to him").)  Plaintiffs do not dispute that

Wells Fargo sent Bishop an account conversion notice and an account agreement following First

Security Bank's merger with Wells Fargo.  (*Id*. ¶¶ 151-58.)  Plaintiffs do not dispute that Bishop

continues to actively use his x6866 checking account.  (*Id*.)  Instead, Plaintiffs allege that Bishop

"does not recall any arbitration terms."  (*Id*. ¶ 157.)  Plaintiffs further allege that Bishop "would

not have opened up an 'Add-On Package' if he had been informed at the time that Wells Fargo

was actively taking customer information and creating fake accounts" and thus his "accounts

were opened under a fraudulent inducement."  (*Id*. ¶ 158.)  Notably, Plaintiffs do not allege that

Bishop was fraudulently induced into converting his account to a Wells Fargo account and

accepting the terms of the agreement, including arbitration, found in the conversion package

mailed to Bishop.

**<u>Don Black</u>**

30.     Wells Fargo's original Motion to Compel included the following facts regarding

Don Black:

a)      Donald Black, a Washington state resident, opened a Wells Fargo joint

consumer checking account with Georgina Valdez on April 7, 2010.

(Nelson Decl. ¶ 49.)  Black signed the Consumer Account Application,

and in doing so verified:  "I have received a copy of the applicable

account agreement and privacy brochure and agree to be bound by them

… I also agree to the terms of the dispute resolution program described in

the account agreement."  (*Id*., Ex. 11-A at 3, Ex. 1-G (March 2010

Account Agreement).)  Black further agreed that "disputes will be decided

before one or more neutral persons in an arbitration proceeding and not by

a jury trial or a trial before a judge."  (*Id*., Ex. 11-A at 3.)  Black and

Valdez have actively used the checking account (x0529), including direct

payroll deposits for Valdez.  (*Id*. ¶ 50, Ex. 11-B.)

31.      In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 159  ("Defendants argue that Plaintiff Don Black

opened a joint consumer checking account on April 7, 2010.").)  Plaintiffs do not dispute that

Black opened and authorized the x0529 account.  (*Id.* ¶¶ 159-63.)  Plaintiffs do not dispute that

Black signed a consumer account application stating—directly above his signature block—that

he had received an applicable account agreement and agreed to be bound by the dispute

resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Black has actively used

checking account x0529, including for payroll deposits.  (*Id.*)  Instead, Plaintiffs allege that

Black "does not recall arbitration terms," that Black "would not have opened up his account if he

had been informed at the time that Wells Fargo was actively taking customer information and

creating fake accounts," and thus Black's "accounts were opened under a fraudulent

inducement." (*Id.* ¶¶ 162-63.)

**<u>Aaron Brodie</u>**

      32.    Wells Fargo's original Motion to Compel included the following facts regarding

Aaron Brodie:

> a)    Aaron Brodie, a California resident, opened two accounts with Wells
> Fargo on May 10, 2011, a consumer checking account (x1587) and a
> consumer savings account (x2590).  (Nelson Decl. ¶ 51, Ex. 12-A.)  In
> signing the Consumer Account Application for these accounts, Brodie
> confirmed:  "I have received a copy of the applicable account agreement
> and privacy brochure and agree to be bound by them." (*Id.*, Ex. 12-A at 2,
> Ex. 1-H (September 2010 Account Agreement).)  Brodie further agreed
> that "disputes will be decided before one or more neutral persons in an
> arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.*
> ¶ 51, Ex. 12-A at 2.)  Brodie actively used these accounts. (*Id.* ¶¶ 52-53,
> Ex. 12-B, Ex. 12-C.)

      33.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 164  ("Defendants argue that Plaintiff Aaron Brodie

opened up a consumer checking and consumer savings account on May 10, 2011.").)  Plaintiffs

do not dispute that Brodie opened and authorized the x1587 and x2590 accounts. (*Id.* ¶¶ 164-

76.)  Plaintiffs do not dispute that Brodie signed a consumer account application stating—

directly above his signature block—that he had received an applicable account agreement and

agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not

dispute that Brodie has actively used both account x1587 and account x2590.  (*Id.*)  Instead, Plaintiffs allege that Brodie "does not recall any arbitration terms," that "[h]ad Wells Fargo disclosed to [Brodie] their fraudulent sales activities, he would never have opened an account with them," and thus that "he was fraudulently induced into the agreement."  (*Id.* ¶¶ 167, 176.)

**<u>Particia Burkhalter</u>**

34.    Wells Fargo's original Motion to Compel included the following facts regarding Particia Burkhalter:

a)    Patricia Burkhalter, an Arizona resident, opened two accounts with Wells Fargo on June 13, 2014, a consumer checking account (x3784) and a consumer savings account (x2240).  In the course of opening these accounts, Burkhalter signed a Consumer Account Application certifying: "I have received a copy of the applicable account agreement and the privacy policy (each may be amended from time to time) and agree to be bound by their terms.  I also agree to the terms of the dispute resolution program described in the foregoing agreements."  (Nelson Decl. ¶ 54, Ex. 13-A at 2, Ex. 1-K (April 2014 Account Agreement).)  Burkhalter further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." *Id*.  Burkhalter began to actively use her accounts immediately after opening them.  (*Id.* ¶¶ 55-56, Ex. 13-B, Ex. 13-C.)

35.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 176 ("Defendants argue that Patricia Burkhalter opened a checking account and a consumer savings account on June 13, 2014.").)  Plaintiffs do

not dispute that Burkhalter opened and authorized the x3784 account and the x2240 account.

(*Id.* ¶¶ 176-81.)  Plaintiffs do not dispute that Burkhalter signed a consumer account application

stating—directly above her signature block—that she had received an applicable account

agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)

Plaintiffs do not dispute that Burkhalter actively used her accounts immediately after opening

them.  (*Id.*)  Instead, Plaintiffs allege that Burkhalter "does not recall any arbitration terms," that

Burkhalter "would not have opened up any account with Wells Fargo if she had been informed at

the time that Wells Fargo was actively taking customer information and creating fake accounts,"

and thus Burkhalter's "accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 179-81.)

**Marcia Cameron**

36.   Wells Fargo's original Motion to Compel included the following facts regarding

Marcia Cameron:

> a)   On July 11, 1994, Marcia Cameron, a Utah resident, opened a First
>
> Security checking account.  (Nelson Decl. ¶ 57.)  Marcia Cameron signed
>
> the application to open the joint account (x0959) with Bruce Cameron.
>
> (*Id.*, Ex. 14-A.)  As stated previously, after the merger of First Security
>
> and Wells Fargo, and First Security accounts in Utah were converted to
>
> Wells Fargo accounts on April 21, 2001.  On or around March 19, 2001, a
>
> package of materials related to the conversion of the x0959 account was
>
> mailed to Cameron.  (*Id.* ¶ 58.) The enclosed welcome letter informed her
>
> that as of April 21, 2001, her joint account (x0959) would become a Wells
>
> Fargo account, and if her account remained open after that date, it would
>
> be governed by the terms of the Consumer Disclosure brochure and

Consumer Account Agreement provided in the conversion packet.  (*Id.* ¶ 58, Ex. 14-B at 1.)

b)      Cameron received the same First Security Conversion CAA as did Travis Ashby and Mathew Bishop (*supra* ¶¶ 11-12, 18-19), and thus received notice of the same terms of the "Dispute Resolution Program: Arbitration Agreement." (Nelson Decl. ¶ 58, Ex. 14-B at 30 (internal page 14).)

c)      Cameron actively used her checking account (x0959) as a Wells Fargo customer after the conversion.  (*Id.* ¶ 59, Ex. 14-C.)

37.      In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 182  ("Defendants argue that Marcia Cameron opened a First Security checking account on July 11, 1994.").)  Plaintiffs do not dispute that Wells Fargo sent Cameron an account conversion notice and an account agreement following First Security Bank's merger with Wells Fargo.  (*Id.* ¶¶ 182-88.)  Plaintiffs do not dispute that Cameron actively used her x0959 account as a Wells Fargo customer after the conversion.  (*Id.*)  Instead, Plaintiffs allege that Cameron "does not recall any arbitration terms." (*Id.* ¶ 185.)  Plaintiffs further allege that Cameron "would not have used her account if she were made aware that Wells Fargo would begin to take customer information and create fake accounts"—an allegation apparently premised on Plaintiffs' realization that by their own allegations there was no basis for their argued fraudulent inducement *at the time of conversion in 2001*—and thus "her accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 186, 188.)

**Cameron Casey**

38.      Wells Fargo's original Motion to Compel included the following facts regarding Cameron Casey:

a)    Cameron Casey, a California resident, opened two accounts with Wells Fargo on September 20, 2013, a consumer checking account (x9477) and a consumer savings account (x2261).  The Consumer Account Application signed by Casey provides that: "I have received a copy of the applicable account agreement…and agree to be bound by [its] terms.  I also agree to the terms of the dispute resolution program described in the account agreement."  (Nelson Decl. ¶ 60, Ex. 15-A at 2, Ex. 1-J (April 2013 Consumer Account Agreement).)  As a signatory, Casey further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id*., Ex. 15-A at 2.)  Casey actively used his checking account, making deposits, withdrawals, and transfers.  (*Id*. ¶ 61, Ex. 15-B.)

39.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 189 ("Defendants argue that Cameron Casey opened a consumer checking account and a consumer savings account on September 20, 2013.").) Plaintiffs do not dispute that Casey opened and authorized the x9477 account and the x2261 account.  (*Id*. ¶¶ 189-94.)  Plaintiffs do not dispute that Casey signed a consumer account application stating—directly above his signature block—that he had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it. (*Id*.)  Plaintiffs do not dispute that Casey actively used his checking account, making deposits, withdrawals, and transfers.  (*Id*.)  Instead, Plaintiffs allege that Casey "does not recall any arbitration terms," that Casey "would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and

creating fake accounts," and thus "his accounts were opened under a fraudulent inducement." (*Id.* ¶¶ 192-94.)

**<u>Zachary Christensen</u>**

40.    Wells Fargo's original Motion to Compel included the following facts regarding Zachary Christensen:

a)    Zachary Christensen, a Utah resident, applied for a Wells Fargo Visa Credit Card (x7714) on April 16, 2016; the application he signed an application notified him in bold lettering above his signature that "You acknowledge receipt of a copy of the Credit Card Agreement . . . . You acknowledge the existence of the Arbitration Agreement contained in the Credit Card Agreement and you specifically agree to be bound by its terms." (Nelson Decl. ¶ 62, Ex. 16-A.)  The Arbitration Agreement in the application states that the signatory and Wells Fargo "agree that if a Dispute (As defined below) arises between you and the Bank, upon demand by either you or the Bank, the Dispute shall be resolved by the following arbitration process." (*Id.*, Ex. 16-A at 2.)   A "dispute" is defined as "any unresolved disagreement between you and the Bank," including "claims based on broken promises or contracts, torts, or other wrongful actions.  It also includes statutory, common law and equitable claims." (*Id.*)  A "dispute" further includes "any disagreements about the meaning or application of this Arbitration Agreement." (*Id.*)  The Arbitration Agreement in the credit card application provided that any arbitration would be administered according to the Commercial

Arbitration Rules of the AAA.  (*Id.*) In signing the application, Christensen agreed that he was "waiving the right to a jury trial or a trial before a judge in a public court."  (*Id.*)

b)    On the same day he opened the credit card, Christensen made a purchase and proceeded to carry a balance on the card and make regular monthly payments.  (*Id.* ¶ 63, Ex. 16-B.)

41.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 195  ("Defendants argue that Zachary Christensen applied for a Wells Fargo Visa Credit Card on April 16, 2016.").)  Plaintiffs do not dispute that Christensen opened and authorized the x7714 credit card account.  (*Id.* ¶¶ 195-99.)  Plaintiffs do not dispute that Christensen signed a credit card application stating—directly above his signature block—that he had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that, on the same day he opened the credit card, Christensen made a purchase and proceeded to carry a balance on the card and make regular monthly payments.  (*Id.*)  Instead, Plaintiffs allege that Christensen "does not recall any arbitration terms," that Christensen "would not have opened up a Wells Fargo Visa Credit Card with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and thus "his accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 198-99.)

**<u>Jamal Dean</u>**

42.    Wells Fargo's original Motion to Compel included the following facts regarding Jamal Dean:

a)      Jamal Dean, a California resident, opened a Wells Fargo business

checking account (x6035) on September 19, 1996, for Focus-on-u

Photography.  (Nelson Decl. ¶ 64.)  Dean signed up for online banking on

December 31, 2013, (*id.* ¶ 65), and in doing so Dean had to affirmatively

agree to the terms of the operative Online Account Agreement by clicking

"I Agree" on an online portal.  (*Id.*, Ex. 17-B.)  The terms included the

"agreement with [Wells Fargo] to use binding arbitration for most disputes

arising under this Agreement or concerning the Service and to waive the

right to a trial by jury."  (*Id.* at 1.)  A "dispute" was defined as "any

unresolved agreement between or among you and us." (*Id.* at 24.)  That

included "claims based on broken promises or contracts, torts . . . or other

wrongful actions" as well as all "statutory, common law, and equitable

claims."  (*Id.*)  A "dispute" subject to arbitration also encompasses the

disputes concerning the "interpretation of this Agreement (including the

meaning of this arbitration agreement and whether a disagreement is a

'dispute' subject to binding arbitration as provided for in this arbitration

agreement.)"  (*Id.*)  The agreement specified that any arbitration would be

administered by the AAA according to the Commercial AAA Rules.  (*Id.*

at 25.)  The Online Account Agreement provides notice that the operative

"separate agreements" that govern the customer's accounts continue to

apply.  (*Id.* at 5; Ex. 2-B (April 2013 Business Account Agreement); *id.* ¶

22 (the operative Business Account Agreements have been available

online via the Wells Fargo website since 1999).)

b)     Dean both actively used the x6035 account and his business online banking.  (*Id.* ¶¶ 64, 67, Exs. 17-A, 17-C, 17-D.)  Dean continues to use business online banking and his x6035 account.  (*Id.* ¶ 67, Exs. 17-E, 17-F.)

43.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 200  ("Defendants argue that Jamal Dean opened a business checking account on September 19, 1996, and signed up for online banking on December 31, 2013.").)  Plaintiffs do not dispute that Dean opened and authorized the x6035 account or that he enrolled in online banking.  (*Id.* ¶¶ 200-06.)  Plaintiffs do not dispute that Dean affirmatively clicked "I Agree" while visiting Wells Fargo's online banking portal, agreeing to the terms of the operative online banking agreement and expressing his assent to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Dean both actively used the x6035 account and business online banking, and they do not dispute that Dean continues to use business online banking and his x6035 account.  (*Id.*)  Instead, Plaintiffs allege that: (1) Dean "does not recall any arbitration terms," (2) "if he were made aware during any of the Business Account Agreements that Wells Fargo was going to take customer information and create false accounts, he would not have kept his business checking account with Wells Fargo," (3) Dean "would not have opened up Online Banking if he knew that Wells Fargo was in the practice of creating fraudulent accounts with customer information accounts," and thus (4) Dean's "accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 204-06.)

**<u>Mbegane Diouf</u>**

44.     Wells Fargo's original Motion to Compel included the following facts regarding Mbegane Diouf:

a)      Mbegane Diouf, a New Jersey resident, opened a Wells Fargo consumer

checking account (x4444) on October 19, 2012.  The Consumer Account

Application Diouf signed stated: "I have received a copy of the applicable

account agreement … and agree to bound by [its] terms.  I also agree to

the terms of the dispute resolution program described in the account

agreement."  (Nelson Decl. ¶  69, Ex. 18-A at 4, Ex. 1-I (October 2011

Account Agreement).)  Diouf further agreed that "disputes will be decided

before one or more neutral persons in an arbitration proceeding and not by

a jury trial or a trial before a judge."  (*Id*. ¶ 69, Ex. 18-A at 4.)  Diouf

began to actively use her checking account (x4444) immediately after

opening it.  (*Id*. ¶ 70, Ex. 18-B.)

45.      In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 207  ("Defendants argue that Mbegane Diouf opened

a consumer checking account on October 19, 2012.").)  Plaintiffs do not dispute that Diouf

opened and authorized the x4444 account.  (*Id.* ¶¶ 207-11.)  Plaintiffs do not dispute that Diouf

signed a consumer account application stating—directly above her signature block—that she had

received an applicable account agreement and agreed to be bound by the dispute resolution

program described in it.  (*Id.*)  Plaintiffs do not dispute that Diouf actively used her checking

account immediately after opening it.  (*Id.*)  Instead, Plaintiffs allege that Diouf "does not recall

any arbitration terms," that Diouf "would not have opened up any account with Wells Fargo if

[s]he had been informed at the time that Wells Fargo was actively taking customer information

and creating fake accounts," and therefore "any accounts opened were under fraudulent

inducement."  (*Id.* ¶¶ 210-11.)

**<u>Curtis Dowdle</u>**

46.     Wells Fargo's original Motion to Compel included the following facts regarding

Curtis Dowdle:

a)      Curtis Dowdle, a Utah resident, opened a Wells Fargo consumer checking

account (x1401) on January 9, 2006.  Dowdle signed the Consumer

Account Application on January 9, 2006, and the next day, January 10,

2006, he signed a Relationship Change form to add Martha A. Dowdle as

a joint owner on the account.  (Nelson Decl. ¶¶ 71-72, Ex. 19-A, Ex. 19-

B.)  Both of these agreements required Dowdle to acknowledge and

consent to the following with his signature:  "I have received a copy of the

applicable account agreement and privacy brochure and agree to bound by

them.  I also agree to the terms of the dispute resolution program described

in the account agreement."  (*Id*. ¶ 71, Exs. 19-A, 19-B at 1.)  As a

signatory, Dowdle further agreed that "disputes will be decided before one

or more neutral persons in an arbitration proceeding and not by a jury trial

or a trial before a judge."  (*Id*.)  Curtis and Martha Dowdle also opened a

consumer savings account (x3461) on February 23, 2009, and several

months later, a consumer checking account (x5152) on August 18, 2010,

wherein they also agreed to the dispute resolution program in the

Consumer Account Agreement.  (*See id*. ¶¶ 73-74, Exs. 19-C, 19-D; *see

also id*. ¶ 71, Ex. 1-C (October 2005 Consumer Account Agreement).)

47.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 212 ("Defendants argue that Curtis Dowdle opened a

consumer checking account on January 9, 2006.").)  Plaintiffs do not dispute that Dowdle opened

and authorized account x1401, account x3461, or account x5152.  (*Id.* ¶¶ 212-21.)  Plaintiffs do

not dispute that Dowdle signed a relationship change form and a consumer account application

stating—directly above his signature block—that he had received an applicable account

agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)

Instead, Plaintiffs allege that Dowdle "does not recall any arbitration terms," that Dowdle

"would not have opened up any account with Wells Fargo if he had been informed at the time

that Wells Fargo was actively taking customer information and creating fake accounts," and

therefore "any accounts were entered into under fraudulent inducement, without sufficient

disclosures of material facts."  (*Id.* ¶¶ 220-21.)  Plaintiffs also include allegations regarding an

alleged unauthorized Visa issued on an account in his brother's name, who is not named either in

the allegations or as a plaintiff in this lawsuit.  (*Id.* ¶¶ 215-17.)

**<u>Edward Dowdy</u>**

48.     Wells Fargo's original Motion to Compel included the following facts regarding

Edward Dowdy:

a)      Edward Dowdy, a Utah resident, opened two Wells Fargo bank accounts

on October 16, 2013, a consumer checking account (x7160) and a

consumer savings account (x8249).  In the course of signing a Consumer

Account Application for the two accounts, Dowdy certified:  "I have

received a copy of the applicable account agreement…and agree to bound

by [its] terms.  I also agree to the terms of the dispute resolution program

described in the account agreement."   (Nelson Decl. ¶ 75, Ex. 20-A at 2,

Ex. 1-J (April 2013 Consumer Account Agreement).)  Dowdy further

agreed that "disputes will be decided before one or more neutral persons in

an arbitration proceeding and not by a jury trial or a trial before a judge."

(*Id.* ¶ 75, Ex. 20-A at 2.)  Dowdy actively used his accounts (x7160,

x8249).  (*Id.* ¶¶ 76-77, Ex. 20-B, Ex. 20-C.)

49.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 222  ("Defendants argue that Edward Dowdy opened

up a consumer checking account and a consumer savings account on October 16, 2013.").)

Plaintiffs do not dispute that Dowdy opened and authorized account x7160 and account x8249.

(*Id.* ¶¶ 222-26.)  Plaintiffs do not dispute that Dowdy signed a consumer account application

stating—directly above his signature block—that he had received an applicable account

agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)

Plaintiffs do not dispute that Dowdy actively used his accounts.  (*Id.*)  Instead, Plaintiffs allege

that Dowdy "does not recall any arbitration terms," that he "would not have opened up any

account with Wells Fargo if he had been informed at the time that Wells Fargo was actively

taking customer information and creating fake accounts," and therefore "his accounts were

opened under a fraudulent inducement."  (*Id.* ¶¶ 225-26.)

**Jennifer Ellsworth**

50.     Wells Fargo's original Motion to Compel included the following facts regarding

Jennifer Ellsworth:

        a)      Jennifer Ellsworth, a California resident, opened a consumer checking

                account (x9893) with Wells Fargo on November 29, 2014.  (Nelson Decl.

                ¶ 78, Ex. 21-A.)  In signing the Consumer Account Application, Ellsworth

                confirmed that she had "received a copy of the applicable account

agreement, and the privacy policy (as each may be amended from time to time) and agree to bound by their terms.  I also agree to the terms of the dispute resolution program described in the foregoing agreements." (*Id*. at 2.)  Ellsworth further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.*; Ex. 1-L (October 2014 Consumer Account Agreement).)  Ellsworth proceeded to actively use her checking account (x9893) for a wide variety of transactions, including direct deposit.  (*Id*. ¶ 79, Ex. 21-B.)

51.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 227  ("Defendants argue that Jennifer Ellsworth opened up a consumer checking account on November 29, 2014.").)  Plaintiffs do not dispute that Ellsworth opened and authorized account x9893.  (*Id.* ¶¶ 227-32.)  Plaintiffs do not dispute that Ellsworth signed a consumer account application stating—directly above her signature block—that she had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Ellsworth proceeded to actively use her checking account x9893 for a wide variety of transactions, including direct deposit.  (*Id.*)  Instead, Plaintiffs allege that Dowdy "does not recall any arbitration terms," that she "would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and therefore "her accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 230-32.)

**Richard Lynn Farr**

52.     Wells Fargo's original Motion to Compel included the following facts regarding Richard Lynn Farr:

a)      R. Lynn Farr, a Florida resident, signed a Consumer Account Application to open a consumer checking account (x7401) with Wells Fargo on December 15, 2015.  (Nelson Decl. ¶ 80, Ex. 22-A.)  On September 27, 2016, Farr executed a Legal Name Change Request to change the Customer Name on the account (x7401) to "Richard Lynn Farr."  (*Id.* ¶ 81, Ex. 22-B.)  In signing the account application, Farr confirmed:  "I have received a copy of the applicable account agreement, and the privacy policy (as each may be amended from time to time) and agree to bound by their terms.  I also agree to the terms of the dispute resolution program described in the foregoing agreements."  (*Id.* ¶ 80, Ex. 22-A.)  Farr further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.* ¶ 80, Ex. 22-A, Ex. 1-M (July 2015 Consumer Account Agreement).) Farr has maintained active use of his checking account as of October 2016.  (*Id.* ¶ 82, Ex. 22-C.)

53.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 234 ("Defendants argue that Richard Farr opened up a consumer checking account on December 15, 2015.").)  Plaintiffs do not dispute that Farr opened and authorized account x7401.  (*Id.* ¶¶ 234-38.)  Plaintiffs do not dispute that Farr signed a legal name change form and a consumer account application stating—directly above his

signature block—that he had received an applicable account agreement and agreed to be bound

by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Farr

maintained active use of his checking account at least through October 2016.  (*Id.*)  Instead,

Plaintiffs allege that Farr "does not recall any arbitration terms," that he "would not have opened

up any account with Wells Fargo if he had been informed at the time that Wells Fargo was

actively taking customer information and creating fake accounts," and therefore "his accounts

were opened under a fraudulent inducement."  (*Id.* ¶¶ 237-38.)

**Glenn Gilleshammer**

    54.    Wells Fargo's original Motion to Compel included the following facts regarding

Glenn Gilleshammer:

          a)    On September 29, 2005, Glenn Gilleshammer, a North Dakota resident,

               opened a consumer savings account (x7450) with Wells Fargo.  (Nelson

               Decl. ¶ 83, Ex. 23-A.)  On the same day, he filled out and signed an

               Information Change Request form for the account to add a personalized

               account name of "Farm Acct" to account x7450.  (*Id.* ¶ 84, Ex. 23-B.)  In

               the course of signing the account application, Gilleshammer certified the

               following:  "I have a received a copy of the applicable account agreement

               and privacy brochure and agree to be bound by them …. I also agree to the

               terms of the dispute resolution program described in the account

               agreement."  (*Id.* ¶ 83, Ex. 23-A at 1.).  Gilleshammer actively used his

               consumer savings account.  (*Id.* ¶¶ 83, 85, Ex. 23-C, Ex. 1-B (October

               2004 Consumer Account Agreement).)

          b)    Gilleshammer opened a consumer savings account (x4315) by signing an

application on February 2, 2009.  (*See id.* ¶ 86, Ex. 23-D.)  Several weeks later, on February 28, 2009, Gilleshammer signed a Relationship Change Application transforming the x4315 account into a trust account for the "g a & l m gilleshammer" trust, with Gilleshammer serving as sole trustee. (*Id.* ¶ 87, Ex. 23-E.)  Gilleshammer kept the x4315 account well funded. (*Id.* ¶ 88, Ex. 23-F.)  Both the Consumer Account Application (x4315) and the Relationship Change Application required Gilleshammer to agree to the terms of the dispute resolution program described in the account agreement.  (*Id.* ¶¶ 86, 88, Ex. 23-F, Ex. 1-F (November 2008 Consumer Account Agreement).)

55.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 239  ("Defendants argue that Plaintiff Glenn Gilleshammer opened a consumer savings account on September 29, 2005, a consumer savings account on February 2, 2009.").)  Plaintiffs do not dispute that Gilleshammer opened and authorized account x7450 and account x4315.  (*Id.* ¶¶ 239-48.)  Plaintiffs do not dispute that Gilleshammer signed a consumer account application stating—directly above his signature block—that he had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Gilleshammer actively used his consumer savings account x7450 and kept the x4315 account well-funded.  (*Id.*)  Instead, Plaintiffs allege that Gilleshammer "does not recall any arbitration terms," that he "would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and therefore "all credit cards, savings and other accounts were opened under fraudulent inducement,

xxxix

without disclosure of material facts by Defendants." (*Id.* ¶¶ 242-43, 248.)  Plaintiffs

additionally allege that "Plaintiff Glenn Gilleshammer contends that he had a credit card with

Wells Fargo which was stolen," that he "called and cancelled the card," and that subsequently

new cards were issued which had "transferred all the costs, fees, bank charges, and interest from

the original card to this new card." (*Id.* ¶¶ 244-47.)

      56.    On September 1, 2015, Gilleshammer signed a Wells Fargo Credit Card

Application and Agreement.  (Nelson Decl. ¶ 88(a), Ex. 23-G.)  The application and agreement

stated, directly above the signature line, that "You agree to be bound by the terms and conditions

of the Customer Agreement and Disclosure Statement," and "[y]ou hereby stipulate to the terms

of the arbitration program described in the Customer Agreement and Disclosure Statement."

(*Id.*)  Gilleshammer's application was approved and the bank issued him a Wells Fargo Visa

credit card, account ending (x9984).  (*Id.* ¶ 88(a).)  The Customer Agreement and Disclosure

Statement mailed to Gilleshammer provided that he and Wells Fargo "agree that if a Dispute

arises between you and the Bank, upon demand by either you or the Bank, the Dispute shall be

resolved by the following arbitration process." (*Id.*, Ex. 23-H at 14.)  The agreement stated: "A

'Dispute' is any unresolved disagreement between you and the Bank" and a "Dispute also

includes any disagreements about the meaning or application of this Arbitration Agreement."

(*Id.*)  Furthermore, any arbitration would be administered according to AAA Rules.  (*Id.* at 15.)

On September 11, 2015, Gilleshammer activated the plastic card for his x9984 credit account,

and proceeded to actively use the credit card.  (*Id.*, Ex. 23-I.)

**Shanell Golden**

      57.    Wells Fargo's original Motion to Compel included the following facts regarding

Shanell Golden:

xl

a)      Shanell Golden, a California resident, opened a consumer checking

account (x3129) and consumer savings account (x2435) with Wells Fargo

on October 20, 2008.  (Nelson Decl. ¶ 89, Ex. 24-A.)  In the course of

signing a Consumer Account Application for these accounts, Golden

certified the following:  "I have received a copy of the applicable account

agreement and privacy brochure and agree to be bound by them…I also

agree to the terms of the dispute resolution program described in the

account agreement."  (*Id.* ¶  89, Ex. 24-A at 2, Ex. 1-E (November 2007

Consumer Account Agreement).)  As a signatory, Golden further agreed

that "disputes will be decided before one or more neutral persons in an

arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id.*

¶ 89, Ex. 24-A at 2.)  Golden actively used her x3129 and x2435 accounts.

(*Id.* ¶¶  90, Ex. 24-B.)

58.     In the Third Amended Complaint, Plaintiffs acknowledge the facts

outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 249 ("Defendants argue that Plaintiff

Shanell Golden opened a consumer checking and a consumer savings account on October 20,

2008.").)  Plaintiffs do not dispute that Golden opened and authorized account x3129 and

account x2435.  (*Id.* ¶¶ 249-53.)  Plaintiffs do not dispute that Golden signed a consumer account

application stating—directly above her signature block—that she had received an applicable

account agreement and agreed to be bound by the dispute resolution program described in it.

(*Id.*)  Plaintiffs do not dispute that Golden actively used her x3129 and x2435 accounts.  (*Id.*)

Instead, Plaintiffs allege that Golden "does not recall any arbitration terms," that she "would not

have opened up any account with Wells Fargo if she had been informed at the time that Wells

Fargo was actively taking customer information and creating fake accounts," and therefore "her accounts were opened under a fraudulent inducement." (*Id.* ¶¶ 252-53.)

**<u>Andrew Gorayeb</u>**

59.     Wells Fargo's original Motion to Compel included the following facts regarding Andrew Gorayeb:

> a)      Andrew Gorayeb, a California resident, opened a Wells Fargo consumer checking account (x5716) on June 20, 2007.  In the course of signing a Consumer Account Application for this account, Gorayeb certified the following:  "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them… I also agree to the terms of the dispute resolution program described in the account agreement."  (Nelson Decl. ¶ 91, Ex. 25-A at 2, Ex. 1-D (October 2006 Consumer Account Agreement).)   Gorayeb further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id.* ¶ 91, Ex. 25-A at 2.)  Gorayeb continues to actively use this account as of October 2016.  (*Id.* ¶ 92, Ex. 25-B.)

60.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 254 ("Defendants argue that Plaintiff Andrew Gorayeb opened a consumer checking account on June 20, 2007.").)  Plaintiffs do not dispute that Gorayeb opened and authorized account x5716.  (*Id.* ¶¶ 254-62.)  Plaintiffs do not dispute that Gorayeb signed a consumer account application stating—directly above his signature block—that he had received an applicable account agreement and agreed to be bound by the

dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Gorayeb

maintained active use of his checking account at least through October 2016.  (*Id.*)  Instead,

Plaintiffs allege that Gorayeb "does not recall any arbitration terms," that he "would not have

opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo

was actively taking customer information and creating fake accounts," and therefore "his

accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 257-58, 262.)

**<u>Kenneth Gregory</u>**

      61.    Wells Fargo's original Motion to Compel included the following facts regarding

Kenneth Gregory:

          a)     Kenneth Gregory, a Colorado resident, opened a Wells Fargo consumer

checking account (x4327) and consumer savings account (x9996) on

January 2, 2015.  In the course of signing a Consumer Account

Application for these accounts, Gregory certified the following:  "I have

received a copy of the applicable account agreement and privacy brochure

and agree to be bound by them. … I also agree to the terms of the dispute

resolution program described in the foregoing agreements."  (Nelson Decl.

¶¶ 93, Ex. 26-A at 2; Ex. 1-L (October 2014 Consumer Account

Agreement).)   Gregory further agreed that "disputes will be decided

before one or more neutral persons in an arbitration proceeding and not by

a jury trial or a trial before a judge."  (*Id.* ¶ 93, Ex. 26-A at 2.)  Gregory

continues to actively use these accounts.  (*Id.* ¶ 94, Ex. 26-B.)

      62.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 263  ("Defendants argue that Plaintiff Kenneth

Gregory opened a consumer checking account and consumer savings account on January 2, 2015.").)  Plaintiffs do not dispute that Gregory opened and authorized account x4327 and account x9996.  (*Id.* ¶¶ 263-67.)  Plaintiffs do not dispute that Gregory signed a consumer account application stating—directly above his signature block—that he had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Gregory continues to actively use his accounts.  (*Id.*)  Instead, Plaintiffs allege that Gregory "does not recall any arbitration terms," that he "would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and therefore "his accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 266-67.)

**Aaron Hands**

63.    Wells Fargo's original Motion to Compel included the following facts regarding Aaron Hands:

    a)     Aaron Hands opened a Wells Fargo consumer checking account (x9788) on December 1, 2015.  Three days later he signed a Relationship Change Application adding Rebecca Barsoum as a joint owner on the account. (Nelson Decl. ¶¶ 95-96, Ex. 27-A, Ex. 27-B.)  In the course of signing both documents, Hands certified the following:  "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them … I also agree to the terms of the dispute resolution program described in the account agreement."  (*Id.* ¶ 95, Ex. 27-A at 2, Ex. 1-M (July 2015 Consumer Account Agreement).)  Hands further agreed that "disputes will be decided before one or more neutral persons in

an arbitration proceeding and not by a jury trial or a trial before a judge."
(*Id.* ¶ 95, Ex. 27-A at 2.)  Hands continues to actively use his Wells Fargo
account (x9788) as of October 2016.  (*Id.* ¶ 97, Ex. 27-C.)

64.      In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in
Wells Fargo's Motion to Compel.  (TAC ¶ 268 ("Defendants argue that Plaintiff Aaron Hands
opened up a consumer checking account on December 1, 2015.").)  Plaintiffs do not dispute that
Hands opened and authorized account x9788.  (*Id.* ¶¶ 268-72.)  Plaintiffs do not dispute that
Hands signed a consumer account application stating—directly above his signature block—that
he had received an applicable account agreement and agreed to be bound by the dispute
resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Hands continued to
actively use his Wells Fargo account x9788 through at least October 2016.  (*Id.*)  Instead,
Plaintiffs allege that Hands "does not recall any arbitration terms," that he "would not have
opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo
was actively taking customer information and creating fake accounts," and therefore "his
accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 271-72.)

**<u>Charles Jones</u>**

65.      Wells Fargo's original Motion to Compel included the following facts regarding
Charles Jones:

a)       Charlie Jones opened a Wells Fargo consumer checking account (x2031)
and consumer savings account (x2999) on July 27, 2010.  In the course of
signing a Consumer Account Application for these accounts, Jones
certified the following, "I have received a copy of the applicable account
agreement and privacy brochure and agree to be bound by them. I also

agree to the terms of the dispute resolution program described in the
account agreement."  (Nelson Decl. ¶ 98, Ex. 28-A at 2, Ex. 1-G (March
2010 Consumer Account Agreement).)  Jones further agreed that "disputes
will be decided before one or more neutral persons in an arbitration
proceeding and not by a jury trial or a trial before a judge."  (*Id.* ¶ 98, Ex.
28-A at 2.)  Jones actively used the x2031 account.  (*Id.* ¶ 99, Ex. 28-B.)

66.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in
Wells Fargo's Motion to Compel.  (TAC ¶ 273 ("Defendants argue that Plaintiff Charles Jones
opened a consumer checking account and consumer savings account on July 27, 2010.").)
Plaintiffs do not dispute that Jones opened and authorized account x2031 and account x2999.
(*Id.* ¶¶ 273-80.)  Plaintiffs do not dispute that Jones signed a consumer account application
stating—directly above his signature block—that he had received an applicable account
agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)
Plaintiffs do not dispute that Jones actively used the x2031 account.  (*Id.*)  Instead, Plaintiffs
allege that Jones "does not recall any arbitration terms," that he "would not have opened up any
account with Wells Fargo if he had been informed at the time that Wells Fargo was actively
taking customer information and creating fake accounts," and therefore "any account was opened
under fraudulent inducement."  (*Id.* ¶¶ 276-78.)

**Erica Bendixsen Jones**

67.     Wells Fargo's original Motion to Compel included the following facts
regarding Erica Bendixsen Jones:

      a)     On August 19, 2003, Jan Bendixsen opened a consumer savings account
(x9685) with Wells Fargo.  Several months later, on December 11, 2003,

Plaintiff, then named Erica Bendixsen, signed a Consumer Account

Application for Relationship, Name or Title Change form, which added

her as a joint owner to the preexisting consumer savings account (x9685)

owned by Jan Bendixsen.  (Nelson Decl. ¶ 100, Ex. 29-A.)  Carrie

Bendixsen was also added as a joint owner to the x9685 account on the

same Consumer Account Application.  (*Id*. at 1)  In signing this

application, Erica Bendixsen verified the following:  "I have received a

copy of [the] applicable account agreement and use of information

brochure and agree to be bound by them. I also agree to the terms of the

dispute resolution program described in  the account application."  (*Id.*,

Ex. 29-A at 1, Ex. 1-A (April 2003 Consumer Account Agreement).)  She

further agreed that "disputes will be decided before one or more neutral

persons in an arbitration proceeding and not by a jury or a trial before a

judge."  (*Id.*, Ex. 29-A at 1.)  The joint owners of the x9685 account have

actively used the account.  (*Id*. ¶ 101, Ex. 29-B.)

68.    In the Third Amended Complaint, Plaintiffs attempt to acknowledge the facts

outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 281  ("Defendants argue that Erica

Bendixsen Jones opened a consumer savings account on August 19, 2003.").)  Plaintiffs do not

dispute that Erica Bendixsen Jones signed a consumer account application for relationship, name,

or title change, stating—directly above her signature block—that she had received the applicable

account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*

¶¶ 281-85.)  Plaintiffs do not dispute that the joint owners of the x9685 account have actively

used the account.  (*Id.*)  Instead, Plaintiffs allege that Erica Bendixsen Jones "does not recall any

arbitration terms," that she "would not have opened any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and therefore "her accounts were opened under a fraudulent inducement." (*Id.* ¶¶ 284-85.)

**Reza Kamali-Sarvestani**

69.     Wells Fargo's original Motion to Compel included the following facts regarding Reza Kamali-Sarvestani:

> a)     Reza Kamali-Sarvestani, an Alabama resident, opened a Wells Fargo consumer checking account (x0925) and consumer savings account (x6401) on September 2, 2011.  Kamali-Sarvestani signed the Consumer Account Application using the name "Rezi," a typographical error that was corrected by a legal name change request signed and submitted on the same day, September 2, 2011.  (Nelson Decl. ¶¶ 102-03, Ex. 30-A, Ex. 30-B.)  In signing and executing both the account application and name change form, Kamali-Sarvestani certified the following: "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them … I also agree to the terms of the dispute resolution program described in the account agreement." (*Id.* ¶ 102, Ex. 30-A at 2, Ex. 30-B, Ex. 1-H (September 2010 Consumer Account Agreement).) Kamali-Sarvestani further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.*, Ex. 30-A, 30-B.)  Kamali-Sarvestani

continues to actively use the accounts as of October 2016.  (*Id.* ¶¶ 104-105, Ex. 30-C, Ex. 30-D.)

70.   In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 286  ("Defendants argue that Plaintiff Reza Kamali-Sarvestani opened a consumer checking account and consumer savings account on September 2, 2011.").)  Plaintiffs do not dispute that Kamali-Sarvestani opened and authorized account x0925 and account x6401.  (*Id.* ¶¶ 286-90.)  Plaintiffs do not dispute that Kamali-Sarvestani signed a name change form and a consumer account application confirming receipt of the applicable account agreement and agreeing to be bound by the dispute resolution program described in it. (*Id.*)  Plaintiffs do not dispute that Kamali-Sarvestani actively used the accounts through at least October 2016.  (*Id.*)  Instead, Plaintiffs allege that Kamali-Sarvestani "does not recall any arbitration terms," that he "would not have opened up any account with Wells Fargo if Plaintiff had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and therefore "his accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 289-90.)

**<u>Jennifer King</u>**

71.   Wells Fargo's original Motion to Compel included the following facts regarding Jennifer King:

   a)   Jennifer King, a Florida resident, opened a Wells Fargo consumer checking account (x1925) and consumer savings account (x7693) on June 10, 2014.  In the course of signing a Consumer Account Application for these accounts, King certified that she had "received a copy of the applicable account agreement and the privacy policy … and agre[ed] to be

bound by their terms." (Nelson Decl. ¶ 106, Ex. 31-A at 2, Ex. 1-K (April 2014 Consumer Account Agreement).) King also "agree[d] to the terms of the dispute resolution program described in the foregoing agreements" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id*. ¶ 106, Ex. 31-A at 2.) On November 13, 2014 King signed a Relationship Change Application to add Evan Jones as a beneficiary to the x1925 account. (*Id*. ¶ 107, Ex. 31-B.) King reaffirmed in this document that she agreed to the terms of the dispute resolution program as described in the account agreement. (*Id*.) King continues to actively use her x1925 account as of October 2016. (*Id*. ¶ 108, Ex. 31-C.)

72.      In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel. (TAC ¶ 291 ("Defendants argue that Plaintiff Jennifer King opened a consumer checking account and consumer savings account on June 10, 2014.").) Plaintiffs do not dispute that King opened and authorized account x1925 and account x7693. (*Id*. ¶¶ 291-95.) Plaintiffs do not dispute that King signed a relationship change application and consumer account application stating—directly above her signature block—that she had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it. (*Id*.) Plaintiffs do not dispute that King continued to actively use her x1925 account at least through October 2016. (*Id*.) Instead, Plaintiffs allege that King "does not recall any arbitration terms," that she "would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and

1

creating fake accounts," and therefore "her accounts were opened under a fraudulent inducement." (*Id.* ¶¶ 294-95.)

**Edward Klann**

73.    Wells Fargo's original Motion to Compel included the following facts regarding Edward Klann:

> a)    Edward Klann, a Georgia resident, opened a Wells Fargo consumer
>       checking account (x6086) and consumer savings account (x0749) on April
>       25, 2011.  In the course of signing a Consumer Account Application for
>       these accounts, Klann certified the following: "I have received a copy of
>       the applicable account agreement and the privacy brochure and agree to be
>       bound by them." (Nelson Decl. ¶ 109, Ex. 32-A at 2.)  Klann also
>       "agree[d] to the terms of the dispute resolution program described in the
>       account  agreement" whereby "disputes will be decided before one or
>       more neutral persons in an arbitration proceeding and not by a jury trial or
>       a trial before a judge." (*Id.*, Ex. 1-H (September 2010 Consumer Account
>       Agreement).)  Klann actively used his checking and savings accounts.  (*Id.*
>       ¶¶ 110-11, Ex. 32-B, Ex. 32-C.)

74.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 296  ("Defendants argue that Plaintiff Edward Klann opened a consumer checking and a consumer savings account on April 25, 2011.").)  Plaintiffs do not dispute that Klann opened and authorized account x6086 and account x0749.  (*Id.* ¶¶ 296-300.)  Plaintiffs do not dispute that Klann signed a consumer account application stating—directly above his signature block—that he had received an applicable account agreement and

agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not

dispute that Klann actively used his checking and savings accounts.  (*Id.*)  Instead, Plaintiffs

allege that Klann "does not recall any arbitration terms," that he "would not have opened up any

account with Wells Fargo if he had been informed at the time that Wells Fargo was actively

taking customer information and creating fake accounts," and therefore "his accounts were

opened under a fraudulent inducement."  (*Id.*. ¶¶ 299-300.)

**<u>Austin Law</u>**

      75.    Wells Fargo's original Motion to Compel included the following facts

regarding Austin Law:

          a)     Austin Law, a California resident, opened a Wells Fargo consumer

                checking account (x8747) and consumer savings account (x6759) on May

                5, 2016.  In the course of signing a Consumer Account Application for

                these accounts, Law certified the following that he had "received a copy of

                the applicable account agreement and the privacy policy (each may be

                amended from time to time) and agre[ed] to be bound by their terms."

                (Nelson Decl. ¶ 112, Ex. 33-A at 2, Ex. 1-N (April 2016 Consumer

                Account Agreement).)  Law also "agree[d] to the terms of the dispute

                resolution program described in the foregoing agreements" whereby

                "disputes will be decided before one or more neutral persons in an

                arbitration proceeding and not by a jury trial or a trial before a judge."

                (*Id.*)  Law actively used both accounts.  (*Id.* ¶¶ 113-14, Exs. 33-B, 33-C.)

      76.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 301 ("Defendants argue the Plaintiff Austin Law

opened a consumer checking account and consumer savings account on May 5, 2016.").)

Plaintiffs do not dispute that Law opened and authorized account x8747 and account x6759.  (*Id.*

¶¶ 301-05.)  Plaintiffs do not dispute that Law signed a consumer account application stating—

directly above his signature block—that he had received an applicable account agreement and

agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not

dispute that Law actively used both his checking and savings accounts.  (*Id.*)  Instead, Plaintiffs

allege that Law "does not recall any arbitration terms," that he "would not have opened up any

account with Wells Fargo if he had been informed at the time that Wells Fargo was actively

taking customer information and creating fake accounts," and therefore "his accounts were

opened under a fraudulent inducement."  (*Id.* ¶ 304-05.)

**Ayoka Lawani**

77.    Wells Fargo's original Motion to Compel included the following facts

regarding Avoka Lawani:

a)    Ayoka Evelyn Lawani, a Maryland resident, signed a Wachovia Customer

Access Agreement on April 26, 2006.  (Nelson Decl. ¶ 115, Ex. 34-A.)

Lawani opened a Wachovia checking account (x5419) and savings

account (x9343) on August 11, 2010 which remained open after the

merger of Wachovia and Wells Fargo.  Wachovia bank accounts were

gradually converted to Wells Fargo accounts in a staggered process, and

Wachovia deposit accounts in Maryland were converted to Wells Fargo

accounts on February 18, 2012.  (*Id.* ¶ 116.)  On or about December 30,

2011, a package of materials related to the conversion of the two accounts

(x5419, x9343) was mailed to Lawani.  (*Id.*)  The enclosed welcome letter

informed Lawani that her existing Wachovia accounts would become

Wells Fargo accounts on February 18, 2012. (*Id.*, Ex. 34-B.) The

welcome letter, which came enclosed with a conversion packet, notified

Lawani that after the conversion date, if her accounts remained open, they

would be governed by the terms of the Consumer Disclosure booklets

provided to her, which contained a copy of the Wells Fargo Consumer

Account Agreement.  (*Id.*, Ex. 34-B, Ex. 34-C.)

b)    The first booklet in the Consumer Disclosures provided to Lawani

contained the Consumer Account Agreement; a section entitled "Dispute

Resolution Program: Arbitration Agreement" can be found on page 4 of

the booklet. (*Id.*, Ex. 34-C at 4.)  The Arbitration Agreement provided

that, "[i]f you have a dispute with the Bank, and you are not able to

resolve the dispute informally, you and the Bank agree that upon demand

by either you or the Bank, the dispute will be resolved through the

arbitration process as set forth in this part…" (*Id.*)  A "dispute" was

defined as "any unresolved disagreement between you and the Bank."

(*Id.*) It included "claims based on broken promises or contracts, torts, or

other wrongful actions.  It also includes statutory, common law, and

equitable claims." (*Id.*)  "Disputes" also included "disagreements about

the meaning, application or enforceability of this Arbitration Agreement."

(*Id.*)  In bold, block letters, the Arbitration Agreement made clear: "YOU

AGREE THAT YOU AND THE BANK ARE WAIVING THE RIGHT

TO A JURY TRIAL OR TRIAL BEFORE A JUDGE IN A PUBLIC

COURT." (*Id.*)  The agreement provided that any arbitration would be

administered by the AAA using AAA Rules.  (*Id.* at 5.)

    c)    Lawani continues to use her Wells Fargo x5419 account.  (*Id.* ¶ 117, Ex.

34-D.)

78.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 306 ("Defendants argue that Plaintiff Ayoka Lawani

opened a Wachovia checking and savings account on August 11, 2010, which was converted to a

Wells Fargo account on February 18, 2012.").)  Plaintiffs do not dispute that Lawani received a

welcome letter, conversion packet, and account agreement containing an arbitration agreement

following Wachovia's merger with Wells Fargo.  (*Id.* ¶¶ 306-10.)  Plaintiffs do not dispute that

Lawani has continued to use her account x5419 following its conversion into a Wells Fargo

account.  (*Id.*)  Instead, Plaintiffs allege that Lawani "does not recall any arbitration terms."  (*Id.*

¶ 309.)  Plaintiffs further allege that Lawani "would have closed her Wachovia account and

opened an account elsewhere in lieu of having her account converted to Wells Fargo if she had

been informed at the time that Wells Fargo was actively taking customer information and

creating fake accounts," and thus "her accounts were opened under a fraudulent inducement."

(*Id.* ¶ 310.)

**<u>Ralph McCoy</u>**

79.    Wells Fargo's original Motion to Compel included the following facts

regarding Ralph McCoy:

    a)    Ralph McCoy, a California resident, opened a Wells Fargo consumer

checking account (x2033) on November 14, 2014.  In the course of

signing a Consumer Account Application for this account, McCoy

certified that he had "received a copy of the applicable account agreement and privacy brochure … and agree[s] to be bound by their terms." (Nelson Decl. ¶ 120, Ex. 36-A at 2, Ex. 1-L (October 2014 Consumer Account Agreement).)  McCoy also "agree[d] to the terms of the dispute resolution program described in the foregoing  agreements" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.*, Ex. 36-A at 2.)  McCoy continues to use this account actively as of October 2016.  (*Id.* ¶ 121, Ex. 36-B.)

80.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 311 ("Defendants argue that Plaintiff Ralph McCoy opened a consumer checking account on November 14, 2014.").)  Plaintiffs do not dispute that McCoy opened and authorized account x2033.  (*Id.* ¶¶ 311-315.)  Plaintiffs do not dispute that McCoy signed a consumer account application stating—directly above his signature block—that he had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that McCoy has continued to actively use his account at least through October 2016.  (*Id.*)  Instead, Plaintiffs allege that McCoy "does not recall any arbitration terms," that he "would not have opened any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and therefore "his accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 314, 315.)

**<u>Kay and Lawrence Mitchell</u>**

81.     Wells Fargo's original Motion to Compel included the following facts

regarding Kay and Lawrence Mitchell:

    a)    Lawrence Mitchell, a Utah resident, opened a Wells Fargo consumer checking account (x9055) on April 2, 1982.  ( Nelson Decl. ¶ 122.) Lawrence Mitchell signed up for online banking on May 20, 2005, and in doing so he had to affirmatively agree to the terms of the operative Online Account Agreement by clicking "I Agree" on an online portal.  (*Id.*) The terms of the Online Account Agreement Lawrence Mitchell agreed to included a Dispute Resolution provision that read:  "[a]t the request of either party, any dispute concerning the Service shall be decided by binding arbitration pursuant to the commercial arbitration rules of the American Arbitration Association."  (*Id*. at 14)  The Online Account Agreement provides notice that the customer's accounts "continue to be subject to the agreements otherwise governing them."  (*Id*., Ex. 37-A at 2; *id.,* Ex. 1-B (October 2004 Consumer Account Agreement); *id*. ¶ 7 (the operative Consumer Account Agreements have been available online via the Wells Fargo website since 1999).)

    b)    Kay Mitchell was added to the x9055 account as a joint owner. (*Id*. ¶ 124.) The Mitchells actively used the x9055 account, and had Kay Mitchell's monthly social security check deposited to the account. (*Id*. ¶ 124, Ex. 37-D.)  In their December of 2011 statement, the Mitchells received an "Important Change in Terms Notice" from Wells Fargo, notifying them that the Consumer Account Agreement would be revised effective February 15, 2012.  (*Id*. ¶ 125, Ex. 37-E.)  This notice, which constituted

an Addenda to the Consumer Account Agreement, was titled, "Dispute Resolution Program: Arbitration Agreement." (*Id.*) The Addenda provides that "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process set forth in this part." (*Id.*)  A "dispute" was defined as "any unresolved disagreement between you and the Bank."  (*Id.*)  Such a dispute includes "claims based on broken promises or contracts, torts, or other wrongful actions.  It also includes statutory, common law, and equitable claims." (*Id.*)  Moreover, a "dispute" encompassed "disagreements about the meaning, application or enforceability of this arbitration agreement."  (*Id.*)

c)   The Mitchells continued to actively use the x9055 account after the change in terms took effect (*id.* ¶ 126, Ex. 37-F), and continue to actively use the account up to the present. (*Id.* ¶ 127, Ex. 37-G.),  Lawrence Mitchell has actively used is online banking account from May 2005 to the present.  (*Id.* ¶ 123, Exs. 37-B, 37-C.)

82.   In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 316 ("Defendants argue that Plaintiff Kay Mitchell was added to a consumer checking account, and that she received on her December 2011 statement 'Important Changes in Terms of Notice'"); *id.* ¶ 321 ("Defendants argue that Plaintiff Lawrence Mitchell opened a consumer checking account with First Security Bank on April 2, 1982, and signed up for online banking with Wells Fargo on May 20, 2005.").)  Plaintiffs do not

dispute that Lawrence Mitchell opened and authorized the x9055 account.  (*Id.* ¶¶ 316-325.)

Plaintiffs do not dispute that Lawrence Mitchell clicked "I Agree" while visiting the Wells Fargo

online banking portal, assenting to Wells Fargo's online account agreement, including the

arbitration agreement described therein.  (*Id.*)  Plaintiffs do not dispute that the Mitchells

received an addenda to their account agreements outlining an updated arbitration agreement.

(*Id.*)  Plaintiffs do not dispute that the Mitchells continued to actively use account x9055 after the

addenda and updated arbitration agreement took effect.  (*Id.*)  Plaintiffs do not dispute that Kay

Mitchell is an authorized joint owner on account x9055, and that she continues to use the

account, including by depositing her social security check into it.  (*Id.*)  Instead, Plaintiffs allege

that the Mitchells "do[] not recall any arbitration terms."  (*Id.* ¶¶ 319, 324.)  Lawrence Mitchell

alleges that "he would not have signed up for online banking, and would have closed his account

if he was informed that Wells Fargo was going to start taking customer information to create

fake accounts," and therefore "his accounts were opened under a fraudulent inducement."  (*Id.*

¶ 325.)  Kay Mitchell alleges that she "would not have been put on as a joint owner, and would

have encouraged her son to not open an account with Wells Fargo, if she had been informed at

the time that Wells Fargo was actively taking customer information and creating fake accounts,"

and therefore "her accounts were opened under a fraudulent inducement."  (*Id.* ¶ 320.)

**<u>Robert Moyer</u>**

83.    Wells Fargo's original Motion to Compel included the following facts

regarding Robert Moyer:

        a)      On October 20, 2006, Noel Taxin, a Utah resident, signed a Consumer

                        Account Application to open three consumer accounts with Wells Fargo

                        (x8542, x6341, x6333).  ( Nelson Decl. ¶ 128, Ex. 38-A.)  Less than two

months later, Taxin signed a relationship change form adding Robert

Moyer, another Utah resident, as a beneficiary to one of the consumer

savings accounts (x6341).  (*Id.* ¶ 129, Ex. 38-B.)  On December 5, 2009,

Taxin and Moyer signed a Relationship Change Application, making

Moyer a joint owner of the x6341 account.  (*Id.* ¶ 130, Ex. 38-C.)

    b)    In signing the Relationship Change Application, Moyer confirmed that he

had  "received a copy of the applicable account agreement and privacy

brochure and agree[s] to be bound by them."  (*Id.*, Ex. 38-C at 3, Ex. 1-F

(November 2008 Consumer Account Agreement).)  Moyer also "agree[d]

to the terms of the dispute resolution program described in the account

agreement" whereby "disputes will be decided before one or more neutral

persons in an arbitration proceeding and not by a jury trial or a trial before

a judge."  (*Id.*, Ex. 38-C at 3.)

84.    In the Third Amended Complaint, Plaintiffs acknowledge the facts

outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 326 ("Defendants argue that Plaintiff

Robert Moyer was added to three consumer accounts opened by Noel Taxin, which were opened

on October 20, 2006.").)  Plaintiffs do not dispute that Moyer authorized account x6341and

served as its joint owner.  (*Id.* ¶¶ 326-30.)  Plaintiffs do not dispute that Moyer signed a

relationship change form stating that he had received an applicable account agreement and

agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Instead, Plaintiffs

allege that Moyer "does not recall any arbitration terms," that he "would not have been added to

any account with Wells Fargo, and he would have encouraged Noel Taxin not to open any

account whatsoever with Wells Fargo, if he had been informed at the time that Wells Fargo was

actively taking customer information and creating fake accounts," and therefore "his accounts were opened under a fraudulent inducement." (*Id.* ¶¶ 329, 330.)

**<u>Nathan Ornellas</u>**

85.    Wells Fargo's original Motion to Compel included the following facts regarding Nathan Ornellas:

> a)    Nathan Ornellas, a California resident, opened a Wells Fargo consumer
> checking account (x5197) on July 12, 2016.  ( Nelson Decl. ¶ 131, Ex. 39-
> A.)  The same day, Ornellas signed a Relationship Change Application to
> add Cara Pellegri as a joint owner of the account.  (*Id.* ¶ 132, Ex. 39-B.)
> In signing these applications, Ornellas and Pellegri certified they had
> "received a copy of the applicable account agreement and the privacy
> policy … and agree to be bound by their terms." (*Id.* ¶¶ 131-32, Exs. 39-
> A, 39-B, 1-N (April 2016 Consumer Account Agreement).)   They further
> confirmed that they "agree to the terms of the dispute resolution program
> described in the foregoing agreements," wherein "disputes will be decided
> before one or more neutral persons in an arbitration proceeding and not by
> a jury trial or a trial before a judge." (*Id.*, Ex. 39-A at 2.)  They continue
> to use their checking account up to the present.  (*Id.* ¶ 133, Ex. 39-C.)

86.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 331 ("Defendants argue that Plaintiff Nathan Ornellas opened a consumer checking account on July 12, 2016.").)  Plaintiffs do not dispute that Ornellas opened and authorized account x5197.  (*Id.* ¶¶ 331-335.)  Plaintiffs do not dispute that Ornellas signed a relationship change application and consumer account application stating—directly

above his signature block—that he had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Ornellas continues to use his checking account up to the present.  (*Id.*)  Instead, Plaintiffs allege that Ornellas "does not recall any arbitration terms," that he "would not have opened any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and therefore "his accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 334, 335.)

**Gloria Pledger**

87.   Wells Fargo's original Motion to Compel included the following facts regarding Gloria Pledger:

a)    Gloria Pledger, a Maryland resident, opened a Wells Fargo consumer checking account (x7310) and consumer savings account (x0990) on April 15, 2016.  ( Nelson Decl. ¶ 134, Ex. 40-A.)  In the course of signing a Consumer Account Application for these accounts, Pledger certified the following: "I have received a copy of the applicable account agreement and the privacy policy (each may be amended from time to time) and agree to be bound by their terms. I also agree to the terms of the dispute resolution program described in the foregoing agreements." (*Id.* ¶ 134, Ex. 40-A at 2, Ex. 1-M (July 2015 Consumer Account Agreement).) Pledger further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.*, Ex. 40-A at 2.)  Pledger has continued to use these accounts.  (*Id.* ¶ 135, Ex. 40-B.)

88.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 336 ("Defendants argue that Plaintiff Gloria Pledger opened a consumer checking account and consumer savings account on April 15, 2016.").) Plaintiffs do not dispute that Pledger opened and authorized account x7310 and account x0990. (*Id.* ¶¶ 336-343.)  Plaintiffs do not dispute that Pledger signed a consumer account application stating—directly above her signature block—that she had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*) Plaintiffs do not dispute that Pledger has continued to use these accounts.  (*Id.*)  Instead, Plaintiffs allege that Pledger "does not recall any arbitration terms," that she  "would not have opened any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and thus that "her accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 339, 340.)

**Denise Poe**

89.     Wells Fargo's original Motion to Compel included the following facts regarding Denise Poe:

a)      Denise Poe, an Ohio resident, opened a Wells Fargo Cash on Demand account (x8211) and, on November 7, 2005, signed a Supplemental Disclosure form for the account, wherein she "agre[ed] to the terms of the Cash on Demand Account Agreement (form number NA-1613-1005) and acknowledg[ed] receipt of the agreement."  ( Nelson Decl. ¶ 136, Ex. 41-A at 1.)  Poe further "acknowledge[d] the existence of the Arbitration Agreement" and "agree[d] to be bound by its terms."  (*Id.*)

b)       The operative Cash on Demand Account Agreement (form number NA-1613-1005) explained that any party covered by the agreement "may elect to have any claim, dispute or controversy ('Claim') of any kind (whether in contract, tort or otherwise) arising out of or relating to your Cash on Demand Account Agreement, or any prior or future dealings between us, resolved by binding arbitration."  (*Id.,* Ex. 41-B at 3.)  Furthermore, a "Claim" included "the issue of whether any particular Claim must be submitted to arbitration, or the facts and circumstances involved with your signing of this Agreement, or your willingness to abide by the terms of this Agreement or the validity of this Agreement."  (*Id.*)  The agreement specified that any arbitration would be conducted pursuant to the rules of the AAA.  (*Id.*)

90.       In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 344 ("Defendants argue that Plaintiff Denise Poe opened a Cash on Demand account on November 7, 2005.").)  Plaintiffs do not dispute that Poe opened and authorized account x8211.  (*Id.* ¶¶ 344-348.)  Plaintiffs do not dispute that Poe signed a cash on demand account application stating that she had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Instead, Plaintiffs allege that Poe "does not recall any arbitration terms," that she "would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and "her accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 347, 348.)

**Jennifer Porter**

91.    Wells Fargo's original Motion to Compel included the following facts

regarding Jennifer Porter:

a)    Jennifer Porter, a Utah resident, opened a Wells Fargo consumer checking

account (x8047) and consumer savings account (x3740) on October 31,

2011.  In the course of signing a Consumer Account Application for these

accounts, Porter certified that she had "received a copy of the applicable

account agreement and privacy brochure and agre[es] to be bound by

them." ( Nelson Decl. ¶ 137, Ex. 42-A at 2.)  As a signatory, Porter also

"agre[ed] to the terms of the dispute resolution program described in the

account agreement" whereby "disputes will be decided before one or more

neutral persons in an arbitration proceeding and not by a jury trial or a trial

before a judge."  (*Id.*)  Porter made active use of her checking account

(x8047) in the months following its creation.  (*Id.* ¶ 138, Ex. 42-B.)

92.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 349  ("Defendants argue that Plaintiff Jennifer Porter

opened a consumer checking account and consumer savings account on October 31, 2011.").)

Plaintiffs do not dispute that Porter opened and authorized account x8047 and account x3740.

(*Id.* ¶¶ 349-353.)  Plaintiffs do not dispute that Porter signed a consumer account application

stating—directly above her signature block—that she had received an applicable account

agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)

Plaintiffs do not dispute that Porter made active use of her checking account x8047 in the months

following its creation.  (*Id.*)  Instead, Plaintiffs allege that Porter "does not recall any arbitration

terms," she "would not have opened up any account with Wells Fargo if she had been informed

at the time that Wells Fargo was actively taking customer information and creating fake

accounts," and "her accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 352, 353.)

**Robin Quigg**

93.     Wells Fargo's original Motion to Compel included the following facts

regarding Robin Quigg:

a)      On May 17, 1995, Robin Quigg, a Florida resident, opened a checking

account (x9160) with First Union National Bank of Florida, which was

later acquired by Wachovia. (Nelson Decl. ¶ 139.) On September 23,

2001, Robin Quigg signed a Wachovia Customer Access Agreement.  (*Id.,*

Ex. 43-A.) Wells Fargo later acquired Wachovia and, over the weekend of

June 11, 2011, certain Wachovia accounts in Florida were converted into

Wells Fargo accounts and integrated into the Wells Fargo system,

including Robin Quigg's x9160 account.  (*Id.* ¶ 140.)  On or about April

29, 2011, a conversion package including a welcome letter was delivered

to each Florida Wachovia account holder whose account would be

converted in June 2011, including Robin Quigg.  (*Id.* ¶ 140, Ex. 43-B at

1.)  The welcome letter, which came attached to a conversion packet,

notified her that after the conversion date, if her account remained open, it

would be governed by the terms of the Consumer Disclosure booklets

provided to her, which contained a copy of the Wells Fargo Consumer

Account Agreement.   (*Id.* ¶ 140, Ex. 43-B, Ex. 43-C.)

b)      The first booklet in the Consumer Disclosures provided to Quigg contained the Consumer Account Agreement; a section entitled "Dispute Resolution Program: Arbitration Agreement" can be found on page 4 of the booklet.  (*Id.*, Ex. 43-C at 4.)  The Arbitration Agreement provided that, "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process as set forth in this part…"  (*Id.*)  A "dispute" was defined as "any unresolved disagreement between you and the Bank." (*Id.*) It included "claims based on broken promises or contracts, torts, or other wrongful actions.  It also includes statutory, common law, and equitable claims."  (*Id.*)  "Disputes" also included "disagreements about the meaning, application or enforceability of this Arbitration Agreement." (*Id.*)  In bold, block letters, the Arbitration Agreement made clear: "YOU AGREE THAT YOU AND THE BANK ARE WAIVING THE RIGHT TO A JURY TRIAL OR TRIAL BEFORE A JUDGE IN A PUBLIC COURT."  (*Id.*)  The agreement provided that any arbitration would be administrated by the AAA using AAA Rules.  (*Id.* at 5.)

c)      After the conversion of her x9160 account, Quigg opened a new Wells Fargo consumer savings account (x4518) on January 6, 2014.  In the course of signing a Consumer Account Application for this account, Quigg certified that she had "received a copy of the applicable account agreement … and agree to be bound by [its] terms."  (*Id.* ¶ 141, Ex. 43-D

at 2, Ex. 1-J (April 2013 Consumer Account Agreement).)  Quigg also

"agre[ed] to the terms of the dispute resolution program described in the

foregoing  agreements" whereby "disputes will be decided before one or

more neutral persons in an arbitration proceeding and not by a jury trial or

a trial before a judge."  (*Id*.)  Quigg continues to actively use her Wells

Fargo checking account (x9160) and savings account (x4518) as of

October 2016.  (*Id*. ¶ 142, Ex. 43-E.)

94.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 354 ("Defendants argue that Plaintiff Robin Quigg

opened a checking account with First Union National Bank of Florida, which was acquired by

Wachovia, and later acquired by Wells Fargo on June 11, 2011.").)  Plaintiffs do not dispute that

Wells Fargo sent Quigg an account conversion notice, a welcome letter, and an account

agreement following Wachovia's merger with Wells Fargo for her x9160 account.  (*Id.* ¶¶ 354-

59.)  Plaintiffs do not dispute that Quigg has continued to use her x9160 checking account

following its conversion into a Wells Fargo account.  (*Id.*)  Plaintiffs likewise do not dispute that

Quigg later opened and authorized Wells Fargo account x4518.  (*Id.*)  Plaintiffs do not dispute

that in opening the x4518 account Quigg signed a consumer account application stating—

directly above her signature block—that she had received an applicable account agreement and

agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not

dispute that Quigg continues to actively use her savings account x4518.  (*Id.*)  Instead, Plaintiffs

allege that Quigg "does not recall any arbitration terms."  (*Id.* ¶ 357.)  Plaintiffs further allege

that Quigg "would have closed her account from Wachovia and found a different bank in lieu of

converting, if she had been informed at the time that Wells Fargo was actively taking customer

information and creating fake accounts," and thus "her accounts were opened under a fraudulent

inducement." (*Id.* ¶¶ 358-359.)

**<u>Carina Rhea</u>**

95.     Wells Fargo's original Motion to Compel included the following facts

regarding Carina Rhea:

> a)      Carina Rhea, a California resident, opened a Wells Fargo consumer bank
>
> account (x3236) on January 19, 1999.  ( Nelson Decl. ¶ 143.)  Rhea
>
> enrolled in online banking on April 3, 2008; to do so she had to
>
> affirmatively agree to the terms of the operative Online Account
>
> Agreement by clicking "I Agree" on an online portal. (*Id.* ¶ 144, Ex. 44-
>
> B.)  The Online Account Agreement provided that, "[i]f you have a
>
> dispute with us, and it cannot be resolved informally, you and we agree
>
> that any dispute between or among you and us, regardless of when it
>
> arose, will be resolved by the following arbitration process."  (*Id.* at 27.)
>
> The Online Account Agreement defined a "dispute" as is "any unresolved
>
> agreement between or among you and us."  (*Id.*) It includes "claims based
>
> on broken promises or contracts, torts . . . or other wrongful actions. It also
>
> includes statutory, common law, and equitable claims." (*Id.*) A "dispute"
>
> subject to arbitration also encompasses "any disagreement about the
>
> meaning of this Arbitration Agreement, and whether a disagreement is a
>
> 'dispute' subject to binding arbitration as provided for in this Arbitration
>
> Agreement."  (*Id.*)  The agreement made clear that any arbitration would
>
> be administered in accordance with AAA rules.  (*Id.* at 28.)

b)      In December of 2011, Rhea received the "Important Change in Terms

Notice" with her monthly statement, notifying her that the Consumer

Account Agreement would be revised effective February 15, 2012.  (*Id*.

¶¶ 146-47, Ex. 44-D, 44-E.)  This notice, which constituted an Addenda to

the Consumer Account Agreement, was titled, "Dispute Resolution

Program: Arbitration Agreement." (*Id.*) The Addenda provides that "[i]f

you have a dispute with the Bank, and you are not able to resolve the

dispute informally, you and the Bank agree that upon demand by either

you or the Bank, the dispute will be resolved through the arbitration

process set forth in this part." (*Id.*)  A "dispute" was defined as "any

unresolved disagreement between you and the Bank."  (*Id.*)  Such a

dispute includes "claims based on broken promises or contracts, torts, or

other wrongful actions.  It also includes statutory, common law, and

equitable claims." (*Id.*)  Moreover, a "dispute" encompassed

"disagreements about the meaning, application or enforceability of this

arbitration agreement."  (*Id.*)

c)      Rhea continued to actively use her account after the change in terms took

effect, including up to the present, and likewise has actively used her

online banking account. (*Id*. ¶¶ 145, 147-48, Exs. 44-C, 44-E, 44-F.).

96.      In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 360 ("Defendants argue that Plaintiff Carina Rhea

opened a consumer bank account on January 19, 1999, and enrolled in online banking on April 3,

2008.").)  Plaintiffs do not dispute that Rhea opened and authorized account x3236.  (*Id.* ¶¶ 360-

364.)  Plaintiffs do not dispute that Rhea clicked "I Agree" while visiting the Wells Fargo online banking portal, assenting to Wells Fargo's online account agreement, including the arbitration agreement described therein.  (*Id.*)  Plaintiffs do not dispute that Rhea received an addenda to her customer account agreement outlining the terms of an applicable arbitration agreement.  (*Id.*) Plaintiffs do not dispute that Rhea has actively used her account x3236 following her receipt of the addenda, nor do they dispute that she has actively used online banking up until at least November 2016.  (*Id.*)  Instead, Plaintiffs allege that Rhea "does not recall any arbitration terms," she "would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and thus "her accounts were opened under a fraudulent inducement."  (*Id.* ¶ 363, 364.)

**<u>David Self</u>**

97.    Wells Fargo's original Motion to Compel included the following facts regarding David Self:

a)    On June 7, 1996, a Wells Fargo consumer checking account (x1623) was opened for David M. Self, Sue A. Waters, and James J. Waters. ( Nelson Decl. ¶ 149.)  In December of 2011, David M. Self, Sue A. Waters, and James J. Waters received the same "Important Change in Terms Notice" with their monthly statement as did Carina Rhea, notifying them that the Consumer Account Agreement would be revised effective February 15, 2012.  (*Id.* ¶¶ 149-50, Ex. 45-B.)  They continued to actively use the account after the change in terms took effect.  (*Id.* ¶ 149, Ex. 45-A.)

98.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 365 ("Defendants argue that Plaintiff David Self

opened a consumer checking account on June 7, 1996, but doesn't identify with what bank. In December of 2011, Wells Fargo alleges that it sent a monthly statement with "Important Change in Terms Notice.".) Plaintiffs do not dispute that Self opened and authorized account x1623. (*Id.* ¶¶ 365-369.) Plaintiffs do not dispute that Self received an "Important Change in Terms" notice identifying an arbitration agreement applicable to his account. (*Id.*) Plaintiffs do not dispute that Self continued to actively use his account following receipt of the "Important Change in Terms" notice. (*Id.*) Instead, Plaintiffs allege that Self "does not recall any arbitration terms," that he "would not have opened up any account with Wells Fargo, or would have closed his account if he had been informed that Wells Fargo was going to begin actively taking customer information and creating fake accounts," and thus "his accounts were opened under a fraudulent inducement." (*Id.* ¶¶ 368, 369.)

**Barbara Shadoan**

99.   Wells Fargo's original Motion to Compel included the following facts regarding Barbara Shadoan:

> a)      Barbara Shadoan, a Nevada resident, opened a Wells Fargo consumer checking account (x0548) by signing a Consumer Account Agreement on August 12, 2005. (Nelson Decl. ¶ 151, Ex. 46-A.) Shadoan's signature on a Form W-9 on April 18, 2011 is identical to the signature on her Consumer Account Application for the x0548 account. (*Id*. ¶ 152, Ex. 46-B.) In the course of signing the Consumer Account Application, Shadoan certified:  "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them…I also agree to the terms of the dispute resolution program described in the account agreement."

(*Id.* ¶ 151, Ex. 46-A at 1, Ex. 1-B (October 2004 Consumer Account

Application).)  Shadoan further agreed that "disputes will be decided

before one or more neutral persons in an arbitration proceeding and not by

a jury trial or a trial before a judge."  (*Id.*)  Shadoan actively used the

x0548 account.  (*Id.* ¶ 153, Ex. 46-C.)

100.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 370 ("Defendants argue that Plaintiff Barbara

Shadoan opened a consumer checking account on August 12, 2005.").)  Plaintiffs do not dispute

that Shadoan opened and authorized account x0548.  (*Id.* ¶¶ 370-76.)  Plaintiffs do not dispute

that Shadoan signed a consumer account application stating—directly above her signature

block—that she had received an applicable account agreement and agreed to be bound by the

dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Shadoan actively

used the x0548 account.  (*Id.*)  Instead, Plaintiffs allege that Shadoan "does not recall any

arbitration terms," she "would not have opened up any account with Wells Fargo if she had been

informed at the time that Wells Fargo was actively taking customer information and creating

fake accounts," and thus "her accounts were opened under a fraudulent inducement."  (*Id.*

¶¶ 373-375.)

**<u>Anurag Sood</u>**

101.    Wells Fargo's original Motion to Compel included the following facts

regarding Anurag Sood:

a)    On July 2, 2001 Anurag Sood, a California resident, and Supriya Sood

opened a checking account with World Savings Bank.  (Nelson Decl.

¶ 154.)  On March 2, 2002, Anurag Sood and Supriya executed an

ownership change form for the checking account (x3882) that changed the
account to a joint ATF account with  Anurag  Sood and Supriya Sood
listed as joint trustees and Mohinder Sood listed as the beneficiary.  (*Id.*,
Ex. 47-A.)  Wachovia later acquired World Savings Bank and, on July 24,
2008, Anurag Sood and Supriya Sood each signed a Wachovia Customer
Access Agreement. (*Id.* ¶¶ 155-56, Exs. 47-B, 47-C.).  The Soods
continued to regularly use the x3882 account.  (*Id.* ¶ 157, Ex. 47-D.)

b)     After Wells Fargo acquired Wachovia, Wachovia bank accounts in
California  were converted to Wells Fargo accounts the weekend of June
11, 2011.  On or around April 29, 2011, a package of materials related to
the conversion of the (x3882) account was mailed to the Soods.  The
conversion package included a welcome letter, informing the Soods that
their Wachovia account was being transferred over to Wells Fargo, and
that as of June 11, 2011, the accompanying Customer Disclosure and
Guide would govern the account.  (*Id.* ¶ 158, Ex. 47-E at 2, Ex. 47-F.)
The Customer Disclosure documents sent to the Soods contained the same
terms for the Arbitration Agreement and dispute resolution program as
what was sent to other former Wachovia customers who had their
accounts converted after the merger, *e.g., supra* ¶¶ 49-50.

c)     The Soods maintained highly active use of account x3882 after it
transitioned to Wells Fargo.  (*Id.* ¶ 159, Ex. 47-G.)  In December of 2011,
the Soods were mailed an "Important Change in Terms Notice" from
Wells Fargo, notifying them that the Consumer Account Agreement would

be revised effective February 15, 2012.  (*Id*. ¶ 160, Ex. 47-H at 1.)  This notice was identical to the December 2011 change in terms notice previously described, *e.g, supra* ¶ 55.  The Soods continued to actively use their account after the change in terms took effect. (*Id*. ¶ 159, Ex. 47-G.)

102.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 377 ("Defendants argue that Plaintiff Anu [*sic*] Sood opened a checking account with World Savings Bank, which was acquired by Wachovia on July 24, 2008, and later acquired by Wells Fargo on June 11, 2011.").)  Plaintiffs do not dispute that Wells Fargo sent the Soods an account conversion notice, a welcome letter, and an account agreement following Wachovia's merger with Wells Fargo.  (*Id.* ¶¶ 377-382.)  Plaintiffs do not dispute that the Soods continued to use the x3882 account following its conversion into a Wells Fargo account.  (*Id.*)  Plaintiffs do not dispute that the Soods received the December 2011 "Important Change in Terms Notice" identifying an arbitration agreement applicable to their account.  (*Id.*)  Instead, Plaintiffs allege that Sood "does not recall any arbitration terms."  (*Id.* ¶ 380.)  Plaintiffs further allege that Sood "would not have permitted his account to be converted to Wells Fargo and would have closed his account with Wachovia if he had been informed that the proposed new servicer Wells Fargo was actively taking customer information and creating fake accounts," and thus "his accounts were opened under a fraudulent inducement."  (*Id.* ¶ 381.)

**<u>Joseph Steele</u>**

103.    Wells Fargo's original Motion to Compel included the following facts regarding Joseph Steele:

a)      On March 26, 2011, Celia Steele opened a consumer savings account with

Wells Fargo (x7182).  ( Nelson Decl. ¶ 161, Ex. 48-A.)   Later that year,

on October 7, 2011, Celia Steele and Joseph W. Steele signed a

Relationship Change Application to add Joseph W. Steele to the x7182

account as a joint owner.  (*Id*. ¶ 162, Ex. 48-B.)  In signing the

Relationship Change Application, Steele confirmed that he had  "received

a copy of the applicable account agreement and privacy brochure and

agree to be bound by them…I also agree to the terms of the dispute

resolution program described in the account agreement."  (*Id*. ¶ 162, Ex.

48-B at 2, Ex. 1-H (September 2010 Consumer Account Agreement).)

Joseph W. Steele further agreed that "disputes will be decided before one

or more neutral persons in an arbitration proceeding and not by a jury trial

or a trial before a judge."  (*Id*., Ex. 48-B.)  The Steeles keep their joint

account well-funded to this day. (*Id*. ¶ 164, Ex. 48-D.)

104.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 383 ("Defendants argue that Plaintiff Joseph Steele

was added to a consumer savings account opened by Celia Steele on March 26, 2011. This took

place allegedly on October 7, 2011.").)  Plaintiffs do not dispute that Steele authorized account

x7182 and served as its joint owner.  (*Id.* ¶¶ 383-87.)  Plaintiffs do not dispute that Steele signed

a relationship change application stating that he had received an applicable account agreement

and agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not

dispute that the Steeles continue to keep their account well-funded to this day.  (*Id.*)  Instead,

Plaintiffs allege that Steele "does not recall any arbitration terms," that he "would not have

opened any account or signed as a joint owner on any account if he had been informed at the

time that Wells Fargo was actively taking customer information and creating fake accounts," and

thus "his accounts were opened under a fraudulent inducement."  (*Id.* ¶ 386, 387.)

**Lisa Stern**

105.    Wells Fargo's original Motion to Compel included the following facts

regarding Lisa Stern:

> a)      Lisa Stern opened a Wells Fargo business account (x2372) on November
>
> 14, 2006 for Closetshoppers.com, Inc.  In signing the Business Account
>
> Application for the x2372 account, Stern agreed that "[t]he Customer's
>
> use of any Bank account, product or service will confirm its receipt of and
>
> agreement to be bound by the Bank's applicable account fee schedule and
>
> account agreement that includes the dispute resolution program under
>
> which any disputes between the Customer and the Bank relating to the
>
> Customer's use of any bank account or service will be decided in an
>
> arbitration proceeding before a neutral arbitrator and not by a jury or court
>
> trial."  (Nelson Decl. ¶ 165, Ex. 49-A at 2, Ex. 2-A (October 2006
>
> Business Account Agreement).)  Stern maintained her business account
>
> over several years.  (*Id*. ¶ 166, Ex. 49-B.)

106.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 388 ("Defendants argue that Plaintiff Lisa Stern

opened a business account on November 14, 2006.").)  Plaintiffs do not dispute that Stern opened

and authorized account x2372.  (*Id.* ¶¶ 388-393.)  Plaintiffs do not dispute that Stern signed a

business account application stating—directly above her signature block—that she had received

an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Stern maintained her business account over several years.  (*Id.*)  Instead, Plaintiffs allege that Stern "does not recall any arbitration terms," that she "would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and thus "the account was obtained by fraudulent inducement."  (*Id.* ¶¶ 391- 393.)

**<u>Steven Stetzel</u>**

107.    Wells Fargo's original Motion to Compel included the following facts regarding Steven Stetzel:

a)      Steven Stetzel, an Idaho resident, opened a consumer checking account (x7618) and consumer savings account (x2006) with Wells Fargo on April 10, 2009.  In the course of signing the Consumer Account Application, Stetzel certified the following:  "I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them…I also agree to the terms of the dispute resolution program described in the account agreement."  (Nelson Decl. ¶ 167, Ex. 50-A at 2, Ex. 1-F (November 2008 Consumer Account Agreement).)  Stetzel further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge."  (*Id.* ¶ 167, Ex. 50-A at 2.)  Stetzel has continued to actively use the x7618 account as of October 2016.  (*Id.* ¶ 168, Ex. 50-B.)

108.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 394 ("Defendants argue that Plaintiff Steven Stetzel

opened a consumer checking account and a consumer savings account on April 10, 2009.").)
Plaintiffs do not dispute that Stetzel opened and authorized account x7618 and account x2006.
(*Id.* ¶¶ 394-398.)  Plaintiffs do not dispute that Stetzel signed a consumer account application
stating—directly above his signature block—that he had received an applicable account
agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)
Plaintiffs do not dispute that Stetzel maintained active use of his x7618 account at least through
October 2016.  (*Id.*)  Instead, Plaintiffs allege that Stetzel "does not recall any arbitration terms."
According to Plaintiffs, Stetzel "would not have opened up any account with Wells Fargo if he
had been informed at the time that Wells Fargo was actively taking customer information and
creating fake accounts," and thus "his accounts were opened under a fraudulent inducement."
(*Id.* ¶ 398.)

**Eric Talaska**

109. Wells Fargo's original Motion to Compel included the following facts
regarding Eric Talaska:

a)  Eric Talaska, a Colorado resident, opened a consumer checking account
(x0787) and consumer savings account (x9625) with Wells Fargo on July
9, 2010.  In the course of signing the Consumer Account Application,
Talaska certified the following:  "I have received a copy of the applicable
account agreement and privacy brochure and agree to be bound by
them…I also agree to the terms of the dispute resolution program
described in the account agreement."  (Nelson Decl. ¶ 169, Ex. 51-A at 2,
Ex. 1-G (March 2010 Consumer Account Agreement).)  Talaska further
agreed that "disputes will be decided before one or more neutral persons in

an arbitration proceeding and not by a jury trial or a trial before a judge."

(Id., Ex. 51-A at 2.)  After agreeing to these terms, Talaska actively used

his Wells Fargo checking and savings accounts.  (Id. ¶ 170, Ex. 51-B.)

110.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 399 ("Defendants argue that Plaintiff Eric Talaska

opened a consumer checking account and consumer savings account on July 9, 2010.").)

Plaintiffs do not dispute that Talaska opened and authorized accounts x0787 and x9625.  (*Id.*

¶¶ 399-406.)  Plaintiffs do not dispute that Talaska signed a consumer account application

stating—directly above his signature block—that he had received an applicable account

agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)

Plaintiffs do not dispute that Talaska actively used his Wells Fargo checking and savings

accounts.  (*Id.*)  Instead, Plaintiffs allege that Talaska "does not recall any arbitration terms," that

he "would not have opened up any account with Wells Fargo if he had been informed at the time

that Wells Fargo was actively taking customer information and creating fake accounts," and thus

"the account was acquired by fraudulent inducement."  (*Id.* ¶¶ 402-404.)

**<u>Jeffery Taylor</u>**

111.     Wells Fargo's original Motion to Compel included the following facts

regarding Jeffrey Taylor:

       a)     Jeffery Taylor opened an individual retirement account with Wells Fargo

on November 23, 2012.  (Nelson Decl. ¶ 171, Ex. 52-A .)  Taylor signed

an IRA application form for the plan (x7038) in addition to a Retirement

Plan Deposit Receipt/Disclosure, which included the following language:

"By signing this receipt, I agree with the Consumer Account Agreement

you have given me."  (*Id.* ¶ 172, Ex. 52-B; Ex. 1-I (October 2011

Consumer Account Agreement).) Taylor routinely signed for distributions

from this IRA account.  (*See, e.g., id.* ¶¶ 173-75, Ex. 52-C, Ex. 52-D, Ex.

52-E.)

112.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 407 ("Defendants argue that Plaintiff Jeffery Taylor

opened an individual retirement account on November 23, 2012.").)  Plaintiffs do not dispute

that Taylor opened and authorized account x7038.  (*Id.* ¶¶ 407-413.)  Plaintiffs do not dispute

that Taylor signed a retirement deposit receipt/disclosure plan stating that he had received an

applicable account agreement and agreed to be bound by the dispute resolution program

described in it.  (*Id.*)  Plaintiffs do not dispute that Taylor routinely signed for distributions from

this IRA account.  (*Id.*)  Plaintiffs allege that Taylor "does not recall any arbitration terms," that

he "would not have opened up any account with Wells Fargo if he had been informed at the time

that Wells Fargo was actively taking customer information and creating fake accounts," and thus

"any accounts that were opened, were opened under a fraudulent inducement."  (*Id.* ¶¶ 410-11,

413.)[4]

**April Thomas**

113.    Wells Fargo's original Motion to Compel included the following facts

regarding April Thomas:

---

[4] Plaintiffs allege that Taylor "went to Wells Fargo for a job interview on or around November 23, 2012," and "during the middle of the interview, Defendants took his personal information and opened up an account without his authorization."  (TAC ¶ 412-13.)  Taylor's IRA account is the account that was opened on November 23, 2012.  This account was well funded with thousands of dollars within a matter of months. (Nelson Decl., Ex. 52-F.)

a)      April Thomas, a Minnesota resident, opened a consumer checking account (x0544) and consumer savings account (x9472) with Wells Fargo on August 18, 2015.  In the course of signing the Consumer Account Application for these accounts, Thomas certified the following:  "I have received a copy of the applicable account agreement and privacy brochure (each to be amended from time to time) and agree to be bound by their terms.  I also agree to the terms of the dispute resolution program described in the foregoing agreements."  (Nelson Decl. ¶ 176, Ex. 53-A at 2, Ex. 1-M (July 2015 Consumer Account Agreement).)  Thomas further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id*. ¶ 176, Ex. 53-A at 2.)  Thomas actively used her Wells Fargo accounts.  (*Id*. ¶ 177, Ex. 53-B.)

114.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 414 ("Defendants argue that Plaintiff April Thomas opened a consumer checking account and consumer savings account on August 18, 2015.").) Plaintiffs do not dispute that Thomas opened and authorized account x0544 and account x9472. (*Id*. ¶¶ 414-420.)  Plaintiffs do not dispute that Thomas signed a consumer account application stating—directly above her signature block—that she had received an applicable account agreement and agreed to be bound by the dispute resolution program described in it.  (*Id*.) Plaintiffs do not dispute that Thomas actively used her Wells Fargo accounts.  (*Id*.)  Instead, Plaintiffs allege that Thomas "does not recall any arbitration terms," that she "would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo

was actively taking customer information and creating fake accounts," and thus "the account was opened under fraudulent inducement."  (*Id.* ¶¶ 417-419.)

**<u>Doug Waters</u>**

115.    Wells Fargo's original Motion to Compel included the following facts regarding Doug Waters:

a)      Doug Waters, a Utah resident, opened a First Security checking account (x5833) on September 2, 1986.  (Nelson Decl. ¶ 178, Ex. 54-A.)  As stated previously, on April 21, 2001 First Security accounts in Utah were converted to Wells Fargo accounts.  On or about March 19, 2001, a package of materials related to the conversion of the x5833 account was mailed to Waters.  (*Id.* ¶ 179.)   The enclosed welcome letter informed him that, as of April 21, 2001, his First Security account would become a Wells Fargo account, and that after the conversion date, if his account remained open, it would be governed by the terms of the Consumer Disclosure brochure and Consumer Account Agreement provided in the conversion packet sent to him.    (*Id.*, Ex. 54-B.)  Waters received the same First Security Conversion CAA as did Travis Ashby, Mathew Bishop, and Marcia Cameron (*supra* ¶¶ 11-12, 18-19, 24-25), and thus received notice of the same terms of the "Dispute Resolution Program: Arbitration Agreement." (Nelson Decl. ¶ 58, Ex. 1454-B at 30 (internal page 14).)

b)      After the conversion, on February 6, 2013, Waters signed an

Authorization for Automatic Transfer for the x5833 account to make

regular transfers to a trust account.  (*Id.* ¶ 180, Ex. 54-C.)

c)      Waters opened a Wells Fargo consumer savings account (x4772) on April

7, 2009.  In signing the application for the savings account (x4772),

Waters acknowledged that he has "received a copy of the applicable

account agreement and privacy brochure and agre[ed] to be bound by

them."  (*Id.* ¶ 181, Ex. 54-D at 2; Ex. 1-F (November 2008 Consumer

Account Agreement).)  He further "agre[ed] to the terms of the dispute

resolution program described in the account agreement," including that

"disputes will be decided before one or more neutral persons in an

arbitration proceeding and not by a jury trial or a trial before a judge."

(*Id.*)

116.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 421 ("Defendants argue that Plaintiff Doug Waters

opened a First Security checking account on September 2, 1986, and allegedly signed an

Authorization for Automatic Transfer on February 6, 2013.").)  Plaintiffs do not dispute that

Wells Fargo sent Waters an account conversion notice, a welcome letter, and an account

agreement following Wachovia's merger with Wells Fargo.  (*Id.* ¶¶ 421-425.)  Plaintiffs do not

dispute that Waters continued to use his x5833 account following its conversion into a Wells

Fargo account, signing an authorization for automatic transfers into a trust account, among other

things.  (*Id.*)  Plaintiffs do not dispute that Waters opened and authorized Wells Fargo account

x4772.  (*Id.*)  Plaintiffs do not dispute that Waters signed a consumer account application

stating—directly above his signature block—that he had received an applicable account

agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)

Instead, Plaintiffs allege that Waters "does not recall any arbitration terms."  (*Id.* ¶ 424.)

Plaintiffs further allege that Waters  "would not have opened up any account with Wells Fargo if

he had been informed at the time that Wells Fargo was actively taking customer information and

creating fake accounts," and thus "his accounts were opened under a fraudulent inducement."

(*Id.* ¶ 425.)

**<u>Scott Westin</u>**

117.    Wells Fargo's original Motion to Compel included the following facts

regarding Scott Westin:

a)      Scott Westin, a Minnesota resident, opened a Norwest bank checking

account (x8066) on January 12, 1995.  (Nelson Decl. ¶ 182, Ex. 55-A.)

Norwest and Wells Fargo merged and Norwest accounts were gradually

converted to Wells Fargo accounts; Northwest accounts in Minnesota

were converted to Wells Fargo accounts on July 8, 2000.  (*Id.* ¶ 183.)  On

or around June 2, 2000, a package of materials related to the conversion of

the (x8066) account were mailed to Westin.  The enclosed welcome letter

explained that as of July 8, 2000, Westin's Norwest account would

become a Wells Fargo account.  (*Id.* ¶ 183, Ex. 55-B at 2.)  The welcome

letter, which came attached to a conversion packet for new Wells Fargo

customers, notified him that after the conversion date, his account would

be governed by the terms of the  Disclosures and the Consumer Account

Agreement.   (*Id.*)

b)      Scott Westin and Lusila R. Westin jointly opened a Wells Fargo consumer

checking account (x0793) on January 8, 2008.  (*Id*. ¶ 184, Ex. 55-C.).  In

signing the Consumer Account Application for the x0793 account, Westin

acknowledged that he has "received a copy of the applicable account

agreement and privacy brochure and agre[ed] to be bound by them."  (*Id*.,

Ex. 55-C, Ex. 1-F.)  He further "agre[ed] to the terms of the dispute

resolution program described in the account agreement."  (*Id*., Ex. 55-C.)

Westin actively used the x8066 account and the x0793 account, including

after he received the "Important Change in Terms Notice" with his

December 2011 statements that concerned his Arbitration Agreement with

Wells Fargo.  (*Id.* ¶¶ 185-87, Exs. 55-D, 55-E, 55-F.)

118.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 426 ("Defendants argue that Plaintiff Scott Westin

opened a Northwest bank checking account on January 12, 1995. This was later converted to a

Wells Fargo account.").)  Plaintiffs do not dispute that Wells Fargo sent Westin an account

conversion notice, a welcome letter, and an account agreement following Norwest's merger with

Wells Fargo.  (*Id.* ¶¶ 426-431.)  Plaintiffs do not dispute that Westin continued to use his x8066

account following its conversion into a Wells Fargo account.  (*Id.*)  Plaintiffs do not dispute that,

subsequent to the merger, Westin opened and authorized a Wells Fargo account (x0793).  (*Id.*)

Plaintiffs do not dispute that Westin signed Wells Fargo's consumer account application

stating—directly above his signature block—that he had received an applicable account

agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)

Plaintiffs do not dispute that Westin continued to use the x8066 account and the x0793 account

following his receipt of the December 2011 "Important Change in Terms Notice" outlining the terms of an applicable arbitration agreement.  (*Id.*)  Instead, Plaintiffs allege that Westin "does not recall any arbitration terms."  (*Id.* ¶ 430.)  Plaintiffs further allege that Westin "would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and thus "his accounts were opened under a fraudulent inducement."  (*Id.* ¶ 431.)

**Brandon Westman**

119.    Wells Fargo's original Motion to Compel included the following facts regarding Brandon Westman:

a)      Brandon Westman, a Minnesota resident, jointly opened a Wells Fargo consumer checking account (x8956) with Nancy Gleue on June 24, 2003. In the course of signing the Consumer Account Application, Westman certified the following:  "I have received a copy of your  applicable account agreement and Use of Information brochure and agree to be bound by them.  I also agree to the terms of the dispute resolution program described in the account agreements."  (Nelson Decl. ¶ 188, Ex. 56-A at 2, Ex. 1-A (April 2003 Consumer Account Agreement).).  Westman further agreed that "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id*. ¶ 188, Ex. 56-A at 2.)  Westman actively used the x8956 account.  (*Id.* ¶ 189, Ex. 56-B.)

120.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in Wells Fargo's Motion to Compel.  (TAC ¶ 432 ("Defendants argue that Plaintiff Brandon

Westman opened a consumer checking account on June 24, 2003.").)  Plaintiffs do not dispute

that Westman opened and authorized account x8956.  (*Id.* ¶¶ 432-439.)  Plaintiffs do not dispute

that Westman signed a consumer account application stating—directly above his signature

block—that he had received an applicable account agreement and agreed to be bound by the

dispute resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Westman actively

used the x8956 account.  (*Id.*)  Plaintiffs allege—incorrectly—that Westman closed the x8956

account in 2009.  (*Id.* ¶ 437.)  Monthly account statements show that Westman was actively

using the x8956 account in 2010.  (Nelson Decl., Ex. 56-B.)  And while Plaintiffs allege that

Wells Fargo opened a credit card in Westman's name without his authorization, Westman's

monthly statements also show that he was making phone payments to a Wells Fargo credit card

and that the credit card was linked to his checking account for overdraft protection.  (*Id.*)

Plaintiffs allege that Westman "does not recall any arbitration terms," that he "would not have

opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo

was actively taking customer information and creating fake accounts," and thus "it was opened

under  fraudulent inducement."  (TAC ¶¶ 436-37, 439.)

**<u>Kim Weston</u>**

121. Wells Fargo's original Motion to Compel included the following facts

regarding Kim Weston:

> a)   Kim Weston, a Washington, DC, resident, opened a Wells Fargo
>
> consumer checking account (x3779) and a consumer savings account
>
> (x1854) on February 3, 2014.  (Nelson Decl. ¶ 190, Ex. 57-A.)  On June 3,
>
> 2014, with a different banker, Weston opened a consumer savings account
>
> (x2391), and signed another Consumer Account Application.  (*Id.* ¶ 191,

Ex. 57-B.)  In the course of signing both Consumer Account Applications,

Weston certified that she had "received a copy of the applicable account

agreement,  the privacy policy … (each may be amended from time to

time) and agre[ed] to be bound by their terms."  (*Id.* ¶¶ 190-91, Ex. 57-A

at 2, Ex. 57-B at 2.)  She further "agre[ed] to the terms of the dispute

resolution program described in the foregoing agreements" whereby

"disputes will be decided before one or more neutral persons in an

arbitration proceeding and not by a jury trial or before a judge." (*Id.* ¶190,

Ex. 57-A at 2.)

  b)    Weston actively used the x3779 and x2391 accounts.  (*Id.* ¶  192, Ex. 57-

        C, Ex. 1-J (April 2013 Consumer Account Agreement).)

122.    In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 440 ("Defendants argue that Plaintiff Kim Weston

opened a consumer checking account and consumer savings account on February 3, 2014.").)

Plaintiffs do not dispute that Weston opened and authorized accounts x2391, x3779, and x1854.

(*Id.* ¶¶ 440-444.)  Plaintiffs do not dispute that Weston signed a consumer account application

stating—directly above the signature block—that Weston had received the applicable account

agreement and agreed to be bound by the dispute resolution program described in it.  (*Id.*)

Plaintiffs do not dispute that Weston actively used the x3779 and x2391 accounts.  (*Id.*)  Instead,

Plaintiffs allege that Weston "does not recall any arbitration terms," that Weston "would not

have opened up any account with Wells Fargo if he had been informed at the time that Wells

Fargo was actively taking customer information and creating fake accounts," and thus "his

accounts were opened under a fraudulent inducement."  (*Id.* ¶¶ 443, 444.)

**<u>Sharon Williams</u>**

123.    Wells Fargo's original Motion to Compel included the following facts

regarding Sharon Williams:

a)       Sharon Williams, a North Carolina resident, applied for a Wells Fargo

Visa Credit Card on September 9, 2013, signing the application below

bold letters in block type reading, "You acknowledge receipt of a copy of

the credit card agreement" and "you acknowledge the existence of the

Arbitration Agreement contained in the credit card agreement and you

specifically agree to be bound by its terms." ( Nelson Decl. ¶ 193, Ex. 58-

A.)  The Arbitration Agreement in the application states that Williams and

Wells Fargo "agree that if a Dispute (as defined below) arises between you

and the Bank, upon demand by either you or the Bank, the Dispute shall

be resolved by the following arbitration process," where a "dispute" is

"any unresolved disagreement between you and the Bank."  (*Id.*, Ex. 58-A

at 2.)  A dispute includes "claims based on broken promises or contracts,

torts, or other wrongful actions. It also includes statutory, common law

and equitable claims. A Dispute also includes any disagreements about the

meaning or application of this Arbitration Agreement."  (*Id.*)  In signing

the application, Williams specifically "waiv[ed] the right to a jury trial or

a trial before a judge in a public court"  (*Id.*)  The Arbitration Agreement

provided that an arbitration would be administered under AAA rules.  (*Id.*)

b)      The same day she applied for the card Williams made a purchase, and
proceeded to carry a balance on the card and make regular monthly
payments.  (*Id*. ¶ 194, Ex. 58-B.)

124.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in
Wells Fargo's Motion to Compel.  (TAC ¶ 445 ("Defendants argue that Plaintiff Sharon
Williams opened a Wells Fargo Visa Credit Card on September 9, 2013.").)  Plaintiffs do not
dispute that Williams opened an authorized Wells Fargo Visa Credit Card.  (*Id*. ¶¶ 445-449.)
Plaintiffs do not dispute that Williams signed a consumer credit card application stating—
directly above her signature block—that she had received an applicable account agreement and
agreed to be bound by the arbitration agreement described in it.  (*Id*.)  Plaintiffs do not dispute
that the same day Williams applied for the card, she made a purchase, and proceeded to carry a
balance on the card and make regular monthly payments.  (*Id*.)  Instead, Plaintiffs allege that
Williams "does not recall any arbitration terms," that she would not have opened up any account
with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking
customer information and creating fake accounts," and thus "her accounts were opened under a
fraudulent inducement."  (*Id*. ¶¶ 448, 449.)

**Jennifer Zeleny**

125.     Wells Fargo's original Motion to Compel included the following facts regarding
Jennifer Zeleny:

a)       Jennifer K. Zeleny, a Utah resident, opened a Wells Fargo business
checking account (x3533) on August 13, 2014 in the name of Jennifer K.
Zeleny dba Jennifer K. Zeleny.  She signed the Business Account
Application, and in doing so certified her "agreement to be bound by, the

Bank's applicable fee and information schedule and account agreement

that includes the Arbitration Agreement under which any dispute between

the Customer and the Bank relating to the Customer's use of any Bank

deposit account, product or service will be decided in an arbitration

proceeding before a neutral arbitrator as described in the Arbitration

Agreement and not by a jury or court trial."   (Nelson Decl. ¶ 195, Ex. 59-

A at 3, Ex. 2-C (April 2014 Business Account Agreement).)  On the same

day, Zeleny signed an Authorization for Information form in connection

with her business account (x3533).  (*Id.* ¶ 196, Ex. 59-B.)  After opening

the account, Zeleny actively used the account for deposits and transfers.

(*Id.* ¶¶ 197-98, Ex. 59-C, Ex. 59-D.)

126.     In the Third Amended Complaint, Plaintiffs acknowledge the facts outlined in

Wells Fargo's Motion to Compel.  (TAC ¶ 450 ("Defendants argue that Plaintiff Jennifer Zeleny

opened a business checking account on August 13, 2014.").)  Plaintiffs do not dispute that

Zeleny opened and authorized account x3533.  (*Id.* ¶¶ 450-454.)  Plaintiffs do not dispute that

Zeleny signed a business account application stating—directly above her signature block—that

she had received an applicable account agreement and agreed to be bound by the dispute

resolution program described in it.  (*Id.*)  Plaintiffs do not dispute that Zeleny signed an

authorization for information form in connection with her business account the same day that she

opened the account.  (*Id.*)  Plaintiffs do not dispute that Zeleny actively used account x3533 for

deposits and transfers.  (*Id.*)  While Plaintiffs allege that Zeleny refused to put a credit line on the

business account (*id.* ¶ 704), the application for the x3533 account includes, directly below

Zeleny's signatures, the terms and condition for a Wells Fargo Business Platinum Credit Card

xcii

with a credit line limit of $10,000.  (Nelson Decl., Ex. 59-A at 4-5.)  Plaintiffs allege that Zeleny "does not recall any arbitration terms," that she "would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts," and thus "her accounts were opened under a fraudulent inducement."  (*Id.* ¶ 453, 454.)

**Dominique Evans**

127.    Plaintiffs allege that "Defendants are unable to compel arbitration on Plaintiff Dominique Evans, as Plaintiff never had a legitimate account to start with."  (TAC ¶ 520.)  But Evans completed a Plaintiff Fact Sheet in July 2017 acknowledging that she opened an authorized Wells Fargo consumer checking account (x4126).  (Cox Decl., Ex. A.)  Evans further marked "NO" in response to questions asking whether Wells Fargo had opened an account without her consent.  (*Id.*)  Evans, a New York resident, opened her Wells Fargo consumer checking account (x4126) on December 30, 2015.  (Nelson Decl. ¶ 195, Ex. 60-A at 2; Exhibit 1-M (July 2015 Consumer Account Agreement).)

**Paul Fosbre**

128.    Plaintiffs allege that "Defendants are unable to compel arbitration on Plaintiff Paul Fos [*sic*], as Plaintiff never had a legitimate account to start with."  (TAC ¶ 508.)  However, in his Plaintiff Fact Sheet Fosbre stated that he had three authorized accounts with Wells Fargo which were still open as of July 2017: a savings account, a certificate of deposit, and a Visa credit card. (Cox Decl., Ex. B.)  Fosbre failed to list account numbers for any of the accounts listed in his Plaintiff Fact Sheet.  (*Id.*)  He indicated that the *only* checking accounts in his name at Wells Fargo, two checking accounts, were unauthorized. (*Id.*)

129.     Fosbre, a New Jersey resident, signed a Wachovia Customer Access Agreement on October 15, 2010.  (Nelson Decl. ¶ 201, Ex. 61-A.)  On January 13, 2007, Fosbre opened a Wachovia Certificate of Deposit account (x6603).  (*Id.* ¶ 201.)  On January 16, 2007, Fosbre opened a Wachovia Crown Banking checking account (x4353).  (*Id.*)  On January 29, 2010, Fosbre opened a Wachovia money market savings account (x7559).  (*Id.*)  On October 15, 2010, Fosbre opened a Wachovia free checking account (x9816).  (*Id.*)  On January 15, 2011, Fosbre opened a Wachovia Way2Save savings account (x6239).  (*Id.*)  Fosbre actively used these accounts both before the Wachovia conversion (*see* Ex. 61-B (Wachovia account statements)), and after the conversion to Wells Fargo accounts (*see* Ex. 61-F (Wells Fargo account statements)). To be clear, two of the accounts which Fosbre opened at Wachovia and were converted to Wells Fargo accounts were checking accounts.

130.     Wachovia bank accounts were gradually converted to Wells Fargo accounts in a staggered process, and Wachovia deposit accounts in New Jersey were converted to Wells Fargo accounts over the weekend of February 5, 2011.  (*Id.* ¶ 203.)  On or about December 27, 2010, a package of materials related to the conversion of New Jersey Wachovia accounts was mailed to Fosbre.  The enclosed welcome letter informed Fosbre that his existing Wachovia accounts would become Wells Fargo accounts.  (*Id.*, Ex. 61-C.)  The welcome letter, which came enclosed with a conversion packet, notified Fosbre that after the conversion date of February 5, 2011, if his accounts remained open, they would be governed by the terms of the Consumer Disclosure booklets provided to him, which contained a copy of the Wells Fargo Consumer Account Agreement.  (*Id.*, Ex. 61-C, Ex. 61-D, 61-E.)

131.     The first booklet in the Consumer Disclosures provided to Fosbre contained the Consumer Account Agreement; a section entitled "Dispute Resolution Program: Arbitration

xciv

Agreement" can be found on page 5 of the booklet.  (*Id.*, Ex. 61-E at 5.)  The Arbitration

Agreement provided that, "[i]f you have a dispute with the Bank, and you are not able to resolve

the dispute informally, you and the Bank agree that any dispute between or among you and the

Bank, regardless of when it arose, shall be resolved by the following arbitration process"  (*Id.*)  A

"dispute" was defined as "any unresolved disagreement between or among you and the Bank."

(*Id.*)  It included "claims based on broken promises or contracts, torts (injuries caused by

negligent, or intentional conduct) or other wrongful actions. It also includes statutory, common

law, and equitable claims."  (*Id.*)  "Disputes" also included "any disagreement about the meaning

of this Arbitration Agreement, and whether a disagreement is a 'dispute' subject to binding

arbitration as provided for in this Arbitration Agreement."  (*Id.*)  In bold letters, the Arbitration

Agreement made clear: "You understand and agree that you and the Bank are each waiving the

right to a jury trial or a trial before a judge in a public court."  (*Id.*)  The agreement provided that

any arbitration would be administrated by the AAA using AAA Rules.  (*Id.* at 6.)

     132.    In December of 2011, Fosbre received the "Important Change in Terms Notice"

with his monthly statement, notifying him that the Consumer Account Agreement would be

revised effective February 15, 2012.  (*Id.* ¶ 205, Ex. 61-G.)  This notice, which constituted an

Addenda to the Consumer Account Agreement, was titled, "Dispute Resolution Program:

Arbitration Agreement." (*Id.*) The Addenda provides that "[i]f you have a dispute with the Bank,

and you are not able to resolve the dispute informally, you and the Bank agree that upon demand

by either you or the Bank, the dispute will be resolved through the arbitration process set forth in

this part." (*Id.*)  A "dispute" was defined as "any unresolved disagreement between you and the

Bank."  (*Id.*)  Such a dispute includes "claims based on broken promises or contracts, torts, or

other wrongful actions.  It also includes statutory, common law, and equitable claims." (*Id.*)

Moreover, a "dispute" encompassed "disagreements about the meaning, application or enforceability of this arbitration agreement." (*Id.*)  Fosbre continued to actively us his accounts after receiving this additional notice of the dispute resolution program.  (*Id.* ¶ 204, Ex. 61-F.)

**Tamar Hodges**

133.    Plaintiffs allege that "Defendants are unable to compel arbitration on Plaintiff Tamar Hodges, as Plaintiff never had a legitimate account to start with."  (TAC ¶ 554.)  This assertion is directly contradicted by the Plaintiff Fact Sheet Tamar Hodges submitted in August 2017 stating that she not only opened an authorized Wells Fargo consumer checking account (x7339), but that there were *no* unauthorized Wells Fargo accounts in her name.  (Cox Decl., Ex. C.)  Indeed, Hodges marked "NO" in response to questions asking whether Wells Fargo had opened an account in her name without her consent.  (*Id.*)

134.    On October 15, 2012, Hodges, a Georgia resident, opened a Wells Fargo consumer checking account (x7339) and a Wells Fargo consumer savings account (x8106) with a single application.  (Nelson Decl. ¶ 206, Ex. 62-A.)  She signed a Consumer Account Application, certifying that she had "received a copy of the applicable account agreement,  the privacy policy . . . and agre[ed] to be bound by their terms."  (*Id.*, Ex. 62-A at 2; Exhibit 1-I (October 2011 Consumer Account Agreement).)  She further "agre[ed] to the terms of the dispute resolution program described in the foregoing agreements" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id*., Ex. 62-A at 2.)  Evans actively used her accounts for purchases, deposits, and withdrawals.  (*Id.* ¶¶ 207-08, Ex. 62-B, Ex. 62-C.)

**Carina Alex Inskeep**

135.     Plaintiffs allege that "Defendants are unable to compel arbitration on Plaintiff Alex Inskeep [*sic*], as Plaintiff never had a legitimate account to start with."  (TAC ¶ 468.)  The Plaintiff Fact Sheet Inskeep submitted in July 2017, however, lists four authorized accounts she opened with Wells Fargo: two pairs of checking and savings accounts (x7562 & x4291, and x0526 & x6178).  (Cox Decl., Ex. D.)  She lists as unauthorized another pair of checking and savings accounts (x2634 & x4445).

136.     The Wells Fargo business checking account (x2634) and business savings account (x4445) were opened on August 3, 2010 for Carina Alex Inskeep Holdings dba Carina Alex Inskeep.  (Nelson Decl. ¶ 209.)  The signature on the account application for these accounts is an exact match for the signature on Inskeep's Plaintiff Fact Sheet she submitted in this case.  (*Compare* Cox Decl., Ex. D (Plaintiff Fact Sheet signed by Inskeep) *with* Nelson Decl. ¶ 209, Ex. 63-A at 4.)  In signing the Business Account Application for these two accounts, Inskeep agreed that "[t]he Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial."  (Nelson Decl. ¶ 209, Ex. 63-A at 3, Exhibit 2-D (March 2010 Business Account Agreement).)  On the same day, Inskeep signed an Authorization for Information Form in connection with her business accounts (x2634) and (x4445).  (*Id.* ¶ 210, Ex. 63-B.)  Again, the signature on this form is an exact match for the signature on Inskeep's Plaintiff Fact Sheet.  (*See* Cox Decl., Ex. D.)

137.     On June 12, 2012, Inskeep opened a Wells Fargo business checking account (x0526) for Argent Enterprises, LLC.  (Nelson Decl. ¶ 211, Ex. 63-C.)  This is an account Inskeep lists as authorized in her Plaintiff Fact Sheet.  (Cox Decl., Ex. D.)  The signature on the account application for the x0526 account is the same as the signature on the account application for the x2634 and x4445 accounts, as well as her Plaintiff Fact Sheet.  (Nelson Decl., Ex. 63-C at 4.)  In signing the Business Account Application for the x0526 account, Inskeep agreed that "[t]he Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial."  (*Id.* ¶ 211, Ex. 63-C at 4, Exhibit 2-E (October 2011 Business Account Agreement).)

138.     On July 25, 2012, Inskeep opened a Wells Fargo business checking account (x3402) and business savings account (x6178) for Argent Enterprises, LLC.  (Nelson Decl. ¶ 212, Ex. 63-D; Exhibit 2-E (October 2011 Business Account Agreement).)  Inskeep lists the x6178 account as authorized on her Plaintiff Fact Sheet, and omits mention of the x3402 account, opened with the same application as the x6178 account, from her Plaintiff Fact Sheet. (Cox Decl., Ex. D.)

139.     On May 24, 2013, Inskeep opened a Wells Fargo business checking account (x7562) and business savings account (x4291) for Inskeep PLLC.  (Nelson Decl. ¶ 213, Ex. 63-E.)  These are accounts listed as authorized on Inskeep's Plaintiff Fact Sheet.  (Cox Decl., Ex. D.)  In signing the Business Account Application for these accounts, Inskeep agreed that "[t]he

Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial." (*Id*. ¶ 213, Exhibit 63-E at 4, Exhibit 2-B (April 2013 Business Account Agreement).)  On the same day that she opened these accounts, Inskeep signed a Legal Name Change Request, changing the entity name on the x7562 and x4291 business accounts from Inskeep PLLC to Alexandra Inskeep PLLC.  (*Id.* ¶ 214, Exhibit 63-F.)

**Brent Miller**

140.     Brent Miller manually completed a Plaintiff Fact Sheet in this case, signed it, and dated it July 25, 2017.  (Cox Decl., Ex. E.)  He asserts in the Plaintiff Fact Sheet that he did not authorize a Wells Fargo checking account (x1535) and savings account (x7695) opened in his name.  (*Id.*)  The x1535 and x7695 accounts were opened based on an out-of-store Consumer Account Application signed on July 24, 2015.  (Nelson Decl. ¶ 215, Ex. 64-A.)  The signature on the application is a match for Miller's distinctive signature which appears on his Plaintiff Fact Sheet. (*Compare* Cox Decl., Ex. E *with* Nelson Decl. ¶ 215, Ex. 64-A at 2.)  In signing the application, Miller certified that he had "received a copy of the applicable account agreement, and the privacy policy . . . and agree[d] to be bound by their terms."  (Nelson Decl., Ex. 64-A at 2; Exhibit 1-M (July 2015 Consumer Account Agreement).)  He further "agre[ed] to the terms of the dispute resolution program described in the foregoing agreements" whereby "disputes will be

decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or

a trial before a judge." (*Id*., Ex. 64-A at 2.)

**Concepcion Powell**

141.    Plaintiffs allege that "Defendants are unable to compel arbitration on Plaintiff

Concepcion Powell, as she never had a legitimate account to start with."  (TAC ¶ 564.)

However, Powell submitted a Plaintiff Fact Sheet in July 2017 listing at least four authorized

Wells Fargo accounts in her name or the names of what appear to be businesses.  (Cox Decl., Ex.

F.)  Powell fails to provide account numbers for any of the accounts she lists, whether authorized

or allegedly unauthorized.  (*Id.*)  Powell asserts in her fact sheet that an account labeled "Powell

For Mayor 2013" was unauthorized, among others in the names of what appear to be businesses.

142.    On March 11, 2013, a Wells Fargo business checking account (x4857) and

business savings account (x4280) were opened for Concepcion M. Powell dba Concepcion

Powell Campaign. (Nelson Decl. ¶ 217.)  The application for these accounts was signed by

Concepcion M. Powell with a signature that matches the signature on her Plaintiff Fact Sheet.

(*Compare id.,* Ex. 65-A at 4 *with* Cox Decl., Ex. F.)  In signing the Business Account

Application for these two accounts, Powell agreed that "[t]he Customer's use of any Bank

deposit account, product or service will confirm the Customer's receipt of, and agreement to be

bound by, the Bank's applicable fee and information schedule and account agreement that

includes the Arbitration Agreement under which any dispute between the Customer and the Bank

relating to the Customer's use of any bank deposit account, product or service will be decided in

an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement

and not by a jury or court trial."  (Nelson Decl. ¶ 217, Ex. 65-A at 3, Exhibit 2-B (April 2013

Business Account Agreement).)  On the same day, Powell signed an Authorization for

c

Information Form in connection with her business accounts (x2634) and (x4445)—again, the signature matches that on her Plaintiff Fact Sheet.  (*Id.* ¶ 218, Ex. 65-B.)  On April 17, 2013, Powell signed a Customer/Account Information Change Request in connection with the x4857 account—also a matching signature—changing the statement mailing name from Concepcion M. Powell dba Concepcion Powell Campaign to Concepcion Powell dba Concepcion Powell for Mayor 2013.  (*Id.* ¶ 219, Ex. 65-C.)   Powell actively used the x4857 account, depositing large sums of money into the account, making purchases, writing checks.  (*Id.* ¶ 220, Ex. 65-D.)

143.    On August 16, 2013, Powell opened a Wells Fargo business checking account (x9754) for Concepcion M. Powell dba Concepcion Powell for Mayor 2013.  (*Id.* ¶ 221, Ex. 65-E.)  Powell agreed that "[t]he Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial."  (*Id.* ¶ 221, Ex. 65-E at 4, Exhibit 2-B (April 2013 Business Account Agreement).)  Powell actively used this account as well, depositing money into the account, depositing checks into the account, paying AT&T bills, making purchases at restaurants and gas stations.  (*Id.* ¶ 222, Ex. 65-F.)

**Adrienne Thompson**

144.    Plaintiffs allege that "Defendants are unable to compel arbitration on Plaintiff Adrian [*sic*] Thompson, as Plaintiff never had a legitimate account to start with,"  (TAC ¶ 570), but Thompson submitted a Plaintiff Fact Sheet in July 2017 acknowledging that she had opened two authorized accounts with Wells Fargo: a checking account and a savings account.  (Cox

Decl., Ex. G.)  Thompson fails to provide account numbers for any of the accounts she lists, whether authorized or allegedly unauthorized.  (*Id.*)  She lists one unauthorized account, labeled only as "savings."  (*Id.*)

145.    On September 25, 2013, a Wells Fargo business checking account (x1047) and business savings account (x7429) were opened for Adrienne R. Thompson dba Sweet-N-Savory. (Nelson Decl. ¶ 223, Ex. 66-A.)  In signing the application for these two accounts, Powell agreed that "[t]he Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial."  (*Id.*, Ex. 65-A at 3, Exhibit 2-B (April 2013 Business Account Agreement).)  On the same day, Thompson signed an Authorization for Information Form for Sweet-N-Savory.  (*Id.* ¶ 224, Exhibit 66-B.) Thompson funded her business accounts with thousands of dollars, as reflected in her combined account statement.  (*Id.* ¶ 225, Ex. 66-C.)  Wells Fargo's files for these accounts include an October 17, 2013 webpage printout from a Harris County, Texas public records search for assumed names under File No. V113269, the same file number listed for Sweet-N-Savory on the application Thompson signed on September 25, 2013.  (*Id.* ¶ 226, Ex. 66-D, Ex. 66-A at 2.)  The public records search reflected that Sweet-N-Savory is an assumed name for Adrienne Thompson. (*Id.,* Ex. 66-D.)

**Kevin Saliba**

146.    Plaintiffs allege that "Defendants are unable to compel arbitration on Plaintiff Kevin Saliba, as Plaintiff never had a legitimate account to start with." (TAC ¶ 526.)  Yet Saliba submitted a Plaintiff Fact Sheet in July 2017 acknowledging that he had opened two authorized accounts with Wells Fargo: a checking account (x5683) and a trading account, for which he does not provide a number.  (Cox Decl., Ex. H.)  Saliba asserts in his Plaintiff Fact Sheet that an unauthorized credit card was opened in his name, ending in x5495.  (*Id.*)

147.    On May 4, 2011, Saliba, a New Jersey resident, opened a Wells Fargo PMA prime checking account (x5683)—this is the account listed as authorized in his Plaintiff Fact Sheet.  (Nelson Decl. ¶ 227, Ex. 67-A.)  Saliba signed a Consumer Account Application to open this account, certifying that he had "received a copy of the applicable account agreement and privacy brochure and agree to be bound by them."  (*Id.*, Ex. 67-A at 2; Exhibit 1-H (September 2010 Consumer Account Agreement).)  He further "agre[ed] to the terms of the dispute resolution program described in the account agreement" whereby "disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (*Id.*, Ex. 67-A at 2.)  The statements for Saliba's x5683 checking account were combined with his statements for other Wells Fargo accounts, including a Crown Banking checking account (x2934), a Command Asset Program account (x1569), and a Roth IRA (x3286).  (*Id.* ¶ 228, Ex. 67-B.)  These combined statements also list Saliba's credit card ending in x5495, which the statements show is linked to his x5683 account for overdraft protection. (*Id.*)

**Edwin Zorrilla**

148.     Edwin Zorrilla submitted a Plaintiff Fact Sheet listing as unauthorized a checking

account ending in x8943.  (Cox Decl., Ex. K.)  The x8943 college checking account was opened

for Zorrilla on January 4, 2012, along with a consumer savings account (x2176), through the

same application which was signed.  (Nelson Decl. ¶ 229, Ex. 68-A.)  Zorrilla immediately

funded the x2176 savings account with a large sum of money.  (*Id.* ¶ 230, Ex. 68-B.)  The x8943

checking account was also funded, and in March 2012 three checks signed by Zorrilla were

drawn against the account.  (*Id.* ¶ 231, Ex. 68-C.)  These checks were made out to the Treasurer

for the State of Connecticut, and the Danbury Police Department (the address on Zorrilla's

accounts, as well as his checks, is in Danbury, Connecticut). (*Id.* ¶ 232, Ex. 68-D.)

**Matthew Gragg**

149.     Matthew Gragg submitted a Plaintiff Fact Sheet in August 2017 stating that Wells

Fargo had opened an unauthorized business line of credit (x7588) in his name.  (Cox Decl., Ex.

I.)  The business line-of-credit account ending x7588 was opened on September 22, 2006 for

Integrity Mechanical LLC.  (Nelson Decl. ¶ 233.)   The owners and guarantors for Integrity

Mechanical LLC's line of credit signed the application: Leo J. Lukas, Owen M. Aasness, and an

individual named Matthew Gragg. (*Id.,* Ex. 69-A.)  About four months prior to opening the line-

of-credit account for Integrity Mechanical LLC, the owners of the business signed acceptance

certificates for a Wells Fargo Business Platinum card in the name of Integrity Mechanical LLC.

(*Id.,* Ex. 69-C.)   The certificate indicated that Integrity Mechanical LLC was a plumbing and

heating/AC business which had been established on February 22, 2006 in Albert Lea, Minnesota

with 3 employees/owners: Leo Lukas, Owen Aasness, and an individual named Matthew Gragg.

(*Id.*)  Leo Lukas and Owen Aasness signed a certificate for Integrity Mechanical LLC on April

28, 2006 (*id.* at 1); the individual named Matthew Gragg signed a certificate for Integrity

Mechanical LLC on May 24, 2006 (*id.* at 3).  With respect to the x7588 business line-of-credit

account which Plaintiff Gragg identifies in his Plaintiff Fact Sheet, Wells Fargo sent monthly

statements to Integrity Mechanical LLC and Leo Lukas.  (*Id.,* Ex. 69-B.)  These statements show

that payments were consistently made on the line-of-credit account by a check up through

January 2010, and starting in February 2010 payments were consistently made on the line-of-

credit through an online payment.  (*Id.*)  Wells Fargo is not presently moving to compel

arbitration of Plaintiff Gragg on the basis of this account, as it appears that the Matthew Gragg

who signed for the x7588 business line-of-credit account for Integrity Mechanical LLC along

with Leo Lukas and Owen Aasnass is not Plaintiff Gragg.  For the same reason, Plaintiff Gragg's

allegations that Wells Fargo employees fraudulently used his personal information to open a

line-of-credit account—an account in the name of a Minnesota plumbing business which was

paid down monthly for years, and which had two other guarantors signing for the account—are

unfounded.

**<u>Richard Fountain</u>**

150.    Plaintiffs allege that "Defendants are unable to compel arbitration on Plaintiff

Richard Fountain, as Plaintiff never had a legitimate account to start with."  (TAC ¶ 478.)

However, Fountain submitted a Plaintiff Fact Sheet in July 2017 which listed a single account—

and labeled it as authorized.  This authorized account is Fountain's mortgage loan ending in

x3165.  (Cox Decl., Ex. J.)  Fountain did not list any alleged unauthorized accounts, and wrote

"NO" next to questions asking if he was claiming that Wells Fargo had opened an account in his

name without consent.  (*Id.*)

### *Consumer Account Agreements*

151.    Each time a Wells Fargo customer opens a new consumer account, he or she receives a Consumer Account Agreement ("CAA"), which provides the terms that govern the account.  (*Id.* ¶ 7.)  From time to time these CAAs are updated or amended, but as relevant to this motion their provisions relating to the arbitration of disputes has remained materially unchanged.

152.    Prominently featured in each of the CAAs is an arbitration provision entitled, "Dispute Resolution Program: Arbitration Agreement."  The binding arbitration agreement in each Consumer Account Agreement covers, as relevant here, the following topics: (1) the resolution of disputes by an arbitration process; (2) the definition of a dispute; (3) delegation of the question of arbitrability to an arbitrator; (4) waiver of the right to a jury trial or a trial before a judge; and (5) the application of the American Arbitration Association Rules ("AAA Rules") to any arbitration.

153.    The CAAs effectively and plainly state, in substantially similar language, that "you and the Bank agree that any dispute between or among you and the Bank, regardless of when it arose, shall be resolved by the following arbitration process."  (*See*, *e.g., id.* ¶¶ 9-12, Exs. 1-B, 1-C, 1-D, 1-E at 8; *see also* Exs. ¶¶ 13-15, 1-F, 1-G, 1-H at 4) (CAAs from Oct. 2004 to Sep. 2010 with identical language).)  The versions of the CAA effective from October 2011 through October 2014 similarly state:  "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process as set forth in this part." (*Id.* ¶¶ 16-19, Exs. 1-I, 1-J,1-K, 1-L at 4; *see also id.* ¶ 8, Ex. 1-A at 4 ("at the request of you or the bank, disputes must be resolved by an arbitration proceeding before a neutral arbitrator"), Exs. 1-M and 1-N at 3 ("[i]f your banker is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section").)

154.     Each CAA also provides a broad definition of a "dispute" under the arbitration clause.  For example, From October 2011 until October 2014, a "dispute" was defined in the CAA as:

> [A]ny unresolved disagreement between you and the Bank. . . .   It includes claims based on broken promises or contracts, torts, injuries caused by negligent or intentional conduct or other wrongful actions. It also includes statutory, common law, and equitable claims."

(*Id*. ¶¶ 16-19, Exs. 1-I, 1-J, 1-K, and 1-L at 4; *id.* ¶¶ 8-12, Exs. 1-A, 1-B, 1-C, 1-D, 1-E at 6; *id.* ¶¶ 13-15, Exs. 1-F, 1-G, 1-H at 4 (nearly identical language); *see also id*. ¶¶ 20-21, Exs. 1-M and 1-N at 3 (a "dispute is any unresolved disagreement between Wells Fargo and you.").)

155.     In every CAA, the definition of a "dispute" subject to arbitration also encompasses "disagreements about the meaning of this Arbitration Agreement, and whether a disagreement is a 'dispute' subject to binding arbitration."   (*Id*. ¶¶ 8-12, Exs. 1-A, 1-B, 1-C, 1-D, 1-E at 6; *cf. id*. ¶¶ 13-15, Exs. 1-F, 1-G, 1-H at 4) ("dispute also includes any disagreement about the meaning of this Arbitration Agreement, and whether a disagreement is a 'dispute' subject to binding arbitration as provided for in this Arbitration Agreement."); *id*. ¶¶ 16-19, Exs. 1-I, 1-J, 1-K, 1-L at 4 (a "dispute includes disagreements about the meaning, application or enforceability of this arbitration agreement."); *see also id. ¶¶* 20-21, Exs. 1-M and 1-N at 3) ("a dispute may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement").)

156.     Each CAA  states that Wells Fargo and the customer "agree that [they] are each waiving the right to a jury or a trial before a judge in a public court."  (*Id*. ¶¶ 8-12; Exs. 1-A, 1-B, 1-C, 1-D, 1-E at 6; *id.* ¶¶ 13-19, Exs. 1-F, 1-G, 1-H, 1-I, 1-J, 1-K, 1-L at 4; *see id.* ¶¶ 20-21, Exs. 1-M and 1-N at 3 ("Wells Fargo and you each agrees to waive the right to a jury trial or a trial in front of a judge in a public court").)

157.   Lastly, each and every CAA specifies that the arbitration "shall be administered by the American Arbitration Association (AAA)" in accordance with the "Commercial Arbitration Rules" known as the AAA rules.  (*See, e.g., id.* ¶¶ 9-19, Exs. 1-B, 1-C, 1-D, 1-E at 9; Exs. 1-F, 1-G, 1-H at 5; Exs. 1-I, 1-J, 1-K, 1-L at 4; *id.* ¶ 8, Ex. 1-A at 6 ("[e]ach arbitration, including the selection of the arbitrator(s) shall be administered by the American Arbitration Association (AAA)");  *id.* ¶¶ 20-21, Exs. 1-M and 1-N at 3 ("[t]he American Arbitration Association (AAA) will administer each arbitration and the selection of arbitrators according to the Commercial Arbitration Rules and the Supplemental Procedures for Consumer Related Disputes (AAA Rules)").)

### *Business Account Agreements*

158.   Each time a Wells Fargo customer opens a new business account, he or she receives a Business Account Agreement ("BAA"), which provides the terms that govern the account.  (*Id.* ¶ 22.)  From time to time these BAAs are also updated or amended, but the BAAs relevant to this motion contain nearly identical arbitration clauses.

159.   Each of the BAAs contain an arbitration provision entitled, "Dispute Resolution Program; Arbitration Agreement" which states:

> [Y]ou and the Bank agree, at your or the Bank's request, to submit to binding arbitration all claims, disputes, and controversies between or among you and the Bank (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract, or otherwise arising out of or relating in any way to your Account(s) and/or Service(s), and their negotiation, execution, administration, modification, substitution, formation, inducement, enforcement, default, or termination.

(*Id.* ¶¶  23-27, Ex. 2-A at 2, Exs. 2-B, 2-C, 2-D & 2-E at 4.)  Furthermore, each BAA provides "Governing rules" stating that "[a]ny arbitration proceeding will:  [p]roceed in a location selected by the American Arbitration Association ("AAA");" "[b]e governed by the Federal Arbitration Act;" and "[b]e conducted by the AAA…in accordance with the AAA's commercial

dispute resolution procedures," or, if the claim exceeds a certain limit, the AAA's optional procedures.  (*Id.* ¶¶ 23-27, Ex. 2-A at 2-3, Exs. 2-B, 2-C, 2-D & 2-E at 4.)

160.   Each of the BAAs also specifically assigns the responsibility for determining whether a dispute is subject to arbitration to the arbitrator—under the heading "Arbitrator qualifications and powers," the agreements state that "[t]he arbitrator(s) will determine whether or not an issue is arbitrable."  (*Id.* ¶¶ 23-27, Ex. 2-A at 3, Exs. 2-B, 2-C, 2-D & 2-E at 5.)

**ARGUMENT**

With respect to the named plaintiffs who were the subject of Wells Fargo's prior motion to compel arbitration, Plaintiffs have conceded that they opened accounts with Wells Fargo, entered into contracts with Wells Fargo, and in doing so agreed to arbitration.  (TAC ¶ 672 ("Plaintiffs contend that none of them would have opened up an account with Defendants, had the illegal, fraudulent activity been disclosed to them, much less would Plaintiffs have agreed to arbitration if they had been informed."); *id.* ¶ 655 ("Plaintiffs and members of the Class entered into banking agreements with Wells Fargo whereby they deposited funds with Defendant.").) These Plaintiffs, as well as the additional named plaintiffs who submitted Plaintiff Fact Sheets and are included in the instant Motion, manifested their agreement to the terms governing their Wells Fargo accounts through their signatures on contracts and the maintenance of  their accounts at Wells Fargo.  Plaintiffs likewise agreed to delegate gateway questions of arbitrability—including the fraudulent inducement arguments they are now pursuing before this Court—to an arbitrator.

**I.      Plaintiffs Agreed to Arbitration With Wells Fargo.**

To determine whether the parties agreed to arbitrate, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).[5]  Plaintiffs' accounts were opened and maintained in offices across the

---

[5] Here, Plaintiffs' agreements with Wells Fargo contain a contractual choice-of-law provision stating that the laws of the state where the account is maintained govern. (*See* Nelson Decl., Exs. 1-G, 1-H, 1-I at 40, Ex. 1-J at 38, Ex. 1-A at 8 (Consumer Account Agreements) ("Your account is governed by the laws and regulations of the United States and, to the extent applicable, the laws of the state in which the office of the Bank that maintains your account is located . . . without regard to conflicts of laws principles."); Exs. 2-A at 2-3, Exs. 2-B and 2-C at 33 (Business Account Agreements) ("The laws governing your Account include the laws and

country, with concentrations in Utah and California, but the result is the same in every

jurisdiction: Plaintiffs agreed to the terms of the Wells Fargo account agreements, including the

arbitration provision, whether manifested through their signature on account agreements or

through their use of their accounts. Plaintiffs' own allegations assume a facially valid agreement

to arbitrate.

### A.     Plaintiffs Agreed to Arbitration by Signing Account Applications.

The FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on

issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v.

Byrd*, 470 U.S. 213, 218 (1985).  Not a single one of the Plaintiffs whom Wells Fargo previously

moved to compel on the basis of their signature on an account application, agreeing to the terms

of the applicable account agreement including its arbitration provision, disputed that they had in

fact signed the application presented to the Court.  And while many of these individuals now

allege that they "do[] not recall arbitration terms," the applications they signed clearly stated—

directly before the signature line—that they received a copy of the applicable account agreement

and agreed to be bound by its terms, including the dispute resolution program, such that their

disputes with Wells Fargo would be decided in an arbitration rather than in a jury trial or by a

judge.

Whether Plaintiffs recall reading the document they signed is legally irrelevant to the

outcome of Wells Fargo's motion to compel arbitration on the basis of the agreements: A person

who signs a contract is bound by its provisions, whether or not he reads them.  "[E]ach party has

---

regulations of the United States and, to the extent applicable, the laws of the state in which the
office of the Bank that maintains your Account is located . . . without regard to conflicts of laws
principles.").)

the burden to read and understand the terms of a contract before he or she affixes his or her signature to it. A party may not sign a contract and thereafter assert ignorance or failure to read the contract as a defense.  This rule is based upon the panoply of contract law upholding the principle that a party is bound by the contract which he or she voluntarily and knowingly signs." *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1207-08 (Utah 1987) (reversing the trial court's determination that there was no "meeting of the minds" as a result of party's failure to read the contract terms); *see also Urbanic v. Travelers Ins. Co.*, No. 10cv-02368-WYD-MJW, 2011 WL 1743412, at *8 (D. Colo. May 6, 2011) ("I am similarly unpersuaded by Plaintiff's contention that he never read the Arbitration Agreement. It is well settled that one who signs a contract without reading it is barred from claiming he or she is not bound by its terms."); *Randas v. YMCA of Metro. L.A.,* 17 Cal. App. 4th 158, 163 (1993) (person who signs a contract "is deemed to assent to all its terms, and cannot escape liability on the ground that he has not read it."); *Sultanem v. Bright House Networks, L.L.C.*, No. 8:12-cv-1739-T-24-TBM, 2012 WL 4711963, at *2 (M.D. Fla. Oct. 3, 2012) ("Under Florida law, a person is deemed to have read a contract that they have signed.").  Additionally, "[n]o law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract, particularly where, as here, the language of the contract expressly and plainly provides for the arbitration of disputes arising out of the contractual relationship."  *Brookwood v. Bank of Am.*, 45 Cal. App. 4th 1667, 1674 (1996) (citation and internal quotation marks omitted). The rule is the same in all relevant jurisdictions—Plaintiffs are bound by the arbitration provision regardless of whether they read the agreement.[6]

---

[6] *See Walther v. Sovereign Bank*, 386 Md. 412, 429–30 (2005) ("[O]ne of the most

### B.   Plaintiffs Agreed to Arbitration By Maintaining Their Accounts With Wells Fargo.

A person may also assent to a contract through action or inaction, and thus arbitration may be compelled even in the absence of a signed agreement.  The FAA does not require "that the agreement to arbitrate be signed by either party; nor does any other provision of the FAA." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1369 (11th Cir. 2005).  "As the Tenth Circuit has explained, 'Decisions under the Federal Arbitration Act . . . have held it not necessary that there be a simple integrated writing or that a party sign the writing containing the arbitration clause. All that is required is that the arbitration provision be in writing.'" *Id.* (quoting *Med. Dev. Corp. v. Indus. Molding Corp.*, 479 F.2d 345, 348 (10th Cir. 1973)); *see also Valero Ref., Inc. v. M/T Lauberhorn,* 813 F.2d 60, 64 (5th Cir. 1987) ("It is established that a party may be bound by an agreement to arbitrate even in the absence of his signature."); *Todd Habermann Constr., Inc.*

---

commonsensical principles in all of contract law [is] that a party that voluntarily signs a contract agrees to be bound by the terms of that contract."); *Wright v. Safari Club Int'l, Inc.*, 322 Ga. App. 486, 493 (Ga. Ct. App. 2013) ("[P]arties to a contract are presumed to have read their provisions and to have understood the contents. One who can read, must read, for he is bound by his contracts."); *Locklear Dodge City, Inc. v. Kimbrell*, 703 So. 2d 303, 306 (Ala. 1997) ("[T]his Court has held that a person who signs a contract is on notice of the terms therein and is bound thereby even if he or she fails to read the document."); *Campanelli v. Conservas Altamira, S.A.*, 86 Nev. 838, 841 (Nev. 1970) ("Parties to a written arbitration agreement are bound by its conditions regardless of their subjective beliefs at the time the agreement was executed."); *Sovereign Camp, W. O. W. v. Daniel*, 48 Ariz. 479, 487 (Ariz. 1936); *Diocese of Bismarck Tr. v. Ramada, Inc.*, 553 N.W.2d 760, 769 (N.D. 1996); *Irwin Rogers Ins. Agency, Inc. v. Murphy*, 122 Idaho 270, 273, (Idaho Ct. App. 1992); *GECMC 2006-C1 Carrington Oaks, LLC v. Weiss*, 757 S.E.2d 677, 679 (N.C. Ct. App. 2014); *Maines Paper & Food Serv. Inc. v. Adel*, 256 A.D.2d 760, 761–62 (N.Y. App. Div. 1998); *Gras v. Assocs. First Capital Corp.*, 786 A.2d 886, 894 (N.J. Super. Ct. App. Div. 2001); *Gartner v. Eikill*, 319 N.W.2d 397, 398 (Minn. 1982); *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 138 n.5 (Colo. 1998); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Benton*, 467 So. 2d 311, 312 (Fla. Dist. Ct. App. 1985); *In re McKinney*, 167 S.W.3d 833, 835 (Tex. 2005); *Nat'l City Bank of Marion v. Bader*, No. 9-85-3, 1986 WL 3482, at \*2 (Ohio Ct. App. Mar. 12, 1986) (unpublished); *Sherman v. Lunsford*, 44 Wash. App. 858, 861 (Wash. Ct. App. 1986).

4

*v. Epstein*, 70 F. Supp. 2d 1170, 1174–75 (D. Colo. 1999) (same).  Again, not a single one of the

Plaintiffs whom Wells Fargo previously moved to compel disputed that they opened and used

their accounts.  "A voluntary acceptance of the benefit of a transaction is equivalent to a consent

to all the obligations arising from it, so far as the facts are known, or ought to be known, to the

person accepting."  Cal. Civ. Code § 1589.  Plaintiffs here "seek to accept the benefits of the

contract, but avoid the full force of its obligations. This they cannot do."  *Lawson v. Woodmen of

the World*, 53 P.2d 432, 435 (Utah 1936).  "When one having the right to accept or reject a

transaction takes and retains the benefits thereunder, he becomes bound by the transaction, and

cannot avoid its obligation or effect by taking a position inconsistent therewith."  *Id.* (citation

and internal quotation marks omitted).  This is, once more, a basic tenet of contract law.[7]

---

[7] *See B.J. Kadrmas, Inc. v. Oxbow Energy, LLC*, 727 N.W.2d 270, 274 (N.D. 2007) ("A
voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the
obligations arising from it so far as the facts are known or ought to be known to the person
accepting." (citing N.D.C.C. § 9-03-25)); *Krutchik v. Chase Bank USA, N.A.*, 531 F. Supp. 2d
1359, 1365 (S.D. Fla. 2008) (continued use of credit card constitutes "a legal acceptance of the
terms contained within the Cardmember Agreement, including the arbitration provision"); *Ellin
v. Credit One Bank*, No. 15-2694 (FLW), 2015 WL 7069660, at *3 (D.N.J. Nov. 13, 2015)
(unpublished) ("New Jersey case law indicates that the cardholder's use of the credit card alone
is sufficient in proving that a valid contract compelling arbitration exists between the parties");
*Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246
S.W.3d 42, 74 (Tex. 2008) ("A contracting party cannot accept the benefits of a contract and
disclaim its obligations."); *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987,
992 (Cal. Ct. App. 1972) ("an offeree, knowing that an offer has been made to him but not
knowing all of its terms, may be held to have accepted, by his conduct, whatever terms the offer
contains."); *Lyles v. Pioneer Hous. Sys., Inc.*, 858 So. 2d 226, 229 (Ala. 2003) ("[A]ssent to a
contract may be manifested when a plaintiff accepts the benefits of a contract."); *Sonneman v.
Blue Cross & Blue Shield of Minn.*, 403 N.W.2d 701, 704 (Minn. Ct. App. 1987); *Terrible v.
Terrible*, 91 Nev. 279, 283–84 (Nev. 1975); *Huisenga v. Dairymen's League Co-Operative
Ass'n*, 16 N.Y.S.2d 137, 138 (N.Y. App. Div. 1939); *New Hermes, Inc. v. Adams*, 125 Wash.
App. 1021, at *4 (Wash. Ct. App. 2005); *Cochran v. Norkunas*, 398 Md. 1, 23–24 (Md. 2007);
*Johnson v. George*, 119 Colo. 594, 597–98 (Colo. 1949); *Texas Co. v. Andres*, 97 F. Supp. 454,
456 (D. Idaho 1951); *Nilavar v. Osborn*, 127 Ohio App. 3d 1, 12 (Ohio Ct. App. 1998), *modified*

Applying foundational contract principles, therefore, "the parties to an arbitration agreement may demonstrate their assent to be bound by the agreement by acting upon or accepting benefits under the contract containing the arbitration agreement." *Athon v. Direct Merchs. Bank*, No. 5:06-cv-1 (CAR), 2007 WL 1100477, at *4 (M.D. Ga. Apr. 11, 2007) (unpublished).

Plaintiffs accepted the benefits of their Wells Fargo accounts by using them—depositing and withdrawing funds, writing checks, using credit lines and paying them down—and thus are bound by the agreement governing Wells Fargo's products and services. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997) (consumer who receives arbitration agreement in the mail bound by terms if he does not return the computer); *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1105 (C.D. Cal. 2002) (satellite television contract was binding where customer used service after receiving contract in the mail); *Honig v. Comcast of Ga. I, LLC*, 537 F. Supp. 2d 1277, 1283–84 (N.D. Ga. 2008) (plaintiffs agreed to the terms of the customer agreement, including arbitration of disputes, by using cable services); *cf. Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593 (1991) (cruise ship passenger bound by forum selection clause in form contract printed on back of ticket). In fact, "[w]hether or not [Plaintiffs] received a copy of the [account] agreement, [they] could not accept services [they] knew were being tendered on the basis of a[n] agreement without becoming bound by that agreement." *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007) (unpublished) (citing Restatement (Second) of Contracts § 23 (1981) ("[W]here an offer is contained in a writing [a party] may, without reading the writing, manifest assent to it and bind himself without knowing its terms . . . . [A]n offeror or offeree who should be aware of [the terms of a writing] may be bound in accordance with

---

*on reconsideration* (May 12, 1998); *Burden Pallet Co. v. Ryder Truck Rental, Inc.*, 49 N.C. App. 286, 289 (N.C. Ct. App. 1980); *Carroll v. Lee*, 148 Ariz. 10, 12–13 (Ariz. 1986).

them if he manifests assent.")); *Brown v. Federated Capital Corp.*, 991 F. Supp. 2d 857, 861

(S.D. Tex. 2014) ("[A] party is bound by the terms of a credit card agreement if the party uses

the credit card, even if the party does not sign the credit card agreement and even if the credit

card agreement is not delivered to the party.").

      For Plaintiffs who first opened their accounts with a different bank that was later acquired

by Wells Fargo, their continued use of the accounts after they were converted to Wells Fargo

accounts likewise manifested their assent to the terms of the agreement.  Each of these

individuals was sent a conversion packet containing a welcome letter and a copy of the Wells

Fargo Consumer Account Agreement that would govern their account following the conversion

to a Wells Fargo account.  (Nelson Decl. ¶¶ 33, 46, 58, 116, 140, 158, 179, 183, 203, Exs. 5-C,

10-B, 14-B, 34-B, 34-C, 43-B, 43-C, 47-E, 47-F, 54-B, 55-B & 61-E.)  The welcome letter

expressly informed the customer that, if their account remained open after the conversion date, it

would be converted into a Wells Fargo account and governed by the terms of the agreement

provided in the conversion packet.  (*Id.*)  If these Plaintiffs did not wish to be bound by the terms

of the Wells Fargo agreement, including the arbitration provision, they could have closed their

accounts.  *See, e.g., Herrington v. Union Planters Bank, N.A.,* 113 F. Supp. 2d 1026, 1031-32

(S.D. Miss. 2000) ("[T]he plaintiffs accepted the terms of the arbitration agreement by

continuing to utilize their accounts. . . .  The plaintiffs could have simply declined to accept the

arbitration provision by terminating their account before the effective date of the amendment.");

*Marsh v. First USA Bank, N.A.,* 103 F. Supp. 2d 909, 921 (N.D. Tex. 2000) (enforcing

arbitration agreement added by way of mailed notice of amendment to credit card agreement);

*Taylor v. Citibank USA, N.A.,* 292 F. Supp. 2d 1333, 1337 (M.D. Ala. 2003) ("Since [plaintiff]

received the notice of change in terms, which included the arbitration provision, did not reject the changes as allowed, but continued to use the account by maintaining an account balance, he assented to the arbitration provision and is bound by it.").

The district court opinion in *Ackerberg v. Citicorp USA, Inc.*, 898 F. Supp. 2d 1172 (N.D. Cal. 2012), is on point.  In *Ackerberg,* the plaintiff had been a long-standing Sears credit card holder; neither party possessed the original account agreement at the time of the motion to compel arbitration but both agreed it did not contain an arbitration provision.  *Id.* at 1173-74. Sears ultimately assigned the plaintiff's account to Citibank, which over a number of years sent the plaintiff various amended account agreements that included arbitration clauses.  *Id.* at 1174. Each amendment gave account holders a period of time to close their accounts if they did not wish to be bound by the new terms.  *Id.*  The plaintiff did not close her account, but continued to use it, and the court found that she was bound by the amendment.  *Id.* at 1176.  The same result is compelled here.

Not one of the nine plaintiffs who were mailed conversion packets dispute that they continued to use their accounts after they were converted to Wells Fargo accounts, and eight of these plaintiffs do not attempt to dispute that they received the conversion packet. Only one plaintiff alleges that he "does not recall receiving a 'welcome packet,'" (TAC ¶ 135), but does not go so far as to state with certainty that he did not receive the mailing, which was sent to his address of record on file with his prior bank, First Security. (Nelson Decl. ¶ 33.)  "[T]he law presumes delivery of a properly addressed piece of mail," *Moya v. United States,* 35 F.3d 501, 504 (10th Cir. 1994), which may be shown through "testimony regarding the customary mailing practices" of a party. *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1340 (10th Cir. 1998).  "[B]are

assertions of non-receipt are insufficient, as [a] matter of law, to overcome the presumption of delivery." *In re Miller*, No. 14-cv-03112-MSK, 2015 WL 13216407, at *3 (D. Colo. Aug. 7, 2015) (citing *United States v. Ekong*, 518 F.3d 285, 287 (5th Cir. 2007)); *Howard v. Ferrellgas Partners, L.P.*, 92 F. Supp. 3d 1115, 1134–35 (D. Kan. 2015) ("This simple denial of receipt is not enough to rebut the presumption that the Master Agreement was indeed mailed.").  Thus, "[i]t is not necessary that Defendant prove actual receipt of the notice." *Marsh*, 103 F. Supp. 2d at 918 (enforcing arbitration amendment to credit card agreement noticed through mailing).  Applying these principles, courts routinely reject unsubstantiated, after-the-fact denials in the face of testimony that a company acted in accordance with its mailing practices.  *See, e.g., Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 227 (5th Cir. 2008) ("Given that Stinger's only evidence was his own unsupported statement that he had not received either CMA, the district court did not commit clear error when it decided to credit Barrett's statement that Chase did send Stinger the CMAs along with his credit cards."); *Krutchik v. Chase Bank USA, N.A.*, 531 F. Supp. 2d 1359, 1361 (S.D. Fla. 2008) (crediting testimony that an "agreement was sent as part of a routine procedure by regular mail to the address listed in [the bank's] records" over a customer's unsubstantiated denial).

## II.    Gateway Questions Concerning Arbitrability—Including Enforceability and Scope—Have Been Clearly and Unmistakably Assigned to the Arbitrator.

Parties may include in a contract an "agree[ment] to arbitrate 'gateway' questions of 'arbitrability' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."  *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).  This agreement "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce." *Id*. at 69.  Thus, "[t]he question of *who* is to decide whether a

dispute is arbitrable is one that must necessarily precede the question of *whether* a dispute is arbitrable." *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 324 (2d Cir. 2013) (cited approvingly in *Belnap v. Iasis Healthcare*,, 844 F.3d at 1272, 1290 (10th Cir. 2017)); *see also Peabody Holding Co. v. United Mine Workers of Am., Int'l Union,* 665 F.3d 96, 101 (4th Cir. 2012) ("First, we determine *who* decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if we conclude that the court is the proper forum in which to adjudicate arbitrability, we then decide *whether* the dispute is, in fact, arbitrable.") (cited approvingly in *Belnap,* 844 F.3d at 1291). The Tenth Circuit recently confirmed its agreement with "the First, Second, Fourth, Eighth, Ninth, Eleventh, and D.C. Circuits [which] have all held that if a court finds evidence of clear and unmistakable intent to arbitrate arbitrability, it must allow an arbitrator to decide issues of arbitrability in the first instance." *Belnap*, 844 F.3d at 1292. Here, because the arbitration provisions in Plaintiffs' agreements "clearly and unmistakably" provide for an arbitrator to address questions of arbitrability, the Court must honor those agreements. *AT&T Techs.*, 475 U.S. at 649.

### A.   The Language of the Arbitration Clauses Unambiguously Delegates Arbitrability Issues to the Arbitrator.

The Consumer Account Agreements, Business Account Agreements, credit card agreements, and Online Access Agreements here clearly and unmistakably assign questions concerning arbitrability to the arbitrator. The Consumer Account Agreements and credit card agreements provide that "disputes" will be arbitrated and states that disputes "include disagreements about the meaning, application or enforceability of this arbitration agreement." (Nelson Decl., Exs. 1-I through 1-L at 4; Exs. 1-M, 1-N at 3 ("A 'dispute' may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.")); Ex.

10

16-A ("A Dispute also includes any disagreements about the meaning or application of this Arbitration Agreement.").)  The consumer agreements also make clear that "[t]he arbitrator shall decide any dispute regarding the enforceability of this arbitration agreement."  (*Id.,* Exs. 1-I through 1-L at 4; Exs. 1-M, 1-N at 3 ("If this Arbitration Agreement is in dispute, the arbitrator will decide whether it is enforceable.").)  This language is tantamount to "clear and unmistakable evidence" of the parties' intent to arbitrate the question of arbitrability.  *See Momot v. Mastro,* 652 F.3d 982, 987-88 (9th Cir. 2011) (language delegating to the arbitrator the authority to determine "the validity or application of any of the provisions" of the arbitration clause was clear and unmistakable) (citation and internal quotation marks omitted); *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199-1200 (2d Cir. 1996) (holding that a provision requiring arbitration of "any and all controversies" concerning "the construction" of the agreement indicates the parties' intent to arbitrate the question of arbitrability).  The language used for business accounts in the Business Account Agreements, Online Account Agreements, and credit card agreements is equally clear, if more succinct: "The arbitrator(s) will determine whether or not an issue is arbitratable."  (Nelson Decl., Ex. 2-A at 3, Exs. 2-B, 2-C, 2-D, and 2-E at 5; Ex. 17-B (disputes subject to arbitration include "interpretation of this Agreement (including the meaning of this arbitration agreement and whether a disagreement is a 'dispute' subject to binding arbitration as provided for in this arbitration agreement.)").

In the context of two different class actions brought by Wells Fargo customers who allegedly had unauthorized accounts opened in their names, Judge Chhabria in the Northern District of California and Judge Coogler in the Northern District of Alabama considered identical or nearly identical language from some of the very same account agreements.  *See Jabbari v.*

*Wells Fargo & Co.*, Case No. 3:15-cv-02159-VC, Dkt. No. 69 at 1 (N.D. Cal. Sept. 23, 2015)

(unpublished) (order granting Wells Fargo's motions to compel arbitration of named plaintiffs'

claims, filed in this case at ECF No. 24-1); *Jeffries v. Wells Fargo & Co.,* 2:16-cv-1987-LSC,

2017 WL 3149513 (N.D. Ala. July 25, 2017).  Judge Chhabria held that "[t]hese provisions

clearly assign arbitrability determinations to the arbitrator," and the agreements did not "contain

other language that would create doubt about whether the parties intended to delegate the

arbitrability determination."  *Wells Fargo & Co.*, Case No. 3:15-cv-02159-VC, Dkt. No. 69 at 1

(filed in this case at ECF No. 24-1).  Judge Coogler likewise determined that the "arbitration

agreement between Plaintiffs and Wells Fargo includes a delegation provision," and given that a

"delegation provision 'is an agreement to arbitrate the 'gateway' question of 'whether [the

arbitration agreement] covers a particular controversy,'" ordered the plaintiffs' claims to

arbitration notwithstanding their arguments concerning the unenforceability of the arbitration

agreement.  *Jeffries v. Wells Fargo & Co.,* 2017 WL 3149513, at *4.  "[B]ecause an arbitration

agreement exists between Plaintiffs and Wells Fargo and that agreement includes a broad

delegation provision, Plaintiffs must present their arguments in the arbitration proceeding." *Id.*

The same result was reached in a related putative class action which asserted claims relating to

alleged unauthorized Wells Fargo accounts brought against a class of defendants consisting of

former Wells Fargo employees.  *Hodge v. Campbell,* No. SU-16-CV-0771 (Ga. Super. Ct.,

Athens-Clark Cnty. May 23, 2017) (order granting motion to compel arbitration filed in this case

at ECF No. 63).  The court enforced the agreements between the plaintiffs and Wells Fargo,

noting that the plaintiffs had agreed to arbitrate the issue of arbitrability and therefore the "matter

shall be referred to arbitration to decide any and all disputes, including whether the claims in the

Complaint are arbitrable and any argument that the account agreements are unconscionable." (*Id.* at 16.)

B.     **Incorporation of the AAA Rules Clearly and Unmistakably Delegates Arbitrability Issues to the Arbitrator.**

Even without the clear language in the account agreements, the issue of arbitrability would still be one for the arbitrator because the agreements incorporate the *AAA Commercial Arbitration Rules.* Rule 7 of the *AAA Commercial Arbitration Rules* provides that the arbitrator shall decide the validity of the arbitration agreement and the arbitrability of any claim, and shall likewise decide "the existence or validity of a contract of which an arbitration clause forms a part."[8]  (Nelson Decl., ¶¶ 8-21, Ex. 1-A at 6-7, Exs. 1-B, 1-C, 1-D, 1-E at 9, Exs. 1-F, 1-G, 1-H at 5, Exs. 1-I, 1-J, 1-K, 1-L at 4, Exs. 1-M and 1-N at 3; *id.* ¶¶ 23-27, Ex. 2-A at 2-3, Exs. 2-B, 2-C, Ex. 2-D, and Ex 2-E at 4.)   "[B]y incorporating the AAA Rules and agreeing to be bound by these rules, the parties 'clearly and unmistakably' evidenced their intent to arbitrate all matters, including the question of arbitrability."  *Getzelman v. Trustwave Holdings, Inc.*, No. 13-cv-02987-CMA-KMT, 2014 WL 3809736, at *3 (D. Colo. Aug. 1, 2014).  The Tenth Circuit recently considered this issue in holding that parties clearly and unmistakably agree to have an arbitrator resolve questions of arbitrability by incorporating the JAMS arbitration rules, noting that "in an analogous context, all of our sister circuits to address the issue have unanimously concluded that incorporation of the substantively identical (as relevant here) AAA Rules

---

[8] Rule 7(a) of the AAA Rules, entitled "Jurisdiction," provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  Rule 7(b) provides that "[t]he arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part."  *See* American Arbitration Ass'n, *Commercial Arbitration Rules & Mediation Procedures* at 13, *available at* https://www.adr.org/sites/default/files/Commercial%20Rules.pdf.

constitutes clear and unmistakable evidence of an agreement to arbitrate arbitrability." *Belnap*, 844 F.3d at 1283.

As numerous courts in the Tenth Circuit, and other circuits, have held, "by incorporating the AAA Rules and agreeing to be bound by these rules, the parties 'clearly and unmistakably' evidenced their intent to arbitrate all matters, including the question of arbitrability." *Getzelman*, 2014 WL 3809736, at *3; *Chen v. Dillard's Inc.*, 2012 WL 4127958, at *2 n.1 (D. Kan. Sept. 19, 2012) (unpublished) ("incorporation of these [AAA] rules is additional clear and unmistakable evidence that the parties intended for the arbitrator to decide threshold issues of arbitrability"); *Pikes Peak Nephrology Assocs., P.C. v. Total Renal Care, Inc.*, No. 09-cv-00928-CMA-MEH, 2010 WL 1348326, at *6 (D. Colo. Mar. 30, 2010) (unpublished); *cf. P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 867 (10th Cir. 1999) ("A party who consents by contract to arbitration before the AAA also consents to be bound by the procedural rules of the AAA, unless that party indicates otherwise in the contract.").  Because the AAA rules give the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement,"' the parties' incorporation of those rules "serves as clear and unmistakable evidence of the parties' intent" to delegate the determination of arbitrability to an arbitrator.  *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) ; *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005) (same); *Fallo v. High–Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009) (same).

The Court should therefore compel arbitration, leaving for the arbitrator to decide the enforceability of the agreement, and whether Plaintiffs' claims are within the scope of the agreement to arbitrate.

III.   **Plaintiffs' Fraudulent Inducement Arguments Must Be Decided By the Arbitrator.**

When parties enter into an arbitration agreement and agree to delegate threshold questions of arbitrability, a claim of fraudulent inducement may only be considered by a court if the fraud is contended to have been directed *specifically* to the delegation clause, as opposed to the entire contract or the arbitration agreement within the contract.  *See Rent-A-Ctr.*, 561 U.S. at 73 (where delegation provision present, arbitrator must hear arguments from plaintiffs who "opposed the motion to compel on the ground that the *entire arbitration agreement*, including the delegation clause, was unconscionable."). "When an arbitration agreement contains a delegation provision and the plaintiff raises a challenge to the contract *as a whole*, the federal courts may not review his claim . . . ."  *Parnell*, 804 F.3d at 1146; *see also Suarez v. Uber Techs., Inc.*, No. 8:16-cv-166-T-30MAP, 2016 WL 2348706, at *4 (M.D. Fla. May 4, 2016) ("Plaintiffs do not *directly* challenge the validity of the delegation provision. As such, Defendant's motion [to compel arbitration] should be granted on this basis alone . . . .").

Here, Plaintiffs allege that "[b]ased upon Wells Fargo's admitted fraudulent sales activities, including fraudulent inducement to open accounts with the bank, dating at least until 2002, any agreements entered into subsequent to that date with Plaintiffs, were based upon fraudulent inducement and are void." (TAC ¶ 95; *see also id.* ¶ 104 ("Wells Fargo's acts of failing to disclose material information prior to opening accounts of any nature . . . constituted actionable fraud in the inducement, vitiating all banking accounts entered into subsequent to 2002.").)   Each of the individual plaintiffs alleges that they "would not have opened any account" with Wells Fargo or continued using their accounts after they converted to Wells Fargo accounts "if [they] had been informed at the time that Wells Fargo was actively taking customer

information and creating fake accounts."[9]  In other words, Plaintiffs claim they would not have

entered into *any* relationship with Wells Fargo, an allegation that plainly targets the entire

agreement.  And though Plaintiffs also contend they would not have agreed to arbitration if they

had been aware of the same information, that argument likewise is not targeted at the delegation

provision specifically.  As a result, these arguments are exclusively for the arbitrator to consider

and rule upon.

Judge Coogler in the Northern District of Alabama addressed this issue in a related class

action concerning alleged unauthorized Wells Fargo accounts, in which the Plaintiffs "argue[d]

that Wells Fargo fraudulently induced them to enter into the arbitration agreement by concealing

the fact that bank employees would open unauthorized accounts in Plaintiffs' names." *Jeffries v.*

*Wells Fargo & Co.*, 2017 WL 3149513, at *4.   "If a contract's arbitration agreement includes a

delegation provision," as the Wells Fargo agreements do, "then a plaintiff seeking to avoid

arbitration must 'direct[ly] challenge' the delegation provision, rather than 'the arbitration

provision generally.'" *Id.* (quoting *Parnell*, 804 F.3d at 1148 (citing *Rent-A-Center*, 561 U.S. at

---

[9] *See, e.g.,* TAC ¶ 129 (Aldous), ¶¶ 134-35 (Ashby), ¶¶ 139-40 (Beach), ¶¶ 144-45 (Beard),
¶¶ 149-50 (Bird), ¶ 158 (Bishop), ¶¶ 162-63 (Black), ¶¶ 167, 176 (Brodie), ¶¶ 179-81
(Burkhalter), ¶¶ 186, 188 (Cameron), ¶¶ 192-94 (Casey), ¶¶ 198-99 (Christensen), ¶¶ 204-06
(Dean), ¶¶ 210-11 (Diouf), ¶¶ 220-21 (Dowdle), ¶¶ 225-26 (Dowdy), ¶¶ 230-32 (Ellsworth),
¶¶ 237-38 (Farr), ¶ 479 (Fountain), ¶¶ 242-43 (Gilleshammer), ¶¶ 252-53 (Golden), ¶¶ 257-58,
262 (Gorayeb), ¶¶ 266-67 (Gregory), ¶¶ 271-72 (Hands), ¶¶ 276-78 (C. Jones), ¶¶ 284-85 (E.
Jones), ¶¶ 289-90 (Kamali-Sarvestani), ¶¶ 294-95 (King), ¶¶ 299-300 (Klann), ¶ 304-05 (Law),
¶ 310 (Lawani), ¶¶ 314-15 (McCoy), ¶ 320 (Kay Mitchell), ¶ 325 (Lawrence Mitchell), ¶¶ 329-
30 (Moyer), ¶¶ 334-35 (Ornellas), ¶¶ 339-40 (Pledger), ¶¶ 347-48 (Poe), ¶¶ 352-53 (Porter),
¶¶ 358-59 (Quigg), ¶ 363-64 (Rhea), ¶¶ 368-69 (Self), ¶¶ 373-75 (Shadoan), ¶ 381 (Sood), ¶ 386-
87 (Steele), ¶¶ 391-93 (Stern), ¶ 398 (Stetzel), ¶¶ 402-04 (Talaska), ¶¶ 410-11, 413 (Taylor),
¶¶ 417-19 (Thomas), ¶ 425 (Waters), ¶ 431 (Westin), ¶¶ 436-37, 439 (Westman), ¶¶ 443-44
(Weston), ¶¶ 448-49 (Williams), ¶ 453-54 (Zeleny), ¶ 521 (Evans), ¶ 509 (Fosbre), ¶ 555
(Hodges), ¶ 469 (Inskeep), ¶ 466 (Miller), ¶ 565 (Powell), ¶ 571 (Thompson), ¶ 527 (Saliba),
¶ 542 (Zorilla).

16

72)).  Judge Coogler noted that "Plaintiffs have not made a sufficiently specific challenge to the delegation provision such that this Court may address their allegations that the arbitration agreement was fraudulently induced," and rejected the contention that the fraudulent inducement argument should apply to the delegation provision as well.  *Id.* at *4.  "Even where a particular argument may apply to the contract as a whole, to the arbitration agreement, and to the delegation clause, the plaintiff must overtly attack the delegation clause."  *Id.* (citing *Rent-A-Center*, 561 U.S. at 74 ("It may be that had [plaintiff] challenged the delegation provision by arguing that these common procedures *as applied* to the delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court." (emphasis in original)).

Judge Coogler's decision adheres to Supreme Court precedent.  In *Rent-a-Center,* the Supreme Court determined that it "need not consider [the plaintiff's unconscionability claim] because none of [his] substantive unconscionability challenges was specific to the delegation provision."  *Rent-A-Center*, 561 U.S. at 73.  The Ninth Circuit considered a plaintiff's opposition to a bank's motion to compel arbitration and found that arguments of procedural and substantive unconscionability were not specifically directed to the delegation provision, and therefore the arbitrator must resolve the question of the validity of the arbitration clause as a whole.  *Brennan v. Opus Bank,* 796 F.3d 1125, 1133 (9th Cir. 2015).  The Eleventh Circuit, following *Rent-a-Center,* observed that "absent a challenge to the delegation provision itself, the federal courts must treat the delegation 'provision as valid under § 2 [of the FAA], and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator.'" *Parnell*, 804 F.3d at 1146–47; *see also Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 202

17

(5th Cir. 2016) ("If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases.").  In a similar vein, the Tenth Circuit has rejected the concept of a court inquiring in the face of a delegation clause whether the assertion of arbitrability is "wholly groundless."  The *Belnap* court reasoned that "the message that we glean from the language of the [Supreme] Court's opinions and our own, as well as the holdings of our sister circuits, is that courts in that situation [where there is clear and unmistakable evidence of delegation] must compel the arbitration of arbitrability issues in *all* instances in order to effectuate the parties' intent regarding arbitration."  844 F.3d at 1286 (emphasis in original).

## IV.     If the Court Were To Reach the Question of Arbitrability, Plaintiffs' Claims Should Be Arbitrated.

Even if this Court were to reach the arbitrability question—which it should not, because that question has been reserved for the arbitrator—the claims at issue here are covered by the arbitration agreement.

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Techs.*, 475 U.S. at 650 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).  And where the arbitration clause is sufficiently broad, as is the case here, there is a heightened presumption of arbitrability such that "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id*.

That principle plainly applies here.  The Consumer Account Agreements state that "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and

18

the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process as set forth in this part." (Nelson Decl. ¶¶ 16-19, Exs. 1-I, 1-J, 1-K, and 1-L at 4; *cf. id*. ¶¶ 8-12, Ex. 1-A at 5-6, Exs. 1-B, 1-C, 1-D and 1-E at 8; *id.* ¶¶ 13-15, Exs. 1-F, 1-G, and 1-H at 4 (nearly identical language); *see also id.* ¶¶ 20-21, Exs. 1-M and 1-N at 3.)  The agreements then define "dispute" as broadly as possible to include any disagreement between the customer and the bank:  "A dispute is any unresolved disagreement between you and the bank." (*See, e.g., id.* ¶ 8, Ex. 1-A at 6.)  The agreements provide examples of things that would come within that expansive scope:  "It includes any disagreement relating in any way to services, accounts or matters; to your use of any of the Bank's banking locations or facilities; or to any means you may use to access your account(s).  It includes claims based on broken promises or contracts, torts, or other wrongful actions.  It also includes statutory, common law, and equitable claims." (*See, e.g., id.* ¶ 16, Ex. 1-I at 4.)  Similarly, under the Business Account Agreements the parties agreed to arbitrate "all claims, disputes, and controversies between or among you and the Bank (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise arising out of or relating in any way to your account(s) and/or service(s), and their negotiation, execution, administration, modification, substitution, formation, inducement, enforcement, default, or termination." (*See, e.g., id.* ¶ 24 Ex. 2-B at 4.)

Plaintiffs' claims, which are indisputably an unresolved disagreement between them and the Bank, fall well within any plausible interpretation of these provisions. Their claims constitute an "unresolved disagreement" with the Bank, and they are inescapably tied to the accounts which Plaintiffs admit to opening.  In support of their claim for conversion, Plaintiffs allege that they "and members of the Class entered into banking agreements with Wells Fargo whereby they

deposited funds with Defendant" (TAC ¶ 655), and that Wells Fargo converted those funds by "requir[ing Plaintiffs] to pay Wells Fargo excessive fees, fines, collection costs, [and] had their person information was misused by Wells Fargo." (*Id.* ¶ 663.) Plaintiffs' claim for invasion of privacy is premised on their "reasonable expectation of privacy in the private information Defendants Wells Fargo obtained from them in opening accounts," (*id.* ¶ 613), the alleged violation of the Stored Communications Act and the Gramm-Leach-Bliley Act is based on a failure "to safeguard sensitive private financial information" Wells Fargo obtained in connection with Plaintiffs' authorized accounts (*id.* ¶ 605; *id.* ¶ 610), and the remainder of Plaintiffs' claims likewise are premised on either an alleged misuse of Plaintiffs' information which was provided to Wells Fargo in connection with authorized accounts, or the misappropriation of funds deposited within those accounts. In short, the Third Amended Complaint is filled with alleged wrongs directly involving Plaintiffs authorized accounts.

Plaintiffs' agreements explicitly contemplate disputes related to such activity. The agreements have a section applying to "unauthorized transactions," which include "a missing signature, an unauthorized signature . . . or otherwise a transaction that was not authorized by you." (Nelson Decl. ¶¶ 13-19, Exs. 1-F,1-G, 1-H, 1-I, 1-J, 1-K, 1-L at 3; *id.* ¶¶ 24-27, Exs. 2-B, 2-C, 2-D, and 2-E at 3; *see also id.* ¶ 8 Ex. 1-A at 32; *id.* ¶¶ 9-12, Exs. 1-B, 1-C, 1-D, 1-E at 14; *id.* ¶¶ 20-21, Exs. 1-M, 1-N at 6; *id.* ¶¶ 23-27, Ex. 2-A at 4-5, Exs. 2-B, 2-C, 2-D, and 2-E at 7-8 (setting forth customer obligations to review account statements and notify the bank of any unauthorized activity); Exs. 1-B, 1-C, 1-D, 1-E at 13-15, Ex. 1-F at 10-11, Exs. 1-G, 1-H, 1-I at 12, Ex. 1-J at 10, Exs. 1-K and 1-L at8- 9, Ex. 2-A at 6-7, Exs. 2-B, 2-C, 2-D, and 2-E at 10-11 (listing "Fraud Prevention" guidelines); Ex. 1-B at 42-43, Ex. 1-C at 45-46, Ex. 1-D at 47-48,

Ex. 1-E at46- 47, Ex. 1-F at 46-47, Ex. 1-G at 50-51, Ex. 1-H, 1-I at 51, 1-J at 47, Ex. 1-K at 39,

Ex. 1-L, at 39-40, Exs. 2-B at 42, 2-C at 41-42, 2-D at 43-44, and 2-E at 42 (listing advice for

ATM card and debit card loss prevention, including a recommendation to regularly review

Account statements to verify transactions and contact Wells Fargo immediately if there are any

discrepancies); Ex. 1-B at 50-51, Ex. 1-C at 54, Ex. 1-D at 56, Exs. 1-E, 1-F at 55-56, Ex. 1-G at

63-66, Exs. 1-H, 1-I at 60,  1-J at 60-63, Ex. 1-K at 46, Ex. 1-L at 47, Ex. 1-M at 35, 41-42, Ex.

2-A at 39, Exs. 2-B and 2-E at 50-51, Ex. 2-C at 52, Ex. 2-D at 51-52 (discussing unauthorized

fund transfers and unauthorized card transactions)).

     The arbitration clause in Plaintiffs' agreements with Wells Fargo "contains no limiting

language, either restricting arbitration to any specific disputes or to the agreement itself."

*Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1146 (10th Cir. 2014) ("we have not found

any case with an arbitration clause as broad as this, stating that '*[a]ny dispute, difference or

unresolved question* between' the parties must be arbitrated").  As the Tenth Circuit has

explained, the presumption in favor of arbitrability "is 'particularly applicable' where, as in the

case before us now, there is a broad arbitration clause.  'In such cases, in the absence of any

express provision excluding a particular grievance from arbitration, we think only the most

forceful evidence of a purpose to exclude the claim from arbitration can prevail.'"  *Local 5–857

Paper, Allied–Indus., Chem. & Energy Workers Int'l Union v. Conoco, Inc.*, 320 F.3d 1123,

1126 (10th Cir. 2003) (citation omitted).  The arbitration clauses here do not contain any carve

outs—they apply across the board to disputes between the customer and the Bank.

## **CONCLUSION**

For the foregoing reasons, Wells Fargo respectfully requests that this Court order

Plaintiffs to bring their claims in arbitration, and dismiss their claims in this lawsuit.

DATED this 18th day of September, 2017.

MUNGER, TOLLES & OLSON LLP

*/s/ Erin J. Cox*
Erin J. Cox

David H. Fry
Eric P. Tuttle

RAY QUINNEY & NEBEKER P.C.
James S. Jardine
Elaina M. Maragakis
Michael D. Mayfield

*Attorneys for Defendants Wells Fargo Bank, N.A.*
*and Wells Fargo & Co.*