Steven A. Christensen, #5190
Christensen Young & Associates, PLLC
9980 South 300 West, Suite 200
Sandy, UT 84070
Phone: 801-676-6447
Facsimile: 888-569-2786
Email:steven@christensenyounglaw.com

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| Lawrence J. Mitchell, Kay Mitchell, Matthew C. Bishop, Tracy Kilgore, Jennifer K. Zeleny, Joseph W. Steele V, Scott Westin, Bruce Bird, Nathan Ornellas, Anu Sood, Brent Miller, Nicholas Beach, Alex Inskeep, Richard Fountain, Matthew Gragg, Akoya Lawani, Sharon Williams, Ken Gregory, David Self, Edward Dowdy, April Thomas, Don Black, Reza Kamali, Carina Rhea, Shanell Golden, Kim Weston, Jennifer King, Ralph McCoy, Aaron Hands, Lisa Stern, Mbegane Diouf, Doug Waters, Paul Fosbre, Patricia Burkhalter, Cameron Casey, Jeffery Taylor, Robert Moyer, Marcia Cameron, Gloria Pledger, Charles Jones, Aaron Brodie, Dominique Evans, Richard Farr, Kevin Saliva, Harold Beard, Travis Ashby, Andrew Gorayeb, Edwin Zorilla, Curtis Dowdle, Edward Klann, Steven Stetzel, Glenn Gilleshammer, Maryann Aldous, Jennifer Porter, Robin Quigg, Tamar Hodges, Barbara Shadoan, Austin Law, Jennifer Ellsworth, Denise Poe, Jamal Dean, Brandon Westman, Concepcion Powell, Adrian Thompson, Eric Talaska, Zachary Christensen, Erica Jones, *et al* and unknown | **PLAINTIFFS' OBJECTION TO DEFENDANTS' RENEWED MOTION TO COMPEL ARBITRATION**<br><br>Case No.  2:16-cv-00966<br>Judge Clark Waddoups |

| | |
|---|---|
| Plaintiffs 1-1,000,000,<br><br>        Plaintiffs<br>        v.<br><br>Wells Fargo Bank, National Association,<br>a National Banking Association, and<br>Wells Fargo & Company, a Delaware<br>Corporation, and Does 1-5,300,<br><br>        Defendants. | |

Plaintiffs by and through their counsel of record, hereby submit this Objection to Defendants' Renewed Motion to Compel Arbitration, and by way of objection, allege as follows:

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Precise Relief Sought and Specific Grounds for Denying the Motion | i |
| Statement of Facts | |
|     Plaintiffs' Accounts | v |
|     Procedural Background | lxxviii |
|     Historical Background | lxxix |
| Argument | |
| I    Wells Fargo has Waived its Right to Enforce Arbitration | 1 |
|   A. Wells Fargo Expressly Waived its Right to Enforce Arbitration Before Congress | 1 |
|   B. Wells Fargo Implicitly Waived its Right to Enforce Arbitration Through Conduct | 5 |
| II    The Court Should Deny the Motion Because Factual Disputes Exist as to the Formation of the Agreements. | 6 |
|   A. Standard of Review | 7 |
|   B. Genuine Issues of Material Fact Remain in this Case | 7 |
| III.    No Contract Ever Existed | 10 |
|   A. Fraudulent Inducement | 11 |
|   B. Lack of Mutual Assent | 12 |
|   C. Unconscionability | 14 |
|     1.Substantive Unconscionability | 15 |
|     2. Procedural Unconscionability | 16 |
|   D. Mistake | 16 |
|   E. Misrepresentation | 17 |
|   F. Illegality | 18 |
| IV.    The Entire Arbitration Agreement is Void and Unenforceable | 19 |
|   A. The FAA's Text Allows the Court to Deny Defendants' Motion | 19 |
|   B. The FAA's Purpose Allows the Court to Deny Defendants' Motion | 21 |
| V.    The Arbitration Agreement is Entirely Void if the Court Finds any Formation Defense Applies. | 22 |
|   A. Fraudulent Inducement | 22 |
|   B. Lack of Mutual Assent | 23 |
|   C. Unconscionability | 24 |
|   D. Mistake | 25 |
|   E. Misrepresentation | 26 |
|   F. Illegality | 26 |
| VI.    The Delegation Provision is Void or Voidable | 27 |
|   A. Fraudulent Inducement | 27 |
|   B. Lack of Mutual Assent | 29 |
|   C. Unconscionability | 30 |
|   D. Mistake | 31 |
|   E. Misrepresentation | 32 |
|   F. Illegality | 33 |
| VII. The Parties Did Not Agree to Arbitrate the Disputes in This Case | 34 |

VII. The Fraudulent Accounts are not Governed by the Arbitration Agreement          38

Conclusion          39

## TABLE OF AUTHORITIES

**Cases**                                                **Page**

*Am. Sugar Ref. Co. v. The Anaconda*, 138 F.2d 765, 767 (5th Cir. 1943) — 1

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) — 7

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) — 20, 21

*AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643 — 24, 30, 34, 36

*Avedon Engineering, Inc. v. Seatex*, 126 F.3d 1279 (10th Cir. 1997) — 19

*Baker v. Latses,* 60 Utah 38, 206 P. 553 (1922) — 18, 27, 33

*Bekins Bar V Ranch v. Huth*, 664 P.2d 455 (Utah 1983) — 14

*Boelens v. Redman Homes, Inc.*, 759 F.2d 504 (5th Cir.1985) — iv

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) — 21

*Burkett v. Convergys Corp.,* No. 2:14-cv-376-EJF, 2015 U.S. Dist. LEXIS — 15, 37
    96781 (D. Utah July 23, 2015)

*Castleglen, Inc., v. Resolution Trust Corp.*, 984 F.2d 1571 (10th Cir. 1993) — 18, 27, 33

*Chassereau v. Global-Sun Pools, Inc.*, 644 S.E.2d 718 (S.C. 2007) — 35

*Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294 (10th Cir. 2001) 7, 8

*Dole v. Arco Chem. Co.*, 921 F.2d 484 (3d Cir.1990) — iv

*Fundamental Administrative Services, LLC v. Cohen*,
    No. 17-2025, 2017 WL 4390374, at *3 (10th Cir. Oct. 3, 2017) — 10

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) — 10, 34

*Hancock v. American Tel. and Tel. Co., Inc.*, 701 F.3d 1248 (10th Cir. 2012) — 7

*Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975 (10th Cir. 2014) — iii, 6, 8, 19

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) — 19

*Hume v. United States*, 132 U.S. 406 (1889) — 14

*In re Checking Account Overdraft Litig.*, 754 F.3d 1290 (11th Cir. 2014) — 7

*Jabbari v. Wells Fargo & Co.*, 3:15-cv-02159 VC (N.D. Cal. 2015) — iv, v, lxxix, 5, 6

*Jeffries v. Wells Fargo & Co.*, 2:16-cv-01987 LSC (N.D. Ala 2016) — iv, v, 6

*Keith v. Mountain Resorts Dev., L.L.C.,* 2014 UT 32 (Utah 2014) — 11

*Kindred Nursing Centers Ltd. P'ship v. Clark,* 137 S. Ct. 1421 (2017) — 20, 21

*Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332 (D. Kan. 2000) — 19

*Lee v. Intelius Inc.*, 737 F.3d 1254 (9th Cir. 2013) — 15, 25, 31

*McCormick v. Life Ins. Corp. of Am.,* 308 P.2d 949 (1957). — 19

*Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35 — 36, 37

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614(1985) — 36

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, — iii, iv
    101 F.3d 1492 (3d Cir.1996)

*Nolin v. S & S Const., Inc.*, 2013 UT App 94 — 36

*Republic Bank, Inc. v. W. Penn Allegheny Health Sys., Inc.*, — 8
    No. 2:08CV934 DAK, 2010 WL 697361, at *3 (D. Utah Feb. 24, 2010)

*Robert Lawrence Company, Inc., vs Devonshire Fabrics, Inc.*, 271 F.2d 402 — 23
    (2nd Cir. Ct App. 1959)

*Roger-Dabbs Chevrolet-Hummer, Inc. v. Blakeney,* 950 So.2d 170 (Miss. 2007) — 35

*Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395 (Utah Sup.Ct. 1998) — 14, 16

*Spahr v. Secco*, 330 F.3d 1266 (10th Cir. 2003) — 24,29, 30

*Trans–Western Petroleum, Inc. v. United States Gypsum Co.*, 830 F.3d 1171      12
   (10th Cir. 2016)
*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574;      35
    80 S. Ct. 1347 (1960)
*Utley v. Donaldson*, 94 U.S. 29 (1876)      12, 14


**Statutes**
Federal Arbitration Act: 9 U.S.C. § 2      14, 19, 20, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33
Federal Arbitration Act: 9 U.S.C. § 4      iii, 10, 19, 21, 28, 38
Utah Code Annotated § 70A-2-302      14

**Other Authorities**
Affidavit of Paul Dubow      13
American Jurisprudence (Second)      1
Black's Law Dictionary      1
Federal Practice and Procedures (Third), Charles Alan Wright and Arthur R. Miller, 2008   iv
Federal Rules of Civil Procedure      7, 8
Restatement (Second) of Contracts      14, 17
Wall Street Journal, Emily Glazer, https://www.wsj.com/articles/wells-fargos-sales-scandal-tally-grows-to-around-3-5-million-accounts-1504184598.      ii
United States Senate Committee on Banking, Housing, and Urban Affairs      1, 5
(https://www.banking.senate.gov/public/index.cfm/hearings?ID=FE4441A6-5D3B-4C88-9637-16F9BD71DCAC)

PRECISE RELIEF SOUGHT AND SPECIFIC GROUNDS FOR DENYING THE MOTION

As an initial matter, Wells Fargo's Motion is moot because Wells Fargo has implicitly and expressly waived its right to enforce arbitration through the testimony of its CEO before Congress and its actions in other cases. If the doctrine of waiver does not apply, the standard becomes that of a motion for summary judgment. The facts must be viewed in favor of the Plaintiffs, and the Court must deny Defendant's Motion if any dispute as to material issues remain.

Defendant's Counsel, misunderstands (perhaps intentionally) Plaintiffs' arguments. Plaintiffs first argue that the entire contract is void or voidable based on basic contract formation defenses. Plaintiffs will clarify the argument they have been making all along: First, the entire Consumer Account Agreement ("CAA") contract was void. Second, if the entire contract was not void, the arbitration agreement specifically was void. Third, if the arbitration agreement is not void, the delegation provision specifically is void. Fourth, if the contract, arbitration agreement and delegation provision are not void, the Parties did not agree to arbitrate the criminal disputes. Fifth, the fraudulent accounts are not governed by other account agreements. If the Court is unpersuaded that Wells Fargo's Motion should be denied from the declarations of Plaintiffs and the admissions of Wells Fargo, the evidence at least creates a genuine dispute of material fact as to each of the issues above.

In the alternative, Plaintiffs argue that the Parties did not agree to arbitrate the disputes in this case. In another alternative, Plaintiffs argue that the fraudulent accounts are not governed by the arbitration agreement.

Defendants are consistent with prior pleadings by starting their motion with misconstrued and misleading information. Defendants assume that there was a valid contract to begin with.

i

Plaintiffs have continually stated the CAA, the arbitration agreement, and the delegation provision were all void or voidable *ab initio* due to standard contract formation defenses, including fraudulent inducement.

Pursuant to Wells Fargo's admissions, there are now over 3,500,000 fraudulent accounts opened by Wells Fargo. This includes some 1,400,000 (nearly 70% more than initially disclosed) "newly discovered" unauthorized accounts which Wells Fargo just announced on August 31, 2017. Wells Fargo has not disclosed any information on these accounts. Many of the fraudulent accounts opened by Wells Fargo were not only without the consent of the individuals, but many of the individuals have never been notified that their information was compromised. Furthermore, Wells Fargo, recently announced that on top of the 1.4 million newly announced fraudulent accounts, Wells Fargo also discovered 528,000 unauthorized online bill-pay enrollments which incurred fees or charges. Emily Glazer, *Wells Fargo's Sales-Scandal Tally Grows to Around 3.5 Million Accounts*, WALL STREET JOURNAL, Aug. 31, 2017, https://www.wsj.com/articles/wells-fargos-sales-scandal-tally-grows-to-around-3-5-million-accounts-1504184598.

Plaintiffs and Class Members still do not know if they have been victimized by Wells Fargo, in part because Wells Fargo refuses to cooperate in providing counsel with the number of customers, or their names. Plaintiffs have tried to obtain this information, but have been continually stonewalled. Further, on September 12, 2017, two days before Defendants submitted their renewed motion to compel, Wells Fargo's CEO Timothy Sloan noted in an investor conference in New York, that "I can't promise you that it's exactly over with . . . we will be reporting more progress in the months ahead that will no doubt result in additional headlines."

Defendants criticize Plaintiff's counsel for failing to investigate the specific fraudulent activity in which Wells Fargo employees and directors engaged in from 2002 through 2016. It is impossible for Plaintiff's Counsel to provide complete information while Wells Fargo continues to withhold the information. It seems that every few months Wells Fargo discovers millions more fraudulent accounts that it forgot to mention, but Wells Fargo is blocking Plaintiffs (and potentially millions other class members) from discovering the truth. Wells Fargo is hiding behind the arbitration clause precisely to preclude this type of discovery.

Defendants continue to intentionally misdirect the Court's attention by referring to prior pleadings as admissions that Plaintiffs agreed to the arbitration process. First, Defendants mischaracterize Plaintiff's argument. Plaintiffs never allege there was ever a valid contract. Rather, Plaintiffs were attempting to point out if a Wells Fargo customer came into the bank and robbed the bank at gunpoint, Wells Fargo's interpretation of the arbitration agreement would compel the bank to move into arbitration. Legally, and logically, a criminal act is beyond the scope of any contract entered into between parties. This holds true for the argument that incorporation of the AAA Rules constitutes clear and unmistakable evidence of an agreement to arbitrate arbitrability. The FAA requires: "If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof. 9 U.S.C. § 4. If there is a dispute of fact regarding the formation of a contract, the Court *mus*t hold a trial on that fact. *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014). Federal Law preempts the AAA Rules.

Second, Defendants fail to recognize that amended pleadings supersede prior pleadings. "[T]he amended complaint 'supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading.'" *New Rock Asset*

*Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1504 (3d Cir. 1996) (quoting *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985)). This approach "ensures that a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990); *see also* 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1474 (3d ed. 2008) ("A liberal policy toward allowing amendments to correct errors in the pleadings clearly is desirable and furthers one of the basic objectives of the federal rules — the determination of cases on their merits."). Defendants repeatedly refer to earlier iterations of the pleadings as proof that the Court should dismiss the complaint and compel arbitration.

Defendants acknowledge engaging in fraudulent activity, opening accounts without authorization, transferring money without authorization, securing identity theft protection without authorization, charging consumers unauthorized fees.

Wells Fargo relies on unpersuasive or inapplicable cases. The vast majority of these cases do not apply because they did not have with similar facts. There are two cases cited by Wells Fargo which involve two similar cases, the *Jabarri v. Wells Fargo & Co.* case in the Northern District of California, and the *Jeffries v. Wells Fargo & Co.* case in the Northern District of Alabama. Judge Chhabria, the judge over the *Jabbari* case, stated during the settlement hearing on May 18, 2017: "I think there's a fair chance at the end of the day that Wells Fargo was not going to prevail on its arbitration argument." Ex. B, Transcript of Motion Hearing on May 18, 2017, page 24/98. Absent *Jabarri* and *Jeffries* (which deal with this fact scenario) there are no cases where a company has engaged in illegal, criminal activity and then had the audacity to claim that the illegal actions were somehow covered by an arbitration agreement.

Here, Wells Fargo has repeatedly admitted that they engaged in illegal actions affecting millions. No previous cases (absent *Jabbari* and *Jeffries*) can appropriately apply here because all previous cases are easily distinguished by the same sentence: neither party in that case was committing fraud, identity theft, or criminal and then sought to hide behind an arbitration clause.

### Plaintiffs' Accounts

Regulatory Agencies have sanctioned Wells Fargo over ten times in the past five years for lying to regulators, lying to Congress, engaging in fraudulent behavior, and violating of a plethora of federal laws. Defendants now attempt to convince this Court through declaration of Karen Nelson that Defendant provided information regarding arbitration to Plaintiffs, without any proof thereof. Ms. Nelson clearly was not at the opening of each of the accounts and clearly cannot speak as to the intent of Plaintiffs. Rather, Ms. Nelson's declaration is limited to what common business practices were. Her declaration talks about common business practices but neglects to state that Wells Fargo's common business practice during this period was to systematically engage in fraud, which included forging signatures. Plaintiffs have set forth testimony regarding their personal experiences with Wells Fargo. Plaintiffs state that **no** documents were given to them when they opened accounts. Wells Fargo did not inform customers that it was engaging in identity theft of customers' confidential information. Wells Fargo withheld information regarding arbitration or delegation of disputes to an arbitrator.

Wells Fargo employees have testified that Wells Fargo instructed them how to perpetrate the identity theft, including, but not limited to falsifying signatures, documents, and engaging in other fraudulent activities. *See* Exs. 13, 14,  and 15 of Plaintiffs Third Amended Complaint, ECF No. 69.

This case disputes that any customer could enter into a contract, arbitration agreement, or delegation provision without knowing that they were entering into a contract that included fraud and identity theft. Plaintiffs' Wells Fargo accounts are suspect, in general, for several reasons, including, but not limited to, Wells Fargo's documented history of forging signatures on accounts, misrepresenting the scope of the accounts, and lying to customers.

The declaration of Karen Nelson is deficient in numerous areas, including, but not limited to, the following:

**Maryann Aldous**

a) Maryann Aldous acknowledges her residency, and that an account was opened. She denies seeing the arbitration provision as it was on a different page from her signature (Defendant Ex. 4-A). Plaintiff denies receiving any information regarding any paperwork she was ultimately provided until she had made a deposit and was ready to leave the bank, and did not receive Defendant Exhibit 1-D to the best of her memory. Plaintiff Aldous further alleges an unauthorized IRA account was opened without her consent in 2007, which information does not appear on Defendants statement. Plaintiff denies she knowingly consented to have "disputes" decided by arbitration, and that no one from Wells Fargo has ever informed her that Wells Fargo was engaging in identity theft, pinning, gaming, overdraft account manipulation, and that if she had been aware of these facts she would never have done business with Wells Fargo, and she would never have agreed to anything which required arbitration, and would never have agreed to allow an arbitrator to decide if she had a dispute to be decided upon.

**Travis Ashby and Tara Blight Ashby**

a) Tara Blight opened an account with First Security Bank of Utah in 1998. In 2000 she was married and Travis Ashby was added to her First Security Bank account. The First Security Bank

of Utah did not have an arbitration provision. Wells Fargo acquired First Security Bank, and on April 21, 2001, all First Security accounts in Utah were converted into Wells Fargo accounts and integrated into the Wells Fargo system. On or about March 19, 2001, a conversion packet was purportedly delivered to each First Security account holder, including Travis J. Ashby and Tara Blight Ashby.

b) However, Wells Fargo does not have proof that it addressed or sent the package to them. Nevertheless, Wells Fargo, in both its prior Motion to Compel Arbitration, and in its Renewed Motion to Compel Arbitration, state that a conversion packet was sent to all Utah First Security accountholders. Wells Fargo has no proof of this mailing and no proof that the same was sent or received by Travis and Tara Ashby. There was nothing produced that the purported conversion packet, containing the Dispute Resolution Program Exhibit 5-C (which exhibit, parenthetically, was not contained in either their first Motion to Compel or in their Renewed Motion to Compel), was addressed or sent to the Ashby's home.

c) Tara and Travis Ashby contend that Wells Fargo was engaged in criminal behavior, identity theft, gaming, pinning, and numerous other illegal activities at the time their First Security account was transferred. Wells Fargo intentionally, and fraudulently induced them to engage in a banking relationship with Wells Fargo by failing to disclose material information regarding Travis and Tara Ashby deny signing any CAA agreement with Wells Fargo regarding accounts, arbitration or delegation of the issue of a dispute to an arbitrator. Furthermore, Wells Fargo does not contend they signed any such agreements, but argues they should be compelled to arbitration nevertheless.

Wells Fargo's criminal conduct, failing to disclose the arbitration and delegation provisions regarding arbitration which fraudulently induced them into continuing their banking

relationship. Ashby Plaintiffs further reiterate and reaffirm their statements in paragraphs 132-135 of the Third Amended Complaint, along with their attached Declarations. Exhibit C-Plaintiff Declarations

**Nicholas Beach**

a) Defendants argue that Plaintiff Nicholas Beach opened a checking and savings account on February 19, 2013.  In reviewing Defendant's Exhibit 7-A, it is clear that the signature of Nicholas Breach, allegedly acknowledging receiving all "applicable account agreements" could have (1) been obtained from anywhere, and (2) fails to specify what documents he received, if any.  Plaintiff denies receiving any information regarding any paperwork he was ultimately provided until he had made a deposit and was ready to leave the bank, and may have received the information at that time. The reference of Plaintiff receiving documents at Ex. 7-A at 2, has to do with withholding and taxpayer identification.

b) Plaintiff Nicholas Beach asserts his signature of cashing a check shows no agreement to be bound by an arbitration clause he never saw, as depicted in Ex. 7-C. Nor does it prove anything other than someone gave him a check and he cashed it.

c) Nicholas Beach contends that Wells Fargo was engaged in criminal behavior, identity theft, gaming, pinning, and numerous other illegal activities prior to 2013. Wells Fargo intentionally and fraudulently induced them to engage in a banking relationship with Wells Fargo by failing to disclose material information regarding Wells Fargo's prior and ongoing criminal conduct, failing to disclose the arbitration and delegation provisions regarding arbitration which fraudulently induced him into engaging in a banking relationship. Mr. Beach further reiterates and reaffirms his statements in paragraphs 137-140 of the Third Amended Complaint, along with his attached Declaration. *See* Exhibit C- Declarations

**Harold Beard**

a) Harold Beard contends that Defendants were fully aware of the gaming and fraud which was transpiring prior to and subsequent to his interaction with Wells Fargo. Plaintiff Harold Beard contends that he was not told at the time of his account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

b) Plaintiff Harold Beard further contends that he would not have opened up his account if he had been informed at the time that Wells Fargo was actively engaged in criminal activity, including identity theft, taking customer information and creating fake accounts, and that the opening of his account was through fraudulent inducement.

**Bruce Bird**

a) Plaintiff Bruce Bird contends that Defendants were fully aware of the gaming and fraud which activities were occurring both before and after July 5, 2005 at Wells Fargo.

b) Bruce Bird denies receiving any information regarding any paperwork he was ultimately provided until after he had made a deposit and was ready to leave the bank, and he did not receive the dispute resolution agreement, nor did he consent to arbitration nor delegation of disputes to an arbitrator to determine if a dispute existed, to the best of his memory. He categorically denies that he was informed told at the time of his account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

c) Plaintiff Bruce Bird contends that he does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customers private information at the time. Bruce Bird contends that he would not have opened up his account if he had been informed at the time that Wells Fargo was actively taking customer

information and creating fake accounts, and that his account was opened by fraudulent inducement.

## Matthew C. Bishop

a) Matthew Bishop opened an account with First Security Bank of Utah on September 23, 1999. The First Security Bank of Utah did not have an arbitration provision. Wells Fargo acquired First Security Bank, and on April 21, 2001, all First Security accounts in Utah were purportedly converted into Wells Fargo accounts and integrated into the Wells Fargo's system. Allegedly, on or about March 19, 2001, a conversion packet was purportedly delivered to each First Security account holder in the Utah region, including Matthew C. Bishop. A true and correct copy of the form of the conversion packet sent to Matthew C. Bishop, including a Consumer Account Agreement, was allegedly attached as **Exhibit 10-B**." There is no Exhibit 10-B and no proof that Matthew C. Bishop received, or agreed to the Consumer Account Agreement.

b) Wells Fargo does not have proof that it addressed or sent the package to Mr. Bishop. Nevertheless, Wells Fargo, in both its prior Motion to Compel Arbitration, and in its Renewed Motion to Compel Arbitration, state that a conversion packet was sent to all Utah First Security accountholders. Wells Fargo has no proof of this mailing and no proof that the same was sent or received by Matthew Bishop. There was nothing produced that the purported conversion packet, containing the Dispute Resolution Program Exhibit 10-B (which exhibit, parenthetically, was not contained in either their first Motion to Compel or in their Renewed Motion to Compel), was addressed or sent to Matthew Bishop.

c) Matthew Bishop contends that Wells Fargo was engaged in criminal behavior, identity theft, gaming, pinning, and numerous other illegal activities at the time his First Security account was transferred. Wells Fargo intentionally, and fraudulently induced him to engage in a banking

relationship with Wells Fargo by failing to disclose material information regarding their illegal activities. Matthew Bishop denies signing any CAA agreement with Wells Fargo regarding accounts, arbitration or delegation of the issue of a dispute to an arbitrator. Furthermore, Wells Fargo does not contend he signed any such agreements, but argues he should be compelled to arbitration nevertheless.

d) There is nothing contained in Exhibit 10-D relative to an arbitration agreement or delegation of a dispute to an arbitrator. The verbiage of Exhibit 10-C's is construed against the drafter, and is ambiguous at best. "*The terms and conditions of the Consumer Account Agreement are supplemented by this Membership Enrollment Form.*"

e) Wells Fargo's criminal conduct, failing to disclose the purported arbitration and delegation provisions regarding arbitration which fraudulently induced them into continuing their banking relationship. Plaintiff further reiterates and reaffirms his statements in paragraphs 152-158 of the Third Amended Complaint, along with his attached Declaration. *See* Exhibit C- Declarations

**Don Black**

a) Defendants argue that Plaintiff Don Black opened a joint consumer checking account on April 7, 2010. Defendants do not deny that Defendants were fully aware of the gaming and fraud which was occurring at Wells Fargo on this date and intentionally, withheld this material information and failed to disclose to Don Black that Wells Fargo was engaged in criminal activity dealing with identity theft of customers' confidential, private information.

b) Plaintiff Don Black contends that he was not told at the time of his account opening that Wells Fargo was in the practice of creating fraudulent accounts with customer information. He did not receive any documents from Wells Fargo until after he deposited money and they opened an account, without disclosing their criminal conduct. Had Don Black been informed of the material

actions of Wells Fargo he would not have opened an account. He was fraudulently induced into opening an account, and any alleged arbitration or delegation provisions were fraudulently obtained through fraudulent inducement.

**Aaron Brodie**

a) Defendants argue that Plaintiff Aaron Brodie opened a consumer checking and consumer savings account on May 10, 2011. Defendants do not deny that Defendants were fully aware of the gaming and fraud which was occurring at Wells Fargo on this date and intentionally withheld this material information and failed to disclose to Aaron Brodie that Wells Fargo was engaged in criminal activity dealing with identity theft of customers'  confidential, private information.

b) Aaron Brodie denies receiving any information regarding any paperwork he was ultimately provided until after he had made a deposit and was ready to leave the bank, and he did not receive the dispute resolution agreement, nor did he consent to arbitration nor delegation of disputes to an arbitrator to determine if a dispute existed, to the best of his memory. He categorically denies that he was informed at the time of his account opening that Wells Fargo was in the practice of stealing customers identity and creating fraudulent accounts with customer information.

c) Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date and have not denied the same.

d) Plaintiff Aaron Brodie contends that shortly after May 10, 2011, he received a Wells Fargo credit card he did not apply for and called Wells Fargo to report the unwanted credit card. Wells Fargo told him to destroy the credit card. He does not recall any arbitration terms, nor would he

have agreed to arbitration if he knew Wells Fargo was creating fake accounts using customer information at the time.

Plaintiff Aaron Brodie informed Wells Fargo that he did not apply for this, Wells Fargo was involved in identity theft and he wanted it removed. Wells Fargo told to just leave it be and not use it and everything would be okay.

e) Without notice of arbitration, Wells Fargo turned over Aaron Brodie's account for collection, and additional fees were charged against the credit card and no notice of the charges were sent to Aaron Brodie. When he learned of the charges he again asked Wells Fargo to remove the charges, cancel the credit card, and to contact the credit agencies and restore his credit. Wells Fargo responded by telling him to just pay the credit card.

f) Plaintiff Aaron Brodie was eventually sent to collections, and his credit score has dropped by an estimated 125 points. Plaintiff Aaron Brodie's credit score was so badly damaged, he had to retain a credit repair specialist and pay thousands of dollars to try and fix his credit. Had Wells Fargo disclosed to him their fraudulent sales activities, he would never have opened an account with them, and contends he was fraudulently induced into the CAA including any undisclosed, material information regarding Wells Fargo's criminal activity, and the presence of an arbitration clause and delegation provision for arbitration issues.

g) Interestingly, Defendants fail to include any credit card information, upon which they sued Aaron Brodie in their motion to compel arbitration. *See* Declaration.

**Patricia Burkhalter (Rivas)**

a) Defendants argue that Patricia Burkhalter opened a checking account and a consumer savings account on June 13, 2014. Plaintiff contends that Defendants were fully aware of the gaming and fraud which activities were occurring both before and after June 13, 2014 at Wells Fargo.

b) Patricia Burkhalter Rivas denies receiving any information regarding any paperwork she was ultimately provided until after she had made a deposit and was ready to leave the bank, and she did not receive the dispute resolution agreement, nor did she consent to arbitration nor delegation of disputes to an arbitrator to determine if a dispute existed, to the best of her memory. She categorically denies that she was informed at the time of her account opening that Wells Fargo was in the practice of creating fraudulent accounts, identity theft, pinning, gaming, and other illegal activities with customer information.

c) Plaintiff Patricia Rivas contends that she does not recall any arbitration terms, nor would she have agreed to arbitration if she knew that Wells Fargo was creating fake accounts using customers private information at the time. She denies seeing the arbitration provision as it was on a different page from her signature. She contends that he would not have opened up her account if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that her account was opened by fraudulent inducement.

d) Defendants do not deny that at the time this account was opened that they were engaged in identity theft, pinning, gaming, illegal transfer of monies between accounts and violation of state and federal banking laws.

e) Plaintiff Patricia Burkhalter Rivas contends that she does not recall any arbitration terms, nor would she have agreed to arbitration or delegation provisions if she knew Wells Fargo was creating fake accounts using customer information at the time. Plaintiff Patricia Burkhalter Rives contends that she would not have opened up any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts.

f) Plaintiff Patricia Burkhalter Rivas contends that a credit card was opened in her name without her authorization, and that all accounts were opened through fraudulent inducement both to arbitration, delegation, and overall banking accounts. *See* Exhibit C- Declarations.

**Marcia Cameron**

a) Marcia Cameron opened an account with First Security Bank of Utah on July 11, 1994. The First Security Bank of Utah did not have an arbitration provision. Wells Fargo acquired First Security Bank, and on April 21, 2001, all First Security accounts in Utah were purportedly converted into Wells Fargo accounts and integrated into the Wells Fargo's system. Allegedly, on or about March 19, 2001, a conversion packet was purportedly delivered to each First Security account holder in the Utah region, including Marcia Cameron. A true and correct copy of the form of the conversion packet sent to Marcia Cameron, including a Consumer Account Agreement, was allegedly attached as **Exhibit 14-B**." There is no Exhibit 14-B and no proof that Marcia Cameron received, or agreed to the Consumer Account Agreement.

b) Wells Fargo does not have proof that it addressed or sent the package to Mrs. Cameron. Nevertheless, Wells Fargo, in both its prior Motion to Compel Arbitration, and in its Renewed Motion to Compel Arbitration, state that a conversion packet was sent to all Utah First Security accountholders. Wells Fargo has no proof of this mailing and no proof that the same was sent or received by Marcia Cameron. There was nothing produced that the purported conversion packet, containing the Dispute Resolution Program Exhibit 14-B (which exhibit, parenthetically, was not contained in either their first Motion to Compel or in their Renewed Motion to Compel), was addressed or sent to Marcia Cameron.

c) Marcia Cameron contends that Wells Fargo was engaged in criminal behavior, identity theft, gaming, pinning, and numerous other illegal activities at the time her First Security account was

transferred. Wells Fargo intentionally, and fraudulently induced her to engage in a banking relationship with Wells Fargo by failing to disclose material information regarding their illegal activities. Marcia Cameron denies signing any CAA agreement with Wells Fargo regarding accounts, arbitration or delegation of the issue of a dispute to an arbitrator. Furthermore, Wells Fargo does not contend she signed any such agreements, but argues she should be compelled to arbitration nevertheless, when they have not produced any documents purporting to show her name on a Wells Fargo CCA.

d) There is nothing contained in Exhibit 14-C is an account statement for July 2012 and contains absolutely nothing discussing the alleged arbitration agreement or any mention of agreeing to a delegation provision to delegate authority to an arbitrator to decide disputes between the parties relative to an arbitration agreement or delegation of a dispute to an arbitrator.

e) Wells Fargo's criminal conduct, failing to disclose the purported arbitration and delegation provisions regarding arbitration which fraudulently induced them into continuing their banking relationship. Wells Fargo has not rebutted, denied or qualified its illegal activity which renders the arbitration clause, the delegation clause and the entire contract void as fraudulently induced. Plaintiff further reiterates and reaffirms her statements in paragraphs 182-188 of the Third Amended Complaint, along with her attached Declaration.

**<u>Cameron Casey</u>**

a) Defendants argue that Cameron Casey opened a consumer checking account and a consumer savings account on September 20, 2013. Wells Fargo does not deny that by 2013 it had already been engaging in identity theft of consumers' confidential information for over eleven years. Cameron denies receiving any information regarding any paperwork he was ultimately provided until after he had made a deposit and was ready to leave the bank, and he did not receive the

dispute resolution agreement, nor did he consent to arbitration nor delegation of disputes to an arbitrator to determine if a dispute existed, to the best of his memory. He categorically denies that he was informed at the time of her account opening that Wells Fargo was in the practice of creating fraudulent accounts, identity theft, pinning, gaming, and other illegal activities with customer information.

b) Plaintiff Cameron Casey contends that he does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customers private information at the time. He denies seeing the arbitration provision as it was on a different page from his signature. He contends that he would not have opened his account if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that his account was opened by fraudulent inducement.

c) Defendants do not deny that at the time this account was opened that they were engaged in identity theft, pinning, gaming, illegal transfer of monies between accounts and violation of state and federal banking laws.

d) Plaintiff Cameron Casey contends that he does not recall any arbitration terms, nor would he have agreed to arbitration or delegation provisions if he knew Wells Fargo was creating fake accounts using customer information at the time. Plaintiff Cameron Casey contends that he would not have opened any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts. Plaintiff Cameron Casey contends that but for Wells Fargo's fraudulent conduct, he would not have lost everything and be forced into a business bankruptcy and a personal bankruptcy, causing him severe damage to his credit and that his accounts were opened under a fraudulent inducement.

**Zachary Christensen**

a) Defendants argue that Zachary Christensen applied for a Wells Fargo Visa Credit Card on April 16, 2016. In fact, Zachary was at an outdoor hot tub event and engaged in discussions with representatives of Bullfrog Spas, and never once communicated with a Wells Fargo agent.

b) Being at an outdoor event, Mr. Christensen did not receive the Wells Fargo CAA, nor did anyone discuss with Zachary that Defendants were fully aware of the gaming, pinning, fraud and other illegal conduct which were occurring at Wells Fargo on this date.

c) Wells Fargo has not denied or disputed that at the time the credit card application with Bullfrog Spas was executed, Wells Fargo was actively engaging in identity theft, gaming, fraud, and other criminal behavior. Mr. Christensen was not told at the time of his credit card application that Wells Fargo was in the practice of creating fraudulent accounts with customer information.

d) Plaintiff Zachary Christensen denies any arbitration terms or issues relating to delegation to an arbitrator of disputes, in fact the only paperwork he received was a receipt on the purchase, he did not receive the CAA package on signing up with Bullfrog Spas from Wells Fargo. Plaintiff Zachary Christensen contends that he would not have opened a Wells Fargo Visa Credit Card with Wells Fargo had he been informed at the time that Wells Fargo was actively stealing customer information and creating fake accounts.

e) Zachary believes he was fraudulently induced into the agreement and would not agree to arbitration or delegation provisions and the account is void as being opened under a fraudulent inducement. *See* Exhibit C-Declaration.

**Jamal Dean, Focus-On-U- Photography**

a) Defendants argue that Jamal Dean opened a business checking account on September 19, 1996 for Focus-on-u Photography, and signed up for online banking on December 31, 2013.

b) Defendants do not allege any signatures by Jamal Dean and all exhibits are nothing more that account documents, none of which address the arbitration issue, or alleged agreement to a delegation provision allowing an arbitrator decide disputes. The only document Wells Fargo claims is signed is Ex. 17-B, which was not produced originally, and still not produced the second motion to compel. No document produced defines dispute or discusses arbitration or delegation of arbitration to an arbitrator to determine.

c) Defendants contend that the online account agreement references "separate agreements" but do not define what separate agreements they are referring to, and they were not provided to Jamal Dean. Plaintiff contends that Defendants never provided updated Business Account Agreements to Plaintiff Jamal Dean indicating that Wells Fargo was using client information to create fake accounts. Plaintiff contends that Defendants were fully aware of the gaming and fraud which were occurring at the date of Plaintiff Jamal Dean's Online Banking and intentionally, with malice hid the fraudulent activity they were engaged in, and misrepresented material facts, thereby fraudulently inducing Jamal Dean to continue.

d) Plaintiff Jamal Dean does not recall any arbitration terms, nor would he have agreed to arbitration or delegation provisions if he knew that Wells Fargo was creating fake accounts using customer information. Plaintiff Jamal Dean contends that he would not have opened Online Banking if he knew that Wells Fargo was in the practice of creating fraudulent accounts with customer information accounts, and that his accounts were opened under a fraudulent inducement. *See* Exhibit C-Declarations.

**<u>Mbegane Diouf</u>**

a) Defendants argue that Mbegane Diouf opened a consumer checking account on October 19, 2012. Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date. Defendants have not denied their illegal, criminal activity, identity theft and other illegal issues raised in the Third Amended Complaint at the time they enrolled Mbegane without disclosing material relevant facts.

b) Plaintiff Mbegane Diouf contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

c) Plaintiff Mbegane Diouf does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information. He denies receiving any information regarding any paperwork he was ultimately provided until after he had made a deposit and was ready to leave the bank, and he did not receive the dispute resolution agreement, nor did he consent to arbitration nor delegation of disputes to an arbitrator to determine if a dispute existed, to the best of his memory.

d) Plaintiff Mbegane Diouf contends that he would not have opened up any account with Wells Fargo if he had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that any accounts opened were under fraudulent inducement, including any clauses relating to arbitration or delegation. *See* Exhibit C-Declarations.

### Curtis Dowdle

a) Defendants argue that Curtis Dowdle opened a consumer checking account on January 9, 2006.  Plaintiffs contend that Defendants were fully aware of the gaming, identity theft, and fraud which were occurring at Wells Fargo on this date. Defendants have not denied their illegal,

criminal activity, identity theft and other illegal issues raised in the Third Amended Complaint at the time they enrolled Curtis Dowdle without disclosing material relevant facts.

b)  Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.  Plaintiff Curtis Dowdle contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

c)  Plaintiff Curtis Dowdle contends that he is the financial caretaker for schizophrenic brother.  Plaintiff asserts that SSDI is deposited into an account on which he is a beneficiary payee.  Plaintiff asserts that Defendants showed a Visa had been issued on this account and was being used by an unknown third person.  Plaintiff contends he attempted to close this account numerous times and Defendants refused to close the account.

d)  Plaintiff asserts that Defendants proceeded to send the account for his schizophrenic brother to collections, and never attempted to arbitrate the action, which they now claim is faster, more convenient for the parties, and which action constituted was a waiver of the arbitration agreement.

e)  Plaintiff Curtis Dowdle does not recall any arbitration terms, nor would he have agreed to arbitration or delegation provisions within an arbitration clause, if he knew that Wells Fargo was creating fake accounts using customer information, falsifying signatures, engaged in identity theft, and engaging in widespread fraud.  Curtis Dowdle contends that Wells Fargo engaged in fraudulent inducement, without sufficient disclosures of material facts, for the CAA, for the arbitration clause in the CAA and the delegation clause in the CAA.

**Edward Dowdy**

a) Defendants argue that Edward Dowdy opened a consumer checking account and a consumer savings account on October 16, 2013.  Wells Fargo has not denied that it was engaging in criminal behavior, identity theft, falsification of accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's plethora of criminal activity, which goes to the heart of the account, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Edward Dowdy contends he was fraudulent induced into opening the original account, and was not provided the necessary documentation to ascertain the presence of an arbitration agreement or delegation clause, and the same were induced by artifice and fraud.

b)  Edward Dowdy contends that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date, and that at the time of opening his checking and savings account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

c)  Plaintiff Edward Dowdy does not recall any arbitration terms, nor would he have agreed to arbitration if he knew that Wells Fargo was creating fake accounts using customer information.  Edward Dowdy denies receiving any information regarding any paperwork which Wells Fargo contends included an arbitration agreement and delegation of disputes to an arbitrator until after he had opened his account and was ready to leave the bank. *See* Exhibit C-Declarations

**Jennifer Ellsworth**

a)  Defendants argue that Jennifer Ellsworth opened a consumer checking account on November 29, 2014.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of accounts, issuing unwanted credit

cards, and automobile insurance at this time.  Based upon Wells Fargo's plethora of criminal activity, which goes to the heart of the account, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Jennifer Ellsworth contends she was fraudulently induced into opening an account and since they were not in an actual bank at the time the account was opened, she signed where she was told she had to sign, but no one from Wells Fargo disclosed any material information regarding their criminal conduct, nor what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

b)  Jennifer Ellsworth contends that at the time of opening her checking account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Jennifer Ellsworth does not recall any arbitration terms, nor would she have agreed to arbitration if she knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

**Richard Farr**

a) Defendants argue that Richard Farr opened a consumer checking account on December 15, 2015.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's plethora of criminal activity, which goes to the heart of the account, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening

accounts.  Richard Farr contends he was fraudulently induced into opening an account and since they were not in an actual bank at the time the account was opened, he signed where he was told he had to sign, but no one from Wells Fargo disclosed any material information regarding their criminal conduct, nor what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

b)  Richard Farr contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

c)  Plaintiff Richard Farr contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Richard Farr contends the only reason he opened an account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information.

**Glenn Gilleshammer**

a)  Defendants argue that Plaintiff Glenn Gilleshammer opened a consumer savings account on September 29, 2005, and a consumer savings account on February 2, 2009.  Wells Fargo has not

denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of accounts, issuing unwanted credit cards, and charging unwanted automobile insurance at this time.  Based upon Wells Fargo's plethora of criminal activity, which goes to the heart of the account, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts with Glenn Gilleshammer. Mr. Gilleshammer contends that after he opened his first account, Wells Fargo continued to hide their illegal activity and he was fraudulent induced into opening a second account, not being aware of Wells Fargo's continued illegal, criminal activity, including identity theft, fraud, falsification of signatures, manipulating accounts when regulators would review accounts and other illegal activity.

b)  Plaintiff Glenn Gilleshammer contends that Wells Fargo issued him a credit card, which was stolen.  Glenn Gilleshammer asserts that he called and cancelled the card.  Without authorization, or his permission, Wells Fargo opened a new credit card, which was not authorized by Gilleshammer, and then closed it without his knowledge.  Thereafter Wells Fargo opened a third credit card in his name, transferred all the costs, fees, bank charges, and interest from the original card, containing unauthorized charges, to this new card.

c)  Plaintiff Glenn Gilleshammer contends that despite numerous attempts, even after hiring an attorney, Defendants have refused to close the third credit card and the associated fraudulent charges and further that all credit cards, savings and other accounts were opened under fraudulent inducement, without disclosure of material facts by Defendants.

**Shanell Golden**

a)  Defendants argue that Plaintiff Shanell Golden opened a consumer checking and a consumer savings account on October 20, 2008.  Wells Fargo does not deny that by 2008 it had already

been engaging in identity theft of consumers' confidential information for over six years.  Shanell denies receiving any information regarding any paperwork she was ultimately provided until after she had made a deposit and was ready to leave the bank, and she did not receive the dispute resolution agreement, nor did she consent to arbitration or delegation of disputes to an arbitrator to determine if a dispute existed, to the best of her memory.  She categorically denies that she was informed at the time of her account opening that Wells Fargo was in the practice of creating fraudulent accounts, identity theft, pinning, gaming, and other illegal activities with customer information.

b)  Plaintiff contends that Defendants were fully aware of the gaming, pinning, identity theft, and fraud which were occurring at Wells Fargo on this date.  Shanell Golden contends that at the time of opening her account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Plaintiff Shanell Golden does not recall any arbitration terms, nor would she have agreed to arbitration if she knew that Wells Fargo was creating fake accounts using customer information.  Plaintiff Shanell Golden contends that she would not have opened any account with Wells Fargo if she had been informed at the time that Wells Fargo was actively taking customer information and creating fake accounts, and that her accounts were opened under a fraudulent inducement, along with fraudulent inducement regarding the arbitration provision and delegation provisions. *See* Exhibit C- Declarations.

**<u>Andrew Gorayeb</u>**

a) Defendants argue that Plaintiff Andrew Gorayeb opened a consumer checking account on June 20, 2007.  In reviewing Defendant's Exhibit 25-A, it is clear that the signature of Andrew Gorayeb is on a separate page which signature Wells Fargo alleges Gorayeb acknowledged receiving all "applicable account agreements" ("applicable account agreements" is not defined

and Plaintiff has no knowledge as to what they refer).  Andrew Gorayeb states that since the forged signature could have been obtained elsewhere.  Plaintiff denies opening any accounts with Wells Fargo, and contends that the signature is a forgery and that Wells Fargo stole his money, time and his identity.

b) Mr. Gorayeb further reiterates and reaffirms his statements in paragraphs 255-262 of the Third Amended Complaint, along with his attached Declaration. *See* Exhibit C- Declarations

## Kenneth Gregory

a)  Defendants argue that Plaintiff Kenneth Gregory opened a consumer checking account and consumer savings account on January 2, 2015.  In reviewing Defendant's Exhibit 26-A, it is clear that the signature of Kenneth Gregory, allegedly acknowledging receiving all "applicable account agreements" could have (1) been obtained from anywhere, and (2) fails to specify what documents he received, if any.  Plaintiff denies receiving any information regarding any paperwork he, was ultimately provided until he had made a deposit and was ready to leave the bank.

b)  Plaintiff Kenneth Gregory contends that Wells Fargo was engaged in criminal behavior, identity theft, gaming, pinning, and numerous other illegal activities prior to 2015.  Wells Fargo intentionally and fraudulently induced him to engage in a banking relationship with Wells Fargo by failing to disclose material information regarding Wells Fargo's prior and ongoing criminal conduct, failing to disclose the arbitration and delegation provisions regarding arbitration which fraudulently induced him into engaging in a banking relationship.  Mr. Gregory further reiterates and reaffirms his statements in paragraphs 263-267 of the Third Amended Complaint, along with his attached Declaration.

## Aaron Hands

a) Defendants argue that Plaintiff Aaron Hands opened a consumer checking account on December 1, 2015. Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Aaron Hands contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b) Aaron Hands contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Aaron was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c) Aaron Hands contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent

inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Aaron Hands contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Aaron Hands contends the only reason he opened an account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. *See* Exhibit C-Declarations

## Charles Jones

a)  Defendants argue that Plaintiff Charles Jones opened a consumer checking account and consumer savings account on July 27, 2010.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Charles Jones contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Charles Jones contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Charles was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive

those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Charles Jones contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Charles Jones contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Charles Jones contends the only reason he opened an account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information

**Erica Bendixsen Jones**

a)  Defendants argue that Erica Bendixsen Jones opened a consumer savings account on August 19, 2003.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its

illegal conduct in opening accounts, Erica contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Erica Jones contends she was fraudulently induced into opening an account and she simply signed where they indicated, giving her no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Erica was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

c)  Erica Jones contends that at the time she was added to her parents account she never received any documentation whatsoever from Wells Fargo, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  She does not recall any arbitration terms, because she was never provided the documents, other than signing the name or title change, nor would she have agreed to arbitration, or a delegation clause hidden in a document she never even received, if she knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

**Reza Kamali-Sarvestani**

a)   Defendants argue that Plaintiff Reza Kamali-Sarvestani opened a consumer checking account and consumer savings account on September 2, 2011.  The first document he signed had an error and they corrected the name on the account.  Wells Fargo argues that this means Reza was provided with two separate opportunities to see and receive the documents containing the arbitration and delegation clauses, however even stating this they know full well that they did not provide two separate sets of documents to Plaintiff.

b)   At the time of the account activity Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Reza Kamali-Sarvestani contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

c)   Reza contends he was fraudulently induced into opening an account and he simply signed where they indicated, even signing where Wells Fargo had misspelled his name, and not giving him a chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Reza was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did

not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

<u>**Jennifer King**</u>

a) Defendants argue that Plaintiff Jennifer King opened a consumer checking account and consumer savings account on June 10, 2014. Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time. Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Jennifer contends she was fraudulently induced into opening an account and, and the Relationship Change Application, and that any arbitration or delegation provision were also fraudulent induced and are void.

b) Jennifer King contends she was fraudulently induced into opening an account and she simply signed where they indicated, giving her no chance to read the documents. No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct. Furthermore, Jennifer was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents. She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

c) Jennifer King contends that at the time she added Evan Jones as a beneficiary to her account she never received any documentation whatsoever from Wells Fargo, she was not told that Wells

Fargo was in the practice of taking customer information and opening fraudulent accounts. She does not recall any arbitration terms, because she was never provided the documents, other than signing the name or title change, nor would she have agreed to arbitration, or a delegation clause hidden in a document she never even received, if she knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

**Edward Klann**

a)  Defendants argue that Plaintiff Edward Klann opened a consumer checking and a consumer savings account on April 25, 2011. In reviewing Defendant's Exhibit 32-A, it is clear that the signature of Edward Klann on a separate page from the application document, allegedly acknowledging receiving all "applicable account agreements" could have (1) been obtained from anywhere, and (2) fails to specify what documents he received, if any. Plaintiff denies receiving any information regarding any paperwork until after he had made a deposit and was ready to leave the bank.

b)  At the time of the account activity Defendants were fully aware of the gaming, pinning, falsification of signatures, and fraud which were occurring at Wells Fargo on this date. Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time. Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening

accounts, Edward Klann contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

c)  Edward contends he was fraudulently induced into opening an account and he simply signed where they indicated.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Edward was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

### Austin Law

a)  Defendants argue the Plaintiff Austin Law opened a consumer checking account and consumer savings account on May 5, 2016.   In reviewing Defendant's Exhibit 33-A, it is clear that the signature of Austin Law was on a separate page from the application document.  There is no signature on the page allegedly acknowledging receiving all "applicable account agreements" which could have (1) been obtained from anywhere, and (2) fails to specify what documents he received, if any.  Plaintiff denies receiving any information regarding any paperwork until after he had made a deposit and was ready to leave the bank.

b)  At the time of the account activity Defendants were fully aware of the gaming, pinning, falsification of signatures, and fraud which were occurring at Wells Fargo on this date.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's admissions of a plethora

of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Austin Law contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

c)  Austin contends he was fraudulently induced into opening an account and he simply signed where they indicated.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Austin was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship

**Ayoka Lawani**

a)  Defendants argue that Plaintiff Ayoka Lawani opened a Wachovia checking and savings account on August 11, 2010, which was converted to a Wells Fargo account on February 18, 2012.  The Wachovia account had no arbitration or delegation provisions.  Plaintiff Ayoka denies receiving a welcome letter or Consumer Disclosure booklet.  Plaintiff Ayoka denies receipt of Exhibits 34-B, and 34-C, which were not provided to counsel as noted in the Declaration of Karen Nelson.

However, Wells Fargo does not have proof that it addressed or sent the alleged conversion package to her, or what documents were allegedly enclosed therein.  Nevertheless, Wells Fargo, in both its prior Motion to Compel Arbitration, and in its Renewed Motion to Compel Arbitration, state that a conversion packet was sent to all Wachovia

accountholders.  Wells Fargo has no proof of this mailing and no proof that the same was sent or received by Ayoka Lawani.  There was nothing produced that the purported conversion packet, containing the Dispute Resolution Program Exhibit 34-b or 34-C.

b)  Ayoka Lawani contends that Wells Fargo was engaged in criminal behavior, identity theft, gaming, pinning, and numerous other illegal activities at the time her Wachovia account was transferred.  Wells Fargo intentionally, and fraudulently induced her to engage in a banking relationship with Wells Fargo by failing to disclose material information regarding Ayoka's signing any CAA agreement with Wells Fargo regarding accounts, arbitration or delegation of the issue of a dispute to an arbitrator.  Furthermore, Wells Fargo does not contend she signed any such agreements, but argues they should be compelled to arbitration nevertheless.

Wells Fargo's criminal conduct, failing to disclose the arbitration and delegation provisions regarding arbitration which fraudulently induced her into continuing her banking relationship.  Lawani further reiterates and reaffirms her statements in paragraphs 306-310 of the Third Amended Complaint, along with her attached Declaration.

**Ralph McCoy**

a)  Defendants argue that Plaintiff Ralph McCoy opened a consumer checking account on November 14, 2014.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Ralph McCoy contends he was fraudulently induced into

opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Ralph McCoy contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Ralph was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Ralph McCoy contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Ralph McCoy contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Ralph McCoy contends the only reason he opened an account was that he was

fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. *See* Exhibit C-Declarations

**Kay and Lawrence Mitchell**

a)  Defendants argue that Plaintiff Lawrence Mitchell opened a consumer checking account with First Security Bank on April 2, 1982, with Kay Mitchell being added later.  Wells Fargo provided no signatures on any accounts for either Lawrence or Kay Mitchell.  The First Security Bank of Utah did not have an arbitration provision.  Wells Fargo acquired First Security Bank, and on April 21, 2001, all First Security accounts in Utah were converted into Wells Fargo accounts and integrated into the Wells Fargo system.  On or about March 19, 2001, a conversion packet was purportedly delivered to each First Security account holder, including Lawrence Mitchell.  Wells Fargo alleges that Lawrence Mitchell on February 15, 2002, at Ex. 37-E, however, no such document has been disclosed or attached.

b)  However, Wells Fargo does not have proof that it addressed or sent the package to them.  Nevertheless, Wells Fargo, in both its prior Motion to Compel Arbitration, and in its Renewed Motion to Compel Arbitration, state that a conversion packet was sent to all Utah First Security accountholders.  Wells Fargo has no proof of this mailing and no proof that the same was sent or received by Lawrence Mitchell.  There was nothing produced that the purported conversion packet, containing the Dispute Resolution Program, was addressed and mailed to Mitchell Plaintiffs.

c)  Lawrence and Kay Mitchell contend that Wells Fargo was engaged in criminal behavior, identity theft, gaming, pinning, and numerous other illegal activities at the time their First Security account was transferred.  Wells Fargo intentionally, and fraudulently induced them to engage in a banking relationship with Wells Fargo by failing to disclose material

information.  Lawrence Mitchell denies signing any CAA agreement with Wells Fargo regarding accounts, arbitration or delegation of the issue of a dispute to an arbitrator.  Furthermore, Wells Fargo does not contend they signed any such agreements, but argues they should be compelled to arbitration nevertheless.

Wells Fargo's criminal conduct, failing to disclose the arbitration and delegation provisions regarding arbitration which fraudulently induced them into continuing their banking relationship.  Mitchell Plaintiffs further reiterate and reaffirm their statements in paragraphs 316-325 of the Third Amended Complaint, along with their attached Declarations.

### Robert Moyer

a)  Defendants argue that Plaintiff Robert Moyer was added to three consumer accounts opened by Noel Taxin, which were opened on October 20, 2006.  Robert Moyer's signature is not contained on Ex.'s 38-A, 38-B or 38-C.

b)  Plaintiffs contend that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo on this date.  Plaintiff Robert Moyer contends that at the time of being added to the accounts, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.

c)  Plaintiff Robert Moyer does not recall any arbitration terms, nor would he have agreed to arbitration if he had been informed that Wells Fargo was creating fake accounts using customer information.

d) Plaintiff Ralph McCoy contends that he would not have been added to any account with Wells Fargo, and he would have encouraged Noel Taxin not to open any account whatsoever with Wells Fargo, if he had been informed at the time that Wells Fargo was actively taking customer

information and creating fake accounts, and that his accounts were opened under a fraudulent inducement.

**Nathan Ornellas**

a)   Defendants argue that Plaintiff Nathan Ornellas opened a consumer checking account on July 12, 2016.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Nathan Ornellas contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)   Nathan Ornellas contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Nathan was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)   Nathan Ornellas contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent

accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Nathan Ornellas contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Nathan Ornellas contends the only reason he opened an account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information.

**Gloria Pledger**

a)  Defendants argue that Plaintiff Gloria Pledger opened a consumer checking account and consumer savings account on April 15, 2016.  Wells Fargo has not denied that at the time the account was opened that Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Gloria contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulently induced and are void.

b)  Gloria Pledger contends she was fraudulently induced into opening an account and she simply signed where Wells Fargo indicated, giving her no chance to read the documents.  No one

from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Gloria was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship. *See* Exhibit C- Declarations

**Denise Poe**

a)  Defendants argue that Plaintiff Denise Poe opened a Cash on Demand account on November 7, 2005.  Wells Fargo has not denied that at the time the account was opened that Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Denise contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulently induced and are void.

b)  Denise Poe contends she was fraudulently induced into opening an account and she simply signed where Wells Fargo indicated, giving her no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Denise was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she

receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship. *See* Exhibit C- Declarations.

**Jennifer Porter**

a)   Defendants argue that Plaintiff Jennifer Porter opened a consumer checking account and consumer savings account on October 31, 2011. Wells Fargo has not denied that at the time the account was opened that Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Jennifer contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulently induced and are void.

b)   Jennifer Porter contends she was fraudulently induced into opening an account and she simply signed where Wells Fargo indicated, giving her no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Jennifer was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

**Robin Quigg**

a)  Defendants argue that Plaintiff Robin Quigg opened a checking account with First Union National Bank of Florida, which was acquired by Wachovia, and later acquired by Wells Fargo on June 11, 2011.  The Wachovia account had no arbitration or delegation provisions.  Plaintiff Quigg denies receiving a welcome letter or Consumer Disclosure booklet from Wells Fargo.  Plaintiff Robin Quigg denies receipt of Exhibits 43-B, and 43-C, which were not provided to counsel as noted in the Declaration of Karen Nelson.

b) Wells Fargo does not have proof that it addressed or sent the alleged conversion package to her, or what documents were allegedly enclosed therein.  Nevertheless, Wells Fargo, in both its prior Motion to Compel Arbitration, and in its Renewed Motion to Compel Arbitration, state that a conversion packet was sent to all Wachovia accountholders.  Wells Fargo has no proof of this mailing and no proof that the same was sent or received by Robin Quigg.

c)  Robin Quigg contends that Wells Fargo was engaged in criminal behavior, identity theft, gaming, pinning, and numerous other illegal activities at the time her Wachovia account was transferred, or subsequent thereto.  Wells Fargo does not dispute that it intentionally, and fraudulently induced her to engage in a banking relationship with Wells Fargo by failing to disclose material information regarding their criminal identity theft and other illegal activities.  Wells Fargo's criminal conduct, failing to disclose the arbitration and delegation provisions regarding arbitration which fraudulently induced her into continuing her banking relationship.  Robin Quigg further reiterates and reaffirms her statements in paragraphs 354-359 of the Third Amended Complaint, along with her attached Declaration. *See* Exhibit C.

**Carina Rhea**

a)  Defendants argue that Plaintiff Carina Rhea opened a consumer bank account on January 19, 1999, and enrolled in online banking on April 3, 2008, however they have no exhibits with her

signature.  Defendants again fail to produce alleged documents 44-B and 44-D which purport to contain her signature.  Nevertheless, Plaintiff Carina contends that Wells Fargo has not denied or disputed that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Carina contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Carina Rhea contends she was fraudulently induced into opening an account and she simply signed where they indicated, giving her no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Carina was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship. *See* Exhibit C- Declarations

**David Self**

a)  Defendants argue that Plaintiff David Self opened a consumer checking account on June 7, 1996, but doesn't identify with what bank.  In December of 2011, Wells Fargo alleges that it sent a monthly statement with "Important Change in Terms Notice," however they do not produce a copy of the alleged notification, although they do note an Ex. 45-B which is not attached.  Wells

Fargo has nothing signed by David Self, yet state he is compelled to arbitration. Wells Fargo has not denied, or disputed, that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time. Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, David Self contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b) David Self contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents. No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct. Furthermore, David Self was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents. He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

**Barbara Shadoan**

a) Defendants argue that Plaintiff Barbara Shadoan opened a consumer checking account on August 12, 2005. Plaintiff Barbara Shadoan contends that Wells Fargo has not denied or disputed that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time. Based upon Wells Fargo's admissions of a plethora of

criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Barbara Shadoan contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Barbara Shadoan contends she was fraudulently induced into opening an account and she simply signed where they indicated, giving her no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Barbara was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship. *See* Exhibit C- Declarations.

**<u>Anu Sood</u>**

a)  Defendants argue that Plaintiff Anu Sood opened a checking account with World Savings Bank, which was acquired by Wachovia on July 24, 2008, and later acquired by Wells Fargo on June 11, 2011. .  The Wachovia account had no arbitration or delegation provisions.  Plaintiff Anu Sood denies receiving a welcome letter or Consumer Disclosure booklet.  Plaintiff Anu Sood denies receipt of Exhibits 47-E, and 47-F, which were not provided to counsel as noted in the Declaration of Karen Nelson.

b) Wells Fargo does not have proof that it addressed or sent the alleged conversion package to Anu, or what documents were allegedly enclosed therein.  Nevertheless, Wells Fargo, in both its prior Motion to Compel Arbitration, and in its Renewed Motion to Compel Arbitration, state that

a conversion packet was sent to all Wachovia accountholders.  Wells Fargo has no proof of this mailing and no proof that the same was sent or received by Anu Sood.  There was nothing produced that the purported conversion packet, containing the Dispute Resolution Program was sent or received.

c)  Anu Sood contends that Wells Fargo had not denied that it was engaged in criminal behavior, identity theft, gaming, pinning, and numerous other illegal activities at the time Anu Sood's Wachovia account was transferred.  Wells Fargo intentionally, and fraudulently induced Anu to engage in a banking relationship with Wells Fargo by failing to disclose material information regarding Anu's signing any CAA agreement with Wells Fargo regarding accounts, arbitration or delegation of the issue of a dispute to an arbitrator.  Furthermore, Wells Fargo does not contend she signed any such agreements, but argues they should be compelled to arbitration nevertheless. Wells Fargo's criminal conduct, failing to disclose the arbitration and delegation provisions regarding arbitration which fraudulently induced her into continuing her banking relationship.  Anu further reiterates and reaffirms her statements in paragraphs 377-382 of the Third Amended Complaint, along with the attached Declaration.

**Joseph Steele**

a)   Defendants argue that Plaintiff Joseph Steele was added to a consumer savings account opened by Celia Steele on March 26, 2011.  This took place allegedly on October 7, 2011.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts,

Joseph Steele contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Joseph Steele contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Joseph was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Joseph Steele contends that at the time of the Relationship Change Application he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Joseph Steele contends that at the time of the Relationship Change, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Joseph Steele contends the only reason he engaged in the account was that he was

fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. *See* Exhibit C- Declarations.

**Lisa Stern**

a)  Defendants argue that Plaintiff Lisa Stern opened a business account on November 14, 2006.  Wells Fargo has not denied that at the time the account was opened that Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Lisa contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulently induced and are void.

b)  Lisa Stern contends she was fraudulently induced into opening an account and she simply signed where Wells Fargo indicated, giving her no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Lisa was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship. *See* Exhibit C- Declarations

**Steven Stetzel**

li

a)  Defendants argue that Plaintiff Steven Stetzel opened a consumer checking account and a consumer savings account on April 10, 2009.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance at this time.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Steven Stetzel contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Steven Stetzel contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Steven was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Steven Stetzel contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating

fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Steven Stetzel contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.   Steven Stetzel contends the only reason he opened an account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. *See* Exhibit C- Declarations.

**Eric Talaska**

a)  Defendants argue that Plaintiff Eric Talaska opened a consumer checking account and consumer savings account on July 9, 2010.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Eric Talaska contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Eric Talaska contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Eric was not informed what constituted

"a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Eric Talaska contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Eric Talaska contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Eric Talaska contends the only reason he opened an account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. *See* Exhibit C- Declarations

**<u>Jeffery Taylor</u>**

a)  Defendants argue that Plaintiff Jeffery Taylor opened an individual retirement account on November 23, 2012.  Jeffery Taylor asserts that he went to Wells Fargo for a job interview on or around November 23, 2012.

b) Plaintiff Jeffery Taylor contends that during the middle of a job interview, Defendants took his personal information and opened up an account without his authorization, and any accounts

that were opened, were opened under a fraudulent inducement, or theft. Plaintiff reasserts paragraphs 407-413 of the Third Amended Complaint, along with his declaration.

**April Thomas**

a)  Defendants argue that Plaintiff April Thomas opened a consumer checking account and consumer savings account on August 18, 2015. Wells Fargo has not denied that at the time the account was opened that Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance. Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, April contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulently induced and are void.

b)  April Thomas contends she was fraudulently induced into opening an account and she simply signed where Wells Fargo indicated, giving her no chance to read the documents. No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct. Furthermore, April was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents. She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship. *See* Exhibit C- Declarations

**Doug Waters**

a)  Defendants argue that Plaintiff Doug Waters opened a First Security checking account on September 2, 1986, and allegedly signed an Authorization for Automatic Transfer on February 6, 2013.  The First Security Bank of Utah did not have an arbitration provision.  Wells Fargo acquired First Security Bank, and on April 21, 2001, all First Security accounts in Utah were purportedly converted into Wells Fargo accounts and integrated into the Wells Fargo's system.  Allegedly, on or about March 19, 2001, a conversion packet was purportedly delivered to each First Security account holder in the Utah region, including Doug Waters. A true and correct copy of the form of the conversion packet sent to Doug Waters, including a Consumer Account Agreement, was allegedly attached as **Exhibit 54-B and E**. There is no Exhibit 54-B or 54-E and  no proof that Doug  Waters  received, or  agreed to the   Consumer Account Agreement.

b)  Wells Fargo has not denied that at the time the Authorization for Automatic Transfer account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Doug Waters contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

c)  Doug Waters contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information

regarding Wells Fargo's criminal conduct.  Furthermore, Eric was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.


**Scott Westin**

a)  Defendants argue that Plaintiff Scott Westin opened a Northwest bank checking account on January 12, 1995. This was later converted to a Wells Fargo account.  The Northwest account did not have an arbitration of delegation provision.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Scott Westin contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Scott Westin contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Scott was not informed what

constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Scott Westin contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Scott Westin contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Scott Westin contends the only reason he opened an account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information.

**Brandon Westman**

a)  Defendants argue that Plaintiff Brandon Westman opened a consumer checking account on June 24, 2003.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that

Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Brandon Westman contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Brandon Westman contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Brandon was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Brandon Westman contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Brandon Westman contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening

fraudulent accounts.  Brandon Westman contends the only reason he opened an account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information.

## Kim Weston

a) Defendants argue that Plaintiff Kim Weston opened a consumer checking account and consumer savings account on February 3, 2014.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Kim Weston contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Kim Weston contends he was fraudulently induced into opening an account and he simply signed where they indicated, giving him no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Kim was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Kim Weston contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, other than the application, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Kim Weston contends that at the time of opening his checking account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Kim Weston contends the only reason he opened an account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. *See* Exhibit C- Declarations

**Sharon Williams**

a) Defendants argue that Plaintiff Sharon Williams opened a Wells Fargo Visa Credit Card on September 9, 2013. Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Sharon Williams contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Sharon Williams contends she was fraudulently induced into opening an account and she simply signed where they indicated, giving her no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Sharon was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

c)  Sharon Williams contends that at the time of opening her Visa Credit Card, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  She does not recall any arbitration terms, because she was never provided the documents, other than the application, nor would she have agreed to arbitration, or a delegation clause hidden in a document she never even received, if she knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

d)  Plaintiff Sharon Williams contends that at the time of opening her Visa Credit Card, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Sharon Williams contends the only reason she opened an account was that she was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information.

**Jennifer Zeleny**

a) Defendants argue that Plaintiff Jennifer Zeleny opened a business checking account on August 13, 2014. Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Jennifer Zeleny contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Jennifer Zeleny contends she was fraudulently induced into opening an account and she simply signed where they indicated, giving her no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Jennifer was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

c)  Jennifer Zeleny contends that at the time of opening her account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  She does not recall any arbitration terms, because she was never provided the documents, other than the application, nor would she have agreed to arbitration, or a delegation clause hidden in a document she never even received, if she knew that Wells Fargo was creating fake accounts

using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

d)  Plaintiff Jennifer Zeleny contends that at the time of opening her account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Jennifer Zeleny contends the only reason she opened an account was that she was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. *See* Exhibit C- Declarations

**Dominique Evans**

a) Defendants state that Plaintiff Dominique Evans opened a consumer checking account on December 30, 2015. Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Dominique contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Dominique Evans contends she was fraudulently induced into opening an account and she simply signed where they indicated, giving her no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Dominique was not

informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents. She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

c) Dominique Evans contends that at the time of opening her checking account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts. She does not recall any arbitration terms, because she was never provided the documents, other than the application, nor would she have agreed to arbitration, or a delegation clause hidden in a document she never even received, if she knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

d) Plaintiff Dominique Evans contends that at the time of opening her checking account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts. Dominique Evans contends the only reason she opened an account was that she was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. While Dominique has marked NO in response to questions about unauthorized accounts being opened to her knowledge, she is still concerned, given that Wells Fargo continues to increase the number of accounts which have been found to be fraudulent every few months.

**Paul Fosbre**

a) Defendants allege that Paul Fosbre has three authorized Wells Fargo accounts, which were opened while he was with Wachovia. Paul asserts that there are at least two checking accounts

opened without his authorization. Wells Fargo has not denied that at the time the account was converted Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance. Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Paul Fosbre contends he was fraudulently induced into maintaining an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b) Paul Fosbre contends he was fraudulently induced into maintaining an account. No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct. Furthermore, Paul was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents. He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c) Paul Fosbre contends that at the time of the account conversion, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts. He does not recall any arbitration terms, because he was never provided the documents, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Paul Fosbre contends that at the time of conversion of his accounts, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Paul Fosbre contends the only reason he permitted his account to be converted was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information.

**Tamar Hodges**

a)  Defendants state that Plaintiff Tamar Hodges opened a consumer checking account on October 15, 2012. Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Tamar contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Tamar Hodges contends she was fraudulently induced into opening an account and she simply signed where they indicated, giving her no chance to read the documents.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Tamar was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or

delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

c)  Tamar Hodge contends that at the time of opening her checking account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  She does not recall any arbitration terms, because she was never provided the documents, other than the application, nor would she have agreed to arbitration, or a delegation clause hidden in a document she never even received, if she knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

d)  Plaintiff Tamar Hodge contends that at the time of opening her checking account, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Tamar Hodge contends the only reason she opened an account was that she was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. While Tamar has marked "NO" in response to questions about unauthorized accounts being opened to her knowledge, she is still concerned, given that Wells Fargo continues to increase the number of accounts which have been found to be fraudulent every few months.

**Carina Alex Inskeep**

a) Defendants allege that Carina Alex Inskeep has four authorized Wells Fargo accounts and she lists as unauthorized another pair of checking and savings accounts.  Defendants assert that on August 3, 2010, Carina Alex Inskeep opened a business checking and business savings account.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was

engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Carina Alex Inskeep contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Carina Alex Inskeep contends she was fraudulently induced into opening an account.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Carina was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

c)  Carina Alex Inskeep contends that at the time of the account opening, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  She does not recall any arbitration terms, because she was never provided the documents, nor would she have agreed to arbitration, or a delegation clause hidden in a document she never even received, if she knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

d)  Plaintiff Carina Alex Inskeep contends that at the time of opening of her accounts, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Carina Alex Inskeep contends the only reason she opened her account  was that she was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. *See* Exhibit C- Declarations

## Brent Miller

a) Defendants assert that Plaintiff Brent Miller opened a checking account and savings account out of store on July 24, 2015. Plaintiff Brent Miller asserts in the Plaintiff Fact Sheet that he did not authorize these accounts. Defendants contend the signature from these accounts match the signature on his Plaintiff Fact Sheet. Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, *falsification of signatures* and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Brent Miller contends he never willingly opened an account and even if he had, he would have been fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Brent Miller contends he never opened up an account. Brent Miller further asserts that in the unlikely event he had signed up for an account, he was fraudulently induced.as Wells Fargo never disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Brent was not informed what

constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents, as he asserts he did not open an account.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Brent Miller contends that at the time of the account opening, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Brent Miller contends that at the time of the account opening, which he contends he did not authorize, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts. *See* Exhibit C- Declarations

**Concepcion Powell**

a) Defendants assert that Concepcion Powell has at least 4 authorized accounts in her name. In Plaintiff's Fact Sheet, Powell asserts that an account labeled "Powell For Mayor 2013" was unauthorized, among others in the names of what appear to be businesses. Defendants assert that on March 11, 2013, Powell opened a business checking account and business savings account.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that

Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Powell contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b) Powell contends she was fraudulently induced into opening an account. No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct. Furthermore, Powell was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents. She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

c) Concepcion Powell contends that at the time of the account opening, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts. She does not recall any arbitration terms, because she was never provided the documents, nor would she have agreed to arbitration, or a delegation clause hidden in a document she never even received, if she knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

d) Plaintiff Concepcion Powell contends that at the time of account opening, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts. Concepcion Powell contends the only reason she opened an account was that she was

fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information.

**Adrienne Thompson**

a) Defendants assert that Plaintiff Adrienne Thompson opened a business checking account and a business savings account on September 25, 2013. Plaintiff asserts in her Plaintiff Fact Sheet of one unauthorized account. Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Adrienne Thompson contends she was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Adrienne Thompson contends she was fraudulently induced into opening an account.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Adrienne was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did she receive those documents.  She did not agree to be bound to an arbitration agreement, or delegation clause which usurped her right to go to court, and she was fraudulently induced into entering into a banking relationship.

c)  Adrienne Thompson contends that at the time of the account opening, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent

accounts. She does not recall any arbitration terms, because she was never provided the documents, nor would she have agreed to arbitration, or a delegation clause hidden in a document she never even received, if she knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that her accounts were opened under a fraudulent inducement.

d) Plaintiff Adrienne Thompson contends that at the time of opening of her accounts, she was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts. Adrienne Thompson contends the only reason she opened her account was that she was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. *See* Exhibit C- Declarations

**<u>Kevin Saliba</u>**

a) Defendants assert that on May 4, 2011, Kevin Saliba opened a Wells Fargo PMA prime checking account. Plaintiff asserts an unauthorized credit card was opened in his name pursuant to his Plaintiff Fact Sheet. Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance. Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Kevin Saliba contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Kevin Saliba contends he was fraudulently induced into opening an account.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Kevin was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Kevin Saliba contends that at the time of the account opening, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Kevin Saliba contends that at the time of opening of his accounts, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Kevin Saliba contends the only reason he opened his account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information. *See* Exhibit C- Declarations

**Edwin Zorilla**

a) Defendants assert that Plaintiff Edwin Zorilla opened a college checking account and a consumer savings account on January 4, 2012. Plaintiff Edwin Zorilla asserts in his Plaintiff Fact

Sheet, the college checking account was unauthorized.  Wells Fargo has not denied that at the time the account was opened Wells Fargo was engaging in criminal behavior, identity theft, falsification of signatures and accounts, issuing unwanted credit cards, and automobile insurance.  Based upon Wells Fargo's admissions of a plethora of criminal activity, which goes to the heart of the account opening, and the fact that Wells Fargo has never denied that it did not disclose material facts surrounding its illegal conduct in opening accounts, Edwin Zorilla contends he was fraudulently induced into opening an account and that any arbitration or delegation provision were also fraudulent induced and are void.

b)  Edwin Zorilla contends he was fraudulently induced into opening an account.  No one from Wells Fargo disclosed that Wells Fargo was engaged in criminal conduct, including customer account manipulation, falsification of documents, fraudulent signatures, and other material information regarding Wells Fargo's criminal conduct.  Furthermore, Edwin was not informed what constituted "a copy of the applicable account agreement, and privacy policy" nor did he receive those documents.  He did not agree to be bound to an arbitration agreement, or delegation clause which usurped his right to go to court, and he was fraudulently induced into entering into a banking relationship.

c)  Edwin Zorilla contends that at the time of the account opening, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  He does not recall any arbitration terms, because he was never provided the documents, nor would he have agreed to arbitration, or a delegation clause hidden in a document he never even received, if he knew that Wells Fargo was creating fake accounts using customer information, and further that the account was opened by fraudulent inducement without disclosure of material facts, and that his accounts were opened under a fraudulent inducement.

d)  Plaintiff Edwin Zorilla contends that at the time of opening of his account, he was not told that Wells Fargo was in the practice of taking customer information and opening fraudulent accounts.  Edwin Zorilla contends the only reason he opened his account was that he was fraudulently induced into so doing by Wells Fargo personnel skilled at lying, deceit and hiding material information.

**Matthew Gragg**

a)  Defendants assert that on September 22, 2006, a business line of credit was opened for Integrity Mechanical LLC, with signors Leo J. Lukas, Own M. Aasness, and an individual named Matthew Gragg.  Plaintiff Matthew Gragg asserts that he never signed for a business line of credit.

b) Defendants state "Wells Fargo is not presently moving to compel arbitration of Plaintiff Gragg on the basis of this account, as it appears that the Matthew Gragg who signed for the x7588 business line of credit account for Integrity Mechanical, LLC along with Leo Lukas and Owen Aasnass is not Plaintiff Gragg".  *See* Defendants Renewed Motion to Compel Arbitration, page cv.

c) Plaintiff Matthew Gragg still had this account reported on his credit, and therefore his personal information was inappropriately used. As Defendants have admitted to not pursuing arbitration for Plaintiff Matthew Gragg, Plaintiff respectfully requests that this Court permit his claim to move forward to discovery.

**Tracy Kilgore**

a)  Plaintiffs have stated in their Third Amended Complaint that an inappropriate account application was submitted for Tracy Kilgore.

b) Defendants requested more information to compel arbitration on Tracy Kilgore.

c) Plaintiff Tracy Kilgore, after providing a copy of the denial letter, filled out the requested Plaintiff Fact Sheet.

d) Defendants have not moved to compel arbitration on Plaintiff Tracy Kilgore in Defendants Renewed Motion to Compel Arbitration.

e) Plaintiff Tracy Kilgore asserts that by failing to move to compel arbitration against Tracy Kilgore, Defendants have waived any assertion for arbitration against Tracy Kilgore.

f) Plaintiff Tracy Kilgore therefore respectfully requests that this Court permit her claim to move forward to discovery.

## **Procedural Background**

1.      Starting in 2002, Wells Fargo fraudulently induced customers into accounts. Wells Fargo engaged in a systematic scheme to steal customer's identities to open unauthorized accounts.

2.      Los Angeles Times reporter, E. Scott Reckard broke the story regarding the fraudulent sales practices in an article published in 2013.

3.      In September of 2016, news broke of a $185 million dollar Consent Order between Wells Fargo, the Los Angeles City Attorney, the Office of the Comptroller of the Currency and the Consumer Financial Protection Bureau for the sales practice violations.

4.      On September 16, 2016, Plaintiffs filed this Case.

5.      As more fraudulent accounts were opened, and as the timeframe of the illegal activity became clearer, Plaintiffs amended their Complaint.

6.      On August 31, 2017, Wells Fargo announced another 1,400,000 fraudulently opened accounts.

7.      On September 18, 2017, Wells Fargo filed its Motion to Compel Arbitration (ECF No. 88).

### Historical Background

1.      On October 3, 2017 Wells Fargo's CEO Timothy Sloan officially **waived forced arbitration** on unauthorized accounts.

2.      On September 8, 2016 Wells Fargo entered into Consent Orders with the City of Los Angeles, The Consumer Financial Protection Bureau and the Office of the Comptroller of the Currency.  The terms of the Consent Order required Wells Fargo to pay $185 million dollars for fraudulently opening over 1.5 million unauthorized checking and savings accounts, and over 500,000 unauthorized credit card accounts.

3.      In March of 2017, Wells Fargo announced a $110 million dollar settlement in the *Jabbari vs. Wells Fargo,* Case No. 3:15-cv-02159 VC (N.D. Cal.) litigation.

4.      In the *Jabbari* action the parties filed a motion for preliminary approval of the proposed settlement with a new proposed settlement of $142 million dollar settlement days before the hearing. The Proposed Settlement included victims from 2009-2016.  Mitchell Plaintiffs filed an objection to the proposed settlement as being inadequate.  Judge Chhabria refused to accept the proposed settlement agreement. On June 13, 2017, an amended proposed settlement as required by Judge Chhabria was filed with the Court.  The Court granted preliminary approval of the amended proposed settlement on July 8, 2017.  The deadline set by the Jabbari Court to file opt-out is December 5, 2017.

5.      The Independent Directors of the Board of Wells Fargo & Company, released its Sales Practices Investigation Report on April 10, 2017.  The report noted that sales misconduct dated

back at least to 2002.  "Internal Investigations first noticed an increase in sales integrity cases in

2002." (p.91).

6.  On August 4, 2017, Wells Fargo announced that an additional 1.4 million fraudulent

accounts had been discovered, bringing the total number of victims to over 3.5 million.

7.  Wells Fargo has not moved to compel arbitration against Matthew Gragg or Tracy Kilgore.

8.  Wells Fargo has refused to divulge the names of individuals who they have discovered in

their investigations who have had fraudulent accounts opened.

9.     Wells Fargo announced in 2016 that it had fired over 5,300 employees for opening over

1.5 million unauthorized checking and savings accounts and 500,0000 credit cards from  May

2011 – July 2015.


## ARGUMENT

## I.     Wells Fargo has waived its Right to Enforce Arbitration

Wells Fargo's Motion is moot because Wells Fargo has waived its right to enforce

arbitration. Arbitration provisions may be waived by either party.  *See, e.g.*, *Am. Sugar Ref. Co.*

*v. The Anaconda*, 138 F.2d 765, 767 (5th Cir. 1943). Generally, a party waives a right when it

has knowledge of a legal right and an intention to forego the right. *Waiver*, Black's Law

Dictionary (10th ed. 2014). A party may waive a right by engaging in conduct inconsistent

with an other intention than to waive it. *See* 28 Am. Jur. 2D *Estoppel and Waiver* § 160, at 845–

46 (1966).

### A. Wells Fargo Expressly Waived Its Right to Enforce Arbitration before Congress

Wells Fargo expressly waived its right to enforce arbitration at a hearing before the

Senate Committee on Banking, Housing, and Urban Affairs on October 3, 2017. Wells Fargo

CEO Timothy Sloan affirmatively waived, on multiple occasions, Wells Fargo's current right to enforce the arbitration clause.

Furthermore, Timothy Sloan unequivocally waived Wells Fargo's continued use, or future use of the arbitration provision. A relevant exchange with Senator Tester went as follows:

| | |
|---|---|
| Senator Tester: | **The question is, is were you using, um, forced arbitration from a real account and applying it to a fake account that was set up unauthorized?** |
| Timothy Sloan: | **There, there were instances, historically, that we did.** |
| Senator Tester: | **Is that happening today?** |
| Timothy Sloan: | **We're not doing that right ... We're not doing that today**, because we've addressed- |
| Senator Tester: | **Well, will you commit-** |
| Timothy Sloan: | **Yeah.** |
| Senator Tester: | **To not use forced arbitration on accounts that weren't set up without the authorization of, of the, of the customer?** |
| Timothy Sloan: | Senator, if, if we find, if, if there's a situation in which a customer is provide- |
| Senator Tester: | **Yes or no would work.** |
| Timothy Sloan: | Uh, **yes**. |
| Senator Tester: | **You commit not to use that, forced arbitration**. |
| Timothy Sloan: | **Uh, if, if we have, if we have set up an account, all right, that was inappropriately set up-** |
| Senator Tester: | **Yep**. |
| Timothy Sloan: | **Or fraudulently set up-** |
| Senator Tester: | Yep. Yep. |
| Timothy Sloan: | **Without the customer-** |

2

| | |
|---|---|
| Senator Tester: | Yep. |
| Timothy Sloan: | We're going to make it right by them. We're not- |
| Senator Tester: | **And you're not going to forced arbitration?** |
| Timothy Sloan: | There's not, there's not going to be a reason to even have the conversation, because we're going to make it right by that customer. |
| Senator Tester: | **But Tim, let me point out that, that, that was being used, uh, um, six months ago, and I think my staff whispered in my ear that this, they were using arbitration on fake accounts that was set up on real accounts.** |
| Timothy Sloan: | **Senator Tester, I completely appreciate your question, and we're not doing that, because, we-** |
| Senator Tester: | Okay. And you're not going to do that? |
| Timothy Sloan: | We, we, if, if we have set up an account- |
| Senator Tester: | Okay, Tim, the only time I get in fights with folks who are talking is when they don't give me a yes or no answer when I really ask it, and the question is this, and you can ask it another way, answer it in another way if you want, but, uh, are you, **will you commit to not use forced arbitration on accounts that were not authorized by the customer?** |
| Timothy Sloan: | **The, the easy answer for that, uh, Senator, is yes**, because we haven't done that. |
| Senator Tester: | Okay. |
| Timothy Sloan: | **We're, we are not doing that**. |
| Senator Tester: | **And you're not going to do it moving forward**? |
| Timothy Sloan: | **We're not doing tha**t. |
| Senator Tester: | Okay. Thank, thank you very much. I used more time than I should of. Thank you, Mr. Chairman. |

*See* Ex. A, Testimony of CEO Timothy Sloan Before Congress; Ex. D, Transcript of Hearing

(emphasis added). Timothy Sloan again waived the right in answering Senator Van Hollen:

| | |
|---|---|
| Van Hollen: | You said to Senator Tester that you were not applying forced arbitration with respect to the fake accounts. Remember that answer? |
| Timothy Sloan: | Yes, I did. |
| Van Hollen: | Are yo- There's an article here, uh, S- Monday, September 18th, 2017, just a short time ago. In a case in Utah, uh, Wells Fargo lawyers have actually taken the position that the forced arbitration does apply to those fake accounts. Are you aware of that case? |
| Timothy Sloan: | Uh, I'm not familiar with that case, Senator. I apologize. |
| Van Hollen: | Well, let me, let me read to you from, uh, a Reuters excerpt and they reported, uh, this in September 18th, 2017. It says, "In a motion on Monday, lawyers for Wells Fargo said consumers signed agreements to arbitrate disputes when they first opened their accounts at the bank, and those agreements also cover other accounts allegedly opened without their consent." That directly contradicts your testimony to Senator Tester, doesn't it? |
| Timothy Sloan: | Senator, uh, I'll have- uh, I will look into that matter- |
| Van Hollen: | If that is true- |
| Timothy Sloan: | Senator, I will look into that matter and I will respond. |
| Van Hollen: | If that is true, it directly contradicts your testimony to this committee, doesn't it? |
| Timothy Sloan: | Senator, I will look into that matter- |
| Van Hollen: | I'm not asking you to look into it. I'm asking you to say if that's true, doesn't that contradict your testimony today? |
| Timothy Sloan: | Senator, I'm not familiar with the the, the, the facts of the situation, so I can't answer that question, but I'd be happy to look into it and respond to you. |
| Van Hollen: | Well, if it's true it violates- it's in contradicts- uh, I don't know if you were sworn in today or not, but it violates your, your earlier testimony. |

*See* Ex. A, Testimony of CEO Timothy Sloan Before Congress; Ex. D, Transcript of Hearing

(emphasis added). A recording of the full hearing is available at:

https://www.banking.senate.gov/public/index.cfm/hearings?ID=FE4441A6-5D3B-4C88-9637-

16F9BD71DCAC. Senator Tester's questions are from 47:30 to 53:22. Senator Van Hollen's

questions are from 1:27:00 to 1:33:45.

In these exchanges, Wells Fargo affirmatively testified to Congress that they will not

pursue the use of the arbitration clause. Wells Fargo's CEO, in his capacity of CEO, testified

before Congress that it is currently not, and will not in the future pursue the arbitration right in

cases where there are fraudulent accounts. As CEO, Timothy Sloan has the ability to bind the

company by his statements, when they are made in his capacity as CEO. This case involves

fraudulent accounts, and Wells Fargo promised that will not pursue the use of the arbitration

clause. Therefore, Wells Fargo cannot now seek to enforce the arbitration clause after explicitly

waiving the right to do so.

> **B.** **Wells Fargo Implicitly Waived its Right to Enforce Arbitration Through Conduct**

Wells Fargo implicitly waived its ability to enforce the arbitration provision by taking

actions contrary to its right.  In the *Jabbari* case, Wells Fargo initially moved to compel

arbitration. The judge granted Wells Fargo's motion to compel arbitration. The *Jabbari* plaintiffs

then appealed to the Ninth Circuit Court of Appeals. Before the Ninth Circuit Court of Appeals

heard arguments, Wells Fargo entered into a stipulation to remand the case to *the District Court*.

Wells Fargo made a settlement *in the District Court* and sought class certification. Despite the

arbitration agreement actually being enforced, Wells Fargo voluntarily entered into a settlement

before the District Court. Wells Fargo's actions in first, stipulating to remand the case, second,

entering into a settlement agreement, and third, seeking class certification, each show a clear abandonment of the right to enforce arbitration.

In the *Jefferies* case in the Northern District of Alabama, Wells Fargo implicitly waived its ability to enforce arbitration through its actions. After the court ruled in favor of arbitration, Wells Fargo entered into a settlement agreement with the attorneys and parties in the case.  Wells Fargo settled a dispute outside of arbitration shortly after the District Court specifically granted them the right to arbitrate.

In *Jabbari* and *Jefferies*, Wells Fargo implicitly waived its right to enforce arbitration.  Wells Fargo demanded arbitration, but then actively participated in activities inconsistent with that right. The disputed arbitration agreement requires *any* dispute to be resolved through arbitration. By taking several actions to resolve separate disputes outside of arbitration, Wells Fargo has waived its right to demand arbitration.

Wells Fargo cannot demand arbitration after waiving the right. Wells Fargo expressly waived the right to pursue the arbitration clause though testimony before Congress. Wells Fargo implicitly waived the right to pursue the arbitration clause through its actions inconsistent with the right.   Alternatively, if the Court does not find that Wells Fargo waived its right, Wells Fargo's Motion should still be denied.

## II.     The Court Should Deny the Motion because Factual Disputes Exist as to the Formation of the Agreements

The Court should deny Defendant's Motion because factual disputes exist as to the formation of the contract, arbitration agreement, and delegation provision. *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014)("One thing the district court may never do is find a material dispute of fact *does* exist and then proceed to *deny* any trial to resolve that dispute of fact.")(emphasis original).

6

### A.      Standard of Review

Defendant's Motion is akin to a motion for summary judgment. *See Hancock v. American Tel. and Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012)(stating "a court may grant a motion to compel arbitration if there are no genuine issues of material fact regarding the parties' agreement" and stating a motion to compel arbitration is "similar to summary judgment practice.") ; *In re Checking Account Overdraft Litig*., 754 F.3d 1290,1294 (11th Cir. 2014)(describing an order compelling arbitration as "summary-judgment-like" because it is "in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate.").

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001). A fact is material if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

A genuine dispute as to a material fact exists where the nonmoving party has produced evidence such that a reasonable jury could return a verdict in its favor. *Id.* at 249.

### B.  Genuine Issues of Material Fact Remain in This Case

The burden is on Wells Fargo to prove that there is no material dispute as to *any* material fact. Wells Fargo fails to meet its burden. Genuine disputes as to material facts include, but are not limited to:

(1) the formation of the entire contract,
(2) the formation of the arbitration agreement,
(3) the formulation of the delegation provision of the arbitration agreement,
(4) the intent of the parties to actually dispute the events of this case, and
(5) if fraudulent accounts are governed by the alleged contracts for real accounts.

Each of these are a material dispute of fact. In each of these disputes, the Court must draw inferences in Plaintiff's favor. *Commercial Union Ins. Co.*, 251 F.3d at 1298. Plaintiffs produce evidence that creates a genuine dispute as to each these material issues. Simply, Plaintiffs and Defendants have a different interpretation of what the intent of the Parties consisted of at the time of formation. This material fact is disputed. Therefore, the Court must deny Wells Fargo's Motion. Fed. R. Civ. P. 56; *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014).

The formation of a contract is a question fact. *See Republic Bank, Inc. v. W. Penn Allegheny Health Sys., Inc.*, No. 2:08CV934 DAK, 2010 WL 697361, at *3 (D. Utah Feb. 24, 2010)(In cases "where material facts are in dispute, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact.").

Here, the Consumer Account Agreement was void or voidable from the start based on several formation defenses. In the alternative, the arbitration agreement was void or voidable from the start based on several statutorily-provided formation defenses. In another alternative, Plaintiffs specifically contend that formation defenses apply to the delegation provision of the arbitration agreement.  In yet another alternative, even if there was a valid contract with a valid arbitration clause and a valid delegation provision (which there are not), Wells Fargo's illegal activities were not intended to be covered by either the contract or the arbitration agreement. Finally, the fraudulent accounts are not governed by alleged contracts for other accounts.

Plaintiffs state that Wells Fargo fraudulently induced them into signing CAA contracts. Plaintiffs have provided affidavits attesting of Wells Fargo's fraudulent inducement. *See* Ex. C-. Declarations. Plaintiffs attest that they never would have entered into a contract with Wells Fargo if they would have known what would happen. *Id.* Plaintiffs attest that they did not intend to enter into a contract to either grant Wells Fargo the right to commit fraud against them, nor to have an arbitrator decide if Wells Fargo had committed fraud. *Id.*

Defendant's Motion would require the Court to find several facts in favor of Wells Fargo, which it cannot at this stage of the litigation. First, Wells Fargo's motion would require the Court to find facts pertaining to the opening of each "authorized" account. The Court would be required to find that that Wells Fargo did not fraudulently induce any of the plaintiffs into signing the accounts.

Even if the Court was able to find facts in favor of Wells Fargo at this stage of the litigation, Wells Fargo provides no facts or evidence, nor does it address that the initial contracts were fraudulently induced. Rather, Wells Fargo merely provides signatures on the contracts and declares the contract valid. Nowhere does Wells Fargo provide anything close to any set of facts that prove anything beyond that there was a signature on an account. On the contrary, Wells Fargo has admitted that it was standard procedure at the time to steal identities, commit fraud, and open illegal accounts. Wells Fargo admits that fraud and deceit were rampant in the account opening process for years. Wells Fargo's own admissions, provide sufficient evidence to create a dispute as to if Plaintiffs were affected by Wells Fargo's admitted fraud when Plaintiffs were attempting to open accounts. [1]

---

[1] To further complicate matters, Wells Fargo has admitted that in some cases, a Wells Fargo representative would forge a signature to open new accounts. Discovery would be necessary to determine the validity of any account with Wells Fargo.

Well Fargo's entire Motion rests on a series of unsubstantiated presumptions. First, Wells Fargo presumes there is a valid contract between the customer and Wells Fargo. There is not. Second, Wells Fargo presumes that the arbitration provision is valid. It is not. Third, Wells Fargo presumes that the delegation provision of the arbitration agreement is valid. It is not. Fourth, Wells Fargo presumes that millions of consumers actually intended for Wells Fargo's illegal, unheard of, and shocking activities to be included in the arbitration agreement. The customers did not intend for Wells Fargo to have commit fraud and open false accounts.  Finally, Wells Fargo presumes that the new, fraudulent accounts are governed by the original account agreement. Wells Fargo's motion fails collectively, and fails specifically to meet its burden to show that its presumptions are valid.

## III.    NO CONTRACT EVER EXISTED

The making of the entire contract, the arbitration agreement, and the delegation provision are at issue in this case. If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof.  9 U.S.C. § 4.

Contract formation defenses render the CAA entirely void or voidable.  The Supreme Court of the United States stated that it is "well settled where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010*); Fundamental Administrative Services, LLC v. Cohen*, No. 17-2025, 2017 WL 4390374, at *3 (10th Cir. Oct. 3, 2017) ("[W]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally should apply ordinary state-law principles that govern the formation of contracts."). This Court may thus decide if the contract formation was valid before addressing the issue of arbitration. *See id.*

Contract formation defenses apply to the contract as a whole and the defenses expressly set forth in the FAA apply in the present case. When each, or any of these formation defenses apply, the entire contract fails. Parties cannot pick and choose to enforce convenient clauses of an entirely void contract. When the entire contract is void, that includes everything in the contract. Here, Wells Fargo cannot demand that the parties adhere to a provision in a contract that was entirely void from the start. That is not how contracts work.

When the contract fails, the arbitration agreement fails. When the arbitration agreement fails, the delegation provision fails. When both the contract and arbitration agreement fail, Wells Fargo's Motion fails.

### A. Fraudulent Inducement

Wells Fargo fraudulently induced millions of clients into contracts. To prevail on a claim of fraudulent inducement, a plaintiff must establish:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Keith v. Mountain Resorts Dev., L.L.C.*, 2014 UT 32, ¶ 41, 337 P.3d 213, 225–26.

Wells Fargo promised a contract for a single account, when everybody from customer service representatives to high-level managers knew that Wells Fargo would steal customer's identities to fraudulently open other accounts. Wells Fargo knew that fraudulent accounts were rampant, and that Plaintiffs would also become victims of Wells Fargo's illegal activities. Wells

Fargo promised a single account specifically to induce Plaintiffs to open an account. Plaintiffs reasonably relied on Wells Fargo's misrepresentations that there would only be one account, unaware that they would fall prey to Wells Fargo's illegal activities. Plaintiffs were induced to act and have suffered the consequences.

Named Plaintiffs have provided affidavits attesting that they were fraudulently induced into the CAAs. Millions of other people were duped into a contract they thought was for a single account when Wells Fargo intended to steal their identities to create fake accounts.

If, as Wells Fargo argues, Wells Fargo knew that its ongoing criminal activity was going to be covered by this contract, they had a duty to disclose that information to Class Members. Failure to do so would constitute fraudulent inducement into the contract, and delegation provision, because Wells Fargo knowingly failed to disclose material facts surrounding the contract.  Conversely, if Wells Fargo contends that they did not know of the illegal activities transpiring, they cannot now allege the criminal conduct is within the "intent" of the parties to the agreement.

### B.   Lack of Mutual Assent

Mutual assent, or a meeting of the minds, is essential to the formation of a contract. The United States Supreme Court has stated: "It is essential to the validity of a contract that the parties should have consented to the same subject-matter in the same sense." *Utley v. Donaldson*, 94 U.S. 29, 48 (1876). Utah law requires a meeting of the minds, or mutual assent to form a valid contract. *Trans–Western Petroleum, Inc. v. United States Gypsum Co.*, 830 F.3d 1171, 1176 (10th Cir. 2016)("Before forming an enforceable contract, there must be a meeting of the minds on the essential terms of the agreement.").

Mutual assent is lacking here. It would be an essential term for a party to know if a contract covers fraud and identity theft. Plaintiffs never intended that a contract for a single account with Defendant would open the door for Defendant to engage in identity theft.   In order to have mutual assent, both parties must consent to the subject-matter. To defeat this defense, Wells Fargo must admit that it intended for the CAA to allow Wells Fargo to engage in illegal activity. Wells Fargo must then also find some proof to show that the consumer also knew of, and consented to the contract for identity theft.   Wells Fargo makes no claim and provides no evidence that the consumer and Wells Fargo both intended to enter into a contract to allow Wells Fargo to steal people's identities. Such a subject matter is absurdly beyond any plausible contract.

Plaintiffs, and other members of the class, never intended to limit their judicial remedies for the kinds of illegal actions that Wells Fargo committed.

Wells Fargo's illegal activities were completely beyond the scope of the intended coverage by this agreement. Ex. E- Affidavit of Paul Dubow. Clearly there is a limit to how far this arbitration agreement extends.  For example, if a Wells Fargo customer entered a branch location and robbed the bank, would it be reasonable for that customer to be able to demand that the bank call an arbitration panel instead of the police to return the money to the bank?  Under Wells Fargo's line of argument, a robber with a bank account could demand arbitration and the case would of necessity be removed from the judicial system and placed in the hands of an arbitration panel instead.  Wells Fargo never agreed to that kind of extreme and illegal behavior to be arbitrated. Likewise, no customer in the world actually intended to agree to arbitrate a disagreement when their bank stole their identity to create fake accounts. The subject-matter of criminal activity was so far beyond the scope of the parties' initial agreement, it was never meant

13

to be arbitrated. Because neither party consented to the same subject-matter in the same sense, the contract for arbitration is invalid. *Utley v. Donaldson*, 94 U.S. 29, 48 (1876)).

### C. Unconscionability

The FAA allows for contracts to be voided for "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Unconscionability is one of such grounds. The arbitration provision of this contract is void under the FAA because it is unconscionable.

Federal Law describes unconscionable contracts are those that "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other;" damages were then limited to those to which the aggrieved party was "equitably" entitled. *Hume v. United States*, 132 U.S. 406 (1889).

Utah law allows for unconscionable contracts or clauses to be voided by the court. U.C.A.§70A-2-302.  This law has been explained: "If a contract is unconscionable, in whole or in part, the court may, on equitable grounds, refuse to enforce the unconscionable provisions, or it may construe the contract to avoid an unconscionable result." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah Sup.Ct. 1998) (quoting *Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 459 (Utah 1983)).

The Restatement (2d) of Contracts also provides that contracts with unconscionable portions are invalid.

> If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.

Restatement 2d § 208.

Courts apply a two-pronged analysis to determine whether a contract qualifies as unconscionable: "The first prong—substantive unconscionability—focuses on the agreement's contents. The second prong—procedural unconscionability—focuses on the formation of the agreement." *Burkett v. Convergys Corp*., 2015 U.S. Dist. LEXIS 96781, at *10 (D. Utah July 23, 2015) (citations omitted). Unconscionability is determined "according to the mores and business practices of the time and place." *Id*.

### 1.   Substantive Unconscionability

Substantive unconscionability "requires evidence that a term is so one-sided as to oppress or unfairly surprise an innocent party." *Burkett,*  2015 U.S. Dist. LEXIS 96781, at *10. "The terms of the contract should be considered 'according to the mores and business practices of the time and place.'" *Id.*

In *Lee v. Intelius Inc*, the 9th Circuit Court of Appeals dealt with a problem similar to the arbitration agreement in this case. In that case, the Court of Appeals held that an agreement to arbitrate is invalid when even a careful consumer would not have known that he was agreeing to arbitrate a certain provision. *Lee v. Intelius Inc.*, 737 F.3d 1254 (9th Cir. 2013). Similar to *Lee*, the Plaintiffs in this case are unfairly surprised. Even the most careful and suspicious consumer could not read "you agree to arbitrate disputes" to mean "we will force you to arbitrate our criminal activity."

Even the most careful or suspicious consumer would not have expected that by signing up for an account, he was giving Wells Fargo *carte blanche* to do whatever illegal activity it wanted with the ensuing claims going to arbitration.  Wells Fargo's actions were scandalous and surprising partially because it is so unexpected for a bank to engage in this kind of

behavior. Therefore, it is an unfair surprise to force arbitration on countless unsuspecting victims in this case.

Additionally, it is an unfair surprise that the fake accounts opened by Wells Fargo are "governed" by the account agreement of legitimate accounts. Every time a new account is created, customers receive a new account agreement. *See* Defendants Renewed Motion to Compel Arbitration, at  151, 158, ECF No. 88. This is common business practice, and is what every consumer has come to expect. It is nonsensical for a customer to claim they unilaterally opened an investment account with Wells Fargo and they decided that the fees associated with the investment account would be governed by the old agreement for a checking account. Likewise, it is an unfair surprise for class members to find that there are new unauthorized accounts opened, and even more surprising for the members to find out that the new accounts are governed by a contract for a different account.

### 2. Procedural Unconscionability

Procedural unconscionability also voids the CAA. "Procedural unconscionability focuses on the negotiation of the contract and the circumstances of the parties." *Ryan v. Dan's Food Stores*, 972 P.2d at 403 (citation omitted). "[The] principle inquiry is whether there was overreaching by a contracting party occupying an unfairly superior bargaining position." *Id.* (citation omitted). To evaluate procedural unconscionability, Utah courts look to several factors. The key factor here is "whether the stronger party employed deceptive practices to obscure key contractual provisions." *Id.* at 403. Wells Fargo was the stronger party and deceptively concealed that it would engage in illegal conduct.

### D. Mistake

The Restatement (Second) of Contracts allows for voidable contracts in the case of mistake:

> Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and
>
> (a)  the effect of the mistake is such that enforcement of the contract would be unconscionable, or
>
> (b)  the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (Second) of Contracts, § 153.

Plaintiffs were mistaken as to the scope of the CAA before they signed any CAA. One of the basic assumptions of Plaintiffs was that Wells Fargo would not commit fraud and identity theft. The scope of the contract is material in this case because it affects the rights of both parties.  Additionally, if Wells Fargo knew that these kinds of illegal actions were intended to be covered by the CAA, then it had a duty to explain to consumers that when they signed up for a checking account the client was intending intentional, illegal actions by Wells Fargo with no judicial remedy.

### E. Misrepresentation

Wells Fargo's misrepresentations regarding the CAA make the CAA voidable. Wells Fargo, if it knew that the kinds of actions in this case were covered by the CAA, had a duty to disclose such information. *See* Restatement (Second) of Contracts § 161. The Restatement (Second) of Contracts allows for misrepresentation to render a contract voidable:  "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." *Id.* at § 164(a).

Defendants made a misrepresentation by first, failing to make known that it intended to commit fraud and identity theft, and second, that the fraud and identity theft would be governed by the CAA. Class members were induced into assent based on this material misrepresentation. But for the lack of Wells Fargo neglecting to mention that criminal activity was governed by an arbitration agreement, class members would not have agreed to the CAA.

Wells Fargo's CAA states "Except where otherwise expressly noted, this Agreement *governs only your consumer deposit accounts and deposit services;* it does not govern, for example, credit accounts or credit-related services" Wells Fargo Consumer Account Agreement and Safe Deposit Box Lease Terms, (2003) p. 5. This is an affirmative misrepresentation that the CAA would only govern that account. Now Wells Fargo contends that the CAA somehow governs fraudulent accounts.

Wells Fargo misrepresented to Plaintiffs that the CAA would govern just one account. The CAA is therefore voidable.

### F. Illegality

The general rule surrounding illegality is that that "every contract in violation of law is void[.]" *Castleglen, Inc., v. Resolution Trust Corp.*, 984 F.2d 1571, 1582 (10th Cir. 1993) (quoting *Baker v. Latses*, 60 Utah 38, 141, 206 P. 553, 555 (1922)).

There is an underlying issue of illegality in this contract. If Wells Fargo's arguments hold true, Plaintiffs consented to a contract in which Wells Fargo could commit financial crimes against Plaintiffs, misappropriate their identities, and a plethora of other crimes without their consent. Underlying this kind of contract is a bizarre situation where the perpetrator holds contractual power to commit actions which with consent would be legal, but are now being committed without consent based on the pretense of an umbrella contract. After finding that a

contract is illegal, courts must then determine whether a statute or public policy demands that the contract be held unenforceable. *McCormick v. Life Ins. Corp. of Am.*, 6 Utah 2d 170, 175, 308 P.2d 949, 952 (1957).

## IV. The Entire Arbitration Agreement is Void and Unenforceable

Plaintiffs contend that the CAA was a void or voidable contract. However, if the Court decides that the CAA was valid, the entire arbitration provision of the CAA is invalid. The formation of the entire contract, and specifically the arbitration agreement is at issue in this case. "If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

Under the FAA it remains a fundamental principle that arbitration is a matter of contract, not something to be foisted on the parties at all costs. *Howard v. Ferrellgas Partners, L.P.,* 748 F.3d 975, 977 (10th Cir. 2014). If the parties dispute making an arbitration agreement, a jury trial on the existence of an agreement is warranted if the record reveals genuine issues of material fact regarding the parties' agreement. *Klocek v. Gateway, Inc.,* 104 F. Supp. 2d 1332, 1336 (D. Kan. 2000)(citing *Avedon Engineering, Inc. v. Seatex,* 126 F.3d 1279, 1283 (10th Cir. 1997).

### A. The FAA's Text Allows the Court to Deny Defendants' Motion

Statutory analysis must start with the text of the statute. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). This case depends largely on an interpretation of the Federal Arbitration Agreement, codified at 9 U.S.C. § 1 et seq..

The plain text of 9 U.S.C. § 2 expressly allows for arbitration agreements to be nullified for the same reasons as any other contract:

A written provision in any . . .  contract evidencing a transaction involving commerce to

settle by arbitration a controversy thereafter arising out of such contract or transaction, or

the refusal to perform the whole or any part thereof, or an agreement in writing to submit

to arbitration an existing controversy arising out of such a contract, transaction, or

refusal, shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at*

*law or in equity for the revocation of any contract*.

9 U.S.C. § 2 (emphasis added).

The final clause of Section 2 is commonly called the "Savings Clause." The Savings

Clause provides that the defenses for contract formation apply to arbitration agreements. The

Supreme Court of the United States explained:

The final phrase of 9 U.S.C. § 2 permits arbitration agreements to be declared

unenforceable upon such grounds as exist at law or in equity for the revocation of any

contract.  This saving clause permits agreements to arbitrate to be invalidated by

generally applicable contract defenses, such as fraud, duress, or unconscionability, but

not by defenses that apply only to arbitration or that derive their meaning from the fact

that an agreement to arbitrate is at issue.

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted).

The Supreme Court recently stated "A court may invalidate an arbitration agreement based on

'generally applicable contract defenses' like fraud or unconscionability". *Kindred Nursing*

*Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017).

The interpretation of the plain text of Section 2 provides that arbitration clauses are

treated the same way as any other contracts. Arbitration clauses are not given greater

consideration or higher priority than other provisions in contracts. The plain text of the FAA merely requires courts to treat arbitration clauses like any other contractual provision.

The FAA further reads: "If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. The making of the arbitration agreement is specifically in issue in this case. Since the making of the arbitration agreement is in issue and a jury trial has been requested, the FAA requires the Court to "make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose." *Id*.

This Court should follow the plain text of what Congress passed in the FAA as well as apply the analysis of the Supreme Court in *Concepcion* and *Kindred Nursing Centers* to the present case. The Court would be well within the limits of the FAA statute and the analysis of the FAA to deny Defendants' Motion. If the Court denies Wells Fargo's Motion, it would be following the express text of the FAA and the analysis of the Supreme Court. This Court would not be making new law, it would not be making a new interpretation of the law, but would simply be following Congressional intent and established precedent.

### B. The FAA's Purpose Allows the Court to Deny Defendants' Motion

The FAA "places arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). The FAA was not designed give special treatment to arbitration agreements. The text and the purpose of the FAA was merely to put contracts and arbitration agreements on the same level. *Id*. The arbitration agreement of the CAA is not entitled to special consideration. The purpose of the FAA was merely to give arbitration agreements the *same* recognition as other provisions of contracts. The

purpose and text of the FAA show that the arbitration agreement here should be given the same respect and analysis as other contracts. The same consideration given to contract formation defenses should be given to the formation defenses applying to contracts containing arbitration agreements.

The plain text and the purpose of the FAA both show that the arbitration provision in the present case is subject to the standard defense contracts.

### V. The Arbitration Agreement is Entirely Void if the Court finds that any Single Formation Defense Applies

The CAA anticipates that the arbitration agreement may be unenforceable: "If any of the provision of this arbitration agreement dealing with class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, that invalid provision shall not be severable and this entire arbitration agreement shall be unenforceable." Page 4, Wells Fargo Consumer Account Agreement - Effective April 1, 2013.

The entire agreement is unenforceable because the entire CAA is void or voidable. Formation defenses allowed by the FAA also provide numerous reasons why the arbitration agreement is unenforceable. The terms of the contract specifically lay out that if *any* of the provisions are not enforceable, the entire arbitration agreement is unenforceable. Note that the CAA does not state that the entire arbitration agreement shall be turned to an arbitrator to determine if it is unenforceable.  Plaintiffs argue the entire agreement is invalid for numerous reasons, but the Court need only find a single provision in the arbitration agreement for the entire arbitration agreement to fall.

### A.      Fraudulent Inducement

22

The Savings Clause of the FAA allows for arbitration agreements to be voided based on contract formation defenses such as fraudulent inducement. *See* 9 U.S.C. § 2. The entire contract, and specifically the arbitration provision, as well as the delegation provision, of the CAA are void and voidable because Wells Fargo fraudulently induced clients into the contracts.

The Second Circuit Court of Appeals stated "If [an] arbitration clause was induced by fraud, there can be no arbitration; and if the party charging this fraud shows there is substance to his charge, there must be a judicial trial of that question before a stay can issue in a case of the type with which we are now dealing." *Robert Lawrence Company, Inc. v. Devonshire Fabrics, Inc.*, 271 F.2d 402 (2nd Cir. 1959).

Plaintiffs incorporate by reference the arguments that apply to the entire contract, as outlined above. These arguments are applicable specifically to the arbitration agreement.

Plaintiffs reasonably relied on Wells Fargo's misrepresentations that there would only be one account, unaware that they would fall prey to Wells Fargo's illegal activities. Plaintiffs were induced to sign the CAA along with its arbitration agreement and have suffered the consequences.

If Wells Fargo knew that its ongoing criminal activity was going to be covered by this arbitration agreement, they had a duty to disclose that information to Class Members. Failure to do so would constitute fraudulent inducement into the contract because Wells Fargo knowingly failed to disclose material facts surrounding the arbitration agreement. Conversely, if Wells Fargo contends that they did not know of the illegal activities transpiring, they cannot now allege the criminal conduct is within the "intent" of the parties to the arbitration agreement.

### B.    Lack of Mutual Assent

The Savings Clause of the FAA allows for arbitration agreements to be voided based on contract formation defenses such as lack of mutual assent. See 9 U.S.C. §2. The entire contract, and specifically the arbitration provision, as well as the delegation provision, of the CAA are void and voidable because there was no mutual assent as to the scope of the arbitration agreement.

Plaintiffs incorporate by reference the arguments that apply to the entire contract, as outlined above. These arguments are applicable specifically to the arbitration agreement.

"Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir. 2003) (quoting *AT & T Techs.*, 475 U.S. at 648) (internal quotations omitted). In order to have a valid arbitration provision, parties must consent to the subject-matter. To defeat this defense, Wells Fargo must admit that it intended for the Consumer Account Agreement to allow Wells Fargo to engage in illegal activity. Wells Fargo must then also find some proof to show that the consumer also knew of, and consented to the contract for identity theft.

Plaintiffs state in their declarations that they were unaware that Wells Fargo would either engage in the activity it did, or that the illegal conduct would be required to be arbitrated. There was no meeting of the minds, no mutual assent, and therefore, no valid arbitration agreement.

Plaintiffs never intended that an arbitration agreement for a single account with Defendant would open the door for Defendant to engage in identity theft. Wells Fargo's intentions are a mystery. In order for mutual assent, both parties have to consent to the subject-matter. Wells Fargo has not made any claims that the consumer and Wells Fargo both intended to enter into a contract to allow Wells Fargo to steal people's identities.

**C.     Unconscionability**

24

The Savings Clause of the FAA allows for arbitration agreements to be voided based on contract formation defenses such as unconscionability. *See* 9 U.S.C. § 2. The entire contract, and specifically the arbitration provision, as well as the delegation provision, of the CAA are void and voidable because it was unconscionable.

Plaintiffs incorporate by reference the arguments that apply to the entire contract, as outlined above. These arguments are applicable specifically to the arbitration agreement.

Similar to the plaintiffs in *Lee v. Intelius Inc.*, the Plaintiffs in this case are unfairly surprised. 737 F.3d 1254 (9th Cir. 2013). Even the most careful and suspicious consumer could not read "you agree to arbitrate disputes" to mean "we will force you to arbitrate our criminal activity."

Wells Fargo's unconscionable actions toward Plaintiffs as to the entire contract also apply specifically to the arbitration agreement. No honest man would force arbitration for illegal conduct, and no man in his right mind would agree to that.

Additionally, Wells Fargo was the stronger party and deceptively concealed that it would engage in illegal conduct and that the illegal conduct would be subject to arbitration.

### D.        Mistake

The Savings Clause of the FAA allows for arbitration agreements to be voided based on contract formation defenses such as mistake. *See* 9 U.S.C. § 2. The entire contract, and specifically the arbitration provision, as well as the delegation provision, of the CAA are void and voidable because of mistake.

Plaintiffs incorporate by reference the arguments that apply to the entire contract, as outlined above. These arguments are applicable specifically to the arbitration agreement.

25

Plaintiffs were mistaken as to the scope of the arbitration agreement before they signed any CAA. One of the basic assumptions of Plaintiffs was that Wells Fargo would not commit fraud and identity theft. Another basic assumption was that activities outside the scope of the arbitration agreement would not be arbitrated.  The scope of the arbitration is material in this case because it affects the rights of both parties.  Additionally, if Wells Fargo knew that these kinds of illegal actions were intended to be covered by the CAA, then it had a duty to explain to consumers that when they signed up for a checking account the client was intending intentional, illegal actions by Wells Fargo with no judicial remedy.

### E.    Misrepresentation

The Savings Clause of the FAA allows for arbitration agreements to be voided based on contract formation defenses such as misrepresentation.  *See* 9 U.S.C. § 2. The entire contract, and specifically the arbitration provision, as well as the delegation provision, of the CAA are void and voidable because of Wells Fargo's misrepresentations.

Plaintiffs incorporate by reference the arguments that apply to the entire contract, as outlined above. These arguments are applicable specifically to the arbitration agreement.

Defendants made a misrepresentation by first, failing to make known that it intended to commit fraud and identity theft, and second, that the fraud and identity theft would be  governed by the arbitration agreement. Class members were induced into assent based on this material misrepresentation. But for the lack of Wells Fargo neglecting to mention that criminal activity was governed by an arbitration agreement, class members would not have agreed to the CAA.

### F.    Illegality

The Savings Clause of the FAA allows for arbitration agreements to be voided based on contract formation defenses such as illegality.  *See* 9 U.S.C. § 2. The entire contract, and

specifically the arbitration provision, as well as the delegation provision, of the CAA are void and voidable because of illegality.

Plaintiffs incorporate by reference the arguments that apply to the entire contract, as outlined above. These arguments are applicable specifically to the arbitration agreement.

The general rule surrounding illegality is that that "every contract in violation of law is void," *Castleglen, Inc., v. Resolution Trust Corp.*, 984 F.2d 1571, 1582 (10th Cir. 1993) (quoting *Baker v. Latses*, 60 Utah 38, 141, 206 P. 553, 555 (1922)).

There is an underlying issue of illegality in this arbitration agreement. First, according to Wells Fargo, the arbitration agreement is specifically tailored to include illegal actions. This would be a contract for illegal actions, and would be void. Second, Federal Law preempts Wells Fargo's CAA and the AAA rules. It is illegal to make a contract that attempts to supersede Federal Law.

Each of the mentioned contract defenses apply to void the arbitration agreement or make the arbitration agreement voidable. Specifically, the delegation provision is void or voidable on account of each of the formation defenses.

## VI. The Delegation Provision is Void or Voidable

In addition to attacking the arbitration clause as a whole, Plaintiffs specifically contend that the Delegation provision of the arbitration agreement is unenforceable. The FAA states "If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. The making of the delegation provision of the arbitration agreement is specifically in issue in this case. *See* Ex. C- Declarations.

### A.      Fraudulent Inducement

The savings clause of the FAA allows for arbitration agreements (and must, by necessity allow for delegation clauses) to be voided for "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The contract formation defenses anticipated by the savings clause specifically applies to the delegation provision of the CAA.

The text the arbitration agreement anticipates that portions of the arbitration agreement may be unenforceable: "If any of the provision of this arbitration agreement dealing with class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, that invalid provision shall not be severable and this entire arbitration agreement shall be unenforceable." Page 4, Wells Fargo Consumer Account Agreement - Effective April 1, 2013.

As previously explained, the entire arbitration agreement is unenforceable. Additionally, Plaintiffs specifically contend that the delegation provision is unenforceable. According to the terms of the arbitration agreement, if this Court finds a single reason that the delegation clause is unenforceable, the entire arbitration agreement is unenforceable.

Defendants attempt to convince this Court that Plaintiffs do not allege that the delegation clause is void, and therefore it must be enforced.  Plaintiffs have asserted to counsel, and in signed declarations, that they would never have agreed to a delegation provision to an arbitrator regarding disputes with Wells Fargo, and would never had signed such an agreement had Wells Fargo ever informed them of its unethical criminal identity theft of consumer account information. Furthermore, Plaintiffs specifically state that they believe they were fraudulently induced into signing any agreement (including any agreement relating to a delegation provision) with Wells Fargo. *See* Ex. C- Declarations.

Plaintiffs state with no uncertain terms that they were fraudulently induced into the contract, the same contract with the alleged delegation clause.  It is nonsense to state that an individual can be fraudulently induced into signing a contract, but have consented to delegate the question of arbitrability to a third party.  No person absent being under a sense of delusion, would agree to delegate the issue of whether a contract was void if they had been fraudulently induced into the contract. Plaintiffs would not have taken the risk if Defendants would have indicated that they were actively creating false accounts at the time, and that by agreeing to open a real account, that any fraudulent accounts would be governed by the delegation provision. No sane person would have taken that risk.

### B.      Lack of Mutual Assent

The Savings Clause of the FAA allows for arbitration agreements to be voided based on contract formation defenses such as lack of mutual assent.  *See* 9 U.S.C. § 2. The delegation provision of the CAA is void and voidable because there was no mutual assent as to the scope of the arbitration agreement.

Plaintiffs incorporate by reference the arguments that apply to the entire contract, and to the arbitration agreement as outlined above. These arguments are applicable specifically to the delegation provision.

"Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir. 2003) (quoting *AT & T Techs.*, 475 U.S. at 648) (internal quotations omitted). In order to have a valid delegation provision, parties must consent to the subject-matter.  To defeat this defense, Wells Fargo must admit that it intended for the Consumer Account Agreement to allow

Wells Fargo to engage in illegal activity. Wells Fargo must then also find some proof to show that the consumer also knew of, and consented to the contract for identity theft.

Plaintiffs state in their declarations that they were unaware that Wells Fargo would either engage in the activity it did, or that the illegal conduct would be required to be arbitrated. There was no meeting of the minds, no mutual assent, and therefore, no valid arbitration agreement.

Plaintiffs never intended that an arbitration agreement for a single account with Defendants would open the door for Defendants to engage in wholesale identity theft. Wells Fargo's intentions are a mystery. In order for mutual assent, both parties have to consent to the subject-matter. Wells Fargo has not made any claims that the consumer and Wells Fargo both intended to enter into a contract to allow Wells Fargo to steal people's identities.

The FAA allows for arbitration agreements to be voided for "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Lack of mutual assent is one of such grounds. "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir. 2003) (quoting *AT & T Techs.*, 475 U.S. at 648) (internal quotations omitted). The delegation provision of the arbitration agreement is void under the FAA because there was never mutual assent.

Plaintiffs did not agree to delegate the question of whether criminal activities are governed by the arbitration clause to an arbiter.  Such a suggestion is so far out of the context of anything imagined by either party that it approaches absurdity.

## C.   Unconscionability

Plaintiffs incorporate by reference the arguments that apply to the entire contract and the arbitration agreement, as outlined above. These arguments are applicable specifically to the delegation provision. .

Similar to the plaintiffs in *Lee v. Intelius Inc.*, 737 F.3d 1254 (9th Cir. 2013)  the Plaintiffs in this case are unfairly surprised. Even the most careful and suspicious consumer could not read "you agree to arbitrate disputes" to mean "we will force you to arbitrate our criminal activity."

Wells Fargo's unconscionable actions toward Plaintiffs as to the entire contract also apply specifically to the arbitration agreement. No honest man would force arbitration for illegal conduct, and no man in his right mind would agree to that.

Additionally, Wells Fargo was the stronger party and deceptively concealed that it would engage in illegal conduct and that the illegal conduct would be subject to the delegation provision.

**D.      Mistake**

The Savings Clause of the FAA allows for arbitration agreements to be voided based on contract formation defenses such as mistake.  *See* 9 U.S.C. § 2. The entire contract, and specifically the delegation provision of the CAA are void and voidable because of mistake.

Plaintiffs incorporate by reference the arguments that apply to the entire contract and the arbitration agreement, as outlined above. These arguments are applicable specifically to the delegation provision.

Plaintiffs were mistaken as to the scope of the delegation provision before they signed any CAA. One of the basic assumptions of Plaintiffs was that Wells Fargo would not commit fraud and identity theft. Another basic assumption was that activities outside the scope of the

delegation provision would not be arbitrated.  The scope of the delegation provision is material

in this case because it affects the rights of both parties.  Additionally, if Wells Fargo knew that

these kinds of illegal actions were intended to be covered by the delegation provision, then it had

a duty to explain to consumers that when they signed up for a checking account the client was

intending intentional, illegal actions by Wells Fargo with no judicial remedy.

> ### E.    Misrepresentation

The Savings Clause of the FAA allows for arbitration agreements to be voided based on

contract formation defenses such as misrepresentation.  See 9 U.S.C. §2. The entire contract, and

specifically the arbitration provision, as well as the delegation provision, of the CAA are void

and voidable because of Wells Fargo's misrepresentations.

Plaintiffs incorporate by reference the arguments that apply to the entire contract and the

arbitration agreement, as outlined above. These arguments are applicable specifically to the

delegation provision.

Defendant made a misrepresentation by first, failing to make known that it intended to

commit fraud and identity theft, and second, that the fraud and identity theft would be governed

by the delegation provision. Class members were induced into assent based on this material

misrepresentation. But for the lack of Wells Fargo neglecting to mention that criminal activity

was governed by an arbitration agreement, class members would not have agreed to the

delegation provision, the arbitration agreement, or any part of the CAA.

Further, Wells Fargo misrepresented the scope of the delegation provision by stating

that the delegation provision would apply only to the account Plaintiffs were attempting to

open.  Wells Fargo's CAA notes "Except where otherwise expressly noted, this Agreement

*governs only your consumer deposit accounts and deposit services…*" Wells Fargo Consumer

Account Agreement and Safe Deposit Box Lease Terms, (2003) p. 5. Wells Fargo now seeks to apply the CAA from one account to another, which is a material misrepresentation that voids the delegation provision. Plaintiffs would not have agreed to delegate if they would have known the delegation provision applied to other accounts, in contrast to the language of the CAA itself.

### F.    Illegality

The Savings Clause of the FAA allows for arbitration agreements to be voided based on contract formation defenses such as illegality.  *See* 9 U.S.C. § 2. The entire contract, and specifically the arbitration provision, as well as the delegation provision, of the CAA are void and voidable because of illegality.

Plaintiffs incorporate by reference the arguments that apply to the entire contract, as outlined above. These arguments are applicable specifically to the delegation provision.

The general rule surrounding illegality is that that "every contract in violation of law is void." *Castleglen, Inc., v. Resolution Trust Corp.*, 984 F.2d 1571, 1582 (10th Cir. 1993) (quoting *Baker v. Latses*, 60 Utah 38, 141, 206 P. 553, 555 (1922)).

There is an underlying issue of illegality in the delegation provision. First, according to Wells Fargo, the arbitration agreement is specifically tailored to include illegal actions. This would be a contract delegate illegal actions to arbitrate, and would be void. Second, Federal Law preempts Wells Fargo's CAA and the AAA rules. It is illegal to make a contract that attempts to supersede Federal Law.

Each of the mentioned contract defenses apply to void the delegation provision of arbitration agreement or makes the delegation provision of the arbitration agreement voidable.

Specifically, the delegation provision is void or voidable on account of each of the formation defenses.

**VII. The Parties did not Agree to Arbitrate The Disputes in This Case**

A court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)(emphasis original).  The Court would have to find that the Plaintiffs and Wells Fargo "clearly and unmistakably" agreed to arbitrate the kinds of disputes found in this case. *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649 (1986)("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

This Court has the ability to decide if the Parties clearly and unmistakably intended for Wells Fargo's criminal activities to be arbitrated. If the Court finds the Parties did not intend to arbitrate criminal activity, the Court may make a decision as to validity of the arbitration agreement. *Id.*; *Granite Rock Co.*, 561 US at 297.

First, Plaintiffs produce evidence in the form of declarations to show that this material fact is disputed. Plaintiffs state that they never would have agreed to a delegation provision regarding disputes with Wells Fargo if they would have known that the provision included identity theft.

Wells Fargo has provided no evidence to show that the Parties actually intended to arbitrate criminal activity. It is outlandish to suppose the Parties would intend for the criminal activities to be arbitrated if one party commits criminal activity against the other party.

Wells Fargo certainly cannot be arguing that if a customer robs the bank at gunpoint, the teller cannot dial 911, but rather can only call the arbitrator to rush to the rescue. Wells Fargo

34

certainly cannot be arguing that a contract, arbitration agreement, or delegation provision covers a situation if a Wells Fargo teller intentionally runs over a customer in the parking lot. It is ludicrous for Wells Fargo to make the argument that an arbitration agreement covers robbery, or attempted vehicular manslaughter. It is just as ludicrous for Wells Fargo to claim that the Parties actually intended for identity theft to be covered by an arbitration agreement.

Second, Parties cannot be required to arbitrate disputes they have not agreed to submit to arbitration. *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) ("For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

Unforeseeable and outrageous torts or criminal activity do not fall within the reasonable expectations of consumers who sign normal arbitration clauses that apply to claims arising from or relating to a contract. *See Chassereau v. Global-Sun Pools, Inc.* 644 S.E.2d 718 (S.C. 2007). Claims for fraud, breach of warranty, and negligent supervision, arising from alleged misuse of a consumer's personal information, are not subject to an arbitration clause. See *Roger-Dabbs Chevrolet-Hummer, Inc. v. Blakeney*, 950 So.2d 170, 177 (Miss. 2007)("While Blakeney no doubt agreed to arbitrate claims that originated from the sale of the vehicle or related to the sale of the vehicle, no reasonable person would agree to submit to arbitration any claims concerning a Hummer to which he would never receive a title; a scheme of using his name to forge vehicle titles and bills of sale to sell stolen vehicles; and the commission of civil fraud against him.").

Wells Fargo claims that its illegal conduct constitutes an unresolved disagreement, which "fall well within any plausible interpretation of [the arbitration agreement] provisions".  Motion to Compel Arbitration at p. 19, ECF No. 88.  If Wells Fargo's actions were within a plausible interpretation of the CAA, its actions would not be a scandal. If Wells Fargo's actions were

within a plausible interpretation of the contact, Congress would not have to have multiple hearings on the issue.  If Wells Fargo's actions were within a plausible interpretation of the contact, they would not have a new CEO. If Wells Fargo's actions were within a plausible interpretation of the contact, Wells Fargo would not be entering into multi-million dollar settlements to make the problem go away. If Wells Fargo's actions were within a plausible interpretation of the contact, Wells Fargo would not have to work to re-earn the trust of its customers. It is not within a plausible interpretation when reading the CAA that "unauthorized transactions" would be ones *initiated* by the bank. Rather, a *plausible* interpretation is that "unauthorized transactions" was intended to relate to those performed by third parties.

Parties must agree, "clearly and unmistakably," to arbitrate a dispute. *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 649. The interpretation is governed by standard contract analysis. See e.g. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 624, 105 S. Ct. 3346, 3352 (1985)(describing arbitration agreement  the analysis as "a matter of standard contract interpretation").

Utah contract analysis shows that the Parties did not intend to arbitrate the dispute, or have a delegation provision apply to this dispute.

Under Utah law, Courts first look to the contract's plain language to determine the parties' intent. *Nolin v. S & S Const., Inc.*, 2013 UT App 94, ¶ 12, 301 P.3d 1026, 1029. "A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 64, 266 P.3d 671, 687 (quotation marks and citation omitted). Courts follow a two-step process to resolve ambiguous language in contracts: first courts "seek to resolve the ambiguity by looking to extrinsic evidence

36

of the parties' intent. If extrinsic evidence does not resolve the ambiguity and uncertainty remains, only then will [courts] resolve the ambiguity against the drafter." *Burkett v. Convergys Corp.*, No. 2:14-cv-376-EJF, 2015 U.S. Dist. LEXIS 96781, at *22-23 (D. Utah July 23, 2015) (quoting *Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 64, 266 P.3d 671, 687(citations and footnotes omitted)).

Here, the parties' intent was to engage in a banking relationship. Parties did not clearly and unmistakably agree to arbitrate criminal activity such as fraud or identity theft. If consumers actually clearly and unmistakably agreed to arbitrate Wells Fargo's illegal activity, Wells Fargo would not have to fire its CEO, Congressional hearings would not be necessary, and Wells Fargo would not have to spend millions on campaigns in attempt to regain the trust of consumers. If this issue is not clear to a legal conclusion for the Court, there is a factual dispute as to the actual intent of the parties, and more information would be required to adequately address this issue.

The word "any" is limited to banking-related disputes. The CAA, by its very title, indicates that the document is intended to limit the agreement to the Consumer Account, not to criminal activity.

Further, the arbitration agreement enumerates the kinds of disputes are covered by the arbitration agreement. Wells Fargo defined what constitutes "dispute" as "any unresolved agreement between or among you and us . . .  including claims based on broken promises or contracts, torts . . . or other wrongful action . . . as well as all "statutory, common law, and equitable claims."  The contract includes clearly does not include criminal activities.

The incorporation of the AAA agreements does not save Wells Fargo's grasp at straws. The AAA rules do not supersede Federal Law. Federal Law regarding arbitration states: "If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial

37

thereof." 9 U.S.C. § 4. The making of the delegation provision of the  arbitration agreement is specifically in issue in this case.

## VIII. The Fraudulent Accounts are Not Governed by the Arbitration Agreement

The final reason Wells Fargo's Motion fails is because the new, fraudulent accounts are not governed by prior account agreements. Defendants' Counsel admits this point. "Each time a Wells Fargo customer opens a new account, he or she receives a Consumer Account Agreement ("CAA"), which provides the terms that govern the account." (Defendants Motion to Compel Arbitration, at . 151, 158, ECF No. 88). Defendants' counsel admits that the fraudulent accounts are not subject to the contract, arbitration agreement, or delegation provision of the original CAA agreements because they are separate accounts, which would have to be governed by a separate account contract. Further, the alleged contracts clarify that the CAA does not cover any other accounts: "Except where otherwise expressly noted, this Agreement *governs only your consumer deposit accounts and deposit services;* it does not govern, for example, credit accounts or credit-related services." Wells Fargo Consumer Account Agreement and Safe Deposit Box Lease Terms, (2003) p. 5.

Defendants' counsel's admissions and the CAA itself follow common sense. A checking account agreement does not govern a savings account. A money market account agreement does not govern a checking account. Each account opened, whether legitimate or not, must be governed by its own individual account agreement.  It is Wells Fargo's course of dealing and is industry practice to have each separate account governed by a separate account agreement. Wells Fargo cannot reasonably claim that a new, fraudulent account is governed by a prior account agreement because new accounts are never governed by prior agreements. The new, fraudulent accounts would have to have their own account agreements, governed by a separate contract.

In order for this to be untrue, Wells Fargo would have to claim that a single contract allows either party to open as many kinds and sorts of accounts that they want unilaterally. Wells Fargo's business practices show that this never is appropriate. Each account is always governed by a new, separate contract.

Wells Fargo cannot enforce the provisions of a previous contract on a new, unrelated matter. That is not how contracts work. The new, fraudulent accounts would need to be governed by a new contract. No contract for the fraudulent accounts ever existed, and that is precisely why the case is before the Court.

## CONCLUSION

Based upon the arguments presented, the Court should deny Defendants' Renewed Motion to Compel Arbitration. Defendants have waived the right to enforce arbitration. Defendants have admitted to the facts upon which Plaintiffs oppose the Defendants Renewed Motion. Even if the Court cannot deny the Motion on its face, the Court must deny the Motion because there are genuine disputes as to material facts regarding the formation of any agreements between the Parties.  Further, the Parties never agreed to arbitrate the disputes at issue in this case, much less "clearly and unmistakably" doing so. Finally, Wells Fargo admits that one account is governed by its own, unique contract. Any contract for a valid account cannot be used in the context of a fraudulent account.

Wells Fargo does not seek to enforce arbitration on two Plaintiffs, Matthew Gragg and Tracy Kilgore. The entire Motion should be denied as to all Plaintiffs, but even if the Court grants the Motion to the majority of Plaintiffs, the Motion cannot be granted as to Mr. Gragg and Ms. Kilgore.

Therefore, Plaintiffs respectfully request that the Court DENY Defendants Renewed Motion to Compel Arbitration.

Respectfully submitted this 9th day of October 2017

/s/ Steven A. Christensen
Steven A. Christensen
Christensen Young & Associates, PLLC
9980 South 300 West, Suite 200
Sandy, UT 84070

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of October, 2017, a true and correct copy of the foregoing Plaintiff's Objection to Defendants Renewed Motion to Compel Arbitration, was filed using CM/ECF which sent notification of the filing to the following:

David H. Fry
Erin J. Cox
Eric P. Tuttle
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071

James S. Jardine
Elaina M. Maragakis
Michael D. Mayfield
Ray Quinney & Nebekker
36 South State Street, Suite 1400
Salt Lake City, UT 84145

/s/ Steven A. Christensen            .
Steven A. Christensen