| | |
|---|---|
| LAWRENCE J. MITCHELL, *et al.*,<br><br>  Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, *et al.*,<br><br>  Defendants. | **MEMORANDUM DECISION AND ORDER RESERVING RULING ON DEFENDANTS' MOTION TO COMPEL ARBITRATION PENDING A SUMMARY TRIAL**<br><br>Case 2:16-cv-00966-CW-DBP<br><br>Judge Clark Waddoups<br>Magistrate Judge Dustin B. Pead |

Sixty-seven plaintiffs[1] have sued Wells Fargo Bank, N.A. and Wells Fargo & Company ("Wells Fargo") for engaging in various unauthorized and fraudulent activities using their personal information. (*See* ECF No. 69 (Third Am. Compl. [hereinafter "TAC"]).) Plaintiffs purport to represent a class of individuals who opened accounts with or purchased services from Wells Fargo, or a bank later acquired by Wells Fargo, and/or were notified that Wells Fargo had opened an account or service on their behalf without their knowledge or consent, and who thereby suffered damages from the unauthorized and fraudulent activities. (TAC ¶¶ 24, 582.)

Wells Fargo has moved to compel all but two of the Plaintiffs to arbitrate their claims pursuant to arbitration agreements embedded in the Plaintiffs' authorized account agreements or other agreements. (*See generally* ECF No. 88 ("Mot").)[2]

---

[1] Originally, eighty plaintiffs were named in this action. Over the course of the proceedings, thirteen plaintiffs have filed voluntary dismissals or been removed from amended pleadings. (*See* ECF Nos. 69, 81, 83, 84, 85.)

[2] Wells Fargo has not moved to compel Plaintiff Matthew Gragg or Tracy Kilgore to arbitration at this time. (*See* Mot. at cv; Opp'n at lxxvii-iii, ECF No. 103.)

For the reasons discussed below, the court **RESERVES** ruling on Wells Fargo's Motion to Compel, (ECF No. 88). Material questions of fact preclude the court from finding, as a matter law, that (1) certain Plaintiffs have formed agreements to arbitrate with Wells Fargo; (2) the remaining Plaintiffs have formed valid agreements to delegate all threshold questions to an arbitrator; and (3) Wells Fargo has not intentionally waived its right to seek arbitration in the circumstances. As further elaborated below, the court must proceed to a summary trial under the Federal Arbitration Act (FAA or Act) to resolve these factual disputes. *See Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 984 (10th Cir. 2014) (observing that "when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them . . . is by proceeding *summarily* to trial").

## BACKGROUND

### A. Wells Fargo's Unauthorized Accounts Scandal

In September 2016, news broke that Wells Fargo had entered into a consent order including penalties of $185 million with three governmental agencies, after investigations revealed that Wells Fargo had opened millions of unauthorized accounts and products without consumer knowledge. (*See* TAC ¶ 66 & Ex. 1, p. 5; Consent Order, Consumer Fin. Prot. Bureau (CFPB), 2016-CFPB-0015 (Sept. 8, 2016).)[3] An independent review going back to 2011 "identified approximately 2.1 million potentially unauthorized consumer and small business accounts, including 623,000 consumer and small business unsecured credit card accounts."

---

[3] The CFPB determined that Wells Fargo had "engaged in the following acts and practices: (1) opened unauthorized deposit accounts for existing customers and transferred funds to those accounts from their owners' other accounts, all without their customers' knowledge or consent; (2) submitted applications for credit cards in consumers' names using consumers' information without their knowledge or consent; (3) enrolled consumers in online banking services that they did not request; and (4) ordered and activated debit cards using consumers' information without their knowledge or consent." Consent Order at 1. Wells Fargo stipulated to entry of the Consent Order without admitting or denying the CFPB's findings and conclusions. *Id.* at 2.

Wells Fargo Form 10-Q, Quarterly Report for period ending September 30, 2016, p. 3 (hereinafter, "Form 10-Q").[4] Wells Fargo's CEO at the time, John Stumpf, was called to testify before the U.S. Senate Banking Committee regarding the misconduct, and he acknowledged the opening of unauthorized accounts and widespread misconduct in sales practices. *See* U.S. Senate Comm. on Banking, Hous., & Urban Affairs, "An Examination of Wells Fargo's Unauthorized Accounts and the Regulatory Response" (Sept. 20, 2016)[5]; *see also* Form 10-Q at 3, 67, 121 (acknowledging investigations by and settlements with government agencies and numerous lawsuits related to wrongdoing in sales practices).

Investigations have concluded that sales practice violations were widespread and recognized within the company for many years. A report commissioned by Wells Fargo's Board of Directors noted that internal departments first noticed an increase in sales practice violations in 2002. Independent Directors of the Board of Wells Fargo & Co., *Sales Practices Investigation Report*, pp. 31, 88-90 (April 10, 2017) (ECF No. 69-5 [hereinafter *Sales Practices Report*]).[6] In 2004, a sales integrity taskforce, including representatives in Wells Fargo's Community Bank, Internal Investigations, and Law Department, produced a report finding that employees could not meet the bank's aggressive sales goals without cheating or gaming the system. *Id.* at 89. The taskforce recommended eliminating sales goals for employees, and the report was relayed to senior Wells Fargo management, but no action appears to have been taken at the time. *Id.* at 31, 89-90. The Board's report noted an "array of misconduct" continued to occur, including issues with "customer consent, generally employees opening unauthorized personal checking or

---

[4] The Form 10-Q is available at: https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2016/third-quarter-10q.pdf (last accessed November 20, 2017).
[5] This hearing testimony is available at: https://www.banking.senate.gov/public/index.cfm/2016/9/an-examination-of-wells-fargo-s-unauthorized-accounts-and-the-regulatory-response.
[6] The report is available at: https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/board-report.pdf (last accessed November 20, 2017).

savings accounts for existing customers; falsification of bank records, generally falsifying customer identification or contact information or forging customer signatures; funding manipulation, generally employees funding an account held by a customer with their own money or money from another account held by that customer; and the creation of unnecessary accounts, generally employees opening accounts which served no customer financial need . . . ." *Id.* at 36. The report found that "sales integrity issues reflected a systemic breakdown in Wells Fargo's culture and values and an ongoing failure to correct the widespread breaches of trust in the misuse of customers' personal data and financial information." *Id.* at 78. Sales practice violations continued and increased through at least 2013, after which more attention was brought to the issue and violations apparently declined. *Id.* at 6.[7] Wells Fargo finally eliminated sales goals in October 2016, after the announcement of the Consent Order and attendant penalties. *See* Form 10-Q at 3.

In August 2017, Wells Fargo announced that a third-party review had revealed more potentially unauthorized cases, bringing the total reported unauthorized accounts, credit cards, and other services between 2009 and 2016 to about 3.5 million.[8] On October 3, 2017, Wells Fargo's new CEO, Tim Sloan, testified in front of the Senate Banking Committee about this latest disclosure, as well as Wells Fargo's use of forced mandatory arbitration of these disputes.[9]

---

[7] As the Board report found: "Trends in the data show, perhaps not surprisingly, that as sales goals became harder to achieve, the number of allegations and [employee] terminations increased and the quality of accounts declined. Thus, the number of sales integrity-related allegations and associated terminations and resignations increased relatively steadily from the second quarter of 2007 and both peaked in the fourth quarter of 2013, when a newspaper article brought to light improper sales practices in Los Angeles." *Id.*

[8] Maggie McGrath, *Wells Fargo Admits To More Unauthorized Accounts, Increasing Tally To 3.5 Million*, Forbes (Aug. 31, 2017, 9:55 AM), https://www.forbes.com/sites/maggiemcgrath/ 2017/08/31/wells-fargo-admits-to-more-unauthorized-accounts-increasing-tally-to-3-5-million.

[9] This hearing testimony is available at: https://www.banking.senate.gov/public/index.cfm/2017/ 10/wells-fargo-one-year-later.

*B.  This Action*

On September 16, 2016, in the midst of this public scandal, individuals residing in Utah and many other states filed this action against Wells Fargo. (*See* ECF No. 2.) Plaintiffs have amended their complaint three times, most recently on June 27, 2017. (ECF Nos. 6, 15, 69.) Plaintiffs pursue several legal theories against Wells Fargo, including violations of Utah law protecting privacy and personal information; the Stored Communications Act, 18 U.S.C. § 2702; the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801; the Fair Credit Reporting Act, 15 U.S.C. § 1681; anti-tying violations, 15 U.S.C. § 1972; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68; electronic mail fraud, 18 U.S.C. § 1037; conversion; fraud and misrepresentation; unjust enrichment; intentional/negligent infliction of emotional distress; and declaratory and injunctive relief. (*See* TAC at 1, 94-136.) Plaintiffs seek class certification; an injunction enjoining Wells Fargo from further misconduct; compensatory, statutory, and punitive damages (in excess of one billion dollars ($1,000,000,000.00)); and costs and attorneys' fees. (*See id.* at 136-37.)

On November 23, 2016, Wells Fargo moved to compel arbitration as to fifty-eight of the eighty named Plaintiffs and sought to dismiss the Second Amended Complaint. (ECF Nos. 24 & 30.) In light of the motion to compel, the parties stipulated and moved the court to stay the dismissal arguments and any discovery not connected to the issue of arbitration. (ECF Nos. 36 & 37.) After the parties completed briefing on the motion to compel, the court received notice that the Judicial Panel on Multidistrict Litigation ("JPML") would hear argument on whether to create an MDL action from the several cases filed against Wells Fargo related to fraudulent

account openings.[10] The court stayed the case pending the JPML's decision. (ECF No. 54.)

On April 5, 2017, the JPML determined it would not order centralization due to the nationwide class settlement-in-principle reached by the parties in the first-filed putative class action, *Jabbari v. Wells Fargo Bank, N.A.*, No. 3:15-cv-2159-VC (N.D. Cal., filed May 13, 2015).[11] *See In re Wells Fargo Fraudulent Account Opening Litig.*, ___F. Supp. 3d___, 2017 WL 1283679, at *1 (J.P.M.L. Apr. 5, 2017). Plaintiffs then moved to lift the stay in this case. (ECF No. 55.) On April 13, 2017, the court heard argument from the parties regarding the propriety of lifting the stay in light of the pending *Jabbari* settlement. (*See* ECF Nos. 58, 61.) The court ultimately lifted the stay for the limited purpose of hearing argument on the motion to compel. (ECF No. 60.) On June 7, 2017, the court held a hearing on the motion, during which the court granted Plaintiffs' oral motion to amend their complaint. (ECF No. 67.)

Plaintiffs filed their currently operative Third Amended Complaint on June 27, 2017. (ECF No. 69.) In light of the amended pleading, the court denied Wells Fargo's motions to compel and dismiss without prejudice and set a briefing schedule for refiling. (ECF No. 73.) The

---

[10] The JPML identified ten related actions pending in six federal district courts. (*See* ECF No. 55, p. 6.)

[11] The *Jabbari* plaintiffs filed their action against Wells Fargo in May 2015, well in advance of the CFPB's Consent Order in September 2016, due to local reporting and investigation in California. In September 2015, Judge Vince Chhabria granted Wells Fargo's motion to compel and dismissed the action to arbitration. *See* ECF No. 24-1 (Order Granting Mot. to Compel, *Jabbari*, No. 3:15-cv-2159-VC (N.D. Cal. Sept. 23, 2015), ECF No. 69). Judge Chhabria found plaintiffs Jabbari and Heffelfinger "clearly assigned arbitrability determinations to the arbitrator" by agreeing to arbitration provisions when they opened their bank accounts with Wells Fargo, and that "defendants plausibly assert that the plaintiffs' claims bear some relationship to their banking with Wells Fargo." (*Id.* at 1-2.) The *Jabbari* plaintiffs appealed Judge Chhabria's order to the Ninth Circuit Court of Appeals, but the parties settled while the appeal was pending and the Ninth Circuit dismissed the appeal without prejudice so the parties could seek approval of the settlement. On July 8, 2017, Judge Chhabria preliminarily approved the settlement. *Jabbari*, 2017 WL 5157608, at *1–2 (N.D. Cal. July 8, 2017) (unpublished). The opt-out deadline is currently set for February 19, 2018 and the final fairness hearing is set for March 22, 2018. *See* Order Granting Stipulation & Mot. re Settlement Reserve & Schedule, *Jabbari*, No. 3:15-cv-2159 (N.D. Cal. Oct. 20, 2017), ECF No. 176; *id.* at ECF No. 177 (resetting fairness hearing).

court also facilitated the parties' efforts to identify information about twenty-one named Plaintiffs whom Wells Fargo had not been able to identify, to determine whether these Plaintiffs were also potentially subject to arbitration agreements. (*See* ECF Nos. 76-80.)

On September 18, 2017, Wells Fargo renewed its Motion to Compel Arbitration as to sixty-five out of the sixty-seven Plaintiffs remaining in the case. (*See* ECF No. 88.) The Motion has been fully briefed, (*see* ECF Nos. 103, 109), and the court heard argument on October 31, 2017, (ECF Nos. 111, 112). This order follows.

## LEGAL STANDARD

The FAA was enacted in 1925, and reenacted and codified in 1947. *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 288 (2002). Its core substantive provisions have not been amended since. *See id.*; 9 U.S.C. § 2-4.

Section 2 of the FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision balances the "liberal federal policy favoring arbitration" with the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (first quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); then quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). The Act places arbitration agreements "on equal footing with other contracts," *Waffle House*, 534 U.S. at 293, and courts enforce them on their terms and according to the parties' intentions, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947 (1995), unless invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability," *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

The Supreme Court has consistently emphasized that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options*, 514 U.S. at 943. "[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986) (citing *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 374 (1974)). Thus, "[a]rbitration under the FAA is a matter of consent, not coercion." *Waffle House*, 534 U.S. at 294 (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).

A party may petition a court to compel another party to arbitrate under the terms of their agreement if the court is "satisfied that the making of the agreement for arbitration . . . is not in issue." 9 U.S.C. § 4. But "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." *Id.* As the Tenth Circuit has acknowledged, "before the Act's heavy hand in favor of arbitration swings into play, the parties themselves must *agree* to have their disputes arbitrated," for "even under the FAA it remains a 'fundamental principle' that 'arbitration is a matter of contract,' not something to be foisted on the parties at all costs." *Howard*, 748 F.3d at 977 (quoting *Concepcion*, 563 U.S. at 339); *see Commc'n Workers of Am v. Avaya, Inc*., 693 F.3d 1295, 1300 (10th Cir. 2012) ("Because arbitration is a creature of contract, a party cannot be forced to arbitrate any issue he has not agreed to submit to arbitration.").

Wells Fargo, as the party seeking to compel arbitration, has the burden to show that arbitration agreements exist and apply to these Plaintiffs. *See Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012). The court affords the Plaintiffs, as the party resisting

arbitration, "the benefit of all reasonable doubts and inferences that may arise." *Id.* (quoting

*Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980)). If the

court finds material factual disputes preclude it from determining the arbitration question as a

matter of law, the court must proceed to a summary trial to resolve those disputes of fact.

*Howard*, 748 F.3d at 978.

## THE PLAINTIFFS & ALLEGED AGREEMENTS

Wells Fargo seeks to compel to arbitration Plaintiffs who initially interacted or engaged

with Wells Fargo in varied circumstances. In order to understand which contracts may be

relevant, the court has broken the Plaintiffs into sub-groups by the account type or service

allegedly opened and quotes the relevant language in the agreements associated with these

accounts or services. Because Plaintiffs opened consumer accounts going back to 1982, and up

through 2016, the court has laid out the changes to Wells Fargo's contract language from 2003

(the earliest agreement provided) through 2016.

### A. *Consumer accounts*

Fifty Plaintiffs appear to have opened consumer accounts or services with Wells Fargo

between 1982 and 2016 ("consumer account Plaintiffs").[12] These accounts include checking and

savings accounts (including "out-of-store" or "off-site" accounts), "consumer time accounts,"

credit cards, a "Cash on Demand" account, an IRA account, online banking services, and

mortgage loans.

Between at least 2003 and 2016, consumers who opened a checking and/or savings

account with Wells Fargo signed a Consumer Account Application, which states, in small type

---

[12] Nine other Plaintiffs opened consumer accounts with a different bank that was then acquired
by Wells Fargo. The court breaks out and discusses these Plaintiffs separately below. Though
they have consumer accounts, the interaction between Wells Fargo and these Plaintiffs is
factually distinct and requires a different inquiry.

directly above the signature line or the bottom of the page immediately before:

> I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them . . . . I also agree to the terms of the dispute resolution program described in the account agreement Service Agreement and Product Guide. Under this program our disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge.

(ECF No. 99, Exs. 4-A & 25-A (2007); *see* Exs. 29-A & 56-A (2003) (includes substantially the same language, and the last two lines are bolded), 33-A (2016) (includes substantially the same language, but also notes that the applicable account agreement and privacy brochure "may be amended from time to time," and the first and third lines are bolded).)[13]

Wells Fargo represents that the "applicable account agreement" mentioned in the application is the Consumer Account Agreement (CAA) that each consumer receives when opening a new account or service. Wells Fargo submitted the declaration of Karen Nelson, a Vice President of Wells Fargo and Operational Risk Consultant, attesting to Wells Fargo's recording-keeping policies and common business practices around account openings, conversions, and other transactions. (*See* Nelson Decl. ¶¶ 1, 4-5, ECF No. 90.) As to the CAAs, Ms. Nelson avers:

> According to the Bank's standard operating procedure, the Consumer Account Agreement was included as a part of a package called the 'New Account Kit' that was physically handed to the customer, or mailed to him or her, when the account is opened. The customer is also provided a document titled Consumer Account Addenda that reflects any changes since the packaging of the New Account Kit. The operative Consumer Account Agreement is available upon request at any banking location and, since 1999, has been available on Wells Fargo's website, located at https://www.wellsfargo.com/.

(*Id.* ¶ 7.) Wells Fargo notes that the CAAs have been amended from time to time, but contends

---

[13] Wells Fargo did not produce signed Consumer Account Applications for accounts opened with the bank prior to 2003, such as those of Carina Rhea (1999) or David Self (1996). (*See* Nelson Decl., Exs. 44 & 45.)

that the dispute resolution provisions within the CAAs have "remained materially unchanged." (Mot. at ¶ 151; *see* Nelson Decl., Exs. 1-A to 1-N (CAAs from 2003 to 2016).) After reviewing the CAAs, however, the court finds that Wells Fargo has noticeably broadened the dispute resolution language over this time. Thus, the court first presents the language starting in 2003, which noticeably changed in 2011, and changed again in 2016.

In April 1, 2003, the first section of the CAA was entitled "Terms for All Consumer Deposit Accounts." This introductory section stated, in relevant part:

> **Together, these terms and conditions form a binding contract and make up the entire agreement between you and us regarding your deposit account ("Agreement"), and supercede** [sic] **all prior agreements governing your account.** . . .
>
> **Please note: The Agreement contains the terms of the dispute resolution program to be followed in the event of a dispute between you and the bank (see below). Please read them carefully. Under this program, at the request of you or the bank, disputes must be resolved by an arbitration proceeding before a neutral arbitrator. If arbitration is requested, you do not have the right to a jury or court trial to resolve the dispute.** . . .
>
> Except where otherwise expressly noted, this Agreement governs only your consumer deposit accounts and deposit services; it does not govern, for example credit accounts or credit-related services.

(Nelson Decl., Ex. 1-A, pp. 4-5 (bold in original).) The dispute resolution section followed this initial section and provided, in relevant part:

> **Non-Judicial Resolution of Disputes**
> . . . [I]f you and the bank are not able to resolve the differences informally, you agree, by opening or maintaining a deposit account with the bank or by accepting a service from us described in this Agreement, such as our Safe Deposit Box service, that any dispute between you and the bank, regardless of when it arose, shall be resolved using the following procedures.
>
> **You understand and agree that you and the bank are each waiving the right to a jury trial or a trial before a judge in a public court.**

**Disputes**

A dispute is any unresolved disagreement between you and the bank relating in any way to accounts or services described in this Agreement . . . . It includes any claim that arises out of, or is related to, these accounts, services or related agreements. It includes claims based on broken promises or contracts, torts (injuries caused by negligent or intentional conduct) or other wrongful actions. It also includes statutory, common law and equitable claims. A dispute also includes any disagreement about the meaning of this Arbitration Agreement, and whether a disagreement is a "dispute" subject to binding arbitration as provided for in this Arbitration Agreement.

(*Id.* at 5-6 (bold in original).) The October 2004 through October 2011 CAAs contained substantially the same language, with stylistic updates in 2008. (*See id.* Exs. 1-B, p. 8-9 (2004); 1-F, p. 4 (2008; simplified layout).)[14] The 2004 CAA removed the language in the prior version stating that the agreement only governed the consumer's deposit accounts and services, rather than credit accounts or services.

The CAA effective October 15, 2011 appears to have both simplified and broadened the definition of "disputes" in the dispute resolution section:

**Binding arbitration**

If you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process as set forth in this part. A "dispute" is any unresolved disagreement between you and the Bank. It includes any disagreement relating in any way to *services*, accounts or matters; . . . . It includes claims based on broken promises or contracts, torts, or other wrongful actions. It also includes statutory, common law, and equitable claims.

"Disputes" include disagreements about the meaning, application or enforceability of this arbitration agreement. . . . **YOU AGREE THAT YOU**

---

[14] The 2004-2010 CAAs defined "disputes" as follows: "**Disputes.** A dispute is any unresolved disagreement between or among you and the Bank (and its employees officers, directors, attorneys, and other agents), arising out of or relating in any way to your Account and/or Services. It includes any dispute relating in any way to your Accounts and Services; . . . A dispute also includes any disagreement about the meaning of this Arbitration Agreement, and whether a disagreement is a "dispute" subject to binding arbitration as provided for in this Arbitration Agreement. **A dispute does not include a claim that may be filed in small claims court.** . . . ." (*Id.* at 1-B, p. 8-9 (bold in original).)

**AND THE BANK ARE WAIVING THE RIGHT TO A JURY TRIAL OR TRIAL BEFORE A JUDGE IN A PUBLIC COURT.**

(*Id.* Ex. 1-I, p. 4 (emphasis in original).) Further down the page, in the section entitled "Arbitration procedure; severability," the 2011 CAA states, in relevant part: "The parties agree that in this relationship: . . . (2) The arbitrator shall decide any dispute regarding the enforceability of this arbitration agreement; . . . ." (*Id.*) This dispute resolution section remained unchanged until the July 15, 2015 update.

The July 2015 and April 2016 CAAs reflect the most simplified dispute resolution section yet. First, as in prior CAAs, an introductory section presents generally applicable terms and definitions for "your account and any services." (*Id.* Ex. 1-N, p. 2.) The next section, entitled "Resolving disputes through arbitration," states:

> **Arbitration Agreement between you and Wells Fargo**
>
> If you have a dispute, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.
>
> **Definition:** . . . A "dispute" is any unresolved disagreement between Wells Fargo and you. A "dispute" may also include a disagreement about this Arbitration Agreement's meaning, application or enforcement.
>
> **Wells Fargo and you each agrees** [sic] **to waive the right to a jury trial or a trial in front of a judge in a public court.**

(*Id.* Exs. 1-M & 1-N, p. 3.) Further down the page the agreement has a bullet pointed section entitled "What rules apply to arbitration?" that states: "If this Arbitration Agreement is in dispute, the arbitrator will decide whether it is enforceable." (*Id.*)

Every CAA from 2003 to 2016 contains a waiver of class action arbitration; mandated non-disclosure of arbitration proceedings; a provision shifting the costs and expenses associated with compelling arbitration to the party resisting it; and a statement that the arbitration

proceedings will be governed by the American Arbitration Association (AAA) rules, to the extent they do not conflict with the terms of the Arbitration Agreement. (*See id.* Exs. 1-A, pp. 5-7 (2003); 1-N, pp. 3-4 (2016).) The 2016 CAA also states: "If a service we offer has a separate agreement, and there is a conflict between the terms of the Agreement and the separate agreement, the separate agreement will apply." (*Id.* Ex. 1-N, p. 5.)

Although Wells Fargo connects each consumer account to the relevant CAA in effect at that time (i.e., a checking account opened before November 1, 2007 would have been subject to the October 2006 CAA), Wells Fargo ultimately contends that the operative CAA for this analysis is the April 2016 CAA (assuming all consumer account Plaintiffs have authorized accounts that remain open in 2016). Wells Fargo bases this conclusion on other provisions in the CAAs. The CAAs each contain a (unilateral) modification clause, stating that Wells Fargo "can change the Agreement by adding new terms or conditions, or by modifying or deleting existing ones" at any time and with no strict requirement of notice,[15] and a merger clause, stating that the most recent CAA "is the entire Agreement between Wells Fargo and you for your account and any services" and "[r]eplaces all prior agreements." (*Id.* Ex. 1-N, p. 2 (2016 CAA).)[16]

---

[15] In this regard, the 2016 CAA states: "**Notice of a modification:** If we are required to notify you of a modification to the Agreement, we will describe the modification and its effective date by a message within your account statement or any other appropriate means." (Nelson Decl. Ex. 1-N at 2.) The Agreement does not clarify when notice is "required" or what constitutes "other appropriate means." The consumer is deemed to have consented to the modification if he or she continues to use the account after the modification becomes effective. (*Id.*)

[16] The 2004-2014 CAAs use the following language: "This Agreement governs your Account and related Services, and replaces all prior agreements with the Bank regarding them." (*E.g.*, Nelson Decl., Exs. 1-B, p. 10 (2004); 1-C, p. 7 (2005); 1-F, p. 1 (2008); *see id.* Exs. 1-I to 1-L (2011 to 2014) (with some stylistic changes to the language).) These CAAs also include a "Miscellaneous" section with a clause stating: "This Agreement constitutes the entire agreement between you and the Bank and supersedes prior oral or written representations, conditions, warranties, understandings, proposals or agreements regarding your Account and any Service." (*E.g., id.* Exs. 1-B, p. 31 (2004); 1-I, p. 38 (2011) (with stylistic changes).) In 2015, the "Miscellaneous" section was removed.

Many Plaintiffs submitted declarations pertaining to the CAAs. (*See* Opp'n Ex. C, ECF No. 103-3.) Plaintiffs each contend that they were not provided with any paperwork during their enrollment, other than the account application, and that they do not recall receiving any other documentation. (*See, e.g.*, *id.* at 7 (Decl. of Nicholas Beach); *see also* Opp'n at viii (alleging that if Mr. Beach received any paperwork, it was not until he had made a deposit and was ready to leave the bank).) Others allege that they were not informed of what constituted "a copy of the applicable account agreement, and privacy policy," and were not given those documents. (*See, e.g.*, Opp'n at xxiii (Jennifer Ellsworth), xxviii (Aaron Hands).) Some deny any authorized account openings at all, contending that the signatures Wells Fargo produced are forged. (*See, e.g.*, *id.* at xxvii (Andrew Goryeb).) Invariably though, Plaintiffs allege they never agreed to an arbitration agreement or delegation clause, and never would have agreed to an arbitration agreement or delegation clause if they had been informed of Wells Fargo's misconduct. (*See generally* Opp'n Ex. C.)

### B. Converted accounts

Nine Plaintiffs opened accounts with banks later acquired by Wells Fargo (i.e., First Security, Wachovia, and Norwest)[17] between 1986 and 2011 ("conversion Plaintiffs"). Wells Fargo does not dispute that these banks did not have arbitration agreements when these Plaintiffs opened their accounts or when Wells Fargo acquired the banks. (*See, e.g.*, Nelson Decl., Exs. 10-C (First Security account form); 34-A (Wachovia Customer Access Agreement); 43-A (First Union/Wachovia Customer Access Agreement); 47-A (World Savings Bank account form); 55-A (Norwest account form).) Instead, Wells Fargo asserts that it sent account conversion mailings

---

[17] Two plaintiffs opened checking accounts with First Union Bank (Robin Quigg) and World Savings Bank (Anurag Sood) that were acquired by Wachovia, which was later acquired by Wells Fargo. (*See* Mot. at ¶¶ 93, 101.)

to each of these customers, after each bank was acquired and shortly prior to the time the accounts were converted, and that each mailing contained the relevant CAA with the dispute resolution terms therein.

For example, First Security merged with Wells Fargo in 2000, and First Security accounts in Utah were converted to Wells Fargo accounts in 2001. (*E.g.*, Mot. at ¶ 20; Nelson Decl. at ¶ 33 (Travis Ashby).) Wells Fargo asserts that all First Security accounts received a mailing on March 19, 2001 with a welcome letter about the conversion and an enclosed "consumer disclosure," which included the CAA effective at the time. (*See* Nelson Decl. at ¶ 33.) Wells Fargo utilized First Security's database to send the mailings to the same addresses at which customers received their monthly account statements. (*Id.*) Wells Fargo employed "multiple validation procedures" to ensure each consumer's address was accurately captured for the mailings; if a mailing was returned as undeliverable, that would have been reflected in the consumer's mailing file. (*Id.*) Similarly, when Wells Fargo acquired Wachovia in 2011, a conversion package with a welcome letter and disclosure packet was mailed to each Wachovia account holder with a mailing address in the Wachovia system. (*Id.* ¶ 116.) The welcome letters do not mention or discuss any arbitration agreement or dispute resolution program, but simply state that the consumer disclosure booklets "explain the terms and conditions that will govern" the converting accounts and services. (*E.g.*, *id.* at Ex. 34-B (Wachovia conversion letter).) Wells Fargo attached to its motion copies of form welcome letters and consumer disclosure booklets.

These Plaintiffs, in declarations and/or allegations in opposition to Wells Fargo's Motion, contend that they never spoke with anyone at the bank about the terms or conditions of Wells Fargo's accounts prior to the account conversions; do not recall ever receiving a welcome letter or conversion package; and do not recall any periodic updates in the terms and conditions of their

accounts. (*E.g.*, Decl. of Travis Ashby, Opp'n Ex. C at 3; Opp'n vi-vii (allegations of Travis Ashby).) They also state that they never agreed to an arbitration agreement or a delegation provision, and would never have agreed to arbitrate or delegate arbitrability if they had been informed of Wells Fargo's misconduct. (*E.g.*, Opp'n Ex. C at 3.)

### C. *Business accounts*

Six Plaintiffs opened business checking or savings accounts between 1996 and 2014 ("business account Plaintiffs"). When an individual opens a business account with Wells Fargo, they sign a Business Account Application. A "Certificate of Authority" section on the page before the signature page provides, in small, bold print:

> The customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.

(*E.g.*, Nelson Decl., Ex. 59-A (Jennifer Zeleny).) Wells Fargo again represents that the "account agreement" mentioned above is the "Business Account Agreement" (BAA), and describes a procedure for providing the BAA to the customer that is identical to the CAA procedure:

> According to the Bank's standard operating procedure, the Business Account Agreement was included as a part of a package called the "New Account Kit" that was physically handed to the customer, or mailed to him or her, when the account is opened. The customer is also provided a document titled Business Account Addenda that reflects any changes since the packaging of the New Account Kit. The operative Business Account Agreement is available upon request at any banking location and, since 1999, has been available on Wells Fargo's website, located at https://www.wellsfargo.com/.

(*Id.* ¶ 22.)

The dispute resolution language in the BAAs has not changed over time. The most recent version Wells Fargo provided, effective on April 4, 2014, contains a "Dispute resolution

program; Arbitration agreement" section that states, in relevant part:

**Agreement to arbitrate**

Except as stated in "No waiver of self-help or provisional remedies" below, you and the Bank agree, at your or the Bank's request, to submit to binding arbitration all claims, disputes, and controversies between or among you and the Bank (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise arising out of or relating in any way to your account(s) and/or *service(s)*, and their negotiation, execution, administration, modification, substitution, formation, inducement, enforcement, default, or termination (each, a "dispute").

(*Id.* Ex. 2-C, p. 4 (bold & italics in original).) On the next page, in the section entitled "Arbitrator qualifications and powers," the following is embedded in a block of text: "The arbitrator(s) will determine whether or not an issue is arbitratable . . . ." (*Id.* at 5.) The BAAs also contain a waiver of class action arbitration; mandated non-disclosure of arbitration proceedings; and a statement that the arbitration proceedings will be governed by the American Arbitration Association (AAA) rules, to the extent they do not conflict with the terms of the Arbitration Agreement. (*Id.* at 4-5.) Finally, the Arbitration Agreement states: "If more than one agreement for arbitration by or between you and the Bank potentially applies to a dispute, the arbitration agreement most directly related to your account or the subject matter of the dispute will control." (*Id.* at 6.)

Like the other Plaintiffs, the business account Plaintiffs make allegations relevant to the BAAs. They allege they did not receive the BAA and do not recall arbitration terms. Some of these Plaintiffs allege that Wells Fargo cannot produce signed Business Account Applications. (*See, e.g.*, Ex. 17 (Jamal Dean).) And, again, the Plaintiffs contend that they did not and would not have agreed to an arbitration agreement or delegation clause if they had been told of Wells Fargo's misconduct.

## ANALYSIS

### I.  Choice of law

 "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944; *accord Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) ("'To determine whether a party has agreed to arbitrate a dispute,' we 'apply ordinary state-law principles that govern the formation of contracts.'" (quoting *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013))).

Plaintiffs reside in states spanning from Washington to New Jersey, and North Dakota to Texas. Wells Fargo's account agreements, moreover, state that the law governing the contracts is generally the law of the state where the Plaintiff opened his or her account. (*See* Nelson Decl., Ex. 1-N, p. 5.) Thus, a preliminary question arises of which state's law should apply to the contractual analysis that follows.

"Because Utah is the forum state, Utah choice-of-law rules apply." *Dahl v. Dahl*, 2015 UT 79, ¶ 23. Where two or more states have an interest in a dispute, Utah courts have applied the test in Section 188 of the Restatement (Second) of Conflict of Laws to analyze which state holds "the most significant relationship" to the contractual dispute. *Am. Nat. Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 190 (Utah 1996). Here, the parties have not argued the conflict of law issue, and the court cannot determine on this record which state may have the "most significant relationship" to the dispute, especially considering the nationwide scope of the misconduct at issue. But where the parties fail to argue or demonstrate that another state's law should apply, a court may default to the forum state's substantive law. *Howard*, 748 F.3d at 982 (discussing Kansas law).

Because the elements of contract formation are foundational common law principles widely adopted in the United States, and because the parties made no objection and highlighted no material difference in the contract formation principles among the various states represented in this matter, the court will apply Utah law at this point. *Cf. Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1284 (10th Cir. 1997) (noting that a "choice of law analysis is generally unnecessary if the relevant states have enacted identical controlling statutes").

## II. Arbitration

This case lies at a crossroads in arbitration analysis—not the only case falling in a gray space of overlapping federal arbitration and state contract law, but certainly unique among them. The Plaintiffs dispute the existence of an agreement to arbitrate and/or an agreement to delegate threshold arbitrability issues to an arbitrator. For the majority of the consumer account Plaintiffs, an agreement appears to exist between those Plaintiffs and Wells Fargo for the authorized accounts that the consumer opened with the bank and continued to use. Those agreements appear to control the authorized accounts, and if this were a fight over authorized accounts and services, the court's determination of the parties' intentions in contracting would be much simpler.

Instead, Wells Fargo seeks to extend contracts clearly tied to specific authorized accounts or services to *unauthorized*, unconsented-to, and previously unknown accounts or services that Wells Fargo unilaterally opened or engaged in without the Plaintiff's consent or agreement. Of course, the unauthorized accounts and/or services do not have any associated agreements signed by the Plaintiffs. And Wells Fargo does not typically open a new authorized account or service without requiring that the consumer sign a new contract for that account or service. So, Wells Fargo seeks to use broad arbitration language embedded in a product-associated agreement to

capture any dispute that may arise, apparently without limit, even though its general course of conduct in account openings suggests more tailored contracting.

In addition, Plaintiffs allege, and Wells Fargo has for all practical purposes conceded, that the bank knew of the widespread practice of opening unauthorized accounts and services, cultivated a culture that practically demanded the practice continue for over a decade, and failed to disclose it to new customers at the time any authorized account agreements were signed. The court must undertake the contractual analysis with this background in mind.

A.    *Existence of an agreement to arbitrate*

"Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations." *Concepcion*, 563 U.S. at 351 (citing *Rent-A-Ctr.*, 561 U.S. at 67). "A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Jacks*, 856 F.3d at 1305 (quoting *AT&T Techs.*, 475 U.S. at 648). The general presumption in favor of arbitration "disappears when the parties dispute the existence of a valid arbitration agreement." *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002); *accord Jacks*, 856 F.3d at 1304 ("When the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away." (alteration omitted) (quoting *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998))).

"To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation . . . of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010). "Such issues always include whether the clause was agreed to, and may include when that agreement was formed." *Id.* "When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact

regarding the parties' agreement." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *Avedon*, 126 F.3d at 1283).

"As every first-year law student knows, 'an agreement or mutual assent is of course essential to a valid contract.'" *Jacks*, 856 F.3d at 1304 (alteration omitted) (quoting *Lucy v. Zehmer,* 196 Va. 493, 84 S.E.2d 516, 522 (1954)). Under Utah law, generally, formation of a contract requires an offer, an acceptance, and consideration. *Cea v. Hoffman*, 2012 UT App. 101, ¶ 24, 276 P.3d 1178, 1185. An offer is a manifestation of willingness to enter into a bargain, and an acceptance is a manifestation of assent to the offer, "such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made." *Id.* ¶¶ 24, 25 (quotations and citations omitted). "Consideration is present when there is an act or promise given in exchange for the other party's promise." *Id.* ¶ 26 (quoting *Healthcare Servs. Group Inc. v. Utah Dep't of Health*, 2002 UT 5, ¶ 17, 40 P.3d 591).

Moreover, "[i]t is fundamental that a meeting of the minds on the integral features of an agreement is essential to the formation of a contract." *LD III, LLC v. BBRD, LC*, 2009 UT App 301, ¶ 14, 221 P.3d 867, 872 (quoting *Richard Barton Enters. v. Tsern*, 928 P.2d 368, 373 (Utah 1996)). "Thus, a binding contract exists where it can be shown that the parties had a meeting of the minds as to the 'integral features of the agreement' and that the terms are sufficiently definite as to be capable of being enforced." *Id.* ¶ 14 (alteration omitted) (quoting *Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, ¶ 13, 94 P.3d 179).

"The proponent of the contract 'has the burden of showing that an offer and acceptance were more probable than not.'" *Cea*, 2012 UT App. 101, ¶ 27 (quoting *Sackler v. Savin*, 897 P.2d 1217, 1222 (Utah 1995)). Plaintiffs state that Wells Fargo's accounts, in general, are suspect due to the bank's documented history of forging signatures and making

misrepresentations during account openings. (*See* Opp'n at vi.) While this may be true in the abstract, suspicion is not specific enough to create an issue of fact on each and every account Wells Fargo contends is authorized here, especially where Wells Fargo presents billing statements showing account use.

For a number of Plaintiffs, however, their initial engagement with Wells Fargo leaves material questions of fact regarding the formation of an agreement to arbitrate and, more specifically, whether there was notice of and a meeting of the minds on the essential terms of the agreement.[18] *See 1-800 Contacts, Inc. v. Weigner*, 2005 UT App 523, ¶ 8, 127 P.3d 1241, 1243 ("The court cannot compel the performance of a contract which the parties did not mutually agree upon." (quoting *Pitcher v. Lauritzen,* 18 Utah 2d 368, 423 P.2d 491, 493 (1967))).

Zachary Christensen, for example, is alleged to have opened a credit card with Wells Fargo in April 2016. (Nelson Decl. ¶ 62.) Mr. Christensen alleges that he was at an outdoor hot tub event and engaged in discussions with representatives of Bullfrog Spas, and never spoke with Wells Fargo representatives. (Opp'n at xviii.) Wells Fargo attaches monthly statements from July 7, 2016 to November 6, 2016 for the credit card Mr. Christensen allegedly opened. But looking at the account application and billing statements, the court finds numerous factual irregularities. First, the account application is not dated and the full application is not provided. (*See* Nelson Decl. Ex. 16-A.) Second, the billing statements do not correspond with the alleged April 2016 opening date. (*See id.* at 16-B.) The account application, above the signature, provides an

---

[18] Wells Fargo may be correct that Plaintiffs who have used their authorized accounts can be deemed to have assented to contract terms through inaction or silence. (Mot. at 4.) The CAAs state as much in the modification provisions. This argument, however, assumes that the Plaintiffs were notified (or can be considered notified) of the arbitration agreement. *See, e.g.*, *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 321 F. Supp. 2d 142, 146 (D. Mass. 2004), *aff'd*, 407 F.3d 546 (1st Cir. 2005) ("Obviously, if General Dynamics' method of notice was insufficient and Campbell was not aware of the proposal, there was no agreement.").

"Acknowledgement" in bold that the signer has received "a copy of the Credit Card Agreement" and the "Arbitration Agreement contained in the Credit Card Agreement," (*id.* at 16-A), but Wells Fargo does not include a Credit Card Agreement with the exhibit, and Mr. Christensen alleges that he did not receive any Credit Card Agreement (or the CAA). The only other page included with the signature page provides the terms of an "Arbitration Agreement," but the court cannot determine, with this minimal documentation and brief outline of the interaction, whether Mr. Christensen was, in fact, presented with that page.

Brent Miller contends that he never opened an authorized account with Wells Fargo. (Opp'n at lxx; *see* Decl. of Erin J. Cox (Cox Decl.), Ex. E.) Wells Fargo alleges that Mr. Miller signed up for two consumer accounts "off-site." In support of this, Wells Fargo attaches a signed "Out of Store" Consumer Account Application with the normal disclosure above the signature line noting that the signer has received a copy of the "applicable account agreement" and is agreeing to the dispute resolution terms described therein, including waiving a jury trial or a trial before a judge. (Nelson Decl., Ex. 64-A.) Wells Fargo next attaches an unsigned Consumer Account Application from three days later and billing statements that show no account balance or activity. (*See id.* Exs. 64-B & 64-C.) On the whole, these documents leave serious questions of fact about whether these accounts were even authorized, let alone whether Mr. Miller agreed to arbitrate with Wells Fargo.[19]

---

[19] Mr. Christensen and Mr. Miller's cases may present some of the issues involved with Wells Fargo's "off-site" account applications. According to the Board's report, "'[o]ff-site' applications, associated with initiatives in which Wells Fargo bankers would collect product applications at events or workplaces outside a Wells Fargo branch, featured prominently in records relating to both customer consent and record falsification. In the reviewed records, employees often processed these applications, which did not require the customer to complete paperwork or provide authorization at the branch, without first properly acquiring customer consent or relevant customer information, such as drivers' license details. For example, one

Richard Fountain had a mortgage loan with Wells Fargo. Mr. Fountain alleges that Wells Fargo manipulated his mortgage and lied about a mortgage reduction program, to the point that he almost lost his house and suffered monetary damages. (*See* Cox Decl., Ex. J.) Wells Fargo responds by providing his mortgage statement from October 2010. (Nelson Decl., Ex. 70.) In light of the allegations, this document is woefully insufficient to establish an arbitration agreement was formed between Mr. Fountain and the bank.[20]

Denise Poe opened a "Cash on Demand" account in November 2005. (*See id.* Ex. 41-A.) Wells Fargo provides a "Supplemental Disclosure" that appears to be signed by Ms. Poe, and that states "you agree to the terms of the Cash on Demand Account Agreement" and "You acknowledge the existence of the Arbitration Agreement on the following page . . . ." (*Id.*) The following page, however, is not an arbitration agreement, but rather a Cash on Demand checklist. (*Id.*) In fact, no arbitration agreement follows the signature page presented in Exhibit 41-A. The next Exhibit, 41-B, contains the Cash on Demand Account Agreement, with an arbitration agreement in small print on the final page. (*Id.* Ex. 41-B, p. 3.) This arbitration agreement

---

branch banker cited explicit instructions from her branch manager to confirm customer consent only after opening accounts." *Sales Practices Report* at 36, n.16.

[20] In a supplemental fact sheet provided to Wells Fargo in advance of its renewed Motion, Mr. Fountain wrote "NO" next to questions asking if he was claiming Wells Fargo opened an account or product in his name without consent. (Cox Decl., Ex. J.) Wells Fargo implies that the court should conclude that Mr. Fountain only has an authorized account and, therefore, is subject to arbitration. (*See* Mot. at cv.) But Wells Fargo has not yet made a prima facie case that an arbitration agreement was formed between it and Mr. Fountain. *See BOSC, Inc. v. Bd. of Cty. Comm'rs of Cty. of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017) (noting that the framework under the FAA's § 4 is similar to summary judgment and thus "the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement . . . ; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement or the failure to comply therewith"). On this record, it appears likely that Mr. Fountain's mortgage loan was authorized, and it may be true that Wells Fargo did not open any unauthorized accounts or products with his information. Nonetheless, at least for the current purposes, it is the bank's burden to show that Mr. Fountain agreed to an arbitration agreement that would send whatever dispute he has with the bank to an arbitrator.

appears to be even more expansive than that in the CAAs, and the document footer states it is the "customer copy." (*Id.*) But no facts demonstrate that Ms. Poe was actually presented with or informed of this document, or that she understood that the arbitration agreement therein was the "Arbitration Agreement on the following page" mentioned in the document she signed.

Jeffery Taylor alleges that he went to Wells Fargo for a job interview in November 2012 and that, during the interview, Wells Fargo took his personal information and opened up an account without his authorization. (TAC ¶¶ 412-13.) Wells Fargo contends Mr. Taylor opened an IRA in November 2012 and provides his signed IRA form, as well as other documents showing IRA distributions in 2013 and 2014, and an account statement in 2013. (Nelson Decl., Exs. 52-A, 52-C to 52-F.) The IRA form does not discuss any arbitration terms, but the "Retirement Plan Deposit Receipt/Disclosure" also signed that day, does state, above the signature line "I agree with the Consumer Account Agreement you have given me." (*Id.* at 52-B.) No reference to arbitration terms or a dispute resolution program is made on that document either. Although the CAA is referenced as having been provided, these circumstances (a job interview, wherein a retirement account was opened, with no dispute resolution terms mentioned on the documents signed and no CAA allegedly given) do not show that, as a matter of law, Mr. Taylor agreed to arbitrate with Wells Fargo when he signed up for the IRA.

Edwin Zorrilla allegedly opened a college checking account in January 2012. Mr. Zorrilla alleges that this account was unauthorized. (*See* Cox. Decl., Ex. K; Opp'n at 1xxv-vi.) Wells Fargo attaches his signed account application and account statements showing a substantial deposit into the account in January 2012 and three checks for small amounts withdrawn in March 2012. (*See* Nelson Decl., Ex. 68-A through 68-D.) Though a close call, the court cannot construe these documents to find, as a matter of law, that this account was in fact authorized and that an

arbitration agreement was formed in light of Mr. Zorrilla's allegations to the contrary and the

requirement, at this stage, that the court view the facts and reasonable inferences in his favor. *See*

*Howard*, 748 F.3d at 980 ("So far the district court has only held that a reasonable person could

believe [the plaintiff]'s account of the facts . . . . In deciding this much, moreover, the district

court has only and always viewed all the facts in the light most favorable to [the plaintiff].").

Accounts opened before 2003 also present questions of fact as to the formation of an

arbitration agreement between these Plaintiffs and Wells Fargo. For example, Jamal Dean

allegedly opened a business checking account in 1996. Wells Fargo does not produce a signed

account application for Mr. Dean, but does attach copies of billing statements for this account

from 2013, 2015, and 2016. (*See* Nelson Decl. Ex. 17.) Wells Fargo does not state whether its

account contracts had arbitration agreements when Mr. Dean opened the account in 1996, but

Wells Fargo contends he agreed to one anyway when he signed up for online banking in

December 31, 2013, which included an arbitration agreement as a part of the Online Access

Agreement. (*See id.* at 17-B.) Wells Fargo does not describe how the terms of the Online Access

Agreement were presented to a Plaintiff like Mr. Dean, or how Mr. Dean's assent to them was

manifested. Wells Fargo contends that Mr. Dean had to "affirmatively agree to the terms of the

operative Online Access Agreement by clicking 'I Agree' on an online portal," but provides no

description of the portal or the presentation of the agreement terms. (*See* Mot. at xxx.) No

allegations demonstrate that Mr. Dean had knowledge of the terms in the agreement or whether

he had an opportunity to see the terms prior to "accepting" them by accessing the website. *See*

*Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24–25 (2d Cir. 2010) (unpublished) (concluding

under New York *and* Utah law that Overstock did not demonstrate that an arbitration agreement

was formed by a user's accessing its website, which had arbitration terms, because Overstock did

not allege any facts tending to show that a user had actual or constructive knowledge of the website's terms and conditions).[21] Moreover, the arbitration terms in the Online Access Agreement state that if its terms conflict with "any separate agreement governing your other Eligible Accounts," those terms control. (*See* Nelson Decl., Ex. 17-B, p. 3.) Without testimony, the court cannot tell, which, if any, agreement controls.

Other older accounts (e.g., Lawrence and Kay Mitchell, Carina Rhea, David Self) suffer from a lack of signed account applications—usually where Wells Fargo provides notice of the arbitration agreement and obtains a consumer's agreement thereto—or from a lack of detail about the dispute resolution program in effect at the time the accounts were opened. Excluding those Plaintiffs who signed more recent applications for newer accounts, Wells Fargo's attempts to show these long-standing account holders later agreed to arbitration are not sufficient to establish arbitration agreements were formed as a matter of law.

For example, the Mitchells opened a checking account with Wells Fargo in 1982. (Nelson Decl. ¶ 122.) Wells Fargo presents no signed account application for this account, and thus the court cannot scrutinize what the Mitchells agreed to at the initial contracting. Lawrence Mitchell then signed up for online banking in 2005, and allegedly agreed to the terms therein, (*see id.* Ex. 37-A), but this line of argument suffers from the same notice and formation issues discussed above with the Online Access Agreement. The Mitchells were also sent Wells Fargo's "Important Change in Terms Notice," with the updated 2011 arbitration agreement laid out in two pages. (*Id.* at 37-E.) The Change in Terms Notice was apparently included in the December 2011 account statements. (*See id.* ¶ 125 ("With the December 2011 statements, Wells Fargo notified its consumer banking customers that the Consumer Account Agreement would be

---

[21] This and all other unpublished decisions are not precedential, but are cited for their persuasive value. *See* Fed. R. App. 32.1; 10th Cir. App. R. 32.1.

revised effective February 15, 2012. . . . The Change in Terms Notice was included as an insert with the account statement . . . .".)

But the Change in Terms Notice only begs more questions about notice and consent in this case: what material change in the arbitration agreement occurred in 2011 that caused Wells Fargo to send this notice to all customers? If it truly sent this notice to all customers, why does Wells Fargo only allege it was sent to six of the many consumer Plaintiffs (specifically, the Mitchells, Carina Rhea, David Self, Paul Fosbre, Anurag Sood, and Scott Westin)? Did Wells Fargo send a Change in Terms Notice in 2015, when the arbitration agreement terms were, at least arguably, materially altered again? What significance should the court place in Wells Fargo's labeling this 2011 update an "important change" in arbitration terms? Should it constitute an alteration that required some new affirmative assent from the customer or consideration by Wells Fargo, or simply a modification for which assent by silence was sufficient? The Notice did not contain an opt-out period or request any response from the customer. Such questions must be explored and resolved before these Plaintiffs without signed account applications can be held to have affirmatively assented to an arbitration agreement with Wells Fargo.[22]

The conversion Plaintiffs did not have arbitration agreements with their banks prior to Wells Fargo's acquisition of those banks and addition of arbitration agreements to the already-existing accounts. The addition of arbitration agreements appears to be at least a material

---

[22] Wells Fargo points out that agreements to arbitrate need not be signed in order to be enforced. *See, e.g.*, *Medical Dev. Corp. v. Indus. Molding Corp.,* 479 F.2d 345, 348 (10th Cir.1973) (noting that it is "not necessary that there be a simple integrated writing or that a party sign the writing containing the arbitration clause" (citations omitted)). But Wells Fargo must still prove the existence of the arbitration agreements, including a meeting of the minds on the essential terms, which may be accomplished or presumed, depending on the circumstances, through some form of actual or constructive notice to the Plaintiffs.

alteration, *see* Restatement (Second) of Contracts § 286(2) (1981) (stating that "[a]n alteration is material if it would, if effective, vary any party's legal relations with the maker of the alteration . . . .), if not an entirely new contract, *see Rent-A-Ctr.*, 561 U.S. at 71 (noting that arbitration agreements are "severable from the remainder of a contract" (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006)). Thus, these Plaintiffs present material issues of fact about the alteration/separate contract: when Wells Fargo purportedly sent them the welcome letter and consumer disclosures, could Wells Fargo materially alter the scope of the terms of these Plaintiffs' accounts without some affirmative act of acceptance by these plaintiffs? What affirmative assent or consideration, if any, supported the material alteration or additional contract? Although such issues can often be resolved as a matter of law, factual questions remain around the conversion mailings and their receipt by the Plaintiffs, as well as the consideration Wells Fargo could be said to have given to these Plaintiffs after adding the contract to arbitrate to their accounts.

If, as the Supreme Court has held, an arbitration agreement is truly severable from the remainder of the contract, it follows that the agreement must be supported by an acceptance and consideration just like any other contract. "An acceptance must be clear, positive and unambiguous," *R.J. Daum Const. Co. v. Child*, 122 Utah 194, 200, 247 P.2d 817, 820 (1952), and consideration may be found "whenever a promisor receives a benefit or where [a] promisee suffers a detriment, however slight," *Gasser v. Horne*, 557 P.2d 154, 155 (Utah 1976). Wells Fargo's assertion that the conversion Plaintiffs' continued use of their accounts is sufficient to show assent to the terms, even assuming the conversion mailings were properly sent to and received by each of these Plaintiffs, falls flat in these circumstances, where the welcome letters do not mention new dispute resolution terms or provide an option to opt-out. Moreover, these

Plaintiffs' continued use does not address the issue of consideration. *See* 17 C.J.S. Contracts § 122 (2008) ("A promise to do something one is already obligated to do is no consideration for a contract and creates no new obligation."). While the court can imagine some circumstances that provide consideration for the agreement, none have yet been presented.

Finally, the documents associated with the business account Plaintiffs present a dispute of fact over whether there was a meeting of minds regarding arbitration. In the Business Account Applications, which were the only documents these Plaintiffs signed, and potentially the only ones they received, the language above the signature line states that the signer is agreeing to an account agreement that "includes the Arbitration Agreement under which any dispute between the Customer and the Bank *relating to the Customer's use* of any Bank deposit account, product or service" will be resolved by arbitration. The Arbitration Agreement terms in the BAA, however, enact a much more expansive agreement than suggested by the Application, where disputes include "all claims, disputes, and controversies between or among you and the Bank . . . arising out of or relating in any way to your account(s) and/or service(s), and their negotiation, execution, administration, modification, substitution, formation, inducement, enforcement, default, or termination." The conflict between these provisions, even assuming the BAA was offered to and read by the consumer, would not leave the consumer with a definite understanding of the essential terms of the Arbitration Agreement, when one statement appears to limit the agreement to "the customer's use" and the other captures all disputes "arising out of or relating in any way to" the customer's accounts and services. Where the essential terms of a contract conflict, there can be no agreement. *See Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, ¶ 31, 355 P.3d 1000, 1009 (observing that "[i]n order to create a contract, the parties must have 'a meeting of the minds on the integral features of an agreement.' This meeting of the minds

requires agreement on the essential terms of the contract" (quoting *Prince, Yeates*, 2004 UT 26, ¶ 13)); *Ragab v. Howard*, 841 F.3d 1134, 1137–38 (10th Cir. 2016) (holding that "the conflicting details in the multiple arbitration provisions indicate that there was no meeting of the minds with respect to arbitration").

The conflict in contract language may be the result of an oversight in drafting; nevertheless, the terms are ambiguous and do not support a meeting of the minds on the agreement to arbitrate. Ambiguous language is construed against the drafter, particularly in the context of adhesion contracts. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) (noting the "common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it"); *Dumais*, 299 F.3d at 1219 (construing ambiguities in arbitration contract against the drafter and noting that "[t]he contract at issue is a form contract effectively written by American Golf without [plaintiff]'s input or any negotiation with her. The power American Golf enjoyed in constructing the [contract] in the manner it preferred justifiably includes the burden of the document's shortcomings in each instance"); *MacArthur v. San Juan Cty.*, 416 F. Supp. 2d 1098, 1187 (D. Utah 2005) (noting that "the Utah Supreme Court has enumerated several equitable doctrines that may be applied to remedy over-reaching in the making of adhesion contracts, including the doctrines of estoppel, waiver, unconscionability, breach of the implied duty of good faith and fair dealing, and the rule that ambiguous language is to be resolved against the drafter"). Testimony will help resolve doubts about what the business account Plaintiffs understood in contracting with Wells Fargo and, thus, whether a meeting of minds on the arbitration agreement truly exists.

It bears repeating that "[m]ost contracts bind only those who bargain for them, and 'the burden of proof for showing the parties' mutual assent as to all material terms and conditions is

on the party claiming that there is a contract.'" *Bybee v. Abdulla*, 2008 UT 35, ¶ 8, 189 P.3d 40, 43 (citations omitted). "Arbitration agreements are not exempt from this rule." *Id.* "Arbitration is an alternative to judicial resolution of disputes in which participation is voluntary. Thus, absent the presence of some intervening circumstance, a party cannot be compelled to surrender his right to seek a remedy or defend himself in court." *Id.* The Utah Supreme Court acknowledges that even the "strong public policy favoring arbitration . . . is insufficient, standing alone, to justify forcing an unwilling party to submit to arbitration." *Id.*

The court finds that a summary trial is necessary to resolve the disputes of fact identified above as to the formation of agreements to arbitrate between Wells Fargo and specific Plaintiffs identified, as well as Plaintiffs who opened accounts prior to 2003 and who had accounts converted (excluding those Plaintiffs who opened newer accounts with Wells Fargo directly) and the Plaintiffs with business accounts.

B.      *Existence of an agreement to delegate*

Typically speaking, questions of arbitrability—such as whether an agreement is valid or enforceable, or whether a concededly binding agreement covers a particular dispute—are "undeniably" for courts to decide. *AT&T Techs.*, 475 U.S. at 649. But parties may agree to submit threshold questions of arbitrability to an arbitrator. *Rent-A-Ctr.*, 561 U.S. at 69. Often referred to as "delegation" provisions, these agreements are separate, antecedent agreements to an arbitration agreement "and the FAA operates on th[ese] additional arbitration agreement[s] just as it does on any other." *Id.* at 70.

An "important qualification" applies when courts are determining whether "a party has agreed that arbitrators should decide arbitrability: Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did

so." *First Options*, 514 U.S. at 944 (alteration omitted) (quoting *AT&T Techs.*, 475 U.S. at 649).

"The 'clear and unmistakable' standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice." *Avaya*, 693 F.3d at 1303 (quoting *Peabody Holding Co. v. United Mine Workers*, 665 F.3d 96, 102 (4th Cir. 2012)).

Because delegation forecloses a judicial determination on the merits of a dispute (as well as the opportunity to pursue a class action, the right to a public trial, and most appellate rights), "who—court or arbitrator—has the primary authority to decide whether a party has agreed to arbitrate can make a critical difference to a party resisting arbitration." *First Options*, 514 U.S. at 942. The court must look to the parties' intentions in determining whether they contracted to delegate. *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1280 (10th Cir. 2017) ("[J]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question who has the primary power to decide arbitrability turns upon what the parties agreed about *that* matter." (quoting *First Options*, 514 U.S. at 943)). The parties may demonstrate "clear and unmistakable 'evidence' of agreement to arbitrate arbitrability" by, for example, "a course of conduct demonstrating assent . . . or . . . an express agreement to do so." *Rent-A-Ctr.*, 561 U.S. at 79–80 (Stevens, J., dissenting) (citing *First Options*, 514 U.S. at 946).

Once again, because arbitrability questions are "presumptively" for the courts, *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 133 S. Ct. 2064, 2068 n.2 (2013), "the presumption in favor of arbitration does not apply here," *Jacks*, 856 F.3d at 1304. Indeed, "instead of applying the presumption in favor of arbitration," the court must "appl[y] the presumption in favor of judicial resolution." *Avaya*, 693 F.3d at 1303.

The court begins "its analysis by asking whether the parties did or said anything to rebut the presumption that questions about the arbitrability of an arbitration dispute will be resolved by

the courts." *Id.* Wells Fargo says the parties have indeed done something to rebut that presumption, for the Plaintiffs who opened and used accounts with Wells Fargo each signed and agreed to account agreements with arbitration agreements containing delegation terms. Thus, the question presented to the court for these Plaintiffs becomes quite narrow: did the Plaintiffs clearly and unmistakably agree to submit threshold questions of arbitrability to the arbitrator?

In answering this question, Utah law again seeks to identify the parties' intentions: "The underlying purpose in construing a contract is to ascertain the intentions of the parties, and to identify what the parties reasonably understood to be the terms of the agreement." *State v. Terrazas*, 2014 UT App 229, ¶ 27, 336 P.3d 594, 605 (citations and quotations omitted). As stated above, "[a] condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced." *Pingree v. Cont'l Grp. of Utah, Inc.*, 558 P.2d 1317, 1321 (Utah 1976) (quoting *Valcarce v. Bitters*, 12 Utah 2d 61, 63, 362 P.2d 427 (1961)).

Standardized contracts of adhesion do not squarely fit within a traditional analysis of contractual intent, and the task becomes particularly disjointed when analyzing a delegation provision embedded in an unsigned standardized agreement referenced by another agreement that is signed. Nonetheless, the terms of the alleged agreement are contained in a written delegation provision, and so the court first looks to that document to determine "its meaning and the intent of the contracting parties." *Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 44, 201 P.3d 966, *holding modified by Central Utah Water Conservancy Dist. v. King*, 2013 UT 13, 297 P.3d 619. "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* (quoting *Green River Canal Co. v. Thayn*, 2003 UT

50, ¶ 17, 84 P.3d 1134). "The interpretation of a contract is a matter of law for the court to determine unless the contract is ambiguous and evidence of the parties' intent (which is a matter of fact) is necessary to establish the terms of the contract." *Saunders v. Sharp*, 806 P.2d 198, 200 (Utah 1991). In the context of standardized contracts, moreover, Utah law recognizes the "rule of construction" outlined in the Restatement (Second) of Contracts § 211 that "allows a fact finder to look at the totality of the circumstances in determining the intent of the parties, rather than being strictly confined to the four corners of a standardized agreement" when the parties' "true intent was not accurately reflected in the written contract." *Allen*, 839 P.2d at 810 (Stewart, J., concurring). This principle "acknowledges the reality that in a standardized or form contract one necessarily relies on the party supplying the contract and that party's good faith that the agreement will reflect the true intent of the transaction. When standardized preprinted forms contain terms not contemplated by the parties, those terms should not be given effect." *Id.*

In arguing that the parties clearly and unmistakably delegated threshold questions to the arbitrator, Wells Fargo points to the language of delegation in the CAA's arbitration agreement stating that disputes submitted to the arbitrator include "disagreement about this Arbitration Agreement's meaning, application, or enforcement." After 2011, Wells Fargo amended the CAAs to also include the following statement in the description of rules or procedures that apply during arbitration: "If this Arbitration Agreement is in dispute, the arbitrator will decide whether it is enforceable." Wells Fargo also points to the fact that the arbitration would be administered in accordance with the AAA rules, to the extent those rules do not conflict with the Arbitration Agreement. The Tenth Circuit has found that when two sophisticated parties (a surgeon and a hospital) included the JAMs rules, which are substantively identical to the AAA rules, in their

arbitration agreement, the parties demonstrated a clear and unmistakable intent to delegate arbitrability issues to the arbitrator. *Belnap*, 844 F.3d at 1283–84.

Without further detail on the parties' intentions in contracting, the court cannot rule as a matter of law that the language submitting disputes over "meaning, application, or enforcement" of the arbitration agreement to the arbitrator and the inclusion of the AAA rules clearly and unmistakably shows an intent to delegate all threshold questions of arbitrability. Some courts have found that language committing the interpretation and application of an arbitration provision to the arbitrator does not demonstrate clear and unmistakable intent to delegate. *E.g.*, *E.I. DuPont de Nemours & Co. v. Martinsville Nylon Emps.' Council Corp.*, 78 F.3d 578, *1–2 (4th Cir.1996) (Table decision) (holding "clear and unmistakable" test not met where contract provided for arbitration of "[a]ny question as to the interpretation of this Agreement or as to any alleged violation of any provision of this Agreement"); *Perez v. Qwest Corp.*, 883 F. Supp. 2d 1095, 1118 (D.N.M. 2012) (holding the language "[a]ny claim, controversy or dispute between you and U S WEST . . . whether sounding in contract, statute, tort, fraud, misrepresentation, discrimination or any other legal theory, including, but not limited to, disputes relating to the interpretation of this Attachment," with the attachment being the Arbitration Agreement, did not satisfy the clear and unmistakable test). Other courts have found language similar to Wells Fargo's current delegation language satisfies the clear and unmistakable intent standard. *E.g.*, *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1148 (11th Cir. 2015) (finding clear and unmistakable intent to delegate where the language "commits all 'Disputes' to arbitration and expressly states that a Dispute includes "any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement"). And, of course, the Tenth Circuit has held that courts can infer clear

and unmistakable intent to delegate from the incorporation of the AAA rules in an arbitration agreement. *Belnap*, 844 F.3d at 1284, 1290.

If there were no issues of notice and intent around the parties' contract to delegate, Wells Fargo's language or the AAA rules alone may well serve as "clear and unmistakable" intent. *See Perez*, 883 F. Supp. 2d at 1113–15 (collecting cases analyzing contract language for clear and unmistakable intent to delegate and finding circuit courts have reached different conclusions on similar language). But disputes of fact preclude the court from determining whether the parties truly had a "meeting of the minds" to delegate all questions of arbitrability to the arbitrator in these specific circumstances.

First, the only document the Plaintiffs signed, the account application, noted that disputes would be "decided before an arbitrator" and "not by a jury trial or a trial before a judge," but this language does not clearly indicate that all questions of arbitrability itself, including an *a priori* dispute over whether a claim falls within the scope of the arbitration agreement, must be resolved by the arbitrator—particularly because an account application was signed for each authorized account, and any new account would necessitate a new contract.

Though delegation terms were not present in the document the Plaintiffs actually signed, Plaintiffs could be held to be on constructive notice of their presence in the CAA. But it remains unclear whether Plaintiffs had the opportunity to comprehend the terms of CAA and delegation provision before signing the account application, or what, if anything, was said about dispute resolution during or after account openings in general. Ms. Nelson's declaration, which attests to Wells Fargo's business practice of "physically handing" or thereafter mailing the CAAs upon account opening, does not provide sufficient detail to establish that the company actually implemented those practices or that the delegation terms were effectively communicated such

that Plaintiffs could be said to be on notice of or have manifested assent to the delegation terms. *Compare Tinder v. Pinkerton Sec.*, 305 F.3d 728, 732 (7th Cir. 2002) (finding as a matter of law that employee received notice of arbitration terms where employer produced two affidavits detailing the "internal campaign" to notify and remind employees of the program, including a payroll stuffer with descriptions of the arbitration program in question-and-answer format, multiple internal memorandums with instructions about the stuffers and the importance of the program, and confirmation of the stuffer's distribution to and within all district offices). As one court put it, "no case law suggest[s] that notice can simply be inferred from a company's statement of its practices and procedures." *Alltel Corp. v. Sumner*, 360 Ark. 573, 578, 203 S.W.3d 77, 81 (2005). Questions of fact remain about whether Wells Fargo's practices were reasonably designed and implemented to give the Plaintiffs fair notice of the fact that they were delegating threshold arbitration questions to an arbitrator.

Likewise, it is not clear that the AAA rules were made available to the Plaintiffs or that their inclusion demonstrates Plaintiffs' knowing delegation of threshold arbitration questions. The court understands that Plaintiffs cannot escape contractual obligations by failing to read or comprehend the contract, *see Elsken v. Network Multi-Family Sec. Corp.*, 49 F.3d 1470, 1474 (10th Cir. 1995) (discussing a limitation of liability provision in a resident alarm services agreement under Oklahoma law), and that arbitration terms generally require no special explanation. But in the context of standardized contracts, where the party with superior bargaining strength and sophistication drafts all terms to the agreement, can the mere mention of AAA rules in a section discussing procedures during arbitration be said to be clear and unmistakable evidence of the consumer's intent to delegate all threshold questions to an arbitrator?

Stepping back to basic principles, *Belnap* states that courts enforce delegation provisions "in order to effectuate the parties' intent." 844 F.3d at 1287. And the Supreme Court has recognized that any ambiguity in delegation must be treated as support for the conclusion that a court, rather than an arbitrator, will decide arbitrability:

> [T]he former question—the "who (primarily) should decide arbitrability" question—is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers. And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.

*First Options*, 514 U.S. at 945.

The court recognizes that Wells Fargo drafted broad language in its CAAs attempting to submit arbitrability issues to the arbitrator, but viewing the principles articulated by the Supreme Court in the context of these facts, the court is not prepared to rule as a matter of law that the Plaintiffs agreed to delegate threshold questions. The court concludes that factual questions exist regarding the formation of delegation agreements with the consumer account Plaintiffs.[23]

C. *Contract defenses to delegation*

Even if the parties' agreement to delegate all threshold issues to the arbitrator was clear and unmistakable here, Plaintiffs may still challenge the formation of that contract like any other. Indeed, "[t]he additional agreement is valid under § 2 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Rent-A-Ctr.*, 561 U.S. at 70.

---

[23] In the prior section, the court found that a factual dispute existed over whether the business account Plaintiffs had a meeting of minds on the essential terms of the arbitration agreement. If that dispute is resolved in favor of agreement, the court will analyze the delegation language in the BAAs at that time.

Wells Fargo objects that the Plaintiffs have not made a sufficiently specific challenge to the delegation provision because their arguments go to the arbitration agreements and/or account agreements as a whole, and thus must be submitted to the arbitrator. *See id.* at 72–73. At this point, however, the court finds the Plaintiffs have sufficiently attacked the delegation clause as being unconscionable in the circumstances.[24]

In Utah, "there are two kinds of unconscionability: procedural and substantive." *Equitable Life & Cas. Ins. Co. v. Ross*, 849 P.2d 1187, 1190 (Utah Ct. App. 1993). "Procedural unconscionability centers on the 'relative positions of the parties and the circumstances surrounding the execution of the contract,' and occurs 'where there is an absence of meaningful choice and where lack of education or sophistication results in no opportunity to understand the terms of the agreement.'" *Id.* (quoting *Jones v. Johnson,* 761 P.2d 37, 39 (Utah App. 1988)). "Substantive unconscionability occurs when contract terms are so lopsided as to unfairly oppress or surprise an innocent party, or where there is an overall imbalance in rights and responsibilities imposed by the contract, excessive price or a significant cost-price disparity, or terms which are inconsistent with accepted mores of commercial practice." *Id.* (quoting *Klas v. Van Wagoner*, 829 P.2d 135, 139 (Utah App. 1992)). Under Utah law, adhesion contracts are not prohibited per

---

[24] The Plaintiffs' other contract defenses appear to go equally to the contract as a whole and, thus, assuming a delegation agreement exists, they would be submitted to the arbitrator for resolution. *Rent-A-Ctr.*, 561 U.S. at 73–75. For instance, Plaintiffs repeatedly emphasize their fraud in the inducement argument, understandably, because Wells Fargo appears to have engaged in (or at least knowingly permitted) fraudulent conduct on a company-wide scale. But any omission of material fact at account opening would apply equally to the account contract generally and the arbitration agreement therein. In another unauthorized accounts case, the district court concluded that the consumer Plaintiffs had not made a sufficiently specific challenge that the arbitration agreement was fraudulently induced because their contention that they would not have extinguished "any of their rights to sue in court" if they had knowledge of the misconduct did not specifically distinguish between fraud in inducing the contract as a whole from fraud in inducing the delegation provision. *Jeffries v. Wells Fargo & Co.*, No. 2:16-cv-01987-LSC, 2017 WL 3149513, at *4 (N.D. Ala. July 25, 2017) (unpublished).

se, but are constrained by equitable doctrines, including unconscionability. *MacArthur*, 416 F. Supp. 2d at 1187 (citing *Allen*, 839 P.2d at 805–07 & nn.11–16).

As an initial matter, the court finds the Plaintiffs specifically attack the delegation provision in their opposition to Wells Fargo's Motion. (*See* Opp'n at 30-31.) Though the arguments are clouded by attacks on the account and arbitration agreements more generally, Plaintiffs have claimed that the delegation provision is unconscionable in these circumstances because (a) the delegation agreement commits to an arbitrator all initial questions regarding the scope of the arbitration agreement, insulating Wells Fargo's widespread fraudulent and illegal activities from class action or judicial review and making the provision surprising and oppressive to the consumer (substantive unconscionability); and (b) the delegation agreement was the product of unequal bargaining power in deceptive circumstances, where the arbitration terms were not provided and may have been purposefully withheld until authorized accounts were opened (procedural unconscionability). The argument about insulating fraudulent conduct does not apply to the CAAs more broadly, which only address the terms and conditions for the account at issue and related services and do not appear to include any surprising or oppressive terms. And while the arguments may relate to the arbitration agreement, Plaintiffs have directed them to the delegation provision specifically and argue it is unconscionable in the circumstances. *See Johnson v. Wells Fargo Bank, N.A.*, No. 1:14-cv-02988-LMM, 2015 WL 12591792, at *2 (N.D. Ga. June 17, 2015) (unpublished) (finding the plaintiff made out a *Rent-A-Center* challenge and noting that "[w]hile the allegedly prohibitive arbitration cost and the alleged bargaining power disparity may be equally applicable to all arbitration provisions, Plaintiff specifically argues those factors make the delegation provision itself unconscionable").

The allegations in *Rent-A-Center* are distinguishable from this case. There, plaintiff Antonio Jackson signed an arbitration agreement as a condition of his employment and later brought an employment discrimination suit against the employer in court. 561 U.S. at 65. The employer moved to compel arbitration. *Id.* In opposing arbitration, Jackson argued the arbitration agreement, which contained a delegation provision, was unconscionable because the agreement gave "undue advantage" to the employer because it was non-negotiable, coverage was one-sided, and procedures on fee-splitting and discovery favored the employer. *Id.* at 73. Jackson did not mention the delegation provision in his opposition, and the Court found all of his arguments went to the arbitration agreement as a whole. *Id.* at 73–74. The court held that "had Jackson challenged the delegation provision by arguing that these common procedures *as applied* to the delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court." *Id.* at 74. Here, the Plaintiffs have sufficiently argued that uncommon and outrageous circumstances (widespread fraudulent conduct across a bank) *as applied* to the delegation provision render it unconscionable because the delegation of threshold questions to an arbitrator in the circumstances is both surprising and oppressive.

In light of the many questions around the Plaintiffs' initial engagement and contracting with Wells Fargo, and the varied fraudulent conduct alleged, this case raises a question of fact on whether enforcing the delegation provision would be unconscionable in these circumstances. Regarding procedural unconscionability, courts acknowledge that standardized consumer contracts are generally adhesive, *Concepcion*, 563 U.S. at 346–47, and that the adhesion contract drafter holds superior, if not all, bargaining power, *see Russ v. Woodside Homes, Inc.*, 905 P.2d 901, 906 n.1 (Utah Ct. App. 1995) ("A contract of adhesion is an agreement forced on one party by another who has superior bargaining strength."). Assuming, however, that one can separate

the delegation clause from the adhesion contract more generally, the parties to the delegation agreement remain in positions of unequal bargaining power, and the consumers do not appear to have meaningful notice of the provision and lack sophistication about delegation. Crucially, the circumstances surrounding the execution of the delegation agreements are not clear, as evidenced by the many disputes of fact identified, and the court simply does not have sufficient detail about the context surrounding the agreements to delegate. Finally, submitting questions about the scope of the arbitration agreements to arbitration, when the agreements are alleged to cover widespread unauthorized and fraudulent conduct, appears both surprising and oppressive. Even members of Congress seemed surprised that plaintiffs damaged by Wells Fargo's unauthorized activities have been held to arbitration agreements in authorized account agreements. *See* Letter from Senators Warren, Reed, Tester, Brown, Menendez, Warner, Heitkamp, Schatz, Masto, Donnelly & Van Hollen to Hon. Mike Crapo, Chairman, Senate Comm. on Banking, Hous., & Urban Affairs (Aug. 1, 2017) [hereinafter "Senate Banking Comm. Letter"] (requesting that the Chairman hold a hearing to question Wells Fargo about new developments in the unauthorized accounts scandal, including forced arbitration of these disputes). Further factual development in a summary trial will greatly assist the court in determining whether enforcing the delegation provisions would be unconscionable.

## III.   Waiver

Beyond factual disputes regarding the existence of agreements to arbitrate and to delegate, as well as whether the delegation provision is unconscionable in the circumstances, the court must also determine whether Wells Fargo has waived its right to compel arbitration in this case. Plaintiffs argue that Wells Fargo's election to settle the *Jabbari* nationwide class action and other litigation around the country dealing with the unauthorized accounts and other fraudulent

activities evinces its use of the judicial forum, rather than the arbitral forum, to resolve the current disputes. Plaintiffs also contend that Wells Fargo relinquished its right to seek arbitration of these claims through the statements of their CEO before Congress. Wells Fargo denies any waiver of the right to seek arbitration through its settlements in other suits or the statements of its CEO.

"It is axiomatic that 'the right to arbitration, like any other contract right, can be waived.'" *In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litig.*, 790 F.3d 1112, 1115 (10th Cir. 2015) (quoting *Reid Burton Constr., Inc. v. Carpenters Dist. Council of S. Colo.*, 614 F.2d 698, 702 (10th Cir. 1980)) (*In re Cox I*). The Tenth Circuit has declared that "[t]here is no set rule as to what constitutes a waiver or abandonment of the arbitration agreement; the question depends upon the facts of each case and usually calls for a finding by the trier of the facts." *Reid Burton*, 614 F.2d 698, 702 (10th Cir. 1980). More recently, the Tenth Circuit has coalesced this broad statement into two types of waiver: "The first is based on a party's intent. A party can 'subjectively' waive its right to arbitration if it intentionally relinquishes or abandons that right; once it has done so, it has no right to demand arbitration later." *In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1205 (10th Cir. 2016) (*In re Cox II*). "Second, and much more commonly, a party's conduct in the course of litigation can foreclose it from the right to switch to arbitration, regardless of its intent." *Id.* The presumption in favor of arbitration applies to questions of waiver, and the Plaintiffs carry the burden of persuasion. *Id.*

The Tenth Circuit outlined six factors courts should weigh when considering whether a party waived its right to arbitration:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties

were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps (e.g., taking advantage of judicial discovery procedures not available in arbitration) had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

*In re Cox II*, 835 F.3d at 1205 (quoting *Peterson v. Shearson/Am. Exp., Inc.*, 849 F.2d 464, 467–68 (10th Cir. 1988)). This list is not exclusive, and courts do not mechanically apply the factors. *Id.* (citing *Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 773 (10th Cir. 2010)).

The court begins by addressing the second, more common type of waiver through litigation conduct. Considering the *Peterson* factors, the court finds that Wells Fargo's litigation conduct is unlikely to support a conclusion that it waived the right to seek arbitration in this case.

Wells Fargo has asserted and maintained its right to seek arbitration from the inception of the case, and it has not otherwise answered the Plaintiffs' pleadings. Indeed, all other issues in this case have been stayed pending resolution of the arbitration issue. (*See* ECF Nos. 36, 37, 78.) Plaintiffs argue instead that Wells Fargo's settlements in other unauthorized account cases—i.e., the national settlement in *Jabbari* and private settlements in other cases, including settlement after the *Jeffries* court granted its motion to compel—demonstrate Wells Fargo's use and manipulation of the judicial forum to resolve these disputes.

In this court's understanding, Wells Fargo has either privately settled or sought and obtained stays due to the nationwide settlement in every other federal case relating to unauthorized accounts, even after moving to compel arbitration (and succeeding). But though the claims across these cases are essentially the same, the other cases involved different plaintiffs and "[t]he difference in parties is dispositive." *In re Cox II*, 835 F.3d at 1205. There may be some overlap due to the class allegations in these proceedings, however, and the Plaintiffs in this

case, unlike in *Jeffries*, have not confirmed whether they will be opting out of the nationwide settlement if approved. The question remains whether Wells Fargo's willingness to settle in the courts is sufficiently inconsistent with the right to arbitrate to be a waiver in this case.

Turning to the first type of waiver, the court finds that Plaintiffs have raised a dispute of fact about whether Wells Fargo has intentionally waived its right to seek arbitration of this dispute during its CEO's public statements to Congress this fall. This type of waiver is narrower, and the Tenth Circuit has yet to apply it. *See BOSC, Inc. v. Bd. of Cty. Commissioners of Cty. of Bernalillo*, 853 F.3d 1165, 1170 (10th Cir. 2017) (explaining that "a party should not be permitted to demand arbitration when it has previously waived its right to arbitrate in the narrow sense of waiver typically used in the criminal-law context, where a waiver is an 'intentional relinquishment or abandonment of a known right.'" (quoting *Hill*, 603 F.3d at 773)); *but see In re Cox I*, 790 F.3d at 1119 (rejecting an attempt to "artificially narrow the scope of waiver" and noting that "our circuit has explicitly rejected the proposition that waiver in the context of contract enforcement, including arbitration contracts, is limited to '. . . intentional relinquishment or abandonment of a known right.'" (quoting *Hill*, 603 F.3d at 773)). "[E]xternal conduct may reveal a party's intentions." *BOSC*, 853 F.3d at 1171.

Testifying before Congress on October 3, 2017, Wells Fargo's CEO, Timothy Sloan, stated that Wells Fargo is no longer utilizing forced arbitration in cases of unauthorized accounts. When Senator Tester asked whether Wells Fargo was using forced arbitration over unauthorized account disputes, Mr. Sloan stated that the company had "dealt with" that issue through the California settlement, and that the company did not waive its right to arbitration but did agree to settle the case and make it "right by the customers." (*See* Opp'n, Ex. D (Tr. of Hr'g Testimony).) When asked again if they had used forced arbitration in these cases, Mr. Sloan conceded that

"there were instances, historically, that [Wells Fargo] did," but, when asked whether the bank

was still doing so, Mr. Sloan affirmed that Wells Fargo was "not doing that today." (*Id.*) After

further back and forth, the following exchange occurred:

| | |
|---|---|
| Senator Tester: | Okay, Tim, the only time I get in fights with folks who are talking is when they don't give me a yes or no answer when I really ask it, and the question is this, and you can ask it another way, answer it in another way if you want, but, uh, are you, will you commit to not use forced arbitration on accounts that were not authorized by the customer? |
| Timothy Sloan: | The, the easy answer for that, uh, Senator, is yes, because we haven't done that. |
| Senator Tester: | Okay. |
| Timothy Sloan: | We're, we are not doing that. |
| Senator Tester: | And you're not going to do it moving forward? |
| Timothy Sloan: | We're not doing that. |

(*Id.*) Later in the hearing, Senator Van Hollen asked Mr. Sloan if Wells Fargo's conduct in "a

case in Utah" where "Wells Fargo lawyers have actually taken the position that the forced

arbitration does apply to those fake accounts" contradicted his earlier testimony. (*Id.*) Mr. Sloan

testified that he was "not familiar" with the situation and would have to look into the matter. (*Id.*)

Overall, the court finds these statements create an issue of fact regarding whether Wells

Fargo intentionally waived its right to seek arbitration here. Mr. Sloan first disavows any current

use of forced mandatory arbitration of unauthorized account cases because of the nationwide

settlement. When later asked if his testimony on forced arbitration was false because Wells

Fargo was still pursuing it in this case, Mr. Sloan stated he was unaware of the case. The court

does not find Mr. Sloan's unawareness credible. First, the August 2017 letter from Senate

Banking Committee members that called for this hearing stated that committee members were

concerned about Wells Fargo's use of mandatory arbitration in litigation over unauthorized accounts and cites an article discussing this case. *See* Senate Banking Comm. Letter at 4 (citing *Wells Fargo Asks Court to Force Customers to Arbitration in Fake Accounts Cases*, N.Y. Times (Nov. 24, 2016), https://nyti.ms/2jPd1v7). Moreover, this case appears to be the only federal class action that remains active and not stayed in light of *Jabbari* or otherwise settled. This was the case in October as well.

Mr. Sloan's statements may bind the corporation. A corporation only acts through its agents, *In re C.W. Mining Co.*, 636 F.3d 1257, 1266 (10th Cir. 2011), and corporate officers are "managing agents" for the corporation, *Merrion v. Scorup-Somerville Cattle Co.*, 134 F.2d 473, 477 (10th Cir. 1943). "The powers of an officer or agent of a corporation to bind the corporation are governed by the general law of agency." *Id.* (citing *Carlquist v. Quayle*, 62 Utah 266, 218 P. 729, 731 (1923); 7 R.C.L., Corporations, § 616; 13 Am. Jur., Corporations, § 889). In general, the representations or admissions of an officer can bind the corporation where the officer is acting on behalf of the corporation and within the scope of his or her authority. *See, e.g.*, 19 C.J.S. Corporations § 725 ("A corporation may be bound by the representations or admissions of its officers or agents, if made while such officer or agent is acting as such and within the scope of his or her authority."); 2A Fletcher Cyc. Corp. § 740 ("The statement must be within the scope of the officer's authority and made in the course of the performance of corporate duties."); 2 Close Corp and LLCs: Law and Practice § 8:5 (Rev. 3d ed.) ("Corporate law, for the most part, follows agency law in basing officer power to act for the corporation upon either actual authority or apparent authority.").

"Corporate intent is shown by the actions and statements of the officers, directors, and employees who are in positions of authority or have apparent authority to make policy for the

corporation." *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 610 F.3d 44, 53 (2d Cir. 2010) (quoting *United States v. Basic Constr. Co.*, 711 F.2d 570, 573 (4th Cir. 1983)); *accord Minor v. Mechanics' Bank of Alexandria*, 26 U.S. (1 Pet.) 46, 70 (1828) ("The officers of the bank are held out to the public as having authority to act, according to the general usage, practice, and course of their business; and their acts within the scope of such usage, practice, and course of business, would, in general, bind the bank in favour of third persons possessing no other knowledge.").

Mr. Sloan's testimony to Congress, given under oath, that Wells Fargo is no longer pursuing mandatory arbitration in these cases raises a question of fact as to whether the company made an intentional waiver in this matter. Wells Fargo does not argue that Mr. Sloan's statements could not have bound the company; it merely argues that they do not show a knowing waiver. This is a question of fact that can be resolved in a summary trial. *See Dist. Lodge 26*, 610 F.3d at 52 ("The corporate state of mind is a fact capable of ascertainment." (quoting *Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912, 925 (S.D.N.Y. 1984))).

## CONCLUSION

For the foregoing reasons, the court **RESERVES** ruling on Well Fargo's Motion to Compel Arbitration. The court will resolve material issues of fact regarding the existence of certain arbitration agreements, the parties' intent to delegate questions of arbitrability and the potential unconscionability of doing so in these circumstances, and the possibility that Wells Fargo intentionally waived its right to arbitrate through its CEO's statements under oath to Congress that it is no longer pursuing arbitration in these cases.

Upon entry of this order, the court will set a telephonic status conference with the parties for **Friday, December 1, 2017 at 2 p.m.** to discuss the timing for the summary trial and

procedures. In order to comply with Section 4 of the Act, the parties should come prepared to discuss the anticipated trial length and whether a jury is requested, as well as whether a trial date in early or mid-January would be feasible.

Finally, if either party contends that the contract issues in this case are governed by some law other than Utah law, that party shall file a supplemental brief citing the factual and legal basis for its position within thirty (30) days of this order.

DATED this 29th day of November, 2017.

BY THE COURT:

Clark Waddoups
United States District Judge