IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LAWRENCE J. MITCHELL, *et. al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, *et. al.*,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' 12(b)(1) MOTION AND GRANTING, IN PART, DEFENDANTS' 12(b)(6) MOTION<br><br>Case No. 2:16-cv-966<br><br>Judge Clark Waddoups |

## **Introduction**

Before the court is Wells Fargo Bank, N.A. and Wells Fargo & Company's Motion to Dismiss Plaintiffs' Third Amended Complaint. Defendants argue that a majority of Plaintiffs fail to allege standing and move to dismiss under Rule 12(b)(1). Defendants also move to dismiss each of the Plaintiffs' fifteen claims under Rule 12(b)(6) for failure to state a claim. After careful consideration of the arguments set forth in the briefs and oral argument, the court now GRANTS Defendants' 12(b)(1) Motion. And, as explained below, the court GRANTS in part, and DENIES in part, Defendants' 12(b)(6) Motion. The conclusion the court was required to reach based on the pleadings and arguments made in this case should not be read as an affirmation that Wells Fargo's conduct was appropriate or correct. Indeed, the facts presented indicate a massive system wide failure by the bank. Many of the claims here, however, fail to meet pleading requirements and must be dismissed as discussed below.

## Background

In this action, Plaintiffs allege that Wells Fargo employees used customers' confidential information to open fraudulent accounts in the customers' names to meet sales goals, and that Wells Fargo encouraged, knew of, or should have known of this practice. Plaintiffs nationwide have made very similar allegations against Wells Fargo, and have filed suit in other districts. *See In re Wells Fargo Fraudulent Account Opening Litig.*, 282 F. Supp. 3d 1360, 1361 (U.S. Jud. Pan. Mult. Lit. 2017).[1] Of those actions filed in other districts, *Jabbari v. Wells Fargo Bank, N.A.*, No. 3:15-cv-2159-VC (N.D. Cal.) is the most relevant to this case. Because this case is so closely tied to *Jabbari*, the court discusses the history of *Jabbari* where relevant.

The *Jabbari* plaintiffs filed their action against Wells Fargo on May 13, 2015, *Jabbari*, No. 3:15-cv-2159 (N.D. Cal. Oct. 20, 2017), (ECF No. 1), making it the first-filed putative class action. Plaintiffs in this case filed this action on September 16, 2016. (ECF No. 2.) On November 3, 2016, Plaintiffs filed a Second Amended Complaint. (ECF No. 15.)[2] Sometime around February 16, 2017, this court received notice that the Judicial Panel on Multidistrict Litigation ("JPML") would hear argument on whether to create an MDL action from the several cases filed against Wells Fargo related to fraudulent account openings. (*See* ECF No. 51.) On February 28, 2017, this court stayed the case pending the JPML's decision. (ECF No. 54.)

On March 28, 2017, the parties in *Jabbari* filed a Joint Notice of Settlement. *Jabbari*, No. 3:15-cv-2159 (N.D. Cal. Oct. 20, 2017), (ECF No. 96.) On April 5, 2017, the JPML determined it would not order centralization due to the nationwide class settlement-in-principle reached by

---

[1] Wells Fargo's conduct has also been the subject of investigations by Congress and wide-spread scrutiny by the media and other investigations. The court here must focus solely on the pleadings and merits of the arguments in this case.

[2] Initially, Wells Fargo moved to compel arbitration and to stay ligation on the merits pending resolution of that motion. (ECF Nos. 24 and 29.) On November 29, 2017, after extensive briefing, argument and evidence, the court ordered a summary trial on the motion to compel arbitration. (ECF No. 114.) On December 26, 2017 Wells Fargo withdrew its motion to compel arbitration. (ECF No. 131.)

the parties in *Jabbari*. *See In re Wells Fargo Fraudulent Account Opening Litig.*, 282 F. Supp. 3d at 1361. On that same day, Plaintiffs moved to lift the stay in this case. (ECF No. 55.) On April 13, 2017, this court heard argument from the parties regarding the propriety of lifting the stay in light of the pending *Jabbari* settlement. (*See* ECF Nos. 58, 61.) The court ultimately lifted the stay. (ECF No. 60.) On June 7, 2017, the court held a hearing during which the court granted Plaintiffs' oral motion to amend their complaint. (ECF No. 67.) Plaintiffs filed their currently operative Third Amended Complaint on June 27, 2017. (ECF No. 69.) The Third Amended Complaint initially listed 76 named Plaintiffs, but through a series of voluntary dismissals, was eventually reduced to 57.[3] (*See* ECF No. 69.)

On July 8, 2017, the court in *Jabbari* entered an order preliminarily approving the settlement in that case. *Jabbari*, No. 3:15-cv-2159 (N.D. Cal. July 8, 2017), (ECF No. 165.) That order provided that the "Settlement Class Members who do not opt out agree to release all claims that could have been asserted, or that arise out of the same transactions or occurrences as the claims against Wells Fargo entities that were or could have been asserted in [the *Jabbari*] action." *Jabbari*, No. 3:15-cv-2159, 2017 WL 5157608, at *5 (N.D. Cal. July 8, 2017). Later, the court in *Jabbari* entered an order setting the opt out deadline for February 19, 2018. *Jabbari*, No. 3:15-cv-2159 (N.D. Cal. Oct. 20, 2017), (ECF No. 176 at 4.) The opt out deadline is relevant here. Those who did not opt out of the *Jabbari* settlement are unable to pursue their claims in this case.

---

[3] On August 16, 2017, Plaintiffs filed a Notice of Voluntary Dismissal of five Plaintiffs. (*See* ECF No. 81.) On August 25, 2017, Plaintiffs filed a Notice of Voluntary Dismissal of two more Plaintiffs. (*See* ECF No. 83.) On September 8, 2017 and September 13, 2017, Plaintiffs filed two more Notices of Voluntary Dismissal, each of a single plaintiff. (*See* ECF Nos. 84 & 85.) On January 12, 2018, Plaintiffs filed a Notice of Voluntary Dismissal of ten Plaintiffs. (*See* ECF No. 141.) After these dismissals, the Third Amended Complaint contained 57 named Plaintiffs.

On January 30, 2018, Defendants filed their Motion to Dismiss the Third Amended Complaint for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). (ECF No. 144.) On February 12, 2018, Plaintiffs filed their Response. (ECF No. 149.) On February 26, 2018, Defendants filed their Reply. (ECF No. 151.)

On June 14, 2018, the court in *Jabbari* entered an order granting final approval of the class action settlement. *Jabbari*, No. 3:15-cv-2159 (N.D. Cal. June 14, 2017), (ECF No. 271.) Attached as "Exhibit A" to that order was a list of those individuals who had opted out of the *Jabbari* settlement. *Jabbari*, No. 3:15-cv-2159 (N.D. Cal. June 14, 2017), (ECF No. 271 at 16–27.) That list contained the names of 967 individuals. (*See Jabbari*, No. 3:15-cv-2159 (N.D. Cal. June 14, 2017), (ECF No. 271 at 27.)

The *Jabbari* court "approve[d] that list, including those who filed untimely exclusions, as constituting the list of all Persons who have submitted timely requests for exclusion from the Settlement Class." *Jabbari*, No. 3:15-cv-2159 (N.D. Cal. June 14, 2017), (ECF No. 271 at 8.) The order also included "Exhibit B," a list of those individuals who "filed both a claim and an exclusion," and for whom the court provided "shall not be excluded unless they subsequently communicate their intent . . . to withdraw their claim and not participate in the Settlement on or before July 7, 2018." *Jabbari*, No. 3:15-cv-2159 (N.D. Cal. June 14, 2017), (ECF No. 271 at 9.)

This court heard oral argument on Defendants' Motion to Dismiss on June 20, 2018. (ECF No. 159.) On July 31, 2018, the Plaintiffs filed a "Request for the Court to take Judicial Notice." (ECF No. 160.) In this filing, Plaintiffs requested that "the Court consider all proposed Plaintiffs as members of a potential class action" because of appeals of the *Jabbari* case. (*See* ECF No. 160 at 2.) Plaintiffs included no authority in support of their request. On August 7, 2018 the defendants filed an Objection to Plaintiffs' request, arguing that "Plaintiffs' submission

is not altogether clear with respect to the implications of the appeals in this action . . . ." (ECF No. 161 at 2.) The court agrees and declines Plaintiffs' request.

## ANALYSIS

### Remaining Plaintiffs

As explained above, the Third Amended Complaint initially listed 76 named Plaintiffs, but through a series of voluntary dismissals, the number was eventually reduced to 57. (*See* ECF Nos. 69, 81, 83–85, & 141.) And, as also explained above, only those Plaintiffs who opted out of the *Jabbari* settlement can proceed in this case.

The court requested that Plaintiffs' attorneys provide a list of those Plaintiffs who opted out of the *Jabbari* settlement. (*See* ECF No. 156.) Plaintiffs' counsel provided a list, representing that 37 "individuals have withdrawn from the *Jabbari* litigation." (ECF No. 157 at 2–3.) As explained below, only 33 individuals involved in this case opted out of the *Jabbari* settlement.

Four individuals on the Plaintiffs' list of 37 should be removed—"Nedelka Martinsen," "Adrienne Thompson," "Concepcion Powell," and "Charles Jones." First, as Defendants point out, "Number 33" on that list, "Nedelka Martinsen," "was left off the Third Amended Complaint." (Tr. 18: 25; *also*, *compare* ECF No. 157 at 3 *with* ECF No. 69.) Without "Nedelka Martinsen," the number of Plaintiffs on Plaintiffs' counsel's list becomes 36.

Second, as the Defendants point out, Plaintiffs mistakenly "repeat" "Number 31" on their list, "Adrian Thompson," "under a different spelling"—"Adrienne Thompson." (*See* Tr. 18: 15–19 *also*, *compare* ECF No. 157 at 3 *with* ECF No. 69.) The court assumes that the person listed in the *Jabbari* court's Exhibit A as "Adrienne Thompson" is the "Adrian Thompson" from this case. Even under that assumption, the court must remove Plaintiffs' "Number 12." This brings the list's total to 35.

Third, Defendants also pointed out at oral argument that "Number 32" on Plaintiffs' list, "Concepcion Powell," is not listed on *Jabbari's* "Exhibit A" as a confirmed opt out, or Exhibit B as a possible opt out. (*See* Tr. 18: 22–24.) At oral argument, Plaintiffs did not respond to Defendants' argument on this point. The court has independently confirmed that no one named "Concepcion Powell" is listed on the *Jabbari* court's Exhibit A or Exhibit B. *See Jabbari*, No. 3:15-cv-2159 (N.D. Cal. Oct. 20, 2017), (ECF No. 271 at 16–30.) Because the Plaintiffs did not respond to Defendants' argument, and because the court has confirmed that no one named "Concepcion Powell" is listed as having opted out, the court assumes Concepcion Powell did not opt out of the *Jabbari* settlement. Plaintiffs' list is reduced to 34.

Fourth, Defendants point out that "Charles Jones" "is the person who the [Plaintiffs'] parenthetical states" "does not appear on [the *Jabarri* court's] opt out list Exhibit A," but for whom Plaintiffs' counsel "attached what appears to be a copy of an opt out form." (Tr. 19: 7–9.) Defendants' counsel argued that Charles Jones' opt out form "is not an effective opt out because it was not sent to the settlement administrator" in *Jabarri*. (*See* Tr. 19: 16–17.) Plaintiffs' counsel did not respond to this argument. Because Plaintiffs counsel did not respond to this argument, and because "Charles Jones" is not a name that appears on the *Jabari* court's Exhibit A, the court assumes Charles Jones did not opt out of the *Jabari* settlement. Plaintiffs' list is reduced to 33 individuals.

The court now turns to 3 individuals that the Plaintiffs acknowledged "filed [an] opt-out and submitted [a] claim form." (ECF No. 157 at 3.) These individuals are "Reza Kamali," "Ralph McCoy," and "Travis Ashby." (*See* ECF No. 157 at 3.) As explained above, the court in *Jabbari* provided that those Plaintiffs who "filed both a claim and an exclusion," "shall not be excluded unless they subsequently communicate their intent . . . to withdraw their claim and not

participate in the Settlement on or before July 7, 2018." *Jabbari*, No. 3:15-cv-2159 (N.D. Cal. June 14, 2017), (ECF No. 271 at 9.) For the purpose of resolving the present Motion, this court assumes that those three Plaintiffs communicated their intent to withdraw their claim. The court therefore assumes that they have opted out of the *Jabbari* settlement. The court proceeds under the assumption that there are 33 Plaintiffs remaining in this case who opted out of the *Jabarri* settlement.

## Article III Standing

As explained above, after the *Jabarri* settlement only 33 Plaintiffs remain. Defendants wrote their Motion to Dismiss prior to the settlement. At that time there were 57 Plaintiffs. In their Motion to Dismiss for lack of standing, Defendants argued that "[t]he majority of the Plaintiffs—38 of the remaining 57 Plaintiffs . . . do not allege any unauthorized accounts were ever opened in the names, that their information was ever improperly used or accessed by any Wells Fargo employee, or that they were subject to any improper sales practice." (ECF No. 144 at 24.) Defendants refer to these 38 Plaintiffs as the "Bystander Plaintiffs." (ECF No. 144 at 24.) The court will refer to those individuals who did allege an unauthorized account was opened in their name as "Wrongful Account Plaintiffs." Since many of the 57 remaining Plaintiffs (those Plaintiffs named in the Third Amended Complaint who did not file a voluntary dismissal) have not opted out of the *Jabbari* settlement, the number of Bystander Plaintiffs is no longer 38.

At oral argument, Defendants' counsel stated that 20 Bystander Plaintiffs have opted out of the *Jabarri* settlement. (*See* Tr. 17: 14–15 ("If you look at those 33 opt outs, of those 33 opt outs 20 are bystander plaintiffs, or bystander plaintiffs as we define the term, meaning they did not allege an unauthorized account was opened in their name.").) But after reviewing the Third

Amended Complaint, the court finds that there are 25 Bystander Plaintiffs and eight Wrongful Account Plaintiffs.

| Plaintiff's Name | Bystander | Wrongful Account |
|---|---|---|
| 1. Lawrence Mitchell | **Bystander** (TAC ¶¶ 321-25) | |
| 2. Kay Mitchell | **Bystander** (TAC ¶¶ 316-20) | |
| 3. Matthew Bishop | **Bystander** (TAC ¶¶ 151-58) | |
| 4. Tracy Kilgore | **Bystander** (TAC ¶¶ 459-460). | |
| 5. Jennifer Zeleny | **Bystander** (TAC ¶¶ 450-454) | |
| 6. Joseph Steele | **Bystander** (TAC ¶¶ 383-87) | |
| 7. April Thomas | **Bystander** (*See* TAC ¶¶ 414-20. (April Thomas does not allege that an unauthorized account was opened in her name, only that "a credit inquiry was made by Wells Fargo.").) | |
| 8. Patricia Rivas | | **Wrongful Account** (TAC ¶181 ("Plaintiff Patricia [Rivas] contends that a credit card was opened in her name without her authorization . . . .").) |
| 9. Andrew Gorayeb | | **Wrongful Account** (TAC ¶ 261 ("Plaintiff Andrew Gorayeb indicates that Defendants opened up an investment account without his authorization.").) |
| 10. Barbara Shadoan | | **Wrongful Account** (TAC ¶ 376 "Plaintiff Barbara Shadoan asserts that she was told that if she didn't open up other accounts, she would be charged additional fees.").) |
| 11. Eric Talaska | | **Wrongful Account** (TAC ¶ 405 ("Plaintiff Eric Talaska asserts that he made several in person visits and phone calls relating to the fraudulent accounts which were opened up in his name.").) |
| 12. Scott Westin | **Bystander** (TAC ¶¶ 426-31) | |
| 13. Brent Miller | **Bystander** (TAC ¶¶ 464-66) | |
| 14. Aaron Brodie | | **Wrongful Account** (TAC ¶169 ("Plaintiff Aaron Brodie contends that at the time of account opening, a credit card was opened without his consent for overdraft protection.").) |
| 15. Lisa Stern | **Bystander** (TAC ¶¶ 388-93) | |
| 16. Erika Jones | **Bystander** (TAC ¶¶ 281-85) | |
| 17. Robert Moyer | **Bystander** (TAC ¶¶ 326-30) | |
| 18. Kenneth Gregory | **Bystander** (TAC ¶¶ 263-67) | |
| 19. Aaron Hands | **Bystander** (TAC ¶¶ 268-72) | |
| 20. Matthew Gragg | **Bystander** (TAC ¶¶ 482-89) | |
| 21. Jeffery Taylor | | **Wrongful Account** (TAC ¶ 413 ("Plaintiff |

| | | |
|---|---|---|
| | | Jeffery Taylor contends that during the middle of the interview, Defendants took his personal information and opened up an account without his authorization . . . .").) |
| 22. Zachary Christensen | **Bystander** (TAC ¶¶ 195-99) | |
| 23. David Self | **Bystander** (TAC ¶¶ 365-69) | |
| 24. Donald Black | **Bystander** (TAC ¶¶ 159-63) | |
| 25. Carina L. Rhea | **Bystander** (TAC ¶¶ 360-64) | |
| 26. Kim Weston | **Bystander** (TAC ¶¶ 440-44) | |
| 27. Cameron Casey | **Bystander** (TAC ¶¶ 189-94) | |
| 28. Glenn Gilleshammer | | **Wrongful Account** (TAC ¶246 ("Plaintiff Glenn Gilleshammer contends that Wells Fargo opened up a new credit card, which was not authorized, and closed.").) |
| 29. Gloria Pledger | | **Wrongful Account** (TAC ¶342 ("Plaintiff Gloria Pledger asserts that she received a credit card following this visit, which she had not applied for.").) |
| 30. Adrian Thompson | **Bystander** (TAC ¶¶ 569-573) | |
| 31. Reza Kamali | **Bystander** (TAC ¶¶ 286-90) | |
| 32. Ralph McCoy | **Bystander** (TAC ¶¶ 311-15) | |
| 33. Travis Ashby | **Bystander** (TAC ¶¶ 130-35) | |

Defendants argue that the court "should dismiss the [Bystander Plaintiffs'] claims for failure to allege standing" because they "do not allege any unauthorized account or improper sales practice in relation to them, and instead allege only that Wells Fargo did not tell them this was happening to other people."  (ECF No. 144 at 27–28.) That is, the Bystander Plaintiffs do not "come close to alleging a concrete and particularized injury." (ECF No. 144 at 28.) The court agrees.

The federal judicial power extends only to "cases" and "controversies." U.S. Const. Art. III. "For a case or controversy to be justiciable, it must involve 'questions presented in an adversary context and capable of resolution through the judicial process.'" *Petrella v. Brownback*, 697 F.3d 1285, 1292–93 (10th Cir. 2012) (quoting *Massachusetts v. E.P.A.,* 549 U.S. 497, 516, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007)). "The three requirements of Article III standing—injury-in-fact, causation, and redressability—ensure that the parties to any litigation

have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Id.* (citing *Massachusetts*, 549 U.S. at 517). "The fact that a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured . . . ." *Gratz v. Bollinger*, 539 U.S. 244, 289, 123 S. Ct. 2411, 2438, 156 L. Ed. 2d 257 (2003). Indeed, "a named plaintiff must possess standing as to each individual claim asserted in a complaint." *Donelson v. United States Through Dep't of the Interior*, 730 F. App'x 597, 601 (10th Cir. 2018) It is Plaintiffs' burden to demonstrate standing. *See Petrella*, 697 F.3d at 1293.

Defendants bring their first Motion under rule 12(b)(1). (*See* ECF No. 144 at 27.) "Motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may take one of two forms." *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001) (citing *Holt v. United States,* 46 F.3d 1000, 1002 (10th Cir.1995). "First, a party may make a facial challenge to the plaintiff's allegations concerning subject matter jurisdiction, thereby questioning the sufficiency of the complaint." *Id.* (citation omitted). "In addressing a facial attack, the district court must accept the allegations in the complaint as true." *Id.* "Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id.* (citation and internal quotation marks omitted). "In addressing a factual attack, the court does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* (internal quotation marks omitted) (citation omitted). Because the court "construe[s] the [Defendants'] Rule 12(b)(1) motion to dismiss for lack of standing to be a facial attack on the complaint, rather than a factual one," it

accepts Plaintiffs' "allegations of material facts as true and construe[s] the complaint in favor of" the Plaintiffs. *Id.*

Plaintiffs' response to Defendants' argument is that the Bystander Plaintiffs *have* alleged that their identities were stolen, but that Plaintiffs cannot know which of the Bystander Plaintiffs had unauthorized accounts opened in their names because Defendants have not disclosed that information. (*See* ECF No. 149 at 16 ("For [the Bystander Plaintiffs], *they allege that their identities were stolen*, but because of Defendants' practices of burying the information, are unable to point to a specific account number that was fraudulently opened.") (emphasis added)).) Plaintiffs' response is directly contrary to Defendants' argument that the Bystander Plaintiffs have "not allege[d] any unauthorized account or improper sales practice in relation to them . . . ." (ECF No. 144 at 27–28.) The question for the court is therefore whether the Bystander Plaintiffs sufficiently alleged an injury in fact.

Even after construing the Third Amended Complaint in Plaintiffs' favor, the court concludes that the Bystander Plaintiffs have not sufficiently alleged an injury in fact. In paragraphs 125–581 of the Third Amended Complaint, the individual plaintiffs make factual allegations regarding their specific Wells Fargo accounts. (*See* TAC ¶¶ 125–581, ECF No. 69 at 35–90). Within this portion of the Third Amended Complaint, the Bystander Plaintiffs do not allege any unauthorized accounts were opened in their names. (*See* TAC ¶¶ 125–581, ECF No. 69 at 35–90). Nor do they allege that their identities were stolen. (*See* TAC ¶¶ 125–581, ECF No. 69 at 35–90). Within this portion of the Third Amended Complaint, the Bystander Plaintiffs only allege that they would not have opened Wells Fargo accounts if the Wells Fargo employees who helped them open the accounts had told them about the ongoing fraud. (*See* TAC ¶¶ 125–581, ECF No. 69 at 35–90). They do not allege any injury from opening the accounts, which

apparently performed exactly as Plaintiffs expected and intended. Plaintiffs' argument appears to be they would not have done business with Wells Fargo if they had known about the unauthorized accounts opened for other customers, but have suffered no injury from the accounts they did open. The court agrees with the reasoning of those cases cited by Defendants that "[t]he 'would not have shopped' theory fails to establish injury for purposes of standing." *See Carlsen v. GameStop, Inc.*, 112 F. Supp. 3d 855, 865 (D. Minn. 2015), *aff'd on other grounds*, 833 F.3d 903 (8th Cir. 2016).

Admittedly, the Plaintiffs did allege generally, in another portion of the Third Amended Complaint, that "Plaintiffs . . . suffered actual identity theft as well as damages in [various] form[s] . . . ." (TAC ¶ 629, ECF No. 69 at 107.) And Plaintiffs did generally allege that "Defendant used Plaintiffs' confidential information to open credit card accounts, savings accounts, loans, or other 'services or products,' without Plaintiffs' knowledge or consent." (*See* TAC ¶ 657, ECF No. 69 at 114.) But even after construing the Third Amended Complaint in Plaintiffs' favor, the court cannot conclude that the Bystander Plaintiffs sufficiently alleged an injury because, without specific facts, these are conclusory statements that the court must disregard. In order to meet their burden, Plaintiffs must "clearly allege facts demonstrating" "an injury in fact." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and "actual or imminent, not conjectural or hypothetical." *Id*. (citation omitted). The Bystander Plaintiffs simply did not allege any concrete and particularized injury. An examination of the entire Third Amended Complaint

reveals that any assertion to the contrary is simply not substantiated.[4] Even after construing the Third Amended Complaint in Plaintiffs' favor, the court cannot conclude that the general allegations—that Defendants opened unauthorized accounts in Plaintiffs' names—apply to all Plaintiffs when, individually, the "Bystander Plaintiffs" did not make those same allegations.

For these reasons, the Defendants' Rule 12(b)(1) Motion to Dismiss the 25 Bystander Plaintiffs' Claims is GRANTED. Only the eight Wrongful Account Plaintiffs remain.

## **Statutory Jurisdiction**

"Federal courts are courts of limited jurisdiction and must have a statutory basis for their jurisdiction." *Dutcher v. Matheson*, 840 F.3d 1183, 1189 (10th Cir. 2016). (internal quotation marks omitted) (citation omitted). This court "presume[s] no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction that jurisdiction exists; that showing must be made by a preponderance of the evidence." *Id.*

In the Third Amended Complaint, Plaintiffs allege that "[t]his Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2)." (TAC ¶ 20, ECF No. 69 at 5.) 28 U.S.C. §1332(d)(2) is known as the Class Action Fairness Act (CAFA). *See Speed v. JMA Energy Co., LLC*, 872 F.3d 1122, 1125 (10th Cir. 2017). "Under CAFA, a federal district court has subject matter jurisdiction 'over class actions involving [1] at least 100 members and [2] over $5 million in controversy when [3] minimal diversity is met (between at least one defendant and one plaintiff-class member).'" *Dutcher*, 840 F.3d at 1190 (quoting *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1243 (10th Cir. 2009)).

---

[4] *See also* § 1206 Pleading Jurisdiction—In General, 5 Fed. Prac. & Proc. Civ. § 1206 (3d ed.) ("[A]llegations of the district court's subject matter jurisdiction . . . will not protect the pleader against a motion to dismiss under Rule 12(b) if an examination of the entire complaint reveals that the assertion of jurisdiction is not substantiated . . . ."

There are not sufficient facts pleaded for the court to conclude that it has jurisdiction under § 1332(d). After dismissing the 25 Bystander Plaintiffs, only eight Plaintiffs remain. There is no factual basis from the Third Amended Complaint from which the court can conclude or reasonably infer that this class action will involve at least 100 members. First, the pool of potential plaintiffs has shrunk considerably after the court in *Jabbari* granted final approval of the class action settlement. The list of those individuals who the *Jabbari* court "approve[d] . . . as constituting the list of *all Persons* who have submitted timely requests for exclusion from the Settlement Class" only contains 967 names. *See Jabbari*, No. 3:15-cv-2159 (N.D. Cal. June 14, 2017), (ECF No. 271 at 27) (emphasis added)). Plaintiffs' counsel conceded at oral argument that he did not know how many of those 967 individuals would be considered Bystander Plaintiffs.[5] This is important. If those individuals are Bystander Plaintiffs, they would not be able to join this class action, as they would lack standing. Plaintiffs' counsel did not provide any convincing argument for this court to conclude that this class action would exceed 100 members. And the court is persuaded by Defendants' argument that there is reason to be skeptical that those individuals who opted out of one Settlement Class would be eager to join another.

Moreover, after carefully reviewing the Third Amended Complaint and the parties' pleadings related to the instant Motion to Dismiss, the court again finds there are not sufficient pleaded facts to conclude or reasonably infer that the amount in controversy will exceed $5,000,000. The alleged damages of the remaining Plaintiffs are minor and do not come close to $5,000,000. Put simply, Plaintiffs, who bear the burden, have not made an adequate showing that

---

[5] (*See* Tr. 26: 7–13):

    MR. CAMERON CHRISTENSEN: So with the Jabbari – the people who have stepped out of the Jabbari case, the opt outs, there are up to 1,000. We -- we're not alleging all 1,000 are going to --

    THE COURT: How many of those are unauthorized accounts?

    MR. CAMERON CHRISTENSEN: We don't know at this time.

federal jurisdiction exists under § 1332(d). The court now considers whether there is a different statutory basis for subject matter jurisdiction.

At oral argument, counsel for Plaintiffs initially argued that the court may have diversity jurisdiction under 28 U.S.C. § 1332(a). (*See* Tr. 29: 2–3.) After conferring with co-counsel, Plaintiffs' attorney then conceded that diversity of citizenship was lacking. (*See* Tr. 29: 16–17.) The court now considers whether federal question jurisdiction exists under 28 U.S.C. § 1331.

Plaintiffs did not specifically allege federal question jurisdiction under the "Jurisdiction and Venue" portion of the Third Amended Complaint. (*See* TAC ¶ 20–23, ECF No. 69 at 5.) But "[a] plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising under" the Federal Constitution or laws." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006). "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 118 S. Ct. 1003, 1010, 140 L. Ed. 2d 210 (1998). "When applying this standard, [the Tenth Circuit] [has] explained that 'the complaint must identify the statutory . . . provision under which the claim arises, and allege sufficient facts to show that the case is one arising under federal law." *Davison v. Grant Thornton LLP*, 582 F. App'x 773, 775 (10th Cir. 2014).

This court, applying this standard, concludes that dismissal for lack of subject-matter jurisdiction is not appropriate in this case. Plaintiffs have pleaded claims under the Stored Communications Act, 18 U.S.C. § 2702(a)(1); the Fair Credit Reporting Act, 15 U.S.C. § 1681; the Bank Holding Co. Act, 12 U.S.C. § 1972; and the Racketeer Influenced Corrupt Organizations Act, 15 U.S.C. § 1972. Plaintiffs have identified the statutory provisions and

alleged facts showing that the case is one arising under federal law. The court therefore has federal question jurisdiction to hear Plaintiffs' claims arising under federal law. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.[6]

## 12(b)(6) Motion to Dismiss

A. Claim 1

Plaintiffs' First Claim for relief is titled "Protection of Personal Information Act, Unfair Competition Act, Deceptive Trade Practices Act and Federal Protection of nonpublic information." (ECF No. 69 at 94.) Plaintiffs allege that "Defendants' conduct constitutes unfair and illegal and fraudulent business practices within the meaning of the Utah Unfair Competition Act [(UUCA)], Utah Protection of Personal Information Act and Deceptive Trade Practices Act," (TAC ¶ 592, ECF No. 69 at 17), as well as acts of many other states. (TAC ¶ 598, ECF No. 69 at 99.) Plaintiffs largely ignore Defendants' arguments seeking to dismiss this claim.

Defendants argue that "Plaintiffs' claim under the UUCA fails because [(1)] the UUCA expressly exempts 'depository institutions' and entities that 'control a depository institution'" and because (2) "Plaintiffs fail to allege that Wells Fargo committed any of the four kinds of business practices covered by the act." (ECF No. 144 at 32) (citing Utah Code Ann. § 13-5a-103(2) and Utah Code Ann. § 13-5a-102(4)(a)(ii)).[7] Plaintiffs do not respond to Defendants'

---

[6] As explained below, the court grants Defendants' 12(b)(6) Motion as to all federal claims. "In deciding whether to exercise [supplemental] jurisdiction, [a] district court is to consider judicial economy, convenience, fairness, and comity." *Nielander v. Bd. of Cty. Comm'rs of Cty. of Republic, Kan.*, 582 F.3d 1155, 1172 (10th Cir. 2009) (internal quotation marks omitted) (citation omitted). It "is proper under 28 U.S.C. § 1367 and not inconsistent with [Tenth Circuit] precedent" for a district court to conduct an analysis of state claims and decide that "some warrant[] supplemental jurisdiction and other [do] not." *Id.*

This case was filed over two years ago. In the interest of judicial economy and convenience to the parties, the court decides many of the supplemental state law claims on the merits. Ultimately, the court dismisses all but four of the state law claims. The court will decide whether these claims warrant further supplemental jurisdiction at a later date.

[7] Utah Code Ann. § 13-5a-103(2) provides that "A person [injured by unfair competition] may not bring an action . . . against "a depository institution or . . . an entity that . . . controls a depository institution."

arguments. (*See* ECF No. 149 at 17.) Instead, Plaintiffs simply conclusorily argue that "Plaintiffs have sufficiently pled that Defendants violated . . . the Utah Unfair Competition Act." (ECF No. 149 at 17.)

Next, the court turns to the Utah Protection of Personal Information Act. Defendants argue that "[t]o the extent Plaintiffs intend to assert claims directly under that statute, there is no private right of action." (ECF No. 144 at 32.) (citation omitted). Plaintiffs do not respond to Defendants' arguments. (*See* ECF No. 149 at 16.) Instead, Plaintiffs conclusorily argue that "Plaintiffs have sufficiently pled that Defendants violated . . . the Utah Protection of Personal Information Act." (ECF No. 149 at 16.)

Next, the court turns to what Plaintiffs describe as the "Deceptive Trade Practices Act." (TAC ¶ 592, ECF No. 69 at 94.) The court agrees with Defendants that here, Plaintiffs appear to refer to the Utah Consumer Sales Practices Act (UCSPA). Defendants make two arguments here. First, they argue that a claim under the UCSPA requires the consumer to have suffered a loss, and argue that "[a]ll but seven of the Plaintiffs fail to allege any loss . . . ." (ECF No. 144 at 33) (citations omitted). Second, Defendants argue that "to the degree Plaintiffs seek to maintain fraud-based claims under the USCPA, they fail to allege those claims with the required particularity." (ECF No. 144 at 33.) Again, Plaintiffs do not respond to Defendants' specific arguments. (*See* ECF No. 149 at 17.) Instead, Plaintiffs again conclusorily argue that "Plaintiffs have sufficiently pled that Defendants violated . . . the Deceptive Trade Practices Act." (ECF No. 149 at 17.)

The court agrees with Defendants that because the Plaintiffs did not respond to any of Defendants' specific arguments in the Motion to Dismiss, Plaintiffs' claim should be dismissed.

---

Utah Code Ann. § 13-5a-102(4)(a)(ii)) provides that "unfair competition" is, among other requirements, one of the following: "malicious cyber activity," "infringement of a patent, trademark, or trade name," "a software license violation, or" "predatory hiring practices."

*See Strand v. W. Bountiful City*, No. 1:08-CV-112-CW, 2011 WL 1344202, at *1 (D. Utah Apr. 8, 2011) (Plaintiff "signal[ed] that he . . . abandoned [his] claim" when he did "not respond to" Defendants' argument).

The Defendants' Motion to Dismiss the Plaintiffs' First Claim is GRANTED.

B. Claim 2 (Stored Communications Act)

Plaintiffs' Second Claim is titled "Stored Communications Act Violations and Data Breach." (ECF No. 69 at 101.) In the Third Amended Complaint, Plaintiffs allege that Defendants violated 18 U.S.C. § 2702(a)(1) and § 2702(2)(A) of the Stored Communications Act (SCA). (*See* TAC ¶ 611, ECF No. 69 at 103 ("As a result of Wells Fargo's conduct described herein and its violations of Sections 2702(a)(1) and (2)(A) of the SCA, Plaintiffs . . . have suffered actual identity theft . . . .").) The SCA prohibits those who provide an 'electronic communication service' (ECS) or 'remote computing service' (RCS) to the public from divulging the contents of a subscriber's communications in certain circumstances.[8] Plaintiffs allege that "[b]y failing to take commercially reasonable steps to safeguard sensitive private financial information, and requiring scrutiny of their own employees, Wells Fargo has knowingly divulged customers' private financial information that was carried and maintained on Wells Fargo's computing data bank services." (TAC ¶ 610, ECF No. 69 at 103.)

In their Motion to Dismiss, Defendants argue that Plaintiffs "have not alleged facts plausibly demonstrating that Wells Fargo provides an ECS or RCS to the public." (ECF No. 144 at 36.) Plaintiffs respond that Defendants "are both an . . . 'ECS' and . . . 'RCS' provider." (ECF

---

[8] Section 2702(a)(1) provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service."

Section 2702(a)(2)(A) provides that "a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service . . . on behalf of, and received by means of electronic transmission from . . . a subscriber or customer of such service."

No. 149 at 18.) As support, Plaintiffs argue that Wells Fargo "has its own messaging system" that "allows for customers to access and respond to messages sent from Wells Fargo." (ECF No. 149 at 18.) Plaintiffs further argue that Wells Fargo is a RCS provider because "Wells Fargo provides, as part of its online banking services, several means by which a customer may use Defendants' " "processing of data" "to do something the customer could have done on its own." (ECF No. 149 at 19.) In their reply, Defendants argue that Plaintiffs made "no such allegations in the Complaint, and so they cannot provide a basis to oppose dismissal." (ECF No. 151 at 8.) Defendants also argue that "[e]ven assuming *arguendo* that these services would constitute an ECS or RCS, Plaintiffs do not contend that Wells Fargo knowingly divulged the contents of any communication sent over them." (ECF No. 151 at 8.)

The court agrees that even if Plaintiffs had included their arguments in the Third Amended Complaint, their claim would still fail. In order to be liable under section 2702(a)(1), the statute requires a "person or entity" to have "divulge[d] . . . the contents of a communication *while in electronic storage . . . .*" 18 U.S.C. § 2702(a)(1) (emphasis added). Plaintiffs have not alleged that Wells Fargo divulged Plaintiffs' private financial information over "its own messaging system." (ECF No. 149 at 18.) Plaintiffs' claim under 2702(a)(2)(A) also fails. In order to be liable under section 2702(a)(2)(A), the statute requires a "person or entity" to have "divulge[d]" "the contents of any communication *which is carried or maintained*" on a "remote computing service." 18 U.S.C. § 2702(2)(A) (emphasis added). Plaintiffs have not alleged that Wells Fargo divulged Plaintiffs' private financial information through the "processing of data" that Plaintiffs describe in their response. (*See* ECF No. 149 at 19.) Plaintiffs have not adequately pleaded a claim under either 18 U.S.C. § 2702(a)(1) or § 2702(2)(A).

In their response, Plaintiffs also allege a violation of a different provision of the SCA—18 U.S.C. § 2701(a). The court agrees with Defendants that because this theory was not alleged in the Complaint, it cannot survive dismissal. *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995) ("It is well-established . . . that in determining whether to grant a motion to dismiss, the district court . . . [is] limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint.").

For all of these reasons, the Defendants' Motion to Dismiss the Plaintiffs' second claim is GRANTED.

C. Claim 3 (Invasion of Privacy)

Plaintiffs have adequately pleaded a claim for invasion of privacy. As Defendants point out, Utah recognizes "four distinct kinds" of privacy torts, one of which is "appropriation of name or likeness for the benefit of another." *Stien v. Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 379 (Utah Ct. App. 1997)). In Utah, a plaintiff must "establish three elements" to demonstrate appropriation of name: "(1) appropriation, (2) of another's name or likeness that has some 'intrinsic value,' (3) for the use or benefit of another." *Id.* (citing *Cox v. Hatch*, 761 P.2d 556 (Utah 1988)). Defendants argue that Plaintiffs claim fails because of the second element—intrinsic value. (*See* ECF No. 144 at 43.) Defendants argue that because Plaintiffs "do not allege that their names or identities have some value beyond those of the general public," (ECF No. 144 at 43) their misappropriation of name claim fails.

The court disagrees. In *Cox*, the Utah Supreme Court "reasoned that intrinsic value cannot 'be shown just because a defendant may have obtained some benefit by using the plaintiff's identity when the benefit is the same as defendant would have had from using the likeness of a number of others.'" *Villalovos v. Sundance Assocs., Inc.*, No. 01 C 8468, 2003 WL

115243, at *4 (N.D. Ill. Jan. 13, 2003) (quoting *Cox* 761 P.2d at 564.) But here, Plaintiffs have plausibly alleged that the names and identities of already existing Wells Fargo customers provided a benefit to Wells Fargo that was *not* the same as Wells Fargo would have received from the general public.

In the Third Amended Complaint, Plaintiffs allege that Wells Fargo sought, and benefited from, having its existing customers increase the number of accounts and products they had with Wells Fargo. For example, in the Third Amended Complaint, Plaintiffs alleged:

> Wells Fargo noted in their 2003, annual report: "Our cross-sell strategy and diversified business model facilitates growth in strong and weak economic cycles, as *we can grow by expanding the number of products our* **current customers** *have with us*. We estimate that each of our current customers has an average of over four of our products. Our goal is eight products per customer, which is currently half of the estimated potential demand."

(TAC ¶ 50, ECF No. 69 at 14) (emphasis added); (*see also* TAC ¶ 70, ECF No. 69 at 19 ("Wells Fargo's *modus operandi* is to attempt to get each customer to maintain numerous accounts with Wells Fargo.").) And Plaintiffs have alleged that Wells Fargo customers had additional accounts opened in their names without their consent. (*See e.g.* TAC ¶ 37, n.12, ECF No. 69 at 10 ("To meet quotas, employees have opened unneeded accounts for customers, ordered  credit cards without customers' permission and forged client signatures on paperwork.").) Additionally, some Plaintiffs have alleged that they "suffered actual identity theft" "as a result of Wells Fargo's conduct" and that Wells Fargo "used Plaintiffs confidential information to open credit card accounts, savings accounts, loans, or other 'services or products' without Plaintiffs' knowledge of consent." (TAC ¶¶ 629, 657, ECF No. 69 at 14.) The access to this type of confidential information is sufficient to distinguish Wells Fargo customers from the general public.

Plaintiffs have alleged that Wells Fargo received a benefit from increasing the number of products existing customers had with Wells Fargo. And Plaintiffs have alleged that Wells Fargo

fraudulently opened accounts in existing customers' names. The names and identities of existing Wells Fargo customers can therefore plausibly be said to have provided a benefit to Wells Fargo that is different from the benefit Wells Fargo would have received from the name and identity of a non-Wells Fargo customer—it allowed Wells Fargo to appear to come closer to its goal of increasing the number of products used by its existing customers. Defendants' 12(b)(6) motion seeking to dismiss Plaintiffs' Invasion of Privacy claim is therefore DENIED. The claim continues to be viable only as to the Wrongful Account Plaintiffs—those who alleged that Wells Fargo opened unauthorized accounts in their name.

D. Claim 4 Negligence Per se Under GLBA

In the Third Amended Complaint, Plaintiffs "assert that under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801," (GLBA) "Wells Fargo had to protect and keep sensitive personal information that it obtained from customers," and that Wells Fargo "violated the [GLBA] by," among other things, "not adequately safeguarding Plaintiffs' . . . sensitive personal information." (TAC ¶¶ 626–27, ECF No. 69 at 107.) The GLBA provides, in relevant part, that "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a). But as Defendants correctly point out, "[n]o private right of action exists for an alleged violation of the GLBA." *Dunmire v. Morgan Stanley DW, Inc.*, 475 F.3d 956, 960 (8th Cir. 2007). In their response, Plaintiffs argue that they "believe liability may arise under a negligence per se theory under the [GLBA]." (ECF No. 149 at 21.)

In Utah, "[n]egligence per se, which usually results from the violation of a statute, is defined as 'conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances.'"

*Child v. Gonda*, 972 P.2d 425, 432 (Utah 1998) (citation omitted).[9] Plaintiffs concede that they "are unaware of any cases where Utah law has specifically allowed a cause of action based on a negligence per se theory arising from the [GLBA]." (ECF No. 149 at 22.) Instead, Plaintiffs turn to *Rollins v. Petersen*, 813 P.2d 1156, 1163 (Utah 1991) in support of their argument that Utah courts would recognize a negligence per se claim for violation of the GLBA. (*See* ECF No. 149 at 22.) Plaintiffs argue that "[p]ursuant to Utah law, Negligence per se may arise" if, "the statute's purpose [is] to protect a class of persons of which the plaintiffs are members and to protect against the type of harm experienced." (ECF No. 149 at 22 (citing *Rollins*, 813 P.2d at 1163–64).) Plaintiffs argue that because they are among the class of persons that the GLBA was designed to protect, and because they "suffered the harm the statute was designed to protect against," "Wells Fargo is liable under a negligence per se theory." (ECF No. 149 at 21, 23.)

But in *Rollins*, "[t]he question . . . presented [was] *not* whether [a] violation of [the state statute at issue in that case] [was] negligence per se . . . but rather the preliminary question of whether the legislative standard imposes a duty recognizable in tort as the standard of a reasonable person." *Rollins*, 813 P.2d at 1164 n. 4 (emphasis added). The court in *Rollins* explained that "before violation of a legislative standard will be held to be negligence per se . . . the legislative standard must first be 'adopted by the court as defining the standard of conduct of a reasonable person.'" *Id*. (citing Restatement (Second) of Torts § 288B (1965)). Plaintiffs have not pointed the court to any Utah case adopting the GLBA as imposing a duty in tort. And as noted above, Plaintiffs concede that they "are unaware of any cases where Utah law has specifically allowed a cause of action based on a negligence per se theory arising from the [GLBA]." (ECF No. 149 at 22.) Moreover, the court agrees with Defendants that "Plaintiffs have

---

[9] "In order to prevail in an action for negligence, a plaintiff must prove that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused (4) the plaintiff to suffer legally compensable damages." *Cope v. Utah Valley State Coll.*, 2014 UT 53, ¶ 11, 342 P.3d 243, 248.

cited no case in which a Utah court applied *Rollins* to find a state-law tort duty arising out of [*any*] federal statute which lacked a private right of action." (ECF No. 151 at 13.) Nor has the court found such a case in its own research.

"When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule." *Williams-Jackson v. Innovative Senior Care Home Health of Edmond, LLC*, 727 F. App'x 965, 968 (10th Cir. 2018) (quoting *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007)). As it relates to the Plaintiffs' claim, *Rollins* presents two questions. First, the court must "endeavor to predict" whether the Utah Supreme Court would adopt the GLBA as imposing a duty recognizable in tort. If it would, the second question this court must predict is whether the Utah Supreme Court would hold that a violation of the GLBA is negligence per se.

The court finds that the Utah Supreme Court would likely not adopt the GLBA as imposing a duty recognizable in tort. The court finds it noteworthy that Plaintiffs, Wells Fargo, and the court have been unable to find a case in which a Utah court applied *Rollins* to find a state-law tort duty arising out of a federal statute which lacked a private right of action. This fact alone gives the court reason to believe the Utah Supreme Court would not adopt the GBLA as imposing a duty recognizable in tort.

But even if the Utah Supreme Court would hold that the GLBA does create a duty in tort, this court finds it unlikely that the Utah Supreme Court would hold that a violation of the GBLA is negligence per se because the GLBA does not involve dangerous instrumentalities. The Utah Supreme Court has explained that it had "at an early date," "held that violation of a statute or ordinance whose purpose is to protect life, limb or property constituted negligence per se."

*Hall v. Warren*, 632 P.2d 848, 851 n.1 (Utah 1981) (citing Smith v. Mine & Smelter Supply Co., 32 Utah 21, 88 P. 683 (1907)). "But [that] rule [underwent] an evolution." *Id*. Subsequent to *Smith*, the per se rule was modified to apply only in cases involving dangerous instrumentalities." *Id*. (citing *White v. Shipley*, 48 Utah 496, 160 P. 441 (1916)). The GLBA does not deal with dangerous instrumentalities. *See* 15 U.S.C. § 6801 *et seq.* Because the GLBA does not deal with dangerous instrumentalities, the Utah Supreme court is unlikely to hold that a violation of the GLBA is negligence per se.

Plaintiffs' fourth claim is premised on a "negligence per se theory." (*See* ECF No. 149 at 21 ("Plaintiffs believe liability may arise under a negligence per se theory under the [GLBA]. Plaintiffs nonetheless maintain that Wells Fargo is liable under a negligence per se theory.").) As explained above, the Utah Supreme Court would be unlikely to hold that a violation of the GLBA is negligence per se. Accordingly, the Defendants' 12(b)(6) Motion to Dismiss Plaintiffs' Fourth claim is hereby GRANTED.

E. Claims 5&6, The Fair Credit Reporting Act

Plaintiffs' Fifth Claim is titled "Intentional Violation of Fair Credit Report Act," (FCRA) and their Sixth Claim is titled "Negligent Violation of [FCRA]." (ECF No. 69 at 108, 111.) Plaintiffs allege that because "Wells Fargo is a consumer reporting agency as defined under the FCRA," it was "required to adopt and maintain procedures designed to protect and limit the dissemination of consumer . . . information." (TAC ¶¶ 636–37, ECF No. 69 at 109.) Plaintiffs further allege that "Defendants violated . . . the FCRA by failing to adopt and maintain [these] protective procedures which . . . resulted in the theft of Plaintiffs' . . . private and confidential information . . . ." (TAC ¶ 638, ECF No. 69 at 110.)

Defendants argue that "Plaintiffs have not, and cannot, plead facts establishing that Wells Fargo" is a consumer reporting agency under 15 U.S.C. § 1681a(f). (ECF No. 144 at 46.) "The term 'consumer reporting agency' means any person which, **for monetary fees**, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports **to third parties**, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."  15 U.S.C. § 1681a(f) (emphases added).

Defendants rely on two Seventh Circuit decisions that "twice rejected as 'frivolous' claims that a bank like Wells Fargo is a consumer reporting agency under the FCRA." (ECF No. 144 at 46) (citing *Frederick v. Marquette Nat'l Bank*, 911 F.2d 1, 2 (7th Cir. 1990); *Mirfashi v. Fleet Mortg. Corp.*, 551 F.3d 682, 686 (7th Cir. 2008)).[10] Defendants further argue that "Plaintiffs allege no facts showing how Wells Fargo gets paid to assemble or evaluate consumer information for the purpose of furnishing consumer reports to third parties," as required under 15 U.S.C. § 1681a(f). (ECF No. 144 at 46) (emphasis removed). Plaintiffs do not respond to Defendants' argument that Wells Fargo is not a consumer reporting agency. (*See* ECF No. 149 at 23–24.) Defendants argue that "[i]n failing to respond to [Defendants'] arguments, Plaintiffs concede their claims should dismissed." (ECF No. 151 at 14.) The court agrees and dismisses Plaintiffs' Fifth And Sixth Claims on this basis. Alternatively, the court is persuaded by the reasoning of the Seventh Circuit cases cited by Defendants and would hold that Plaintiffs' Fifth and Sixth Claims, as pleaded in the Third Amended Complaint, are frivolous because Wells Fargo is not a consumer reporting agency under the FCRA and would dismiss on this basis. The

---

[10] In *Mirfashi*, the Seventh Circuit held that a "claim that [a bank] violated the [FCRA] has no possible merit, and in fact is frivolous" because "it [was] not a consumer reporting agency—it was a bank." *Mirfashi*, 551 F.3d at 686.

court nevertheless addresses the arguments Plaintiffs made in their Response to the Motion to Dismiss regarding their Fifth and Sixth Claims.

In their response, Plaintiffs do not argue that Wells Fargo is a consumer reporting agency. Instead, they argue that Defendants violated the FCRA by "report[ing] [false] information to a credit reporting bureau." (ECF No. 149 at 23.) Defendants rely on 15 U.S.C. § 1681s-2(a)(1)(A), which provides that "[a] person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate." (*See* ECF No. 149 at 23.)

Defendants, relying on *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1147 (10th Cir. 2012), argue that Plaintiffs' argument fails "because there is no private right of action against a furnisher of information to a consumer reporting agency for violation of Section 1682s-2(a) of FCRA." (ECF No. 151 at 14.) In *Sanders*, the Tenth Circuit held that "the FCRA gives consumers no private right of action against those who report credit information to a credit reporting agency." *Sanders*, 689 F.3d at 1147. Instead, "that right of action is limited to claims against the credit reporting agency; it does not extend to furnishers." *Id.* The court agrees with Defendants that the allegations contained in Plaintiffs response do not provide for a private right of action.

For all of these reasons, the court GRANTS Defendants' Motion to Dismiss Plaintiffs' Fifth and Sixth Claims.

F.  Claim 7 Declaratory Judgment

Plaintiffs' Seventh Claim is titled "Declaratory Judgment." (ECF No. 69 at 113.) For this claim, "Plaintiffs seek a declaration that Wells Fargo have engaged in fraudulent inducement to secure accounts of Plaintiffs . . . by failing to disclose to Plaintiffs . . . that Defendants were

engaging in," among other things, "identify theft, opening unauthorized accounts" and "using clients personal information for their personal gain." (TAC ¶ 652, ECF No. 69 at 113.) Defendants argue that "[t]his claim is predicated on the same theory as the fraud claim . . . and fails for the same reasons." (ECF No. 144 at 47.) As explained below, the court denies Defendants' Motion to Dismiss Plaintiffs' Fraudulent Nondisclosure Claim. The court therefore DENIES Defendants' Motion to Dismiss Plaintiffs' Seventh Claim.

G.   Claim 8 Conversion

Plaintiffs' Eighth Claim is titled "Conversion." (ECF No. 69 at 114.) In Utah, "conversion is 'an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession.'" *Healthcare Servs. Grp., Inc. v. Utah Dep't of Health*, 2002 UT 5, 40 P.3d 591, 597 (quoting *Allred v. Hinkley*, 8 Utah 2d 73, 76, 328 P.2d 726, 728 (1958)). Plaintiffs allege two theories of conversion—(1) "[c]onversion of identity" and (2) "[c]onversion of funds." (ECF No. 149 at 25.)

Defendants argue that "no conversion action lies for Plaintiffs' 'private information' because [1] it is intangible and because [2] Plaintiffs have not been deprived of their own use of that information." (ECF No. 144 at 47.) Defendants argue that "Utah . . . does not allow a conversion claim for intangible property." (ECF No. 144 at 47.) In support of this proposition, Defendants cite *Margae, Inc. v. Clear Link Techs., LLC*, 620 F. Supp. 2d 1284 (D. Utah 2009), a case from this court. But in *Margae*, this court noted that the question of whether "Utah law would allow a claim for conversion of intangible property" had "not been answered by Utah courts." *Margae*, 620 F. Supp. at 1287. Neither party has provided the court with any Utah authority resolving this question. Nor has the court found any in its own research. But this court is still "convinced that Utah would not allow a conversion claim for intangible . . . property." *Id.*

The court agrees with Defendants that Plaintiffs' names, addresses, and other personal information are intangible property. Because Utah would likely not allow a conversion claim for intangible property, Plaintiffs' conversion of identity claim fails. Additionally, the court is also convinced Plaintiffs were not deprived of the use of their names, addresses, and other information. In order to bring a conversion claim under Utah law, Plaintiffs must allege that they were deprived of the use of their names, address, etc. Because they have not made this allegation, Plaintiffs' conversion of identity claim fails.

Plaintiffs conversion of funds claim also fails. Defendants argue that "when funds are deposited in a bank, the money becomes the property of the bank and the depositor is a mere creditor with a claim for repayment . . . against the debtor bank." (ECF No. 144 at 48.) Defendants cite a number of cases for the proposition that because the money deposited in the bank becomes the property of the bank, it cannot be tortuously converted by the bank. (*See* ECF No. 144 at 48.) Plaintiffs fail to respond to Defendants' argument. The court dismisses on this basis.

For all of these reasons, the Defendants' Motion to Dismiss Plaintiffs' Eighth claim is GRANTED.

H. Claim 9 Fraud

Plaintiffs' ninth claim is titled "Fraud and Misrepresentation." (ECF No. 69 at 115.) In Utah, the elements of fraud are:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35, 40 (Utah 2003). Pursuant to Federal Rule of

Civil Procedure 9(b), a party "alleging fraud . . . must state with particularity the circumstances

constituting fraud . . . ." This heightened pleading requirement exists "'to afford defendant fair

notice of plaintiff's claims and the factual ground upon which [they] are based.' " *Schwartz v.*

*Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (alteration in original) (quoting

*Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992)). The particularity

requirement is met where the complaint "set[s] forth the time, place and contents of the false

representation, the identity of the party making the false statements and the consequences

thereof." *See Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006) (internal quotation marks

omitted) (citation omitted).

  Defendants argue that "[w]ith the exception of Plaintiff Brodie, Plaintiffs do not attempt

to identify any affirmative misrepresentations by Wells Fargo." (ECF No. 144 at 50.) In their

response, Plaintiffs do not address Defendants' argument that Plaintiffs have not identified any

affirmative misrepresentations by Wells Fargo. (*See* ECF No. 149 at 26–31.) In the Third

Amended Complaint, Plaintiffs allege generally that "Defendants made false and misleading

statements to fraudulently induce Plaintiffs to open, or maintain banking accounts with

Defendants . . . ." (TAC ¶ 675, ECF No. 69 at 117.) And Plaintiffs further allege that Defendants,

"through their fraudulent actions . . . made intentional statements or omissions regarding their

participation in the fraudulent 'sales practices' and that the misrepresentations were material to

Plaintiffs' decision to enter into a banking agreement with Defendants." (TAC ¶ 687, ECF No.

69 at 118.) Except for Aaron Brodie, all Plaintiffs have failed to specifically identify the contents

of the Wells Fargo employees' alleged false statements. To the extent Plaintiffs' fraud claims are

based on affirmative misrepresentations, they fail because the Plaintiffs have completely failed to

set "forth the time, place, and contents" of the Defendants' alleged affirmative misrepresentations. *Hogan*, 453 F.3d at 1263.[11] Defendants' Motion to Dismiss Plaintiffs' Ninth Claim based on affirmative misrepresentations is GRANTED.

The court now considers whether Plaintiffs have adequately pleaded a claim for fraudulent nondisclosure. Plaintiffs' claim for fraud is largely premised on the argument that Wells Fargo knew that it was opening false accounts, but did not disclose that information to Plaintiffs at the time the Plaintiffs agreed to open their initial accounts with Wells Fargo. (*See, e.g.,* TAC ¶ 673, ECF No. 69 at 116 ("Plaintiffs assert that Defendants knew disclosure of [Wells Fargo's fraudulent sales practices] would lead to Plaintiffs refusing to open accounts, and Defendants deliberately . . . withheld this material information from being disclosed, causing Plaintiffs to rely on Defendants intentional omissions of material facts . . . .").) "To support a claim of fraudulent nondisclosure [in Utah,] a plaintiff must prove the following three elements: (1) the nondisclosed information is material, (2) the nondisclosed information is known to the party failing to disclose, and (3) there is a legal duty to communicate." *Hermansen v. Tasulis*, 2002 UT 52, ¶ 24, 48 P.3d 235, 241–42.

Defendants argue that "[a] party may maintain a claim for fraud predicated on non-disclosure only when there exists a duty to disclose." (ECF No. 144 at 50 ("citing *Fidelity Nat'l. Title Ins. Co. v. Worthington*, 344 P.3d 156, 160 (Utah Ct. App. 2015).) Defendants state that "[a] duty to disclose may arise when the parties stand in a fiduciary relationship." (ECF No. 144 at 50 (citation omitted).) Defendants argue that "'[o]rdinarily, no fiduciary relationship exists

---

[11] Aaron Brodie comes closer than the other Plaintiffs, but his claim for fraud based on affirmative misrepresentations still fails. He alleges that "at the time" he opened an account with Wells Fargo, "a credit card was opened up without his consent for overdraft protection." (TAC ¶ 169, ECF No. 69 at 41.) He identifies the date that the account was opened, but not the date he returned to the bank and had the discussions with the bank employees—during which they made the alleged misrepresentations. Brodie's allegations fail to meet the particularity requirements of Rule 9(b) because he has not identified the identity of the employee that made these representations nor the date these representations were made.

between a bank and its customer.'" (ECF No. 144 at 50 (quoting *State Bank of S. Utah v. Troy Hygro Sys. Inc.*, 894 P.2d 1270, 1275 (Utah Ct. App. 1995).) Defendants further argue that "Wells Fargo owed [Plaintiffs] no disclosure duty" because "Plaintiffs allege no facts establishing that their relationship with Wells Fargo was more than a conventional bank-depositor relationship." (ECF No. 144 at 52.) Defendants overlook the fact that there may be other circumstances that create a duty to disclose.

"[W]here fraud on the basis of nondisclosure is asserted," "whether a duty to speak exists is determinable by reference to all the circumstances of the case and by comparing the facts not disclosed with the object and end in view by the contracting parties." *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1328 (Utah 1990). The Utah Supreme Court has provided examples of transactions or relations that may give rise to a duty of disclosure. One such example is "where a party negotiating for a contract is cognizant of facts of which the other party is presumed ignorant and for the disclosure of which one party must rely upon the other to enable it to form a judgment as to the expediency of entering into the contract on the terms proposed." *Id.* at 1330. The Utah Supreme Court also noted that a "duty of disclosure" may exist "when the circumstances are such that the failure to disclose something would violate a standard requiring conformity to what the ordinary ethical person would have disclosed." *Id.* at 1331 (internal quotation marks omitted) (citation omitted). Two relevant factors "important in this determination are" "[t]he importance of the fact not disclosed" and the "conduct of the person not disclosing something to prevent discovery . . . [t]he act of concealment of any material fact . . . ." *Id.*

Plaintiffs have alleged that Pricewaterhouse Coopers, an international accounting firm, "performed" "an analysis" of Wells Fargo's accounts, and "determined that Wells Fargo had . . .

engaged in opening over 1.5 million unauthorized checking and savings accounts . . . ." (TAC ¶ 40, ECF No. 69 at 11.) Plaintiffs have also alleged that Defendants engaged in a "practice known at Wells Fargo as 'pinning,'" in which Wells Fargo bankers impersonated customers online "to enroll . . . customer[s] in online banking . . . ." (TAC ¶ 115, ECF No. 69 at 32.) Plaintiffs further alleged that "Defendants knew of the fraud which was occurring . . . and deliberately omitted disclosing this material information to Plaintiffs prior to opening their initial accounts." (TAC ¶ 670, ECF No. 69 at 116.) They also allege that "Defendants had a duty to disclose material facts surrounding the opening of their accounts . . . ." (TAC ¶ 685, ECF No. 69 at 118.) And Plaintiffs allege that "Defendants were in a superior position to know the truth of the statements made to Plaintiffs, and knew the Plaintiff would rely upon Defendants representations." (TAC ¶ 692, ECF No. 69 at 119.)

At this stage of the proceedings, the court must accept as true Plaintiffs' well-pleaded allegations. Opening 1.5 million unauthorized checking and savings accounts falls far below the standard of the ordinary ethical person. The failure to disclose this massive, system wide unlawful conduct likewise violates this standard. "[W]hether a duty to speak exists is determinable by reference to all the circumstances of [a] case . . . ." *Banberry*, 786 P.2d at 1328. Taken as a whole, the Third Amended Complaint alleges sufficient facts to plausibly support a claim that Wells Fargo had a duty to disclose its ongoing practice of opening unauthorized accounts.

Defendants argue that "[e]ven assuming Wells Fargo had a duty to disclose, Plaintiffs still fail to plead their claims with particularity." (ECF No. 144 at 52.) They argue that "Plaintiffs fail to identify *who* specifically failed to inform them of misconduct at Wells Fargo, *what* specifically should have been said, or *when* it should have been said—and whether that was

before or after the relevant Wells Fargo employees allegedly became aware of the alleged truth and omission." (ECF No. 144 at 52 (emphasis in original).) But the Wrongful Account Plaintiffs have specifically alleged *when* they opened their accounts with Wells Fargo—indeed they provide the exact date. (*See* TAC ¶¶ 164, 176, 239, 254, 336, 370, 399, 407.) The Wrongful Account Plaintiffs should have been informed of Wells Fargo's ongoing practice of creating fake accounts on these dates. And each of the Wrongful Account Plaintiffs did allege *what* they should have been told—that "Wells Fargo was actively taking customer information and creating fake accounts." (*See* TAC ¶¶ 168, 180, 243, 256, 372, 339, 410, 484.)

Wells Fargo suggests that each Plaintiff must allege that an individual Wells Fargo employee—working at the specific branch where the Plaintiffs opened their accounts—had knowledge of Wells Fargo's fraud and failed to disclose that information. (*See* ECF No. 144 at 53 ("they do not allege where they opened their accounts, let alone facts showing that a Wells Fargo employee knew of problems with unauthorized accounts at that branch or in that area at that time and intentionally failed to disclose this.").) It is true that in Utah, "fraudulent nondisclosure is an intentional tort—a type of tort committed by someone acting with general or specific intent." *Anderson v. Kriser*, 2011 UT 66, ¶ 26, 266 P.3d 819, 825 (internal quotation marks omitted). And it is true that a "plaintiff must demonstrate that a defendant had *actual knowledge* of the fact that the defendant failed to disclose to satisfy the second element of a fraudulent nondisclosure claim." *Id.* (emphasis in original). But "for the purpose of proving that a corporation is liable for an intentional tort, a plaintiff must" only prove that "one agent of the corporation had all of the requisite knowledge to support the claim." *Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 28, 361 P.3d 63, 70. "[F]raudulent intent is often difficult to prove by direct evidence." *Kiser*, 266 P.3d at 825. "Because of this difficulty, fraudulent intent is often inferred

based on the totality of the circumstances in a case." *Id.* At this stage of the proceedings, Plaintiffs need only plead facts sufficient to infer that one Wells Fargo agent had the requisite intent to withhold the non-disclosed information at issue—that Wells Fargo was using customer information to open fake accounts.

The court rejects Wells Fargo's suggestion that each Plaintiff must allege that a specific Wells Fargo branch employee who opened their initial accounts had knowledge of Wells Fargo's practice of opening unauthorized accounts. Rule 9(b) of the Federal Rules of Civil Procedure provides, in relevant part, that "knowledge, and other conditions of a person's mind may be alleged generally." Further, the Tenth Circuit has held that "[a]llegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992). The question of whether a single Wells Fargo agent had the requisite knowledge to support a claim of fraudulent non-disclosure is the exact sort of question that Rule 9(b) allows to be "alleged generally." The Wrongful Account Defendants "contend[ed] that Defendants were fully aware of the gaming and fraud which were occurring at Wells Fargo" on the date they opened their respective accounts. (*See* TAC ¶¶ 165, 177, 240, 255, 337, 371, 400, and 408.) This satisfies Rule 9(b)'s requirement.

The court also rejects Defendants' argument that Plaintiffs must specifically identify each Wells Fargo employee who created the initial accounts because Wells Fargo possesses this information. "The purpose of Rule 9(b) is to afford defendant fair notice of plaintiff's claims . . . ." *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (internal quotation marks omitted). With the account creation date and customer name, Wells Fargo can

determine the identities of the employees who opened the initial accounts for the Wrongful Account Plaintiffs.

To summarize, the Wrongful Account Plaintiffs have satisfied the particularity requirement because they have alleged the time of the fraudulent non-disclosure—the dates their initial accounts with Wells Fargo were created. They have alleged what they should have been told—that Wells Fargo was using customer information to create unauthorized accounts. And they have alleged the consequences of that non-disclosure—that unauthorized accounts were opened in their names. Although the Wrongful Account Plaintiffs did not specifically identify a Wells Fargo agent who had knowledge of the fraudulent non-disclosure, based on a review of the entire Third Amended Complaint, and the systematic culture of corruption described therein, it is plausible that a Wells Fargo agent, such as an officer of the company, had the requisite knowledge.

For these reasons, Defendants' Motion to Dismiss Plaintiffs' Fraudulent Nondisclosure Claim is DENIED.

I. Claim 10 Unjust Enrichment

Plaintiffs' tenth claim is titled "Unjust Enrichment." (ECF No. 69 at 120.) To establish a claim for unjust enrichment, Plaintiffs must plead facts that, if taken as true, establish three elements: "(1) a benefit conferred . . . ; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention [of the benefit] by the conferee . . . under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *U.S. Fid. v. U.S. Sports Specialty*, 270 P.3d 464, 468 (Utah 2012). The doctrine of unjust enrichment "may be invoked 'only when no express contract is present.'" *Id.* (quoting *TruGreen Cos., LLC, v. Mower Bros., Inc.,* 199 P.3d 929 (Utah 2008); *see also Ashby v. Ashby*,

227 P.3d 246, 251 (Utah 2000) ("Recovery under unjust enrichment presupposes that no enforceable written or oral contract exists.")).

In order for unjust enrichment to be a valid theory of recovery for the remaining Wrongful Account Plaintiffs, a valid contract must *not* exist between those Plaintiffs and Wells Fargo. The Wrongful Account Plaintiffs alleged that they opened accounts with Wells Fargo. This means a contract existed between them and Wells Fargo. The next question is whether these contracts are voidable.

Plaintiffs contend that these contracts are voidable. (*See* TAC ¶ 93, ECF No. 69 at 26 ("The Plaintiffs contend that any alleged agreements between themselves and Wells Fargo were entered into based upon fraudulent inducement and failure to disclose material elements of the agreement, thereby rendering the alleged agreements void, *ab initio*.").) If the contracts are voidable, the Wrongful Account Plaintiffs may be able to recover under an unjust enrichment theory. *C.f. Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991) ("If it is determined that the [contract] is void or may be voided for fraudulent inducement, then recovery under a theory of unjust enrichment may be proper."). As discussed above, the court has concluded that the Wrongful Account Plaintiffs adequately pleaded a claim for fraudulent inducement. It is therefore plausible that the contracts are voidable.

The court next considers whether the Wrongful Account Plaintiffs have alleged facts supporting the elements of the claim. As discussed above regarding Claim 3, the Wrongful Account Plaintiffs have alleged that they did confer a benefit to Wells Fargo. Their personal information allowed Wells Fargo to create unauthorized accounts, thereby allowing Wells Fargo to create the appearance that it was increasing the number of products/services that its existing customers had with Wells Fargo. Obviously Wells Fargo accepted this benefit, (accepting

Plaintiffs' factual allegations as true), Wells Fargo engaged in massive nationwide fraud to increase its total number of accounts. It is plausible that allowing Wells Fargo to retain the benefit that the Wrongful Account Plaintiffs' information provided it would be inequitable. Thus, the Wrongful Account Plaintiffs have adequately pleaded a claim for unjust enrichment. Wells Fargo's Motion to Dismiss Claim 10 is DENIED.[12]

J. <u>Claim 11 Anti-Tying Statute</u>

Plaintiffs' eleventh claim is titled "Violation of the Anti-Tying Provisions of the Bank Holding Company Act Amendments of 1970 'BHCA' as Codified at 12 U.S.C. § 1972." (ECF No. 69 at 121.) Section 1972 provides, in relevant part, that "[a] bank shall not in any manner extend credit . . . or furnish any service . . . on the condition or requirement . . . that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service." 12 U.S.C. § 1972(1)(A). To show a violation of § 1972,

> Plaintiffs must prove (1) the bank imposed an anticompetitive tying arrangement, that is, it conditioned the extension of credit [or furnishing of a service] upon the [customer's] obtaining . . . additional credit, property, or services to or from the bank; (2) the arrangement was not usual or traditional in the banking industry; and (3) the practice conferred a benefit on the bank.

*Morales v. UBS Bank USA*, No. 2:14-CV-888-JNP-BCW, 2016 WL 3746527, at *3 (D. Utah July 8, 2016) (citation omitted) (internal quotation marks omitted). Plaintiffs make two basic arguments in support of their claim that Defendants violated the BHCA. First, Plaintiffs argue that Wells Fargo violated the BHCA when it opened unauthorized accounts. (*See* TAC ¶ 706, ECF No. 69 at 122) ("Plaintiffs allege that in addition to the accounts that Plaintiffs were aware of, Defendants opened millions of unauthorized accounts, in violation to the anti-tying provisions contained in the BHCA."). Second, "Plaintiffs assert Defendants required numerous Plaintiffs . .

---

[12] If the Wrongful Account Plaintiffs elect to exercise their right to rescind their contracts with Wells Fargo under an unjust enrichment theory, they would be required to tender to Wells Fargo any benefit they received from those contracts.

. to purchase additional products, through their cross-sales and employee incentives, which falls within the prohibitions contained in BHCA Section 1972(1)(A-E)." (TAC ¶ 705, ECF No. 69 at 122.) The court addresses both of Plaintiffs' arguments in turn.

First, the court agrees with Defendants that Plaintiffs' first argument cannot satisfy the first element necessary to demonstrate a violation of § 1972. The first element requires Plaintiffs to demonstrate that Wells Fargo "conditioned the extension of credit upon the borrower's obtaining or offering additional credit, property, or services to or from the bank." *Morales*, 2016 WL 3746527, at *3. The court agrees with the reasoning of the Sixth Circuit authority cited by Defendants that the first element requires evidence that the "bank conveyed an intention" to withhold extending credit or furnishing a service "unless the" customer "fulfilled a 'prerequisite' of purchasing or furnishing some other product or service" offered by the bank. *See Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 567 (6th Cir. 2003). The court also agrees with Defendants that if they were opening accounts without Plaintiffs' authorization and consent, then Wells Fargo never conveyed any intention to withhold any service, meaning there was no "condition," and therefore, no "tying arrangement." *See Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 395 (6th Cir. 1996) ("If the Bank did breach, then the plaintiffs never agreed to purchase the additional insurance and therefore its purchase simply was not a 'condition or requirement' of purchasing the authorized loss or damage insurance or receiving the automobile loan.") (abrogated on other grounds by *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010)). If there was no tying arrangement, Plaintiffs' argument that Wells Fargo violated the BCHA by opening fraudulent accounts fails.

Second, the court agrees with Defendants that the products that Plaintiffs allege were tied are traditional bank products and therefore exempt from § 1972. "A bank account is the

quintessence of a deposit service." *Batten v. Bank One, N.A.*, No. 00 C 1837, 2000 WL 1364408, at *2 (N.D. Ill. Sept. 15, 2000). "[T]he requirement of opening an account with [a bank] [cannot] be a 'tying' product for purposes of section 1972, because the statute expressly exempts 'deposit services' from the statute's purview." *Id.* (citing 12 U.S.C. § 1972(1)(A)). In their response to Defendants' arguments, Plaintiffs do not dispute that the accounts at issue constituted "loan" or "deposit services." (*See* ECF No. 149 at 33.) Instead, they argue that "any claim that Defendants are protected by the 'traditional bank product exemption' fails because fraudulent accounts are not a traditional bank product." (ECF No. 149 at 33.) But as explained above with regard to fraudulent accounts, if Wells Fargo was opening accounts without Plaintiffs' authorization and consent, then Wells Fargo never conveyed any intention to withhold any service, meaning there was no "condition," and therefore, no "tying arrangement." *See Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 395 (6th Cir. 1996). For these reasons, the Defendants' Motion to Dismiss Plaintiffs' eleventh claim is GRANTED.

K. Claim 12 RICO

Plaintiffs' twelfth claim is titled "Civil Violation of Racketeer Influenced Corrupt Organizations [(RICO)] Act 15 U.S.C. § 1972." (ECF No. 69 at 123.) Plaintiffs allege that "[e]ach and every Defendant violated 18. U.S.C. § 1962(c) . . . . " (TAC. ¶ 720, ECF No. 69 at 124.) Under § 1962(c), Plaintiffs must allege that "person[s]' "(1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity. *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1248 (10th Cir. 2016) (citing 18 U.S.C. § 1962(c)). RICO defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

18 U.S.C. § 1961(4).

Plaintiffs allege that "each Defendant is a person within the meaning of 18 U.S.C. § 1961(3) . . . ." (TAC ¶ 716, ECF No. 69 at 124.) And Plaintiffs appear to allege that all Defendants comprise an "enterprise." (TAC ¶ 721, ECF No. 69 at 124–25 ("The Defendants . . . are a 'group of persons' associated together in fact for the common purpose of carrying out an ongoing criminal enterprise . . . [and] [t]hese Defendants form this association in fact . . . and constitute an enterprise.").) But "§ 1962(c) requires that the 'person' conducting the enterprise's affairs be distinct from the 'enterprise.'" *George*, 833 F.3d at 1249 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 160 (2001)). "It is insufficient to identify 'simply the group of defendants accused of engaging in the racketeering' as the enterprise." *Spence v. Basic Research*, No. 2:16-CV-925-CW, 2018 WL 1997310, at *2 (D. Utah Apr. 27, 2018) (quoting *Switzer v. Coan*, 261 F.3d 985, 992 (10th Cir. 2001)). "The Tenth Circuit Court of Appeals has said that the distinction requirement means that the 'person' and 'enterprise' must 'be different entities.'" *Id*. (quoting *Bd. of Cty. Comm'rs of San Juan Cty. v. Liberty Grp.*, 965 F.2d 879, 885 (10th Cir. 1992). Indeed, "the Tenth Circuit has concluded that no enterprise exists when the persons and enterprise alleged were by all appearances the same." *Id*. at *3. Because Plaintiffs allege that the persons and enterprise are comprised of the same entities, "Plaintiff[s] ha[ve] . . . failed to allege an enterprise distinct from the individual defendants." *Switzer*, 261 F.3d 985. The court dismisses Plaintiffs' RICO claim on this basis. Defendants' Motion to Dismiss Plaintiffs' Twelfth Claim is hereby GRANTED.

L. Claim 13 Email Fraud

"Plaintiffs stipulate to the dismissal of the Email Fraud cause of action." (ECF No. 149 at 36.) Plaintiffs' Thirteenth Claim is dismissed.

M. <u>Claim 14 Injunctive Relief</u>

Plaintiffs' fourteenth claim is titled "Request for Injunctive Relief." (ECF No. 69 at 133.) Defendants argue that "'[a] pleading can request injunctive relief in connection with a substantive claim, but a separately pled claim or cause of action for injunctive relief is inappropriate[,]'" and therefore, "[t]he fourteenth claim must be dismissed." (ECF No. 144 at 61 (quoting *Jensen v. Quality Loan Serv. Corp.*, 702 F. Supp. 2d 1183, 1201 (E.D. Cal. 2010).) The court agrees. Defendants' Motion to Dismiss Plaintiffs' Fourteenth Claim is hereby GRANTED.

N. <u>Claim 15 Emotional Distress</u>

Plaintiffs' fifteenth claim is titled "Intentional and/or Negligent Infliction of Emotional Distress." (ECF No. 69 at 134.) Defendants argue that "[p]laintiffs' claim for negligent infliction of emotional distress fails because Plaintiffs have not alleged that the emotional distress 'resulted in illness or bodily harm.'" (ECF No. 144 at 61) (quoting *Carlton v. Brown*, 323 P.3d 571, 585 (Utah 2014)). At oral argument, Plaintiffs conceded that they did not adequately plead negligent infliction of emotional distress. (*See* Tr. 80: 7–9 ("Well, in that case we would concede that negligent infliction of emotional distress we have not pled that sufficiently at this point.").) The court dismisses Plaintiffs' negligent infliction of emotional distress claim.

Regarding the intentional infliction of emotional distress claim, Plaintiffs allege that they have "set forth the great anxiety, anger, frustration, and distress in not getting answers from Defendants, Defendants caviler attitude, keeping Plaintiffs . . . on hold over 4 hours, and not remedying the situation." (TAC ¶ 789, ECF No. 69 at 134.) Defendants argue that Plaintiffs' intentional infliction of emotional distress claim fails for three different reasons. (*See* ECF No. 144 at 61–62.) One reason is that the alleged distress "at most constitutes annoyance or indignity—not 'distress so severe that no reasonable person could be expected to endure it,' as

required to sustain a claim for intentional infliction of emotional distress." (ECF No. 144 at 61) (quoting *James v. Frank's Westates Servs., Inc.,* 747 F. Supp. 2d 1264, 1278-79 (D. Utah 2010)). Plaintiffs do not specifically respond to any of the Defendants' three arguments. (*See* ECF No. 149 at 36–37). Defendants argue that because Plaintiffs did "not respond to any of Wells Fargo's arguments regarding their failure to adequately plead a claim," (ECF No. 151 at 23) Plaintiffs have abandoned their claim. The court agrees and dismisses Plaintiffs' intentional infliction of emotional distress claim on this basis. Alternatively, the court agrees with Defendants that the alleged distress is not adequately severe. Defendants' Motion to Dismiss Plaintiffs' Fifteenth Claim is hereby GRANTED.

## Conclusion

As explained above, because the court granted Defendants' Rule 12(b)(1) Motion, only eight Wrongful Account Plaintiffs remained in the case. Each of those Wrongful Account Plaintiffs brought 15 claims against Defendants. The court has granted Defendants' 12(b)(6) Motion as to 11 of those claims. The Wrongful Account Plaintiffs' only four remaining claims are Claim 3, Invasion of Privacy; Claim 7 for Declaratory Judgment; Claim 9, Fraudulent Nondisclosure; and Claim 10, Unjust Enrichment. All of these claims are state law claims. The court would continue to have jurisdiction over the state law claim under supplemental jurisdiction, 28 U.S.C. § 1367. Nevertheless, when only state law claims remain, after dismissal of the federal causes of action, the court may decline to exercise such jurisdiction. 28 U.S.C. § 1367(c)(3). The court requests the parties to address why the court should not decline to exercise jurisdiction over the remaining state law claims. The Plaintiffs' memorandum shall be filed on or before January 18, 2019; the Defendants' response shall be filed on or before February 1, 2019.

Dated this 21st day of December, 2018.

BY THE COURT:

_____
CLARK WADDOUPS
United States District Court Judge